UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CINDY SLANE, | ) | |
| Plaintiff, | ) | Civil No. 3:02 CV 00821 (AWT) |
| | ) | |
| v. | ) | |
| | ) | |
| QUINNIPIAC UNIVERSITY | ) | |
| SCHOOL OF LAW | ) | February 13, 2004 |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
## REQUEST FOR LEAVE TO FILE AMENDED ANSWER

### I.    BACKGROUND

On July 24, 2002 plaintiff Cindy Slane filed her First Amended Complaint ("Complaint")

alleging discrimination on the basis of pay in violation of the Equal Pay Act, 29 U.S.C.

§ 206(d)("EPA"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e and

the Civil Rights Act of 1991 ("Title VII") and Connecticut General Statute § 46a-60 *et seq.*

Plaintiff further alleges unlawful retaliation in violation of Title VII and Connecticut General

Statute § 46a-60(a)(3)[sic].  On August 14, 2002, defendant Quinnipiac University School of

Law ("QUSL" or "Law School") filed its "Answer and Affirmative Defense to Plaintiff's First

Amended Complaint ("Answer"), denying any liability.  Specifically, QUSL denied that it

discriminated against plaintiff based upon her sex in violation of the EPA, Title VII or

Connecticut General Statute § 46a-60 *et seq.*  Answer ¶¶ 27, 30 & 36.

In accordance with the "Report of Parties' Planning Meeting" dated October 2, 2002

("Scheduling Order"), the parties' stipulated that QUSL denies plaintiff's allegations of gender

discrimination and retaliation under the EPA, Title VII and Connecticut law and "contends that all decisions concerning plaintiff's compensation were legitimate, non-discriminatory business decisions, not based on plaintiff's gender or any other impermissible factor." *See* Scheduling Order, at p. 2 attached hereto as Exhibit A. The Scheduling Order further provides that QUSL had until October 15, 2002 to amend its pleadings and to file a response to plaintiff's complaint. *Id.*, at p. 4.

During the course of discovery, QUSL obtained information concerning the specific nature of former Dean Neil Cogan's ("Cogan") discussions with Leslie Book ("Book"), the male with whom plaintiff compares herself for purposes of her lawsuit, regarding the position of Director of QUSL's on-campus Tax Clinic ("Tax Director"). For instance, during his November 10, 2003 deposition, Book testified that, after he had interviewed for the Tax Director position with several members of QUSL's faculty, he spoke with Cogan concerning the parameters of the job. *See* Deposition of Leslie Book dated November 10, 2003, at pp. 10-14 attached hereto as Exhibit B.[1] According to Book, he advised Cogan that he had received a competing job offer from the Internal Revenue Service ("IRS") in Washington, D.C. with a corresponding salary in the "high eight[y]" thousand dollar range. *Id.*, at p. 15. Book further testified that he informed Cogan that it was an "important condition of employment" that the Tax Director position be a tenure-track position and that Cogan's promises to provide him with adequate resources for research and writing and to support the conversion of the Tax Director position to the tenure-track were important factors in his willingness to accept the job. *Id.*, at pp. 16-18.

## II.    LAW AND ARGUMENT

### A.    Legal Standard.

Rule 15 of the Federal Rules of Civil Procedure provides that a defendant may amend its

-2-

pleading "by leave of court . . . and leave shall be freely given when justice so requires." Fed.

R. Civ. P. 15(a). "The Rule reflects two of the most important principles behind the Federal

Rules: pleadings are to serve the limited role of providing the opposing party with notice of the

claim or defense to be litigated . . . and 'mere technicalities' should not prevent cases from being

decided on the merits . . . ." *Monahan v. New York City Dept. of Corrections*, 214 F.3d 275, 283

(2d Cir.), *cert. denied*, 531 U.S. 1035 (2000)(Citations omitted). Accordingly, Rule 15's

mandate must be followed "absent evidence of undue delay, bad faith or dilatory motive on the

part of the movant, undue prejudice to the opposing party, or futility." *Id. See also Block v.*

*First Blood Associates*, 988 F.2d 344, 350 (2d Cir. 1993)("The rule in this Circuit has been to

allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice

or bad faith"). Where a claim is made that a proposed amendment would result in unfair

prejudice, the court must consider whether the amendment would: "(i) require the opponent to

expend significant additional resources to conduct discovery and prepare for trial; (ii)

significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a

timely action in another jurisdiction." *Block*, 988 F.2d at 350. "Mere delay, however, absent a

showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the

right to amend." *Id.* (Internal quotation marks omitted).

Where a scheduling order has been entered, the standard under Rule 15 "must be

balanced against the requirement under Rule 16(b) of the Federal Rules of Civil Procedure that

the Court's scheduling order 'shall not be modified except upon a showing of good cause.' . . .

'A finding of good cause depends on the diligence of the moving party.'" *Senich v. American-*

*Republican, Inc.*, 215 F.R.D. 40, 42 (D. Conn. 2003)(Citations omitted).

---

[1] Hereinafter cited as "Book Depo., at p. __."

**B.    QUSL is Entitled to Amend its Answer to Include an Affirmative Defense to Plaintiff's EPA Claim.**

As discussed above, since the inception of this lawsuit, QUSL has consistently denied that it discriminated against plaintiff based on her gender and maintained that its salary decisions are supported by legitimate, non-discriminatory factors having nothing whatsoever to do with gender. During the discovery process, QUSL learned of the specific nature of Book's pre-employment communications with former QUSL Dean Cogan, including his disclosure to Cogan that he had received a competing job offer with a corresponding salary in the high eighty-thousand dollar range. Book Depo., at p. 15. Prior to this testimony from Book during his November 2003 deposition, QUSL was unaware that a good faith basis existed upon which the Law School could assert an affirmative defense to plaintiff's gender discrimination claims on the grounds that the disparity between the compensation paid to plaintiff and Book was based upon a "factor other than sex," i.e., market factors. Under these circumstances, QUSL should be allowed to amend its Answer to include this affirmative defense.

In *Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1995), an employer moved for summary judgment with respect to a complaint made by a former employee alleging a violation of the EPA. In so doing, the employer asserted that the discrepancies between plaintiff's salary and those of her male comparators resulted from "factors other than sex" (e.g., experience, education, work and salary history, and salary requested). *Id.* at 1312. Plaintiff filed a counter motion for summary judgment on the grounds that the employer had not raised any of the EPA's affirmative defenses in its pleadings. *Id.*, at n. 10. The district court permitted the employer to amend its answer to include the affirmative defense over four years after plaintiff filed her complaint because it found that the plaintiff would not be prejudiced by the employer's "inadvertent failure to satisfy a technical pleading requirement." *Id.* The Second Circuit affirmed the district court's

- 4 -

decision to allow the amendment but remanded the case for a determination with respect to whether plaintiff was entitled to additional discovery on the employer's affirmative defense. *Id.*

Similarly, in *Monahan*, 214 F.3d at 275, the court affirmed the trial court's decision, which had allowed defendant to amend its answer to include an affirmative defense notwithstanding the fact that defendant did not move to amend its answer but rather raised the defense by way of its motion for summary judgment. Plaintiffs had argued that the amendment should not be allowed because defendant's delay in raising the affirmative defense caused them to misallocate their resources during the discovery process. *Id.* at 284. According to the court, "the fact that one party has spent time and money preparing for trial will usually not be deemed prejudice sufficient to warrant a deviation from the rule broadly allowing amendment to pleadings." *Id.* Because defendant's untimely amendment did not unfairly surprise plaintiffs or impede the fair prosecution of their claims, the amendment was allowed. *Id. See also Block*, 988 F.2d at 350-51 (affirming judgment allowing defendants to amend answer to include affirmative defense more than four years after complaint was filed where plaintiffs' assertion that they expended time, effort and money litigating matter did not constitute "substantial prejudice" necessary to disallow amendment).

Here, there is no basis for the Court to deviate from the clear purpose of Rule 15 permitting liberal allowance of amended pleadings inasmuch as plaintiff would not be prejudiced by the proposed amendment. That is, the proposed amendment does nothing more than further articulate the nature of QUSL's claim that the compensation provided to plaintiff and Book was not a reflection of any prohibited gender discrimination – a claim that QUSL has consistently asserted throughout the course of this lawsuit – and causes the pleadings to conform to the evidence adduced during the discovery process. Accordingly, the proposed amendment will not

- 5 -

result in any unfair surprise to plaintiff. Furthermore, the proposed amendment will not require any additional discovery nor will it delay the resolution of the case inasmuch as QUSL's market factor defense is based solely upon the substance of communications between Cogan and Book prior to Book's employment as Tax Director – an area that was thoroughly explored during Cogan's and Book's depositions. Finally, there is absolutely no evidence of any undue delay, bad faith or dilatory motive on the part of QUSL and, thus, good cause exists to modify the Scheduling Order. As discussed above, prior to Book's November 2003 deposition, QUSL was unaware of the specific nature of Cogan's and Book's discussions with respect to the terms of Book's employment as Tax Director and the existence of a good faith basis for a market factor defense to plaintiff's gender discrimination claims.

## III.    CONCLUSION

For all of the foregoing reasons, QUSL respectfully requests that the Court grant leave to amend its Answer.

DEFENDANT
QUINNIPIAC UNIVERSITY
SCHOOL OF LAW

By:    _____
Stephen B. Harris, ct13125
William J. Albinger, ct19861
Wiggin and Dana LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
(203) 498-4400
Its Attorneys

## CERTIFICATE OF SERVICE

This is to certify that on this 13th day of February, 2004, a copy of the foregoing has been mailed, postage prepaid, to the following:

        Gregg D. Adler, Esq.
        Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.
        557 Prospect Avenue
        Hartford, CT  06105-2922

        Stephen B. Harris

\7377\201\449151.1

A

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CINDY SLANE, | ) | |
| Plaintiff, | ) | Civil No. 3:02 CV 00821 (AWT) |
| | ) | |
| v. | ) | |
| | ) | |
| QUINNIPIAC UNIVERSITY | ) | |
| SCHOOL OF LAW | ) | October 2, 2002 |
| Defendant. | ) | |
| | ) | |

## REPORT OF PARTIES' PLANNING MEETING

Cindy Slane, Plaintiff
Quinnipiac University School of Law, Defendant

Date Complaint Filed:            May 13, 2002
Date Complaint Served:          May 15, 2002
Date of Defendant's Appearance:    July 9, 2002

Pursuant to Fed. R. Civ. P. 16(b), 26(f) and D. Conn. L. Civ. R. 38, a conference was

held on September 12, 2002.  The participants were:

Ruth L. Pulda, Esq. for plaintiff

Stephen B. Harris, Esq. for defendant

I      Certification

Undersigned counsel certify that, after consultation with their clients, they have discussed

the nature and basis of the parties' claims and defenses and any possibilities for achieving a

prompt settlement or other resolution of the case and, in consultation with their clients, have

developed the following proposed case management plan.  Counsel further certify that they have

forwarded a copy of this report to their clients.

*(left margin, rotated text):* APPROVED and so ordered. Discovery shall be completed by June 20, 2003. Dispositive motions, if any, shall be filed on or before August 15, 2003. A Joint Trial Memorandum Order will be issued after the dispositive motions deadline has passed.

*(left margin):* Alvin W. Thompson, U.S.D.J.

*(left margin):* Hartford, CT          10/ , /2002

II.    Jurisdiction

    A.    Subject Matter Jurisdiction

Not contested. This action involves federal questions and this Court has original jurisdiction pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367

    B.    Personal Jurisdiction

Not contested.

III.    Brief Description of Case

Plaintiff claims that she was discriminated against in her compensation on account of her gender in violation of the Equal Pay Act of 1963, 29 U.S.C. § 206(a); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e and the Civil Rights Act of 1991; and Connecticut General Statutes Section 46a-60 *et seq*. She further claims that she was retaliated against after she complained about her compensation in violation of Title VII and C.G.S. Sec. 46a-60(a)(3). She seeks payment of wages and other legal and equitable relief. Defendant denies the allegations and contends that all decisions concerning plaintiff's compensation were legitimate, non-discriminatory business decisions, not based on plaintiff's gender or any other impermissible factor.

IV.    Statement of Undisputed Facts:

Counsel certify that they have made a good faith attempt to determine whether there are any material facts that are not in dispute. The parties state that the following material facts are undisputed:

2

1.    Plaintiff began her employment with the defendant in July 1994.

2.    In October 1996, plaintiff was offered a five year appointment to the position of Assistant Clinical Professor of Law and Director of Field Placement Programs.

3.    Plaintiff's base salary was increased each year.  Her salary for the 2001-2002 academic year was $62,590.

4.    Plaintiff co-authored a letter dated May 26, 2000 to the then Dean of the School of Law complaining about alleged gender based disparities in compensation.


V.    Case Management Plan:

A.    Standing Order on Scheduling in Civil Cases

The parties request modification of the deadlines in the Standing Order on Scheduling in Civil Cases as described below.

B.    Scheduling Conference with the Court

The parties do not request a pretrial conference with the Court before entry of a scheduling order pursuant to Fed. R. Civ. P. 16(b).

C.    Early Settlement Conference

1.    The parties certify that they have considered the desirability of attempting to settle the case before undertaking significant discovery or motion practice.  Settlement is unlikely at this time.

2.    The parties do not request an early settlement conference.

3.    If one is ordered, the parties prefer a settlement conference with a Magistrate Judge.

4.     The parties do not request a referral for alternative dispute resolution pursuant to D. Conn. L. Civ. R. 36.

D.     Joinder of Parties and Amendment of Pleadings

1.     Plaintiff should be allowed until September 30, 2002 to file motions to join additional parties and to file motions to amend the pleadings.

2.     Defendant should be allowed until October 15, 2002 to file motions to join additional parties and to file a response to the amended complaint.

E.     Discovery

1.     The parties anticipate that discovery will be needed on the following subjects: Plaintiff intends to seek discovery concerning the defendant's employment policies and practices, generally and specifically, concerning salary, wage, and benefits issues; job descriptions and duties for certain faculty; the wage, salary, and benefits history of certain faculty; the circumstances surrounding the hiring and retention of the Plaintiff and other faculty; the circumstances surrounding the setting of salaries and benefits for the Plaintiff and other faculty; the Plaintiff's performance/job history; the performance/job history of other faculty; and the Plaintiff's damages. Defendant intends to seek discovery concerning the basis of each of plaintiff's claims, her alleged damages and mitigation efforts.

2.     All discovery, including depositions of expert witnesses pursuant to Fed. R. Civ. P. 26(b)(4), will be commenced by October 1, 2002 and completed (not propounded) by June 30, 2003.

3.     Discovery will not be conducted in phases.

4.     There are no issues for early discovery.

4

5.      The parties anticipate that the plaintiff will require a total of 7 depositions of fact witnesses and that the defendant will require a total of 3 depositions of fact witnesses. The depositions will commence by October 1, 2002 and be completed by March 31, 2003.

6.      The plaintiff may request permission to serve more than 25 interrogatories.

7.      Plaintiff intends to call expert witnesses at trial. Plaintiff will designate all trial experts and provide opposing counsel with reports from retained experts pursuant to Fed. R. Civ. P. 26(a)(2) by March 30, 2003. Depositions of any such experts will be completed by April 30, 2002.

8.      Defendant may call expert witnesses at trial. If so, defendant will designate all trial experts and provide opposing counsel with reports from retained experts pursuant to Fed. R. Civ. P. 26(a)(2) by May 30, 2003. Depositions of such experts will be completed by June 30, 2003.

9.      A preliminary damages analysis will be provided by plaintiff by one week prior to plaintiff's deposition, and a final damages analysis will be provided by March 31, 2003.

F.      Dispositive Motions:

Dispositive motions will be filed on or before August 15, 2003, or 45 days after the close of discovery, whichever is later.

G.      Joint Trial Memorandum

The joint trial memorandum required by the Standing Order on Trial Memoranda in Civil Cases will be filed by September 1, 2003 or 60 days after the Court's ruling on any dispositive motions, whichever is later.

5

## VI.     Trial Readiness

The case will be ready for trial by 30 days after filing of the joint trial memorandum.

As officers of the Court, undersigned counsel agree to cooperate with each other and the

Court to promote the just, speedy and inexpensive determination of this action.


PLAINTIFF
CINDY SLANE


By: _Ruth L. Pulda_                    Date: _10-3-02_
Ruth L. Pulda, ct05697
Livingston, Adler, Pulda, Meiklejohn
   & Kelly P.C.
557 Prospect Street
Hartford, CT 06105
(860) 223-9821
Her Attorneys


DEFENDANT
QUINNIPIAC UNIVERSITY
SCHOOL OF LAW


By: _____    Date: _10/2/02_
Stephen B. Harris, ct13125
Wiggin & Dana LLP
One CityPlace
185 Asylum Street
Hartford, CT 06103-3402
(860) 297-3700
Its Attorneys


cc:   The Honorable Alvin W. Thompson
      United States District Judge
      United States District Court
      450 Main Street
      Hartford, CT 06103

B

# COPY

**SLANE v. QUINNIPIAC UNIVERSITY      LESLIE BOOK      11-10-03**

**DelCASALE, CASEY, MARTIN & MANCHELLO**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*DEL CASALE, CASEY, MARTIN & MANCHELLO*
*Ten Penn Center, Suite 636*
*1801 Market Street*
*Philadelphia, PA    19103*
*Phone:   215-568-2211*
*FAX:   215-568-2622*

e 7

(1) **Q.** Were you eventually called for an interview
(2) at Quinnipiac?
(3) **A.** Yes.
(4) **Q.** And prior to the interview, do you remember
(5) whether you had any contact with Dean Cogan?
(6) **A.** Don't recall.
(7) **Q.** At the time you sent in the application,
(8) had you made any decisions with respect to your
(9) then current position at Davis Polk?
(10) **A.** Yes.
(11) **Q.** I'm sorry – at Baker McKenzie?
(12) **A.** Baker McKenzie, yes.
(13) **Q.** What decision had you made?
(14) **A.** I had decided that I was leaving the –
(15) leaving Baker McKenzie.
(16) **Q.** And you decided that before you applied for
(17) the job at Quinnipiac?
(18) **A.** Correct.
(19) **Q.** Why had you made that decision?
(20) **A.** My group, which was a tax controversy
(21) group, had decided to leave and go to another firm
(22) in New York, and I had decided at that point that I
(23) did not want to practice at that point in a law
(24) firm setting.

8

(1) **Q.** So is it fair to say that you had made a
(2) change-of-lifestyle decision at that point?
(3) **A.** Yes.
(4) **Q.** What attracted you to the Quinnipiac
(5) position?
(6) **A.** I had always been doing pro bono work at my
(7) big law firm work and was interested in the
(8) possibility of combining more public interest
(9) oriented tax profession, as well as was intrigued
(10) about teaching and writing.
(11) **Q.** Would you just describe just sort of the
(12) process you went through that led to your hiring at
(13) Quinnipiac, not so much the substance, just how it
(14) unfolded?
(15) **A.** I recall hearing at the time I spoke with
(16) Mary Morris Winnick in Washington that the odds of
(17) my being hired were not great for the position
(18) because there were many candidates, so I was late
(19) in the process. I had not heard anything for some
(20) time. I don't recall the specific time reference.
(21) At some point, I received a phone call, and I don't
(22) recall from whom, indicating that I was invited to
(23) go give a presentation to the faculty at Quinnipiac
(24) about how I would teach a clinic if I were given

9

(1) the opportunity.
(2) **Q.** Did you go and do that?
(3) **A.** I did.
(4) **Q.** Do you know approximately when that was?
(5) **A.** I don't.
(6) **Q.** Just, basically, what happened that day?
(7) **A.** I recall giving the presentation, as well
(8) as being interviewed by a number of Quinnipiac
(9) faculty members on that date.
(10) **Q.** Do you remember which faculty members?
(11) **A.** I don't.
(12) **Q.** Do you recall whether you were interviewed
(13) by Dean Cogan –
(14) **A.** I don't recall.
(15) **Q.** Wait until I finish the question.
(16) Do you recall whether you were
(17) interviewed by Dean Cogan that day?
(18) **A.** No.
(19) **Q.** Do you recall whether you had any
(20) conversations with him that day?
(21) **A.** No.
(22) **Q.** So what happened, again just the process,
(23) after the presentation and interviews?
(24) **A.** At some point after that day – and again,

Page 13

(1) I don't recall time reference, time frame – I
(2) believe I was called by Neil Cogan with the offer
(3) of employment. And I don't recall whether I went
(4) back up to visit in person before accepting.
(5)     Q.   Do you remember whether you had a second
(6) conversation with Neil Cogan either on the phone or
(7) in person to finalize it?
(8)     A.   I can't recall if it was more than one
(9) conversation.
(10)     Q.   At any time during your conversations with
(11) Dean Cogan, did you specify any minimum salary that
(12) would be necessary for you to be willing to take
(13) the job?
(14)     A.   No.
(15)     Q.   During your conversations with Dean Cogan,
(16) did you have any discussions of what it would take
(17) to get you to relocate from New York to
(18) Connecticut?
(19)     A.   Can you rephrase the question?
(20)     Q.   Yes.
(21) Do you recall whether you, at any
(22) time during your conversations with Dean Cogan,
(23) said anything to the fact that, If you want me to
(24) relocate from New York to Connecticut, this is what

Page 14

(1) I would need?
(2)     A.   In effect, we talked about some parameters,
(3) yes.
(4)     Q.   Had you already decided that you were
(5) leaving New York City or was it still possible you
(6) were going to stay in New York City?
(7)     A.   It was – I had just about decided that I
(8) was leaving New York. There was a possibility that
(9) I might stay. I had ongoing discussions with
(10) attorneys at White & Case, whose my tax controversy
(11) group eventually relocated. I also had discussions
(12) with other employers.
(13)     Q.   The salary that you were then earning at
(14) Baker & McKenzie or that you had earned at White &
(15) Case, was that discussed at all with Dean Cogan?
(16)     A.   No.
(17)     Q.   Was that a factor at all in your
(18) consideration?
(19)     A.   My salary from Baker McKenzie?
(20)     Q.   Correct.
(21)     A.   No.
(22)     Q.   I take it you don't have any notes from
(23) your discussions with Dean Cogan?
(24)     A.   Not that I can find.

Page 15

(1)     Q.   Let me show you what we've marked as
(2) Exhibit 1 for identification. It's a letter dated
(3) August 11, 1997 addressed to you. I'm going to ask
(4) you, is this the offer letter that you received and
(5) accepted from Quinnipiac?
(6)     A.   Yes, it is.
(7)     Q.   And it's dated August 11, 1997. Do you
(8) recall whether you had agreed on a particular
(9) salary or agreed to accept a particular salary
(10) prior to August 11th?
(11)     A.   I don't believe I had.
(12)     Q.   And can you just tell us what discussions
(13) you do recall having with Dean Cogan about what the
(14) salary would be for this position?
(15)     A.   I recall discussing with Dean Cogan a job
(16) offer I had received in Washington to work at the
(17) Internal Revenue Service and mentioned that the
(18) offer was – I recall it being in the high eighties
(19) in terms of annual salary and recall Dean Cogan
(20) mentioning that the salary offer would be around
(21) that.
(22)     Q.   Do you recall having any other discussions
(23) with Dean Cogan about the salary that you would be
(24) offered at Quinnipiac other than what you just

Page 16

(1) testified to?
(2)     A.   I do not.
(3)     Q.   Can you tell us what you recall about your
(4) conversations with Dean Cogan in terms of what you
(5) may have said or he may have said about the factors
(6) that were important to you to be able to accept the
(7) position?
(8)     A.   Yes, I can recall those.
(9)     Q.   Why don't you tell us?
(10)     A.   I was concerned and interested in the
(11) possibility of the position being tenure track
(12) and was – recall speaking with Dean Cogan about
(13) the possibility of the position conversion to a
(14) tenure track slot. And for me, that was an
(15) important condition of employment because I both
(16) wanted to teach – excuse me – wanted to write and
(17) was concerned about the status of the position.
(18)     Q.   What did he tell you about that?
(19)     A.   Dean Cogan told me that he would give me
(20) adequate resources to do research and writing and
(21) that if I was able to produce scholarship that he
(22) would support a position conversation to tenure
(23) track.
(24)     Q.   Was that an important factor in your

Page 17

(1) willingness to accept the job?
(2)     A.   Yes, it was.
(3)     Q.   Turning back to Exhibit 1, under your
(4) agreement with Quinnipiac in that first year, were
(5) you required to teach during the summer?
(6)     A.   No.
(7)     Q.   Did that remain the case for all three
(8) years?
(9)     A.   Yes, it did.
(10)     Q.   It also states in here that there's a
(11) $75,000 salary and a $5,000 reimbursement for
(12) moving expenses; is that what you accepted?
(13)     A.   Yes, it is.
(14)     Q.   And at some point in these proceedings, you
(15) may recall that you submitted an affidavit where
(16) you said that you thought your initial salary was
(17) $80,000, correct?
(18)     A.   Yes, I did.
(19)     Q.   Having reviewed this and thought about it,
(20) does this refresh your recollection?
(21)     A.   Yes, it does.
(22)     Q.   So, as far as you know, Exhibit 1 is
(23) accurate?
(24)     A.   That's correct.

Page 18

(1)     Q.   Did you also have any discussions with
(2) Dean Cogan when you were being hired about doing
(3) research in the summers?
(4)     A.   Yes, I did.
(5)     Q.   What were the nature of those discussions?
(6)     A.   The discussions focused on my having
(7) resources available to do research, including a
(8) research assistant and a summer research stipend.
(9) And, as I recall, Dean Cogan agreed to provide both
(10) of those.
(11)     Q.   I'm going to show you what we've marked as
(12) Exhibit 2 for identification. What we've marked as
(13) Exhibit 2 for identification is a one-page letter
(14) dated May 20, 1998 addressed to you from the
(15) Provost Office, and it shows a salary of $78,750
(16) for the ten-month period from August 1998 through
(17) May 1999; do you see that?
(18)     A.   I do.
(19)     Q.   Having reviewed this, do you believe that
(20) to be an accurate reflection of what your salary
(21) was for that year?
(22)     A.   Yes, I do.
(23)     Q.   So you received about a $3,750 raise; is
(24) that right?