UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CINDY SLANE,<br>    Plaintiff,<br><br>v.<br><br>QUINNIPIAC UNIVERSITY<br>SCHOOL OF LAW<br>    Defendant. | Civil No. 3:02 CV 00821 (AWT)<br><br><br><br>February 13, 2004 |

## DEFENDANT'S LOCAL RULE 56(a)1 STATEMENT

1. Following her graduation from law school in the spring of 1992, plaintiff worked for the Connecticut law firm of Day, Berry & Howard for approximately two years from September 1992 through August 1994. (Exhibit A, Deposition of Cindy Slane dated January 23, 2003, at pp. 11-12).[1]

2. Neil Cogan ("Cogan") served as Dean of the Quinnipiac University School of Law ("QUSL" or "Law School") from July 1, 1993 through June 30, 2000, and was on sabbatical from July 1, 2000 through June 30, 2001. (Exhibit B, Deposition of Neil Cogan dated July 29, 2003, at p. 7[2]; Exhibit C, Affidavit of Neil Cogan dated May 2, 2002, at ¶ 3).[3]

3. Prior to becoming Dean of QUSL, Cogan was employed by Southern Methodist University's ("SMU") law school. While at SMU, Cogan represented the Association of Women Law Students and other individuals in gender discrimination suits against all of the

---

[1] Hereinafter cited as "Slane Depo. 1, at p. ___."
[2] Hereinafter cited as "Cogan Depo., at p. ___."
[3] Hereinafter cited as "Cogan Aff., at ¶ ___."

major law firms in Dallas, Texas. In addition, while working for the United States Department of Justice, Cogan wrote a brief in the 1980 case of *County of Washington v. Gunther* involving equal pay. (Exhibit B, Cogan Depo., at pp. 82-84; Exhibit C, Cogan Aff., at ¶ 20).

4. During his tenure with QUSL, Cogan undertook a systematic evaluation of the salaries of the Law School's legal writing instructors, most of which were female, and recommended that they receive substantial salary increases. (Exhibit B, Cogan Depo., at pp. 20-23; Exhibit C, Cogan Aff., at ¶ 7).

5. As Dean of QUSL, Cogan recommended revisions to the Law School's externship programs, including the addition of a full-time director with responsibility for visiting placement sites, reviewing journals prepared by students concerning their externship experiences and otherwise ensuring that students received an appropriate educational experience. (Exhibit B, Cogan Depo., at p. 28; Exhibit C, Cogan Aff., at ¶ 4).

6. In August 1994, Cogan hired plaintiff as a Visiting Instructor of Law and Director of Field Placement Programs in the new model he had recommended. Plaintiff's initial salary was $40,000. (Exhibit A, Slane Depo. 1, at p. 24; Exhibit C, Cogan Aff., at ¶ 5; Exhibit D, letter from John Bennett to plaintiff dated July 26, 1994).

7. Among plaintiff's responsibilities as Director of Field Placement Programs is to identify and develop placement sites in the legal community where QUSL students work during each semester; review student work product produced at the placement sites; visit each placement site once per semester to meet with the students and their supervisors; and assess the quality of the placement sites. (Exhibit A, Slane Depo. 1, at pp. 24-26).

8. Plaintiff's responsibilities with regard to advertising QUSL's externship programs to students, soliciting applications from students and selecting students for the externship programs are essentially administrative in nature. (Exhibit A, Slane Depo. 1, at pp. 44-45).

9. Over the course of a seven-week period each semester, plaintiff conducts a one-hour site visit with each externship student and his/her supervisor. During plaintiff's employment with QUSL, there have been between 40 and 61 students enrolled in the externship programs each semester. (Exhibit A, Slane Depo. 1, at pp. 51-52 & 55).

10. Plaintiff does not assist QUSL's externship students with the substantive legal work they perform at their externship placements. (Exhibit E, Deposition of Cindy Slane dated March 27, 2003, at p. 221).[4]

11. In her position as Director of Field Placement Programs, plaintiff does not practice law, represent clients, or serve as counsel-of-record in any legal matters. (Exhibit A, Slane Depo. 1, at p. 42; Exhibit E, Slane Depo. 2, at p. 218).

12. QUSL does not maintain professional malpractice insurance for plaintiff. (Exhibit A, Slane Depo. 1, at p. 44).

13. A substantial portion of the job of externship director involves meeting individually with students, commuting to and from placement sites to conduct visits with site supervisors, and reviewing and critiquing student journals. (Exhibit B, Cogan Depo., at pp. 111-113).

14. Aside from assigning students letter grades for their work in the seminar component of QUSL's externship programs, teaching a single semester of the course Introduction to the Representation of Clients, and teaching the externship course Field Placement

---

[4] Hereinafter cited as "Slane Depo. 2, at p. ___."

II, plaintiff's responsibilities have remained essentially the same since she began work at QUSL in 1994. (Exhibit A, Slane Depo., at pp. 31-38).

15. While he was Dean of QUSL, Cogan was required to obtain the approval of John Bennett ("Bennett"), Quinnipiac University's ("QU") Provost, with regard to his salary recommendations for new faculty members. Cogan was also required to obtain Bennett's approval for any adjustments he recommended to the salaries of existing faculty members. Cogan's ability to recommend adjustments to existing faculty members' salaries was constrained by the applicable raise pool allocated to QUSL for all Law School faculty during each academic year. (Exhibit B, Cogan Depo., at pp. 19-20; Exhibit C, Cogan Aff., at ¶ 17).

16. In 1994, when Cogan proposed plaintiff's initial salary, QUSL's externship program was considered temporary and it was unclear whether QUSL's faculty would approve the continuation of the program in the model recommended by Cogan. Accordingly, Cogan offered plaintiff a salary that was greater than QUSL's legal writing instructors but less than tenured faculty members. (Exhibit B, Cogan Depo., at pp. 42, 44 & 90-91; Exhibit C, Cogan Aff., at ¶ 5).

17. During Cogan's tenure with QUSL, plaintiff routinely received salary increases in excess of the average raises for all QUSL faculty. Cogan was also instrumental in securing long-term contract status, and hence job security, for plaintiff. (Exhibit B, Cogan Depo., at pp. 87-88; Exhibit C, Cogan Aff., at ¶ 18).

18. In 1996, Cogan recommended that QUSL's externship program be made permanent and that plaintiff be hired to a tenured position as director of the program. (Exhibit B, Cogan Depo., at pp. 30 & 34; Exhibit F, memorandum from Cogan to QUSL faculty dated September 19, 1996).

19. In the fall of 1996, QUSL's faculty voted to extend to plaintiff an offer of a 5-year contract as permanent Director of Field Placement Programs with the option to request that her position be converted to a tenure-track position. Plaintiff's responsibilities, however, did not change. To date, plaintiff has not exercised the option to have her position converted to the tenure track. (Exhibit A, Slane Depo. 1, at pp. 26-27 & 31).

20. Since the fall of 1997, plaintiff's title has been Assistant Clinical Professor of Law and Director of Field Placement Programs. (Exhibit A, Slane Depo. 1, at p. 31).

21. Cogan recommended that Professor Richard Emmanuel (Emmanuel") receive the same annual salary as that which plaintiff would have received while he performed plaintiff's job during her 1997/1998 leave of absence from QUSL. (Exhibit A, Slane Depo. 1, at pp. 82-83; Exhibit B, Cogan Depo., at pp. 66-68; Exhibit C, Cogan Aff., at ¶ 9).

22. Leslie Book ("Book") has an L.L.M. in Taxation from New York University School of Law. After receiving his L.L.M. in 1994, Book worked as an associate in the New York City law firm of Baker & McKenzie. Book's ending salary at Baker & McKenzie was approximately $145,000. (Exhibit G, Deposition of Leslie Book dated November 10, 2003, at pp. 6-7 & 22).[5]

23. QUSL Professor Mary Wenig ("Wenig") met Book at a meeting of the Tax Section of the American Bar Association and thought he was a good candidate to head QUSL's Tax Clinic. Book interviewed for the position with Wenig, and Professors Mary Ferrari ("Ferrari") and Toni Robinson ("Robinson"), among other QUSL faculty members. Wenig, Ferrari and Robinson communicated to Cogan their enthusiastic support for Book and recommended that Book be hired as Director of QUSL's Tax Clinic. (Exhibit B, Cogan Depo.,

---

[5] Hereinafter cited as "Book Depo., at p. __."

at pp. 99-102; Exhibit H, Deposition of Mary Ferrari dated October 1, 2003, at pp. 17-18 & 23-24[6]; Exhibit I, Deposition of Toni Robinson dated October 1, 2003, at pp. 10-11).[7]

24. Book and Cogan discussed the parameters of the position of Director of QUSL's Tax Clinic. Book advised Cogan that he had received a job offer from the Internal Revenue Service in Washington, D.C., which included a starting salary in the high eighty-thousand dollar range. Book also made known his interest in a tenure-track position and reluctance to leave his position as a lawyer in private practice in New York City to accept a non-tenure track position at QUSL. Cogan promised that QUSL would provide Book with adequate resources for research and writing, including a research assistant and summer stipends, and that Cogan would support the conversion of Book's position to the tenure-track if Book were able to fulfill the scholarship requirements of such a position. Cogan's assurances were an important factor in Book's decision to accept the job at QUSL. (Exhibit B, Cogan Depo., at pp. 52-54; Exhibit C, Cogan Aff., at ¶ 13; Exhibit G, Book Depo., at pp. 13-18).

25. In 1997, Cogan hired Book as an Assistant Clinical Professor of Law and Director of QUSL's Tax Clinic at an annual salary of $75,000. At the time Cogan hired Book, QUSL's Tax Clinic was amongst the oldest continuously running tax clinics in the country and was in danger of closing if a new director were not hired. (Exhibit B, Cogan Depo., at p. 48 & 99; Exhibit J, letter from Bennett to Book dated August 11, 1997; Exhibit K, QUSL Website re: Tax Clinic).

26. As Director of QUSL's Tax Clinic, Book had ultimate responsibility for the cases handled by the clinic and supervised the students enrolled in the clinic. Book also taught a course designed to assist students in the ability to represent individuals in tax controversies,

---

[6] Hereinafter cited as "Ferrari Depo., at p. ___."
[7] Hereinafter cited as "Robinson Depo., at p. ___."

which included a discussion of the substantive and procedural aspect of tax law. (Exhibit G, Book Depo., at pp. 8 & 29; Exhibit K, QUSL Website re: Tax Clinic; Exhibit L, memorandum from Book to Cogan dated April 8, 1998).

27.     Because of the caseload and the intensity of the work performed by QUSL's Tax Clinic, there are typically between 8 and 10 students enrolled in the Tax Clinic during any given semester. The nature of the relationship between the Director of the Tax Clinic and the students enrolled in the clinic is akin to that of a partner and associates in a law firm. (Exhibit B, Cogan Depo., at pp. 55-56; Exhibit K, QUSL Website re: Tax Clinic).

28.     Because Book served as counsel-of-record for the Tax Clinic's clients, he was required to be admitted to the Bar of the State of Connecticut. (Exhibit E, Slane Depo. 2, at p. 218).

29.     Clinical professors such as Book are responsible for the representation of clients; they handle legal matters and appear in court. Because clinical professors are responsible for handling cases, their responsibilities to their clients do not end at the conclusion of each academic semester. (Exhibit B, Cogan Depo., at pp. 94-97).

30.     During the summer months when QUSL was not in session, Book handled the Tax Clinic's on-going cases with the assistance of a paid student. Book was not compensated for the work he performed for QUSL over the summer. (Exhibit G, Book Depo., at p. 28).

31.     While he was employed with QUSL, Book submitted two written proposals to Cogan for summer research grants, which were approved. Book produced written work product, some of which was published, and presented the results of his research to QUSL's faculty. In or about March or April of 2000, Book announced that he was leaving QUSL to accept a position

with Villanova University School of Law as an Associate Professor of Law and Director of its Federal Tax Clinic. (Exhibit G, Book Depo., at pp. 4-5, 20-21 & 23-26).

32.     On May 26, 2000, and after consulting with their attorney, plaintiff and Professor Carolyn Kaas ("Kaas") wrote to Cogan regarding their belief that they were unfairly compensated by QUSL based on information they had obtained concerning Book's salary. In their letter, plaintiff and Kaas suggest that the salary disparities between themselves and Book are gender-based and state that they "do not relish a public, judicial airing of the grievances" but are "determined . . . to demand compensation for past harm and to insist upon an equitable salary structure for the future." (Exhibit A, Slane Depo. 1, at pp. 101-103; Exhibit M, letter from plaintiff and Kaas to Cogan dated May 26, 2000).

33.     On May 30, 2000, plaintiff and Kaas met with Cogan in his office to discuss their letter and salary concerns. During the meeting, Cogan denied that he had discriminated against plaintiff and Kaas based upon gender. Cogan explained that there is no established level for faculty salaries at QUSL and that the Law School must pay candidates the salaries required to obtain their services. Cogan further explained that he had been under pressure from QUSL's faculty to hire Book as Director of the Law School's Tax Clinic. Cogan stated that it is not possible in a law school environment to adjust the salaries of all current faculty members in order to match the salary offered to a new faculty member. Cogan provided examples of female faculty members that he had hired and that were highly-paid. (Exhibit A, Slane Depo. 1, at pp. 104-105; Exhibit N, Deposition of Carrie Kaas dated October 23, 2003, at pp. 28-29).[8]

34.     On May 31, 2000, Cogan sent an email message to plaintiff and Kaas entitled "Draft," which he proposed to send to incoming Interim Law School Dean David King ("King")

---

[8] Hereinafter cited as "Kaas Depo., at p. __."

- 8 -

after he received plaintiff's and Kaas's comments. In his email, Cogan requests that plaintiff and Kaas provide factual information concerning Book's starting salary and teaching experience. He also explains that, to the best of his recollection, he relied upon the salaries earned by QUSL's Assistant Professors of Legal Writing when proposing plaintiff's salary. At the time he drafted the email, Cogan was at the end of his tenure as QUSL's Dean and had no effective authority to address plaintiff's and Kaas's salary concerns. Cogan relied, in part, upon the information contained in plaintiff's and Kaas's May 26, 2000 letter when drafting the May 31, 2000 email message. Cogan was acting as an advocate on plaintiff's behalf when he stated in his email message that plaintiff's and Book's duties and responsibilities were essentially the same. (Exhibit A, Slane Depo. 1, at pp. 108-111; Exhibit B, Cogan Depo., at pp. 40, 72, 86, 88-89 & 92-93; Exhibit O, email message from Cogan to plaintiff and Kaas dated May 31, 2000).

35. By letter dated June 2, 2000, plaintiff and Kaas responded to Cogan's May 31, 2000 email message. In their letter, plaintiff and Kaas supply the information requested by Cogan and recommend changes to his draft email message, including the incorporation of their May 26, 2000 letter. (Exhibit A, Slane Depo. 1, at p. 114; Exhibit P, letter from plaintiff and Kaas to Cogan dated June 2, 2000).

36. On June 2, 2000, Cogan sent an email message to plaintiff in response to plaintiff's and Kaas's June 2, 2000 letter in which he disclaims the arguments and conclusions set forth in that letter and any suggestion that plaintiff's salary was the product of gender discrimination. He further explains that many neutral educational and business reasons precluded him from recommending to QU's Provost that plaintiff receive a $30,000 salary increase at the time Book was hired; and that such a request would not have been approved.

Finally, Cogan provides examples of his favorable treatment of QUSL's female faculty and staff members. (Exhibit Q, email from Cogan to plaintiff dated June 2, 2000).

37. On or about June 2, 2000, plaintiff and Kaas drafted a memorandum to Cogan in which they express their understanding that Cogan did not believe his salary decisions were the product of gender discrimination and reassure him that they did not expect him to admit to any such discrimination. (Exhibit A, Slane Depo. 1, at p. 134; Exhibit R, memorandum from plaintiff and Kaas to Cogan entitled "Letter to Dean King and Provost Bennett").

38. On July 26, 2000, plaintiff and Kaas met with QUSL Interim Dean King in his office for approximately 15 or 20 minutes to discuss the salary concerns they had initially discussed with Cogan. During the meeting, plaintiff and Kaas provided King with a copy of their May 26, 2000 letter to Cogan but did not provide him with copies of the subsequent correspondence and email communications between themselves and Cogan. During the meeting, King stated that, prior to assuming the role of Interim Dean, he was unfamiliar with the salary structure at QUSL and was unsure of the relevant faculty community for purposes of a comparison of plaintiff's salary. King also stated that his initial impression was that plaintiff was somewhat underpaid. King agreed to present plaintiff's and Kaas's salary concerns to Edward Kavanagh ("Kavanagh"), QU's Interim Chief Academic Officer. (Exhibit A, Slane Depo. 1, at pp. 138-146; Exhibit S, Deposition of David King dated October 16, 2003, at pp. 27-28 & 34-35).[9]

39. King met with Kavanagh to review the salaries of QUSL's faculty. King advised Kavanagh that he did not believe the salaries of QUSL's faculty were gender-based but expressed his opinion that plaintiff was somewhat underpaid. King, however, did not express an

---

[9] Hereinafter cited as "King Depo., at p. ___."

opinion as to what he believed plaintiff's salary should be. Kavanagh advised King to request plaintiff to provide QUSL with information concerning her conception of an appropriate salary and entitlement to backpay. (Exhibit S, King Depo., at pp. 37-39; Exhibit T, Deposition of Edward Kavanagh dated November 11, 2003, at pp. 21-22 & 24).[10]

40.    On July 27, 2000, plaintiff and Kaas met with King for a second time in his office. During the meeting, King advised plaintiff and Kaas that he had brought their salary concerns to Kavanagh's attention and requested that plaintiff provide him with information regarding her alleged damages. (Exhibit A, Slane Depo. 1, at pp. 149-152).

41.    Three months after King's request for information regarding plaintiff's alleged damages, and by letter dated October 24, 2000, plaintiff provided King with a broad outline of her alleged damages. Plaintiff advised King that unless her concerns were resolved by QUSL within two weeks, she would file an administrative complaint with the Connecticut Commission on Human Rights and Opportunities ("CCHRO"). (Exhibit A, Slane Depo. 1, at pp. 152-157; Exhibit U, letter from plaintiff to King dated October 24, 2000).

42.    After receiving plaintiff's October 24, 2000 letter, King met with Kavanagh to discuss it. Kavanagh instructed King to develop a response to plaintiff's letter either by way of agreement or counterproposal. King reviewed the salaries of other QUSL faculty members and arrived at what he believed was a fair proposal to adjust plaintiff's salary. (Exhibit S, King Depo., at p. 42 & 57; Exhibit T, Kavanagh Depo., at pp. 30-31).

43.    On December 11, 2000, plaintiff wrote to King to request a sabbatical during the spring 2002 semester in order to pursue various scholarly projects. After speaking with Kathleen McCourt ("McCourt"), QU's Vice President for Academic Affairs, King approved plaintiff's

---

[10] Hereinafter cited as "Kavanagh Depo., at p. ___."

request for a sabbatical. (Exhibit E, Slane Depo. 2, at pp. 224-226; Exhibit S, King Depo., at pp. 17-18; Exhibit V, email from plaintiff to King dated December 11, 2000).

44. On January 9, 2001, plaintiff, Kaas, Kavanagh and King met to negotiate plaintiff's salary concerns. Plaintiff understood that the purpose of this meeting was to discuss settlement of her discrimination claims. Plaintiff made it known that she was representing herself in a *pro se* capacity with respect to her discrimination claims. During the meeting, King communicated QU's offer to adjust plaintiff's salary to $70,000 per year. Plaintiff rejected the offer because she found it unacceptable to be paid a salary less than the amount that Book would have been paid had he remained at QUSL. In addition, it was plaintiff's desire that QU undertake a review of QUSL's entire salary structure for clinical faculty. Plaintiff did not make a counterproposal to QU's offer. (Exhibit A, Slane Depo. 1, at pp. 157-165; Exhibit N, Kaas Depo., at p. 72; Exhibit S, King Depo., at p. 51; Exhibit T, Kavanagh Depo., at pp. 33 & 35-36; Exhibit W, email message from King to plaintiff dated February 14, 2001).

45. On February 18, 2001, plaintiff wrote to King to communicate her perception of a reasonable settlement of her salary concerns. In her letter, plaintiff characterized QUSL's offer to adjust her salary to $70,000 as an "[un]reasonable response." Plaintiff further detailed the "essential elements" of her position which included adjustments to other faculty members' salaries, an "independent review of faculty salaries to verify that the . . . QUSL faculty salary structure . . . evidence[s] gender-neutral policies and practices" and payment of her attorney's fees. (Exhibit X, letter from plaintiff to King dated February 18, 2001).

46. On May 7, 2001, QUSL's counsel sent plaintiff a letter communicating a second proposal to adjust plaintiff's salary, this time to $80,000, and to provide her compensation for her alleged loss of back pay in the amount of $52,079.25. Plaintiff rejected the offer. (Exhibit A,

Slane Depo. 1, at pp. 165-166; Exhibit T, Kavanagh Depo., at pp. 41-42; Exhibit Y, letter from John Zandy to plaintiff dated May 7, 2001).

    47.    Plaintiff was on sabbatical during the spring 2002 semester and thus was relieved of her teaching responsibilities during that 4-month period. (Exhibit E, Slane Depo. 2, at pp. 226-227).

    48.    In March 2002, and following a mediation conference before the CCHRO, QUSL, through its counsel, communicated a third settlement proposal to plaintiff. QUSL offered to adjust plaintiff's salary to $85,000 per year and to provide her compensation for her alleged loss of back pay in the amount of $59,626.01. Plaintiff rejected QUSL's offer. (Exhibit Z, Settlement Agreement).

    49.    On May 19, 2002, King sent an email message to plaintiff requesting that she provide him information concerning her scholarly accomplishments during her spring 2002 sabbatical. (Exhibit E, Slane Depo. 2, at pp. 238-239; Exhibit S, King Depo., at p. 19; Exhibit AA, email from King to plaintiff dated May 19, 2002).

    50.    On June 19, 2002, plaintiff provided King with a "Supplemental Professional Report" in response to his May 19, 2002 request for information concerning her accomplishments during her spring 2002 sabbatical. The report describes three of plaintiff's scholarly activities. The only written work product plaintiff completed during her sabbatical, however, were revisions to an opinion concerning lawyers' relationships with title insurance companies, a preliminary outline for an article concerning mandatory clinical education, and approximately three pages of written testimony for presentation to Connecticut's Judiciary Committee in connection with her work for the Permanent Commission on the Status of Women (Exhibit E, Slane Depo. 2, at pp. 232-233, 235, 241-247, 250-251 & 265-266; Exhibit S, King

Depo., at p. 19; Exhibit BB, memorandum from plaintiff to King and accompanying Supplemental Professional Report dated June 19, 2002).

51.     King consulted with McCourt regarding plaintiff's salary for the 2002-2003 academic year. King recommended that plaintiff receive a salary increase of approximately one percent for the 2002-2003 academic year based on her limited scholarly accomplishments during her spring 2002 sabbatical. King recommended that three other QUSL faculty members receive salary increases of one percent or less for the 2002-2003 academic year. (Exhibit S, King Depo., at pp. 19, 24 & 62-64).

52.     For purposes of her lawsuit, plaintiff compares herself with former QUSL Professors Book and Martin Cowan ("Cowan") whom she claims performed work which is substantially the same as the work she performs. (Exhibit A, Slane Depo. 1, at pp. 90-92; Exhibit E, Slane Depo. 2, at pp. 215-216).

53.     During the fall semester of his one-year visitorship at QUSL, Cowan was responsible for the supervision of QUSL's Tax Clinic – the same job that Book performed. During the spring semester, he taught the course "Taxation and Business Enterprises." (Exhibit H, Ferrari Depo., at pp. 15-16).

54.     Since plaintiff filed her administrative complaint with the CCHRO in 2000, she has continued to receive annual salary increases. Plaintiff's salary history is as follows: 1994/1995 = $40,000; 1995/1996 = $45,000; 1996/1997 = $48,000; $1997/1998 = $54,000 (prorated to $10,000 due to a leave of absence); 1998/1999 = $58,000 (prorated to $46,400 due to her return from a leave of absence at a reduced course load); 1999/2000 = $59,750; 2000/2001 = $59,750; 2001/2002 = $62,590; and 2002/2003 = $63,216. (Exhibit CC, letter agreements between plaintiff and QU).

DEFENDANT
QUINNIPIAC UNIVERSITY
SCHOOL OF LAW

By: _____
Stephen B. Harris, ct13125
William J. Albinger, ct19861
Wiggin and Dana LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
(203) 498-4400
Its Attorneys

**CERTIFICATE OF SERVICE**

This is to certify that on this 13th day of February, 2004, a copy of the foregoing has been mailed, postage prepaid, to the following:

>Gregg D. Adler, Esq.
>Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.
>557 Prospect Avenue
>Hartford, CT 06105-2922

_____
Stephen B. Harris

\7377\201\446081.1