UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CINDY SLANE, | ) | |
| Plaintiff, | ) | Civil No. 3:02 CV 00821 (AWT) |
| | ) | |
| v. | ) | |
| | ) | |
| QUINNIPIAC UNIVERSITY | ) | |
| SCHOOL OF LAW | ) | February 13, 2004 |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

This case is brought by plaintiff Cindy Slane against her current employer, Quinnipiac University School of Law ("QUSL" or "Law School"). The gravamen of plaintiff's complaint is that from the commencement of her employment as director of QUSL's externship programs in 1994 to the present she has been discriminated against on the basis of gender with regard to her compensation. She further asserts that QUSL retaliated against her after she filed a charge of employment discrimination, supposedly by failing to adjust her salary to an appropriate level and by offering her a salary increase for the 2002/2003 academic year below the average increase offered to other QUSL faculty.

In her First Amended Complaint dated July 24, 2002 ("Complaint"), plaintiff alleges a variety of legal claims: that QUSL discriminated against her, and continues to discriminate against her, on account of her gender in violation of the Equal Pay Act of 1964, 29 U.S.C. § 206(d)("EPA"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e and

the Civil Rights Act of 1991 ("Title VII") and Connecticut General Statute § 46a-60 *et seq.*
(Counts 1, 2 and 4); and that QUSL unlawfully retaliated against her in violation of Title VII and
Connecticut General Statute § 46a-60(a)(3)[sic] (Counts 3 and 5). QUSL now moves for
summary judgment with respect to the entirety of the Complaint.

Plaintiff cannot even state a *prima facie* case under the EPA inasmuch as it is undisputed
that she and Leslie Book ("Book") – the former QUSL professor with whom she compares
herself for purposes of this lawsuit – did *not* perform equal work on jobs requiring equal skill,
effort and responsibility. Even if this fatal flaw is ignored, QUSL is still entitled to summary
judgment on the EPA claim because the pay differential that existed between plaintiff and Book
was based upon legitimate reasons having nothing whatsoever to do with gender. Rather, the
undisputed evidence in this case is that plaintiff's and Book's salary histories are products of the
unique and undisputed sets of facts and circumstances under which each of them was hired.
Plaintiff's claim of unequal pay for equal work under Title VII and Connecticut General Statute
§ 46a-60 *et seq.* is deficient for precisely these same reasons. Furthermore, QUSL is entitled to
judgment on these claims for the additional reason that plaintiff has not and cannot adduce any
evidence of discriminatory animus on the part of QUSL, as these statutes require.

Finally, QUSL is entitled to summary judgment on plaintiff's retaliation claims under
Title VII and Connecticut General Statute § 46a-60(a)(3)[sic] for at least three reasons: (1)
plaintiff's theory of retaliation improperly relies upon inadmissible evidence of settlement
negotiations; indeed, plaintiff's novel theory that QUSL retaliated against her after she filed a
complaint by failing to adjust her salary more than it did is so entirely dependent on conduct and
statements made during settlement discussions that, without that evidence, the retaliation claim
completely collapses; (2) however, even when this inadmissible evidence is considered, plaintiff

still cannot establish a *prima facie* case of retaliation under Title VII or Connecticut law; and (3)

QUSL's employment decisions are supported by legitimate, nondiscriminatory reasons. Each of

the foregoing arguments is set forth in more detail below.

## II.    FACTS

Neil Cogan ("Cogan") served as Dean of QUSL from July 1993 through June 2000.

(Local Rule 56(a)1 Statement of Undisputed Facts, at ¶2).[1]  Cogan testified that, while he was

Dean, he recommended changes to QUSL's externship programs, including the addition of a

full-time director. (Undisputed Facts, at ¶ 5).  In August 1994, Cogan hired plaintiff for the

newly-formed and experimental position of Visiting Instructor of Law and Director of Field

Placement Programs ("Externship Director") at an annual salary of $40,000.  (Undisputed Facts,

at ¶¶ 6 & 16).  At the time plaintiff was hired, it was uncertain whether QUSL's faculty would

approve the continuation of the externship programs in the model Cogan had recommended.

(Undisputed Facts, at ¶ 16).  Plaintiff's initial salary was greater than that paid to QUSL's legal

writing instructors but less than that paid to tenured faculty.  (Id.).  Cogan's recommendation

with regard to plaintiff's initial salary had to be approved by Quinnipiac University's ("QU")

Provost, John Bennett ("Bennett"), as did all of Cogan's recommendations concerning salary

offers and salary increases to new and existing QUSL faculty.  (Undisputed Facts, at ¶ 15).

In September 1996, Cogan recommended that QUSL's externship programs be made

permanent and that plaintiff be hired to continue as Externship Director.  (Undisputed Facts, at ¶

18).  QUSL's faculty subsequently voted to extend plaintiff a 5-year contract as Externship

Director, giving her the option to request that the position be converted to tenure-track when and

---

[1] QUSL's Local Rule 56(a)1 Statement of Undisputed Facts, filed herewith, is hereinafter referred to as "Undisputed Facts, at ¶ __."

if she so desired. To date, plaintiff has chosen for personal reasons to remain off the tenure track, and has not asked that her position be converted. (Undisputed Facts, at ¶ 19).

Plaintiff's responsibilities as Externship Director include the following: identifying and developing placement sites in the legal community where QUSL students work during each semester; assessing the quality of the placement sites; advertising, soliciting applications, and selecting QUSL students for the externship programs; reviewing and critiquing students' written work generated at the placement sites; visiting each placement site once per semester; and teaching the seminar component of the externship programs (Undisputed Facts, at ¶¶ 7-9, 13 & 14). Plaintiff testified that she does not assist QUSL's externship students with the substantive legal work they perform at their placement sites; nor does she practice law, represent clients or serve as counsel-of-record in any legal matters. (Undisputed Facts, at ¶¶ 10-11). Accordingly, QUSL is not required to maintain professional malpractice insurance on plaintiff's behalf. (Undisputed Facts, at ¶ 12). According to plaintiff, while she has been employed by QUSL, there have been between 40 and 61 students enrolled in the externship programs each semester. (Undisputed Facts, at ¶ 9).

During his deposition, Cogan testified that, while he was Dean of QUSL, he routinely recommended that plaintiff receive annual salary increases in excess of the average salary increases offered to QUSL faculty. (Undisputed Facts, at ¶17). Plaintiff's salary history with QUSL is as follows: 1994/1995 = $40,000; 1995/1996 = $45,000; 1996/1997 = $48,000; $1997/1998 = $54,000 (prorated to $10,000 due to a leave of absence); 1998/1999 = $58,000 (prorated to $46,400 due to her return from a leave of absence at a reduced course load); 1999/2000 = $59,750; 2000/2001 = $59,750; 2001/2002 = $62,590; 2002/2003 = $63,216. (Undisputed Facts, at ¶ 54).

During the 1997/1998 academic year, when plaintiff was on a leave of absence, Cogan hired Richard Emmanuel ("Emmanuel") to fill plaintiff's position and recommended that he receive a salary identical to plaintiff's. (Undisputed Facts, at ¶ 21).

In 1997, QUSL undertook a search for a director of its on-campus Tax Clinic ("Tax Director"). Cogan testified that, at the time, QUSL's faculty and administration were concerned that the Tax Clinic would have to close if the Law School was unable to fill the position of Tax Director. (Undisputed Facts, at ¶ 25). QUSL Professor Mary Wenig ("Wenig") met Leslie Book during a meeting of the American Bar Association's Tax Section and thought he was a good candidate for the job. (Undisputed Facts, at ¶ 23). Book has an LL.M. in Taxation and was working as an associate in the New York City law firm of Baker & McKenzie, where he earned an annual salary of $145,000. (Undisputed Facts, at ¶ 22). Book interviewed for the Tax Director position with Wenig and QUSL Professors Mary Ferrari ("Ferrari") and Toni Robinson ("Robinson"), among others. (Undisputed Facts, at ¶ 23). Following Book's interview sessions, Wenig, Ferrari and Robinson advised Cogan of their enthusiastic support for Book and recommended that he be hired as Tax Director. (Id.)

Subsequently, Book and Cogan discussed the parameters of the job of Tax Director. (Undisputed Facts, at ¶ 24). Book advised Cogan that he had received a competing offer from the Internal Revenue Service, which included a starting salary in the high eighty-thousand dollar range. (Id.). Book also emphasized that he was interested in a tenure-track position and was reluctant to leave his position in New York City to accept a non-tenure track position at QUSL. (Id.). Cogan assured Book that he would support his research and writing efforts by providing him with a research assistant and summer stipends. (Id.). Cogan further assured Book that he would support the conversion of the Tax Director's position to a tenure-track position, provided

- 5 -

Book was able to fulfill the scholarship requirements of such a position. (Id.). According to Book, Cogan's representations about his ability to seek tenure were an important factor in his decision to accept the Tax Director position. (Id.).

In August 1997, Cogan hired Book as Tax Director at an annual salary of $75,000. (Undisputed Facts, at ¶ 25). As Tax Director, Book was responsible for the operation of QUSL's on-campus Tax Clinic and the supervision of the students enrolled in the clinic. (Undisputed Facts, at ¶ 26). Book served as counsel-of-record for all of the Tax Clinic's clients. (Undisputed Facts, at ¶ 28). He handled legal matters and appeared in court on behalf of the Tax Clinic's clients. (Undisputed Facts, at ¶ 29). Book also taught a course that included the substantive and procedural aspects of tax law, and which was designed to prepare QUSL students to represent individuals in tax controversies. (Undisputed Facts, at ¶ 26). Cogan characterized the relationship between Book and the QUSL students enrolled in the Tax Clinic as being similar to that between a partner and the associates in a law firm. (Undisputed Facts, at ¶ 27). On account of the Tax Clinic's caseload and the intensity of the work performed by the clinic, Book typically supervised only 8 to 10 students each semester. (Id.). Book testified that he was responsible for handling the Tax Clinic's on-going cases during the summer months when QUSL was not in session. (Undisputed Facts, at ¶ 30). During his employment with QUSL, Book submitted two written proposals for research grants, which were approved. (Undisputed Facts, at ¶ 31). According to Book, some of the written work he produced while he was employed by QUSL has been published. (Id.). Book also presented the results of his research to QUSL's faculty. (Id.). Book left QUSL following the 1999/2000 academic year in order to accept a position with the Villanova University School of Law as an Associate Professor of Law and Director of its Federal Tax Clinic. (Id.).

- 6 -

In or about May 2000, plaintiff and QUSL Professor Carolyn Kaas ("Kaas") learned what Book was being paid. In response, on May 26, 2000, and after consulting with legal counsel, they wrote to Cogan concerning their belief that they were unfairly compensated on the basis of gender. (Undisputed Facts, at ¶ 32). Four days later, on May 30, 2000, plaintiff and Kaas met with Cogan in his office to discuss their salary concerns. (Undisputed Facts, at ¶ 33). According to Kaas, during the meeting, Cogan denied any discrimination and explained that there is no formal process for setting faculty salaries at QUSL; rather, the Law School pays candidates the salaries required to obtain their services. (Id.). Cogan further explained that it is not possible for QUSL to adjust the salaries of all existing faculty members on an ongoing basis in order to match the salary offered to a new faculty member. (Id.). In this meeting, Cogan further described how he had been under pressure from QUSL's faculty to hire Book as Tax Director and provided specific examples of female faculty members whom he had hired who were highly paid. (Id.).

Cogan testified that, because his tenure as Dean was ending in only a few weeks, on June 30, 2000, he had no real ability or authority to address plaintiff's and Kaas's salary concerns. (Undisputed Facts, at ¶ 34). Cogan agreed, however, to present their concerns to incoming Interim Dean David King ("King"). (Id.). Accordingly, the following day, Cogan sent an email message to plaintiff and Kaas entitled "Draft," and which he proposed to send to King after plaintiff and Kaas provided some background information. (Id.). Specifically, Cogan requested information concerning Book's starting salary at QUSL and his teaching experience. (Id.). According to Cogan, at the time he drafted the email message he was attempting to serve as an advocate on plaintiff's and Kaas's behalf in order to secure for them salary increases. (Id.).

On June 2, 2000, plaintiff and Kaas responded to Cogan's email message via letter. (Undisputed Facts, at ¶ 35). In their letter, plaintiff and Kaas recommended substantial revisions to Cogan's draft email message. Specifically, they edited Cogan's draft to incorporate the allegations of their May 26, 2000 letter that their salaries are the product of gender discrimination, making it appear that Cogan was admitting that discrimination had occurred. (Id.). Later that day, Cogan responded to plaintiff's and Kaas's letter via email. (Undisputed Facts, at ¶ 36). In his email message, Cogan expressly disclaimed the arguments and conclusions set forth in plaintiff's and Kaas's June 2, 2000 revision, as well as any suggestion that he is guilty of gender discrimination. (Id.). In responding to the revision, Cogan further explained that there were many neutral educational and business reasons which precluded him from recommending that plaintiff receive a salary increase of approximately $30,000 at the time Book was hired, and that QU's Provost would never have agreed to such an increase even if he had. (Id.). Cogan also took the opportunity to reiterate the examples of female faculty and staff whom he had treated favorably. (Id.). Shortly thereafter, plaintiff and Kaas sent a memorandum to Cogan in which they reassured him that they did not expect him to admit to any gender discrimination and clarified that their discrimination claims were based solely upon their perception that the salaries of QUSL faculty break down along gender lines. (Undisputed Facts, at ¶ 37).

On July 26, 2000, plaintiff and Kaas met briefly with King in his office to address their salary concerns. (Undisputed Facts, at ¶ 38). During the meeting, they provided King with a copy of their May 26, 2000 letter to Cogan alleging gender discrimination. Interestingly, plaintiff and Kaas chose not to share their subsequent correspondence and email communications with Cogan, described above. (Id.). Plaintiff recalled that King advised them that, being new to

the Dean's role, he still was unfamiliar with the salary structure at QUSL or the relevant faculty

community for purposes of a comparison of plaintiff's salary. (Id.). King stated, however, that

his initial impression was that plaintiff was "somewhat" underpaid. (Id.). King agreed to present

plaintiff's and Kaas's salary concerns to Edward Kavanagh ("Kavanagh"), QU's Interim Chief

Academic Officer. (Id.).

King testified that, following the July 26, 2000 meeting, he reviewed the salaries of

QUSL's faculty and reported to Kavanagh that it was his opinion that plaintiff was underpaid.

(Undisputed Facts, at ¶ 39). King, however, did not express any opinion with regard to what he

believed plaintiff's salary should be. (Id.). Kavanagh instructed King to ask plaintiff to provide

QUSL with information concerning her conception of an appropriate salary and entitlement to

back pay. (Id.).

On July 27, 2000, King met with plaintiff and Kaas and requested that plaintiff provide

QUSL with information concerning her alleged damages. (Undisputed Facts, at ¶ 40). Three

months later, by letter dated October 24, 2000, plaintiff provided King with a broad outline of

her alleged damages. (Undisputed Facts, at ¶ 41). Plaintiff also advised King that unless her

salary concerns were resolved to her satisfaction within two weeks, she would file an

administrative complaint against QUSL with the Connecticut Commission on Human Rights and

Opportunities ("CCHRO"). (Id.).

King then met with Kavanagh to discuss plaintiff's October 24, 2000 letter. (Undisputed

Facts, at ¶ 42). Kavanagh instructed King to prepare a response to plaintiff's letter either by way

of agreement or a counterproposal. (Id.). According to King, he reviewed the salary structure at

QUSL for a second time and arrived at what he believed was a fair adjustment of plaintiff's

salary, i.e., to $70,000 per year. (Undisputed Facts, at ¶¶ 42 & 44).

Plaintiff did, in fact, file a complaint of gender discrimination with the CCHRO on November 6, 2000. Compl. & Answer ¶ 23. On January 9, 2001, plaintiff, Kaas, King and Kavanagh met to negotiate plaintiff's salary concerns. (Undisputed Facts, at ¶ 44). Plaintiff understood that the purpose of the meeting was to discuss settlement of her discrimination claim and made it known she was representing herself in a *pro se* capacity. (Id.). During the meeting, King communicated QUSL's proposal to adjust plaintiff's salary to $70,000 per year. (Id.). Plaintiff, however, rejected the offer out-of-hand because she found it unacceptable to receive a salary less than that which Book would have been paid had he remained at the Law School. (Id.). In addition, it was plaintiff's desire that QU undertake a review of the entire salary structure for QUSL's clinical faculty. (Id.).

On February 18, 2001, plaintiff wrote to King regarding QUSL's settlement proposal. (Undisputed Facts, at ¶ 45). In her letter, plaintiff characterizes QUSL's offer to adjust her salary to $70,000 as an "[un]reasonable response" and details the "essential elements" of her settlement position, including adjustments to other faculty salaries, an "independent review of faculty salaries to verify that the . . . QUSL faculty salary structure . . . evidence[s] gender-neutral policies and practices" and payment of her attorney's fees. (Id.).

On May 7, 2001, QUSL's counsel sent plaintiff a letter communicating a second settlement proposal. (Undisputed Facts, at ¶ 46). Pursuant to the proposal, QUSL offered to adjust plaintiff's salary to $80,000 per year and provide her a lump sum payment of $52,079.25 to compensate her for her alleged back pay damages. (Id.). Plaintiff, however, rejected the offer. (Id.).

In March 2002, and following a mandatory mediation conference before the CCHRO, QUSL communicated a third settlement proposal to plaintiff. (Undisputed Facts, at ¶ 48).

QUSL proposed to adjust plaintiff's annual salary to $85,000 and to provide her with a lump sum payment of $59,626.01 to compensate her for her alleged back pay damages. (Id.). Again, however, plaintiff rejected the offer. (Id.).

During the spring 2002 semester, plaintiff was on a sabbatical in order to pursue various scholarly projects. (Undisputed Facts, at ¶¶ 43 & 47). On May 19, 2002, King sent an email message to plaintiff requesting that she provide him with information concerning her scholarly accomplishments during her sabbatical. (Undisputed Facts, at ¶ 49). One month later, on June 19, 2001, plaintiff provided King with a document entitled "Supplemental Professional Report," which describes three of plaintiff's scholarly activities during her sabbatical. (Undisputed Facts, at ¶ 50). According to plaintiff, the only written work product she produced during her sabbatical was a revision to a previously written opinion concerning lawyers' relationships with title insurance companies, a preliminary outline for an article concerning mandatory clinical education in law schools, and approximately three pages of written testimony for presentation to Connecticut's Judiciary Committee in connection with her work for the Permanent Commission on the Status of Women. (Id.). King testified that he recommended that plaintiff receive a salary increase of approximately one percent for the 2002/2003 academic year on account of her limited scholarly accomplishments during her sabbatical. (Undisputed Facts, at ¶ 51). King further testified that he consulted with Kathleen McCourt ("McCourt"), QU's Vice President for Academic Affairs, concerning plaintiff's salary increase for the 2002/2003 academic year. (Id.).

## III.    LAW AND ARGUMENT

### A.    Legal standard.

Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue of material fact and that the moving party is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is 'material' for

these purposes if it 'might affect the outcome of the suit under the governing law [while] [a]n

issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of America*, 234 F.3d 92, 97 (2d Cir.

2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In assessing the record to determine whether genuine issues of material fact are in

dispute, a court must resolve all ambiguities and draw all reasonable factual inferences in favor

of the non-moving party. *See Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003). "Although

the moving party bears the initial burden of establishing that there are no genuine issues of

material fact, once such a showing is made, the non-movant must 'set forth specific facts

showing that there is a genuine issue for trial.'" *Weinstock v. Columbia University*, 224 F.3d 33,

41 (2d Cir. 2000), *cert. denied*, 124 S. Ct. 53 (2003) (quoting *Anderson*, 477 U.S. at 256). The

non-moving party, however, may not "rest upon . . . mere allegations or denials." *St. Pierre v.*

*Dyer*, 208 F.3d 394, 404 (2d Cir. 2000); *see also Savino v. City of New York*, 331 F.3d 63, 71 (2d

Cir. 2003)(quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986))("[I]n order to avoid summary judgment, the nonmoving party 'must do more than simply

show that there is some metaphysical doubt as to the material facts"). "Statements that are

devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly

supported motion for summary judgment." *Bickerstaff v. Vasser College*, 196 F.3d 435, 452 (2d

Cir. 1999), *cert. denied*, 530 U.S. 1242 (2000); *see also Scotto v. Almenas*, 143 F.3d 105, 114

(2d Cir. 1998)("If the evidence [presented by the non-moving party] is merely colorable, or is

- 12 -

not significantly probative, summary judgment may be granted")(Internal quotation marks
omitted; alteration in original).

**B.    QUSL is entitled to summary judgment with respect to plaintiff's EPA claim.**

**1.    Plaintiff cannot establish a *prima facie* case under the EPA.**

QUSL is entitled to summary judgment on plaintiff's EPA claim because there is no
genuine issue as to the fact that she and Book had different jobs requiring different degrees of
skill, effort and responsibility.

The EPA prohibits an employer from discriminating against an employee on the basis of
gender by paying higher wages to employees of the opposite sex for "equal work on jobs the
performance of which requires equal skill, effort, and responsibility, and which are performed
under similar working conditions." 29 U.S.C. § 206(d)(1).  Accordingly, in order to establish a
*prima facie* case under the EPA, an employee must prove the following three elements: (1) that
the employer pays different wages to employees of the opposite sex; (2) that the employees
perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) that the jobs
are performed under similar working conditions. *See Belfi v. Prendergast*, 191 F.3d 129, 135 (2d
Cir. 1999); *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974).  With regard to the
second element, "[a] plaintiff need not demonstrate that her job is identical to a higher paid
position, but only must show that the two positions are 'substantially equal'" in skill, effort, and
responsibility. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310 (2d Cir. 1995).  "However, jobs which
are 'merely comparable' are insufficient to satisfy a plaintiff's *prima facie* burden." *Id.*  "[T]he
standard for determining whether jobs are equal in terms of skill, effort, and responsibility is
high." *Heap v. County of Schenectady*, 214 F.Supp.2d 263, 271 (N.D.N.Y. 2002)(quoting
*Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 592 (11th Cir.), *cert. denied*, 513 U.S. 919

(1994)).  Even if it is assumed for purposes of this motion that plaintiff can establish the other two elements of her *prima facie* case, she cannot come close to satisfying the EPA's demanding requirement of proving that she and Book performed equal work on jobs requiring equal skill, effort and responsibility.

Because of its exacting standards, several Circuit Courts of Appeals have rejected EPA claims by teachers and professors against academic institutions.  For instance, in *Soble v. University of Maryland*, 778 F.2d 164 (4th Cir. 1985), the Fourth Circuit upheld summary judgment in favor of a university concerning a professor's EPA claim.  In *Soble*, the plaintiff, a tenured female Assistant Professor in the university's school of dentistry, alleged that she was paid less than similarly situated male faculty members who also held the rank of Assistant Professor.  *Id.* at 167.  The court affirmed the district court's determination that plaintiff had not produced evidence that she performed "work substantially equal in skill, effort, and responsibility . . . as that performed by male Assistant Professors in her department."  *Id.*  In so doing, the court recognized that plaintiff held degrees only in the fields of Sociology and Social Work and that all of the other departments at the university were "highly specialized and require[d] distinct skills foreclosing any comparison [plaintiff] might make."  *Id.*  The court further recognized that all of the Assistant Professors in plaintiff's department, except one, had degrees in dentistry and that the only other non-dentist was a male with a Master's Degree in Business Administration who carried a considerably heavier teaching load than plaintiff.  *Id.* Under these circumstances, the court held that plaintiff could not rest her EPA claim upon the bare allegation that she was receiving lower pay than male members of the dental faculty for comparable work, and that the university was entitled to judgment as a matter of law.  *Id.*

Similarly, in *Horner v. Mary Institute*, 613 F.2d 706 (8th Cir. 1980), the Eighth Circuit

considered a claim by a physical education teacher that she was paid less than a similarly situated

male teacher. The court upheld the district court's determination that the plaintiff had failed to

establish that her job required substantially equal skill, effort, and responsibility as that of her

male comparator. The court recognized that while the jobs were "superficially identical"

inasmuch as both involved teaching physical education, the "consideration of equal pay

standards is based on actual job requirements and performance, not on job classifications or

titles." *Id.* at 714. Because the "work actually required of [the male teacher] was different from

that actually required of [plaintiff]," plaintiff could not make out a *prima facie* case under the

EPA. *Id.* For example, the court found that the male teacher's job required more experience,

training, and ability, and that the jobs differed "in terms of degree of accountability and the

importance of job obligation." *Id.*

Finally, in *Spaulding v. University of Washington*, 740 F.2d 686 (9th Cir.), *cert. denied*,

469 U.S. 1036 (1984), another equal pay case arising in an academic setting, the Ninth Circuit

upheld the dismissal of an EPA claim brought by several past and present members of a

university's nursing faculty. The plaintiffs had sought to compare themselves with male faculty

members in other schools at the university. The plaintiffs had selected the other schools as

comparators, in part, because they were "professional schools 'with a degree mix similar to the

school of nursing with practice related activities, where students are frequently put into clinical

settings under faculty supervision.'" *Id.* at 697. The court affirmed the district court's

determination that plaintiffs' statistical evidence of a pay disparity between themselves and their

male comparators was insufficient to establish a *prima facie* case under the EPA in the absence

of proof that the "actual day-to-day responsibilities, skill, and effort required of the male

comparators were substantially equal to that of the nursing faculty." *Id.* at 698. *See also Tomka*, 66 F.3d 1295, 1310 (affirming summary judgment for employer with regard to plaintiff's EPA claim that she was paid unequal wages as compared with two district managers who had greater responsibility than plaintiff and where plaintiff "set forth no specific facts to indicate that she performed substantially equal work to either of the two named district managers"); *Heap*, 214 F.Supp.2d at 271 (granting summary judgment for employer on EPA claim where plaintiff and male comparator performed many of the same job duties but male comparator performed additional duties not assigned to plaintiff).

Here, there is no dispute that plaintiff and Book performed different jobs. As previously discussed, Book served as Director of the Law School's on-campus Tax Clinic. (Undisputed Facts, at ¶ 26). In that role, he was responsible for the representation of the Tax Clinic's clients and appeared in court on their behalf. (Undisputed Facts, at ¶¶ 28 & 29). Book supervised the students enrolled in the Tax Clinic and instructed them in the substantive and procedural aspects of tax law in order that they could represent the Tax Clinic's clients in various tax controversies. (Undisputed Facts, at ¶ 26). Thus, Book, like the male comparators in *Soble*, performed "specialized" work in the field of tax law for which he utilized the knowledge he acquired while pursuing an advanced degree in tax law and while working as a tax lawyer in New York City. Furthermore, as in *Horner*, there are significant differences here in "accountability" between plaintiff and her comparator. As Director of the Tax Clinic, Book was ultimately responsible for the representation of each of the Tax Clinic's clients in legal proceedings, and the direct supervision of Clinic students involved in those proceedings. Plaintiff, on the other hand, as Director of QUSL's externship programs, herself acknowledges that she performs a job that is predominantly administrative in nature. She readily concedes (as she must) that, unlike Book,

she does not assist students with substantive legal work; nor does she represent clients, serve as counsel-of-record in any legal matters, or otherwise practice law in the traditional sense. (Undisputed Facts, at ¶¶ 8 & 10-11). Rather, she acknowledges that her essential duties are to identify and develop placement sites in the local legal community where QUSL students work each semester, to assess the quality of the placement sites, to review and critique students' written work generated at the placement sites, to visit each placement site once per semester, and to teach the seminar component of the externship programs. (Undisputed Facts, at ¶¶ 7, 9, 13-14). Accordingly, plaintiff herself has conceded that she and Book did not perform jobs that are substantially equal in skill, effort, and responsibility, dooming her EPA claim to failure. *See Tomka*, 66 F.3d at 1310.

Moreover, to the extent plaintiff attempts to suggest or to assert that her job and Book's job, despite their significant differences, are of comparable value or worth to QUSL, her claim still must fail as federal courts have roundly rejected any such theory of liability. *See Conn. Employees Assn. v. State of Conn.*, 31 FEP Cases 191, 193 (D. Conn. 1983)("This Court will not engage in a subjective comparison of the intrinsic worth of various dissimilar jobs"); *Hodgson v. Corning Glass Works*, 474 F.2d 226, 231 (2d Cir. 1973), *aff'd*, 417 U.S. 188 (1974)("Congress did not intend to put either the Secretary [of Labor] or the courts in the business of evaluating jobs and determining what constituted a proper differential for unequal work"); *Horner*, 613 F.2d at 715 ("We note that judicial determination of the relative economic value of unequal work may be particularly ill-advised in the context of faculty salaries in a private school").

For all of the foregoing reasons, plaintiff cannot establish a *prima facie* case of discrimination under the EPA.

2.    **The pay differential between plaintiff and Book is based on factors other than gender.**

Even if one ignores the fatal defects discussed above and assumes for the sake of

argument all the elements of a *prima facie* case under the EPA, QUSL *still* is entitled to

summary judgment because it is undisputed that the Law School's decision to offer different

salaries to plaintiff and Book was wholly unrelated to gender.

"Once the plaintiff makes out a *prima facie* case [under the EPA], the burden of

persuasion shifts to the employer to prove that the disparity is justified by . . . a differential based

on any other factor other than sex. . . . An employer who attempts to justify a pay differential

based on a 'factor other than sex' must also prove that the gender-neutral factor was adopted for

a legitimate business reason." *Tomka*, 66 F.3d at 1310 (Citations omitted).

As discussed in detail above, when plaintiff was hired as QUSL's first-ever full-time

Externship Director on a provisional basis in 1994, the future of the Law School's externship

programs was far from certain. (Undisputed Facts, at ¶ 16). That certainty would not come until

1996 when QUSL's faculty voted to continue the Law School's externship programs in their

existing model and to offer plaintiff a 5-year contract as Externship Director. (Undisputed Facts,

at ¶¶ 18-19). Accordingly, Cogan's decision to offer plaintiff an initial salary greater than that

paid to QUSL's legal writing instructors but less than that paid to the Law School's tenured

professors of law who taught doctrinal legal courses is eminently reasonable. (Undisputed Facts,

at ¶ 16). Moreover, once plaintiff's initial salary was established, Cogan was without authority

to modify it significantly. (Undisputed Facts, at ¶ 15). Rather, all of Cogan's recommendations

for adjustments to the salary levels of existing faculty members were constrained by the

applicable raise pool allocated each year to QUSL for all Law School faculty and required

approval from QU's Provost. (Id.).