The circumstances under which Book was hired were vastly different than those under which plaintiff was hired, irrefutably demonstrating the gender-neutral reasons supporting Book's higher initial salary. When Book was hired in 1997, QUSL's Tax Clinic was among the oldest continuously running tax clinics in the country and was in danger of extinction if a new Tax Director was not hired. (Undisputed Facts, at ¶ 25). It is undisputed that the two female QUSL tax professors responsible for operation of the Tax Clinic interviewed Book, believed him to be an outstanding candidate, conveyed to Cogan their wholehearted support and urged Cogan to hire him. (Undisputed Facts, at ¶ 23). Moreover, during preliminary discussions with Cogan, Book mentioned that he had received a job offer from the Internal Revenue Service with a corresponding salary in the high eighty-thousand dollar range. (Undisputed Facts, at ¶ 24). Book further advised Cogan that he was reluctant to leave his position as an associate with a New York City law firm to accept a non-tenure track position with QUSL. (Id.). Given these undisputed facts, it was entirely reasonable for Cogan to offer Book a salary of $75,000 in hopes of convincing him to accept the position of Tax Director and hence assure the clinic's continued existence. (Undisputed Facts, at ¶ 25). *See Horner*, 613 F.2d at 714 (employer proved salary differential based on a factor other than sex where it paid male employee higher salary "not because [he] was male but because [his] experience and ability made him the best person available for the job and because a higher salary was necessary to hire him"); *Winkes v. Brown University*, 747 F.2d 792 (1st Cir. 1984)(reversing judgment for male professor on EPA claim where female professor had received an offer from another university and employer sought to match offer in order to retain female professor's services). Moreover, as with plaintiff, Book's subsequent salary increases were dictated by his hire-in rate. (Undisputed Facts, at ¶ 15).

The undisputed record evidence conclusively establishes that any disparities between plaintiff's and Book's salary histories were solely the result of the nature of their jobs and the unique and undisputed circumstances under which each was hired. Indeed, when plaintiff first brought her salary concerns to Cogan's attention in late May and early June of 2000, Cogan explained that his salary decisions were not gender-based, but the result of the factors just described. (Undisputed Facts, at ¶ 33-34 & 36). For instance, Cogan explained the informal nature of QUSL's salary policies with regard to new faculty members, the pressure he had been under from QUSL's faculty to hire Book, and the manner in which faculty salaries are guided by initial hire-in rates. (Id.).

This undisputed evidence concerning factors other than sex that led to the hiring of Book at a salary higher than plaintiff similarly compels summary judgment for QUSL.

### C.    QUSL is entitled to summary judgment with respect to plaintiff's claims under Title VII and Connecticut General Statute § 46a-60 *et seq.*

Plaintiff relies upon the same facts alleged to support her EPA claim to support her claims of gender discrimination under Title VII and Connecticut General Statute § 46a-60 *et seq.* Plaintiff's causes of action under Title VII and Connecticut law, however, are unsustainable for the same reason as is her EPA claim, i.e., she and Book did not perform substantially equal jobs.[2] Moreover, plaintiff cannot adduce any evidence whatsoever of a discriminatory intent on the part

---

[2] "It is well-settled that the same legal standards apply to claims under [Connecticut General Statute § 46a-60 *et seq.*] as to claims under Title VII." *Sedotto v. Borg-Warner Protective Services Corp.*, 94 F.Supp.2d 251, 268 (D. Conn. 2000); *see also Levy v. Commission on Human Rights and Opportunities*, 35 Conn. App. 474, 480 (1994), *aff'd*, 236 Conn. 96 (1996)("We look to federal employment discrimination law for guidance in enforcing our own antidiscrimination statute"). Accordingly, the arguments set forth herein with regard to plaintiff's Title VII claims apply equally to her claims under Connecticut law.

of Cogan or any other individual who participated in the decision-making process concerning her salary.

The Second Circuit has recognized that "[a] claim of unequal pay for equal work under Title VII and [state law] is generally analyzed under the same standards used in an EPA claim. . . . However, unlike an EPA plaintiff, a Title VII plaintiff must also produce evidence of discriminatory animus in order to make out a prima facie case of intentional sex-based salary discrimination." *Tomka*, 66 F.3d at 1312-13 (Citation omitted). In *Tomka*, the court held that summary judgment was properly granted with respect to plaintiff's Title VII claim where plaintiff failed to produce evidence that her employer paid her less than male employees *because* of her gender and instead relied simply on evidence that male employees were paid more than she was. *Id.* at 1313 (Emphasis added). The court found such bare facts did not support an inference that the employer "acted with a discriminatory intent." *Id.*

In *Belfi*, supra, 191 F.3d at 129, the Second Circuit articulated the elements of a *prima facie* case of unequal pay for equal work under Title VII. The court held that a plaintiff must show that: "(1) she is a member of a protected class; and (2) she was paid less than non-members of her class for work requiring *substantially the same responsibility*. . . . In addition to the requirements that are generally the same as those under the EPA, a 'Title VII plaintiff must also produce evidence of discriminatory animus in order to make out a prima facie case of intentional sex-based salary discrimination.'" *Id.* at 139 (Citation omitted; emphasis added). *See also Lavin-McEleney v. Marist College*, 239 F.3d 476, 483 (2d Cir. 2001)(relying on Eighth Circuit decision for proposition that where plaintiff raises "claim of unequal pay for equal work on the basis of sex, the standards are the same whether plaintiff proceeds under Title VII or the Equal Pay Act" to the extent plaintiff must prove that employer paid different wages to

- 21 -

employees of the opposite sex for equal work on jobs requiring equal skill, effort, and responsibility); *Soble*, 778 F.2d at 167 (granting summary judgment for university on assistant professor's equal pay claim under Title VII for same reasons as EPA claim, i.e., professor did not perform work substantially equal in skill, effort, and responsibility).

As discussed at length in part III(B)(1) above, plaintiff cannot possibly satisfy this requirement, as plaintiff herself concedes most of the substantial differences between her position and that held by Book. Because plaintiff cannot establish that she and Book performed jobs that are substantially equal in skill, effort, and responsibility, her claims of gender discrimination under Title VII and Connecticut law fare no better than do her claims under the EPA.

Moreover, plaintiff has neither alleged any facts nor adduced any evidence to support an inference that Cogan, or any other individual responsible for determining her compensation, harbored a discriminatory animus toward her on account of her gender or that her compensation was influenced by any improper motive. Rather, Cogan, in his June 2, 2000 email message to plaintiff and Kaas, expressly denies any suggestion that he discriminated against plaintiff. (Undisputed Facts, at ¶ 36). It is noteworthy that plaintiff and Kaas responded to Cogan's denials by reassuring him that they did not expect him to admit to any discrimination and by articulating that their discrimination claims are based simply upon their perception that the salaries of QUSL faculty breakdown along gender lines. (Undisputed Facts, at ¶ 37). At no time did plaintiff contend that Cogan engaged in any intentional discrimination. For instance, in a memorandum to Cogan, plaintiff and Kaas state:

> Of course we understand that you don't believe that the decisions that were made with respect to our compensation were the product of gender discrimination and, for that reason, we didn't expect you to make such an admission in your letter. On the other hand, it seems to us that it is unlikely, in these difficult budgetary

> times, that David King, Provost Bennett and the Executive Committee will be
> willing to implement your recommendations with regard to salary going forward,
> or take any action at all to remedy past inequities, if they don't understand the
> nature and seriousness of our claim:  that we see those inequities as breaking
> down along gender lines, rather than along lines of merit, seniority and rank.

(Id.).

Clearly then, there is a complete absence of evidence in the record to support an inference

that QUSL or its agents *intentionally* discriminated against plaintiff.  Instead, plaintiff's claim of

gender discrimination ultimately rests on nothing more than the simple fact that she was paid less

than the former Director of QUSL's Tax Clinic.  As the Second Circuit made clear in *Tomka*,

however, the mere existence of a pay disparity between males and females does not support an

inference of discriminatory intent.  *Tomka*, 66 F.3d at 1313.  *See also Craine v. Trinity College*,

259 Conn. 625 (2002)(remanding to trial court and directing it to grant college's motion for

judgment notwithstanding verdict on former professor's gender discrimination claim under Title

VII and Connecticut law where there was no evidence that discrimination "actually motivated"

college's decision to deny professor tenure).

For all of the foregoing reasons, QUSL is also entitled to summary judgment with respect

to plaintiff's claims of gender discrimination under Title VII and Connecticut law.

### D.    QUSL is entitled to summary judgment with respect to plaintiff's claim of retaliation under Title VII and Connecticut General Statute § 46a-60(a)(3)[sic].

### 1.    Plaintiff cannot rely upon evidence of QUSL's conduct and statements during the course of settlement negotiations to support her claim of retaliation.

Plaintiff contends that QUSL retaliated against her for filing a charge of discrimination

with the CCHRO by "refusing to adjust [her] salary to an appropriate level since July 2000,"

despite acknowledging that her "salary was inappropriate and should be adjusted and despite

[her] request for fair compensation." Compl. ¶¶ 33 & 39. In support of her claim, plaintiff relies principally upon statements allegedly made by former QUSL Deans Cogan and King to the effect that she was underpaid. There is no genuine issue of material fact, however, that any and all alleged representations made by QUSL and its agents with respect to plaintiff's compensation were in response to her allegations of gender discrimination and threats of legal action as initially set forth in her May 26, 2000 letter. Accordingly, any such representations by QUSL were made in the course of settlement negotiations between plaintiff and the Law School and are not admissible to support plaintiff's claim of retaliation.

Rule 408 of the Federal Rules of Evidence provides that "[e]vidence of conduct or statements made in compromise negotiations is . . . inadmissible" to prove liability. Fed. R. Evid. 408. *See also Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 909 (2d Cir. 1997)("Rule 408 bars the admission of statements and conduct made 'in the course of compromise negotiations'"). "The Advisory Committee on Proposed Rules [has] stated that the exclusion of evidence of compromise offers 'may be based on two grounds. (1) The evidence is irrelevant, since the offer may be motivated by a desire for peace rather than from any concession of weakness of position. . . . (2) A more consistently impressive ground is promotion of the public policy favoring the compromise and settlement of disputes.'" *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 827 (2d Cir. 1992). Two factors that are relevant to a determination of whether a statement is made "in compromising or attempting to compromise a claim" are the timing of the statement and the existence of a disputed claim. *Id.*

Plaintiff testified that, on May 26, 2000, and after consulting with her attorney, she and Kaas wrote to Cogan regarding their belief that they had been discriminated against on the basis of gender. (Undisputed Facts, at ¶ 32). In their letter, plaintiff and Kaas state that they "do not

relish a public, judicial airing of the grievances" but nonetheless are "determined . . . to demand compensation for past harm and to insist upon an equitable salary structure for the future. (Id.). It was against this undisputed backdrop that Cogan met with plaintiff on May 30, 2000 to discuss her salary concerns. Accordingly, any statements or representations Cogan made to plaintiff during their May 30, 2000 meeting, or in his subsequent email communications with plaintiff, concerning the merit of her pay claim and/or entitlement to additional compensation must be viewed in their proper context. That is, all of Cogan's communications with plaintiff about her salary were in response to plaintiff's May 26, 2000 letter alleging gender discrimination and threatening legal action. Consequently, plaintiff may not rely upon any so-called admissions by Cogan about her salary to support her claim of retaliation as they were made during the course of settlement negotiations. *See Simone Corp. v. Connecticut Light and Power Co.*, 187 Conn. 487, 490 (1982)(quoting Tait & LaPlante, Handbook of Connecticut Evidence (1976) § 11.5(d)(2), p. 189)("Where it is not clear whether the statement is an offer of compromise or an admission of liability [or other fact] and the motive of the declarant is subject to speculation and conjecture, the statement must be excluded").

Apparently, plaintiff will further attempt to rely upon evidence that, during the summer of 2000, King reached an independent conclusion that she was underpaid. Again, however, any conduct or statements by King with regard to plaintiff's compensation arose in the course of settlement negotiations and, therefore, are not admissible to support plaintiff's retaliation claim. For instance, it is undisputed that, after he met with plaintiff and Kaas on July 26, 2000 and reviewed their May 26, 2000 letter to Cogan, King met with Edward Kavanagh, QU's Interim Chief Academic Officer, to discuss plaintiff's salary concerns. (Undisputed Facts, at ¶¶ 38-39). King further testified that, upon reviewing the salaries of all QUSL faculty, he concluded that

plaintiff was probably "somewhat underpaid." (Undisputed Facts, at ¶ 39). Subsequently, in January 2001, *after* plaintiff provided QUSL with a broad outline of her damages analysis and *after* she filed an administrative complaint with the CCHRO, King and Kavanagh met with plaintiff to communicate QUSL's offer to adjust her salary to a level which King considered "fair" and "appropriate," i.e., to $70,000 per year, and which would resolve plaintiff's discrimination claims. (Undisputed Facts, at ¶¶ 41-42, 44). Plaintiff understood that the purpose of this meeting was to discuss settlement of her discrimination claims and made it known that she was representing herself in a *pro se* capacity with regard to those claims. (Undisputed Facts, at ¶ 44).

Given the foregoing undisputed facts, it is axiomatic that King's consideration of plaintiff's level of compensation, his formulation of an opinion concerning a "fair" and "appropriate" salary for plaintiff, and his communication of a proposal to adjust plaintiff's salary in order to resolve her discrimination claims are responsive to, and inextricably linked with, plaintiff's allegations of gender discrimination and pursuit of legal action against QUSL. Therefore, in accordance with Federal Rule of Evidence 408 and state law, plaintiff may not rely upon evidence of King's conduct or statements made in the course of settlement negotiations to support her claim of retaliation.

2.    **Plaintiff cannot establish a *prima facie* case of retaliation under Title VII or Connecticut law.**

In order to set forth a *prima facie* case of retaliation under Title VII and Connecticut law, plaintiff must show that: (1) she engaged in a protected activity; (2) the employer was aware of that activity; (3) she suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action, i.e., that a retaliatory motive played a part in the adverse employment action. *See Gregory v. Daly*, 243

F.3d 687, 700 (2d Cir. 2001); *Cifra v. General Electric Co.*, 252 F.3d 205, 216 (2d Cir. 2001).
Even if it is assumed that plaintiff could satisfy the first two elements of a *prima facie* case of
retaliation, she cannot satisfy either the third or fourth elements inasmuch as she has not suffered
an adverse employment action; nor is there any causal connection between plaintiff's complaint
of gender discrimination and QUSL's decision to offer her a salary increase of approximately
one percent for the 2002/2003 academic year.

    (a)    **Plaintiff has not experienced an adverse employment action.**

    "For purposes of a Title VII retaliation claim, an 'adverse employment action' constitutes
a 'materially adverse *change*' in the employee's working conditions . . . such as termination,
demotion, or a *reduction* in wages or benefits." *Wilburn v. Fleet Financial Group, Inc.*, 170
F.Supp.2d 219, 236-37 (D. Conn. 2001)(Citation omitted; emphasis added). *See also Torres v.
Pisano*, 116 F.3d 625, 640 (2d Cir.), *cert. denied*, 522 U.S. 997 (1997). The Second Circuit has
recognized that "not every unpleasant matter" creates a cause of action for retaliation.
*Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997).

    In *Richardson v. New York State Dept. of Correctional Service*, 180 F.3d 426 (2d Cir.
1999), the court affirmed summary judgment for an employer concerning an employee's claim
that she was retaliated against for complaining about racial harassment where she received two
evaluations which rated her performance as "average" rather than "excellent." The court found
that the employee failed to establish that the performance reviews constituted an adverse
employment decision. Specifically, the employee failed to provide any evidence as to why she
deserved more favorable evaluations; nor did she explain how the evaluations were unwarranted.
*Id.* at 443. The court held that the employee's "conclusory allegation that she deserved an

excellent, rather than an average, performance rating is insufficient to establish that the evaluations constitute adverse or disadvantageous actions by [the employer.]" *Id.* at 443.

Similarly, in *Monteiro v. United Technologies Corp.*, 119 F.Supp.2d 71 (D. Conn. 2000), the court granted summary judgment in favor of an employer with regard to an employee's claim that he was denied merit raises after he filed a CCHRO complaint. In rejecting the employee's retaliation claim, the court recognized that he received all of the raises to which he was entitled under the applicable union contract and that at least one employee received a lesser raise than he did. *Id.* at 79. *See also Sedotto v. Borg-Warner Protective Services Corp.*, 94 F.Supp.2d 251, 268 (D. Conn. 2000)(granting summary judgment for employer on employee's retaliation claim where employee did not allege any adverse action against her as a result of her complaints of promotions and pay and where she "actually received a raise").

Plaintiff contends that QUSL retaliated against her after she filed a CCHRO complaint by failing to adjust her salary to an "appropriate level" and by failing to offer her a salary increase for the 2002/2003 academic year equivalent to the average increase offered to all QUSL faculty. As a matter of law, however, neither of these so-called employment actions affected a "material adverse change" in plaintiff's working conditions. *See Wilburn*, 170 F.Supp.2d at 236-237. On the contrary, since the inception of plaintiff's administrative complaint with the CCHRO in the fall of 2000, she has continued to perform her job as Externship Director with no attendant loss of salary or benefits. (Undisputed Facts, at ¶¶ 20 & 54). Indeed, even after filing her CCHRO complaint, plaintiff has continued to receive annual salary increases, albeit not as much as she would like. (Undisputed Facts, at ¶ 54). The mere fact that settlement negotiations between plaintiff and QUSL have not yielded a substantial increase in plaintiff's salary does not, as a matter of law, constitute an adverse employment action for purposes of plaintiff's retaliation

- 28 -

claims under Title VII and Connecticut law.  Nor does plaintiff's dissatisfaction with the amount

of her salary increase for the 2002/2003 academic year transform QUSL's decision *to offer her a*

*salary increase* into an adverse employment action.

> **(b)**  **There is no causal connection between plaintiff's complaint of gender discrimination and her 2002/2003 salary increase.**

While plaintiff is unhappy with the level of her salary increases, generally, she has

focused particular attention on the increase offered for the 2002/2003 academic year, following

her sabbatical, which was less than the average increase offered to other QUSL faculty that year.

With respect to this particular challenged salary increase, which occurred more than two years

after she first raised complaints of gender discrimination in May 2000, plaintiff cannot establish

any causal connection between the two events as she must to sustain a retaliation claim.

The causal connection needed for proof of a retaliation claim may be established

"directly through evidence of retaliatory animus directed against a plaintiff" or "indirectly by

showing that the protected activity was followed closely by discriminatory treatment." *DeCintio*

*v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir.), *cert. denied*, 484 U.S. 965 (1987).

*See also Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir. 1996)(causal

connection shown by evidence that time between plaintiff's protected activity and her discharge

"was a mere twelve days"); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir.

1998)(causal connection exists where discharge came less than two months after plaintiff filed

complaint with company and ten days after she filed complaint with the state division of human

rights).

Here, plaintiff cannot establish a causal connection between QUSL's decision to offer her

a salary increase of approximately one percent for the 2002/2003 academic year and plaintiff's

claim of gender discrimination first raised in May 2000.  As an initial matter, plaintiff cannot

adduce any evidence of a retaliatory animus on the part of King or Kathleen McCourt, the two

individuals responsible for formulating plaintiff's 2002/2003 salary offer. Furthermore, it is

undisputed that plaintiff first asserted her claim of gender discrimination in her May 26, 2000

letter to Cogan and that her 2002/2003 salary offer was not determined until June of 2002 – *more

than two years later*. (Undisputed Facts, at ¶¶ 32, 49-51). Even when measured against the

filing of her CCHRO complaint, there is still a gap of over a year and a half between that filing

and the challenged salary increase. The occurrence of these unrelated events over such an

extraordinary time span is insufficient to constitute indirect evidence from which causation may

be found. *See Richardson*, 180 F.3d at 447 ("two year gap" between discharge and filing of

federal lawsuit is "too wide to support" inference of retaliation).

### 3.   QUSL's employment decisions are supported by legitimate, nondiscriminatory reasons.

"Once a *prima facie* case of retaliation is established, the burden of production shifts to

the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action."

*See Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001). As discussed above, plaintiff's

retaliation claim is premised upon (1) the fact that QUSL has not adjusted her salary despite its

alleged acknowledgement that her salary is inappropriate and in need of adjustment; and (2)

QUSL's decision to offer her a salary increase of approximately one percent for the 2002/2003

academic year. As discussed previously, plaintiff cannot adduce any admissible evidence

whatsoever to support her claim that QUSL has not adjusted her salary to an appropriate level

despite its supposed acknowledgement that her salary is in need of adjustment because of the

settlement context in which any such statements were made. However, even if plaintiff is

permitted to support her retaliation claim by relying upon evidence of statements made by Cogan

and King during the course of settlement discussions, and even if it is assumed that plaintiff can

otherwise establish each of the elements of a *prima facie* retaliation case, QUSL is still entitled to summary judgment because the undisputed evidence is that all of its employment actions with regard to plaintiff are supported by legitimate, nondiscriminatory reasons.

The undisputed evidence shows that it was only *after* plaintiff raised allegations of gender discrimination and threatened legal action that the propriety of her salary level ever became a topic of discussion. Although it is undisputed that both Cogan and King made statements in the course of trying to negotiate a resolution to plaintiff's threatened (and later actual) claim to the effect that plaintiff was underpaid, it is also undisputed that neither of them had the authority to adjust plaintiff's salary on their own. (Undisputed Facts, at ¶¶ 15, 51). Even if one assumes for the purposes of this motion that Cogan and King actually believed that plaintiff was underpaid, there is certainly no evidence in the record to suggest that the other people whose approval was necessary to effect a change to her salary shared that opinion. Rather, the evidence could not be more plain that the only reason anyone at QUSL was even talking about plaintiff's salary and offering to increase it is because she was threatening to file, and later did file, a complaint of gender discrimination. And the undisputed evidence further shows that the only reason none of those settlement offers ever was implemented was because plaintiff rejected them.

The following undisputed facts are pertinent to this aspect of plaintiff's claim:

• Plaintiff first raised her claim of gender discrimination with Cogan by way of her May 26, 2000 letter. (Undisputed Facts, at ¶ 32).

• Cogan met with plaintiff on May 30, 2000 to discuss her claim of unfair compensation and later sent her an email message which he proposed to send to King in which he claimed to have erred in setting plaintiff's salary. (Undisputed Facts, at ¶¶ 33-34).

- 31 -

- Approximately two months later, on July 26, 2000, plaintiff presented her salary concerns to Interim Dean King. (Undisputed Facts, at ¶ 38). Following this meeting, King reviewed the salaries of QUSL's faculty and determined that plaintiff was probably underpaid. (Undisputed Facts, at ¶ 39). King met with plaintiff and requested that she prepare an analysis of her alleged damages and conception of an appropriate salary. (Undisputed Facts, at ¶ 40).

- Three months later, plaintiff provided King with an analysis of her alleged damages. (Undisputed Facts, at ¶ 41).

- King then developed what he considered to be a fair proposal to adjust plaintiff's salary, i.e., to $70,000 per year, in order to resolve her discrimination clams. (Undisputed Facts, at ¶¶ 42 & 44).

- On January 9, 2001, King and Kavanagh met with plaintiff to discuss settlement of her gender discrimination claims and to communicate QUSL's proposal to adjust her salary to $70,000 per year. (Undisputed Facts, at ¶ 44). Plaintiff understood that the purpose of the meeting was to discuss settlement of her discrimination claims and made it known that she was representing herself in a *pro se* capacity with regard to those claims. (Id.). During the meeting, plaintiff summarily rejected QUSL's settlement proposal because it did not represent a salary greater than that which Leslie Book would have received had he remained with the Law School. (Id.). Furthermore, plaintiff desired QU to undertake a wholesale review of the salaries of QUSL's clinical faculty. (Id.).

- In her February 18, 2001 letter, plaintiff described QUSL's settlement offer as "unreasonable" and reiterated the components of what she perceived as an appropriate resolution of her claims, including an independent review of faculty salaries and payment of her attorney's fees. (Undisputed Facts, at ¶ 45).

•     Subsequently, QUSL, through its counsel, communicated two additional offers to resolve plaintiff's discrimination claims and which included lump sum payments to compensate her for her alleged loss of back pay. (Undisputed Facts, at ¶¶ 46 & 48). Plaintiff rejected both of these offers as well. (Id.).

There is absolutely no evidence of any improper or retaliatory motive. Initially, it must be reiterated that plaintiff, like other QUSL faculty, has continued to receive annual salary increases, even after she raised her allegations of gender discrimination and filed a complaint with the CCHRO. What these undisputed facts demonstrate beyond question is that plaintiff's salary has not been subject to any *extraordinary* adjustment simply because plaintiff has refused to accept any of the resolutions that have been proposed to address her claims of gender discrimination. It is undisputed that since plaintiff first presented her salary concerns and allegations of gender discrimination to QUSL in May 2000, the Law School has consistently sought to address her concerns and reach an amicable resolution of her claims. In so doing, King undertook a review of all QUSL faculty salaries and presented plaintiff with a proposal to adjust her salary to a level that he deemed "fair" and "appropriate." (Undisputed Facts, at ¶ 42). Plaintiff, however, rejected the offer and characterized it as "unreasonable." (Undisputed Facts, at ¶¶ 44-45). QUSL, through its counsel, continued to negotiate with plaintiff with respect to her salary and indeed presented her with two additional offers to increase her salary – both of which were rejected. (Undisputed Facts, at ¶¶ 46 & 48). Accordingly, the fact that QUSL has not adjusted plaintiff's salary to the level that King determined to be fair and appropriate in order to resolve her claims of discrimination is explained by legitimate, nondiscriminatory reasons.

With respect to plaintiff's salary adjustment for the 2002/2003 academic year, the undisputed evidence is that this was the result of plaintiff's lack of scholarship during her spring

- 33 -

2002 sabbatical – and not by her claims of gender discrimination first made two years earlier.

During her deposition, plaintiff conceded that, notwithstanding the fact that she had requested a

sabbatical in order to "pursue scholarly interests," including an essay on mandatory clinical

education in law schools, a legal interns' supervisor's manual and an article on ethical issues in

student practice, she did not accomplish any of her stated goals. Rather, the only written work

product she produced toward these ends was a preliminary outline concerning mandatory clinical

education. (Undisputed Facts, at ¶¶ 43 & 50). King testified that he consulted with QU's Vice

President for Academic Affairs when formulating plaintiff's salary proposal for the 2002/2003

academic year and that he recommended that plaintiff receive a salary increase of approximately

one percent based upon plaintiff's limited scholarly accomplishments during her spring 2002

sabbatical. (Undisputed Facts, at ¶ 51). King further testified that he recommended that other

QUSL faculty receive less than the average annual salary increase for the 2002/2003 academic

year based upon their substandard performance in the areas of teaching and/or scholarship. (Id.).

Indeed, plaintiff cannot present any evidence that King's stated basis for his recommendation

with respect to her 2002/2003 salary is pretextual. *See Bennett v. Watson Wyatt & Co.*, 136

F.Supp.2d 236, 249-50 (S.D.N.Y. 2001)(granting employer's motion for summary judgment on

employee's race discrimination claim where employer's decision to deny raise was supported by

legitimate, nondiscriminatory reasons in the form of employee's unsatisfactory performance and

where employee did not offer any evidence that a similarly situated white employee was treated

differently then he was); *Craine*, 259 Conn. at 646 ("[T]he issue of pretext is a particularly

thorny one in an academic setting. A court must be careful not to substitute its judgment

improperly for the academic judgment of the school").

## IV.    CONCLUSION

For all of the foregoing reasons, QUSL is entitled to summary judgment with respect to each and every Count of the Complaint.

DEFENDANT
QUINNIPIAC UNIVERSITY
SCHOOL OF LAW

By:    _____

Stephen B. Harris, ct13125
William J. Albinger, ct19861
Wiggin and Dana LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
(203) 498-4400
Its Attorneys

- 35 -

## CERTIFICATE OF SERVICE

This is to certify that on this 13th day of February, 2004, a copy of the foregoing has been

mailed, postage prepaid, to the following:

        Gregg D. Adler, Esq.
        Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.
        557 Prospect Avenue
        Hartford, CT  06105-2922

        _____
        Stephen B. Harris

\7377\201\447402.5

- 36 -