**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

_____
:
CINDY SLANE,                                :        CIVIL ACTION NO.
      Plaintiff,                       :        3:02 CV 00821 (AWT)
                                       :
v.                                          :
                                       :
QUINNIPIAC UNIVERSITY                       :
SCHOOL OF LAW                               :
      Defendant.                       :
_____:        April 30, 2004


**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

I.     INTRODUCTION

      The plaintiff, Cindy Slane, has been employed by the defendant, Quinnipiac

University School of Law ("QUSL" or the "Law School") in the position of Director of Field

Placement (or "Externship") Programs for the past ten years.  She was hired originally as

a Visiting Instructor of Law.  The plaintiff 's externship program was enormously

successful from its inception, to the point that by 1997 it  became a permanent part of

the Law School's clinical education program.  From the fall of 1997 to the present,

Slane's title has been Assistant Clinical Professor of Law and Director of Field

Placement Programs, and she has consistently received accolades from QUSL, from

her peers on the Law School faculty, from outside agencies, and from the Quinnipiac

University ("University") Administration for her work on behalf of QUSL.

      The instant dispute evolved from a happenstance:  During the spring of 2000,

Professor Slane was informed that her peer, Leslie Book, who had been employed since

- 2 -

1997 as Assistant Clinical Professor of Law and Director of the Tax Clinic, apparently was being paid an annual salary that over $25,000 greater than what the plaintiff was receiving.  After talking to Book to confirm what he was paid, Professor Slane and another female member of the clinical faculty, Carolyn Kaas, wrote to the Law School's then-Dean, Neil Cogan, expressing their concerns about salary discrimination based on gender.  Although Cogan, who was about to end his tenure as Dean, did not believe that he had engaged in sex discrimination, he acknowledged that he had erred by setting the plaintiff's salary lower than Professor Book's, stating that "while [the Plaintiff's and Professor Book's] titles were different, their duties and responsibilities were essentially the same."

Although Cogan had expressed his support for pay equity as between Book and the plaintiff, he made no adjustment to the plaintiff's compensation during the remaining weeks of his deanship.  The Plaintiff then raised her concerns with David King, who was serving as Interim Dean for the 2000-2001 academic year.  King admitted that he was shocked when he learned how little Professor Slane was being paid for the work she was performing (the plaintiff's 2000-2001 salary was $59,750), and promised to bring her concerns to Quinnipiac University administrators immediately.

Although King reported to Quinnipiac University's Interim Chief Academic Officer that the plaintiff, in fact, was being underpaid, and that an adjustment should be made to her salary to correct the pay inequity, no adjustment was forthcoming.  Consequently, on or about November 7, 2000, the plaintiff filed her sex discrimination complaint with the Connecticut Commission on Human Rights and Opportunities, solely for the purpose of preserving her claim, as her understanding was that the statute of limitations was to run

- 3 -

on or about November 13, 2000 (180 days from when she first learned of the salary

disparity between herself and Professor Book).  Despite the fact that both Cogan and

King acknowledged in 2000 that the plaintiff's salary was not commensurate with her

duties and responsibilities and that this inequity should be corrected, the pay disparity

has never been addressed: the only changes to the plaintiff's salary implemented during

the past four years have been merit raises ostensibly based on performance.  The

plaintiff's current salary is $65,150.

The complaint alleges three distinct causes of action, under Title VII, the Equal

Pay Act ("EPA"), and the Connecticut Fair Employment Practices Act ("CFEPA").  The

essence of the defendant's motion for summary judgment, which seeks judgment as a

matter of law as to all counts, is as follows: First, QUSL contends that it is entitled to

judgment as a matter of law on both the EPA and Title VII claims based on its assertion

that Professor Slane's position is not "substantially equivalent" to the position held by

Professor Book.  As an examination of the record will reveal, this argument is unavailing

both because whether the two positions are equivalent for EPA and Title VII purposes is

fundamentally a disputed issue of fact that must be determined by the jury, and because

the plaintiff's *prima facie* burden on the sex discrimination claims does not require proof

that the two positions are "equivalent," as that term is used in the EPA.

QUSL's argument on the retaliation claims is not only unfounded, but also

disingenuous:  The defendant contends that there can be no retaliation because the

defendant's admissions with respect to the plaintiff's salary inequity allegedly occurred in

the context of settlement discussions.  In fact, neither the circumstances surrounding the

relevant admissions nor the applicable case law will permit the Law School to avoid

- 4 -

liability here by hiding behind the cloak of Rule 408; rather, there is abundant admissible evidence in this record from which a reasonable jury could find that the defendant has not appropriately adjusted Professor Slane's salary, and that the defendant has continued to pay her substantially less than what would be commensurate with her job duties, responsibilities and performance, precisely *because* she filed a discrimination complaint, first with the CCHRO and the EEOC and then in this Court.

II.    <u>FACTS</u>

The plaintiff graduated from Yale Law School in 1992, and received her bachelor's degree in history/political science from Douglass College in 1974.  She holds a New Jersey secondary level social studies teaching certificate.  For approximately fifteen years prior to entering law school, the plaintiff was employed as a teacher, first of secondary-level social studies in the New Jersey public school system (from 1974-1980), and then of preparatory courses for the Law School Admission Test and the Scholastic Aptitude Test (from 1981-1989).  (Ex. 2, pp. 78-79;[1] Ex. 1, ¶ 1)

As a law student, the plaintiff participated for five semesters in the Jerome S. Frank Legal Services Organization ("LSO") Disabilities Clinic, first as a student intern, and then as a supervising student and student director of the Clinic, and also worked as a full-time, paid intern during the summer between her first and second year of law school.  (Ex. 2, pp. 19, 77; Ex. 1, ¶ 2)  In her final semester at Yale, the faculty of the Yale Law School awarded the plaintiff the Francis Wayland Prize, the clinical prize given annually to the student who shows the greatest proficiency in the preparation and

---

[1] The exhibits cited herein refer to exhibits which are attached to Plaintiff's Rule 56(a)2 Statement.

- 5 -

presentation of a case in negotiation, arbitration, or litigation.  (Ex. 1, ¶ 3)

After graduation from Yale, from 1992-1994, the plaintiff practiced law in the trial department of Day, Berry & Howard, a large, Connecticut-based, regional law firm, which at that time maintained offices in Hartford, Stamford and Boston.  (Ex. 2, pp. 11-23; Ex. 1, ¶ 4)

In late June or early July 1994, the plaintiff, who was also the mother of three children, the youngest then ten years old, applied for a one-year position as Director of Field Placement Programs advertised by QUSL.  (Ex. 1, ¶ 5; Ex. 2, pp. 18-19)  During the interview period, Slane was provided with a copy of a memo to the Law School faculty describing the director's position.  (Ex. 1, ¶ 6, Attachment A)

In July 1994, the Dean of QUSL, Neil Cogan ("Cogan"), offered the plaintiff a one-year appointment as Visiting Instructor of Law and Director of Field Placement Programs at the School of Law.  Ex. 2, p. 24; (Slane/QUSL 1994-95 Letter Agreement dated July 26, 1994.  She began her employment with the defendant in August 1994.  (First Amended Complaint ("Complaint") ¶ 6; Defendant's First Amended Answer and Affirmative Defenses to Plaintiff's First Amended Complaint ("Answer") ¶ 6) Later that year the faculty voted to suspend its ongoing national search and Slane's contract was extended through May 1997.  (Ex. 1, ¶ 7, Attachment B; Complaint ¶ 7; Answer ¶ 7)

In September 1996, Dean Cogan distributed to the Law School faculty a memo in which he announced that, at the October faculty meeting, he would propose "that a. the externship program be made permanent; b. the directorship of the program be a tenure-track position; and c. Professor Cindy Slane be hired to the position on a three-year

- 6 -

contract, with renewal consideration in the fall of the third year." (Def's Rule 56 Statement at ¶ 18; Ex. 8, p. 34, Dep. Ex. 1)[2]

The faculty did not resolve the issues of the status of legal skills faculty and the new tax clinician until six months later, in April 1997. (Ex. 1, ¶ 9) However, at the October 1996 meeting, the faculty voted to make the externship director's position permanent (Def's Rule 56 Statement ¶ 19), and, breaking with established precedent for filling new, permanent positions (Ex. 1, ¶ 8), to forego a national search to fill the permanent position (Ex. 9, pp. 76-77) instead offering the plaintiff a five-year, renewable appointment to the position, with the option to request that her position be converted to a tenure-track position. (Def's Rule 56 Statement ¶ 19) Her title in the permanent position was Assistant Clinical Professor of Law and Director of Field Placement Programs. (Complaint ¶ 8; Answer ¶ 8)

Throughout the plaintiff's employment at QUSL, the field placement programs consistently have received praise from colleagues and administrators at the School of Law, from counterparts at other law schools, and from ABA Site Inspectors. The field placement programs also have garnered national, and even international, recognition, and the Dean and Acting Dean of the School of Law have, on many occasions, publicly praised the plaintiff's performance and accomplishments. (Complaint ¶ 9; Answer ¶ 9)

The plaintiff's starting salary for 1994-95, when she was a Visiting Instructor of Law, was $40,000. Her salary was increased to $45,000 for 1995-96, and to $48,500 for

---

[2] In October 1996, tenured faculty members taught in both the Civil and the Tax Clinics; by special arrangement with their employers, full-time employees of the Public Defender's Service and Connecticut Legal Services taught in the Defense Appellate and Health Law Clinics, respectively.

- 7 -

1996-97.  Her anticipated salary for the first year of her permanent employment as
Assistant Clinical Professor of Law and Director of Field Placement Programs (1997-98)
was $54,000, although her salary was reduced because she was on a partial leave of
absence during that academic year.  (Complaint ¶ 10; Answer ¶ 10)

The School of Law hired an acting director of externships to assume some of the
plaintiff's duties during the plaintiff's 1997-98 partial leave.  (Ex. 2, p. 82)  After
interviewing several candidates for the position, the plaintiff recommended to Dean
Cogan that he offer the position to a male candidate, a lawyer employed by the Public
Defender Service who had been teaching in the Law School's Defense Appellate Clinic
for the preceding two years.  Dean Cogan both extended the offer of employment to this
candidate and discussed the salary for the position with him in the plaintiff's presence,
responding to the candidate's question about what the job paid by deferring the question
to the plaintiff:  The plaintiff replied that her contract for the 1997-98 year was for
$54,000; Dean Cogan responded, "Then I guess it pays $54,000."  Professor Emanuel
did not perform all of the plaintiff's duties during his year as acting director; rather, the
plaintiff retained a number of those duties and was paid $10,000 for the work she
performed during her leave of absence.  (Ex. 1, ¶ 56; Ex. 8, pp. 62, 66, 67; Ex. 1, ¶ 10)

The plaintiff's anticipated salary for 1998-99 was $58,000, although her salary
was reduced again because she returned from her partial leave at a reduced course
load.  (Complaint ¶ 11; Answer ¶ 11)  In 1999-2000, the plaintiff's compensation for a full
teaching/administrative load was $59,750.  Her salary for the 2000-2001 academic year
was $60,650 (Ex. 1, ¶ 11); for the 2001-2002 academic year, $62,590 (Complaint ¶ 22;
Answer ¶ 22); for the 2002-2003 academic year, $63,216 (Complaint ¶ 25; Answer ¶

- 8 -

25); and for the 2003-2004 academic year, $65,150.  (Ex. 1, ¶ 12, Attachment D)

On or about May 17, 2000, the plaintiff learned about the salaries of some of her colleagues.  (Ex. 1, ¶ 13)

In 1997, Leslie Book, a male, had been hired as an entry-level Assistant Clinical Professor and Director of the Tax Clinic under a newly created personnel policy description for long-term-contract clinicians.  (Ex. 1, ¶¶ 14, 32; Attachment P)  Professor Book held a  Bachelor's degree from Franklin & Marshall College, a J.D. from Stanford Law School, and an LLM from New York University Law School.  (Ex. 4, ¶¶ 2-4)  He had practiced for approximately six years (Ex. 5, pp. 6-7; Ex. 1, ¶ 14, Attachment E)  before joining QUSL, but had no previous teaching experience at all (Ex. 5, p. 7; Ex. 4, ¶ 10), and had not participated in a clinic while in law school.  (Ex. 4, ¶ 5; Ex. 5, pp. 7-8)

In fact, Professor Book had already had decided to leave his firm (Baker and Mackenzie), a move he characterized as a "change-of-lifestyle decision," before he applied for the position at QUSL. (Ex. 5, pp. 10-11)  And, although Dean Cogan contended that he "tried to get Book in the 50s," (Ex. 3, pp. 52-53, Dep. Ex. 1); Ex. 2, p. 107), Professor Book himself testified that he did not negotiate salary (Ex. 5, p. 21) with Dean Cogan, or specify any minimum salary that would be necessary for him to accept the Tax Clinic position in 1997; rather, he accepted the first salary offer proffered by the School of Law.  (Ex. 5, pp. 12-15)  Nor did Professor Book, at any point during the interview process, discuss his salary at Baker & McKenzie with Dean Cogan, or with any of the Law School tax faculty.  (Ex. 5, p. 14; Ex. 6, p. 10; Ex. 7, p. 25)  Finally, although Dean Cogan testified that Professors Toni Robinson, Mary Ferrari and Mary Wenig told him "what it would take to get [Book]" (Ex. 8, p. 100), Professors Robinson and Ferrari

- 9 -

both have testified that they did not discuss Book's salary with Dean Cogan, nor did they

have any knowledge to suggest that Professor Wenig, who passed away in January

2003, participated in setting Professor Book's salary.  (Ex. 6, p. 10; Ex. 7, p. 25)

When Professor Book joined the Law School faculty, the plaintiff was entering her

first year in her long-term contract position and held the same rank, Assistant Clinical

Professor, as did Professor Book.  However, the plaintiff already had  completed three

successful years of teaching at the Law School.  Professor Book's initial appointment

was for the nine-month, 1997-1998 academic year.  His salary for that period was

$75,000; his contract also provided for QUSL to pay Professor Book $5,000 for moving

expenses.  Professor Book's salary in 1998-1999 was $78,750, and his salary in 1999-

2000 was $81,000.  (Complaint at ¶ 13; Answer at ¶ 13)  Thus, the salary gaps between

Professors Slane and Book during the three years Book was employed at the Law

School were as follows: $21,000 in 1997-98; $20,750 in 1998-99; and $21,250 in 1999-

2000.

In addition, although Professor Book had no teaching responsibilities during the

summer of 1998, he received a summer research stipend in the amount of $7000 in

addition to his salary.  (Ex. 5, p. 19)  During the summer of 1999, Professor Book

likewise had no teaching responsibilities, and received a summer research stipend in the

amount of $6500 in addition to his salary.  (Ex. 5, p. 20)

In May 2000, the plaintiff also learned that Professor Carolyn Kaas' salary for

1997-98 was $82,500. (Complaint at ¶ 14; Answer ¶ 14) Notwithstanding the fact that

Professor Kaas had been at the Law School since 1989, had been on the tenure track

for six years, had been tenured for two additional years, and held the rank of Associate

- 10 -

Professor of Law, her salary was only $7500 greater than that of Professor Book, her much junior, entry-level, long-term-contract-status colleague.

During the three years that Professor Book worked at the Law School, he did not have sole responsibility for the Tax Clinic; rather, Professors Ferrari and Robinson remained involved with the Tax Clinic and retained their titles as co-directors.  (Ex. 7, pp. 9, 11, 17-18) In the four years before it hired Professor Book, QUSL twice had hired visiting faculty members to teach in the Tax Clinic, with Professors Robinson and Ferrari retaining their titles as co-directors.  One visitor, a female, taught in the Tax Clinic for two summers (1994 and 1995) and during the fall 1994 term.  (Ex. 7, pp. 12-14; Ex. 1, ¶ 16, Attachment F)  She also taught a doctrinal course, Tax Procedure – Civil, during the spring 1995 term.  (Ex. 1, ¶ 16, Attachment F)  Her salary for  providing one month of coverage in the Tax Clinic during the 1994-95 winter break and teaching one doctrinal course in Tax Procedure during the spring 1995 term was $3,400.  (Ex. 1, ¶ 16, Attachment F)  Her salary for teaching in the Tax Clinic during the fall 1994 term was $15,000.  (Ex. 1, ¶ 16, Attachment F)  Her total compensation for the 1994-95 academic year, then – a year during which she taught in the Tax Clinic in the fall, covered the Tax Clinic during the winter break, and taught one doctrinal tax course in the spring – was $18,400.  On that basis, had she taught only in the Tax Clinic during both of the 1994-95 semesters, her annualized salary would have been $30,000.

The second visitor who provided Tax Clinic coverage was a male.  His salary for the 1995-96 academic year was $80,000  (Ex. 1, ¶ 17, Attachment G), over four times the compensation the defendant paid to the female visitor who had directed the clinic during the fall 1994 term and taught one doctrinal course during the spring 1995 term,

- 11 -

just one year earlier.  Book's entry-level salary in 1997-1998, though slightly lower than that of his male predecessor, was still two-and-a-half times the annualized clinical-teaching salary paid to the female faculty member who taught in the Tax Clinic in 1994-1995.

By letter dated May 26, 2000, the plaintiff and Professor Kaas brought their salary concerns to the attention of Dean Cogan.  Their letter to Dean Cogan expressly set forth their belief that the salary disparities at issue were based on gender, rather than merit, rank, or seniority.  (Ex. 1, ¶ 19, Attachment H)  On or about May 30, 2000, Slane and Kaas met with Cogan to discuss the issues raised in their May 26th letter. (Ex. 8, p. 70; Ex. 2, pp. 104-105; Ex. 3,  pp. 26-27)  At the meeting, Cogan characterized his decisions with respect to the plaintiff's salary as "a mistake" resulting from his incorrect categorization of Slane as a Legal Skills Instructor, rather than as a clinician.  (Ex. 2, pp. 106-107; Ex. 3, pp. 27-31)

Dean Cogan later testified that he initially saw the plaintiff's position as most like the position held by the Director of Legal Skills, a female faculty member he identified by name, and that he had set the plaintiff's entering salary accordingly.  (Ex. 8, p. 42)  In fact, a male faculty member, not the female faculty member Dean Cogan named, was the Director of Legal Skills in 1994-1595 (Ex. 8, pp. 61-62; Ex. 1, ¶ 20); that male faculty member's salary for 1994-95 was $81,095.  (Ex. 1, ¶ 21, Attachment I)  The female faculty member Cogan identified was a Legal Skills Instructor, not the Director of Legal Skills (Ex. 8, p. 90; Ex. 1, ¶ 22), and, like the majority of the Legal Skills instructors at the Law School (Ex. 8, pp. 22-23; Def's Rule 56 Statement ¶ 4), she was a woman.  Her 1995-96 salary, however, was $41,500.  (Ex. 1, ¶ 22, Attachment J)

- 12 -

In his deposition, Dean Cogan noted that most legal writing instructors are women, and explained his view that, because legal writing positions do not pay very well, they are more attractive to women than to men.  (Ex. 8, p. 23)  Teaching legal writing, he pointed out, "provides an opportunity for people who don't want to practice in a law firm, practice where the hours are not as fixed as the case is in a law firm but more fixed than the law school environment.  And certainly the salary range . . . tends to attract more women than men."  Id.

Statistical studies reported by the American Bar Association in an article entitled "Legal Writing Instruction: The Pink Ghetto of Academe" confirm a link between gender and compensation. (Ex. 1, Attachment K) The article reports, too, that gender-based salary differentials exist even within the legal writing academy, with male program directors at many law schools earning more than females in like positions.  (Id.)  Such has been the case at QUSL as well.  (See Rule 56(a)2 Statement ¶ 28)

During the May 30th meeting with the plaintiff and Professor Kaas, Dean Cogan also stated that the plaintiff was a clinician, and that he should have treated the plaintiff as such from the beginning.  (Ex. 2, p. 107; Ex. 3, pp. 28, 30, Dep. Ex. 1)  Dean Cogan stated, too, that there was no basis for a distinction between in-house and externship clinical faculty.  (Ex. 2, p. 106; Ex. 3, pp. 28, 30, 31)  He also offered to present the plaintiff's and Professor Kaas' concerns to Associate Dean David King, who would become Interim Dean on July 1, 2000, and to urge him to remedy the situation.  (Ex. 2, p. 107; Ex. 3, p. 30; Ex. 8, pp. 70-71)

In an e-mail dated May 31, 2000, Dean Cogan forwarded to the plaintiff and Professor Kaas the text of a letter he proposed to send to incoming Interim Dean King.

- 13 -

In the text, he again admitted that he had made a mistake in setting the plaintiff's salary, and stated that Slane and Book's educational and practice credentials "were the same." (Ex. 2, pp. 109-110; Ex. 8, pp. 37-38, Dep. Ex. 3)  He went on to state that "[w]hile their titles were different, their duties and responsibilities were essentially the same; indeed, Professor Slane's can reasonably be said to have been greater, because she worked into the summer, while Professor Book did not."  Id.  He also stated that the plaintiff "should have been categorized as a clinician, which she is, and [that he] should have proposed to the Provost that she be treated the same way that [Cogan] was proposing to treat Professor Book."  Id.

In fact, Professor Book's and Professor Slane's jobs, though not identical, *were* substantially the same.  Both were Assistant Clinical Professors with directorial responsibilities (Ex. 2, pp. 33-40; Ex. 5, p. 8), though Book was responsible for only one clinical program (Ex. 5, p. 8; Ex. 2, pp. 217-218), shared at least some directorial responsibilities with co-directors Robinson and Ferrari (Ex. 7, pp. 17-18), and reported to the Dean through Professor James Trowbridge, Director of Clinics.  (Ex. 1, ¶ 27) Between 1994 and 1998, by contrast, the plaintiff reported directly to the dean (Ex. 2, p. 218) and was responsible for five externship programs, four of which she taught herself and a fifth which she co-taught with an adjunct faculty member over whom she had supervisory responsibility.  (Ex. 2, pp. 24, 217)  In 1998, when Professor Kaas began teaching externship courses, the plaintiff assumed supervisory responsibility for Kaas in that context, as well.  (Ex. 2, pp. 33-38, 217)

Both Professor Book and the plaintiff were responsible for supporting students' skill development (Ex. 2, p. 216; Ex. 5, pp. 8, 29) and helping them to extract lessons

- 14 -

about law and lawyering from real-world experience.  (Ex. 1, ¶ 29; Ex. 2, pp. 56-57, 59-61)  In fact, in spring 2000, in recognition of their common enterprise as clinicians, Professors Trowbridge, Kaas, Book and Stark and the plaintiff met and agreed upon a set of shared goals applicable to all in-house clinics and externship programs.  (Ex. 1, ¶ 28, Attachment O)  Both Book and Slane reviewed and critiqued students' work product.  (Ex. 2, pp. 25, 41-42, 72-73, 217; Ex. 1, ¶ 29)  Both were required to be knowledgeable about substantive and procedural law (Ex. 2, pp. 72, 217), Book about tax law and procedure, the plaintiff about the substantive and procedural law applicable in the multiple practice settings in which her students worked.  (Ex. 2, p. 221)  Both helped students develop mastery of the rules of conduct that govern attorneys in Connecticut, and assisted students in recognizing and responding to ethical dilemmas.  (Ex. 2, pp. 43, 217, 218-223; Ex. 1, ¶ 30)  Both taught seminar courses and reviewed and responded to student journal entries.  (Ex. 2, pp. 34-35, 55-56; Ex. 1, ¶ 31)

Both Book and the plaintiff also served on Law School committees (Ex. 2, pp. 24, 72; Ex. 1, ¶ 31), although under the Law School's personnel policies, neither was required to produce scholarship.  (Ex. 9, p. 17; Ex. 1, ¶ 32, Attachment P)  Because both practiced law, Book as the supervisor of students representing Tax Clinic clients (Ex. 5, p. 8; Ex. 2, p. 218) and Slane as advisor to students who came to her with questions about how Connecticut Rules of Professional Conduct applied to their conduct in their placements (Ex. 2, pp. 218-223), both were required to be admitted to the bar.  (Ex. 1, ¶ 33, Attachment P at p. 6; Ex. 2, pp. 218-223)  In lieu of malpractice insurance, both were covered by a general errors and omissions policy maintained by Quinnipiac University.  (Ex. 1, ¶ 34, Attachment Q)

- 15 -

The plaintiff and Professor Kaas responded to the May 31st Cogan e-mail with a memo that included a revised version of the proposed letter to incoming Interim Dean King.  The revised version of the letter supplied the factual details Dean Cogan had requested and proposed a number of changes to the text to clarify certain facts.  (Ex. 2, pp. 113-114; Ex. 1, ¶ 36)  Slane and Kaas also suggested that Dean Cogan attach to his message to Dean King a copy of the May 24, 2000 letter from Professor Kaas and the plaintiff to Dean Cogan.  (Def's Rule 56 Statement at ¶ 35)

Although Dean Cogan did respond to a 6/19/2000 e-mail message from Kaas, stating that he was "willing to talk to David about the equities" (Ex. 1, ¶ 39, Attachment U), Slane and Kaas did not talk again with Dean Cogan about the salary issues before his deanship ended (Ex. 2, pp. 137-138; Ex. 3, p. 42), nor did Cogan reply to Professor Kaas' July 12, 2000  request for update on the status of their matter in advance of a planned meeting with Dean King. (Ex. 2, p. 138; Ex. 3, p. 50; Ex. 1, ¶ 40, Attachment V) Based on his silence, the plaintiff and Professor Kaas surmised that Dean Cogan had not sent the proposed letter to Interim Dean King, and therefore concluded that they would have to begin the process of addressing the salary inequities anew with King. (Ex. 2, pp. 144-146; Ex. 3, p. 50)

In or about the last week in July, 2000, after Interim Dean King returned from his vacation (Ex. 1, ¶ 41) the plaintiff and Professor Kaas provided King with a copy of their May 26th letter to Dean Cogan, and met with King in his office to discuss their concerns. (Ex. 2, pp. 138, 140-145; Ex. 3, p. 67; Ex. 9, pp. 33-37)  During that meeting, King stated that he was "shocked" when he learned what the plaintiff's salary was (Ex. 2, pp. 140-141; Ex. 3, p. 67), and said that he would bring the plaintiff's and Professor Kaas'

- 16 -

concerns to University Vice President Edward Kavanagh and University President John Lahey as soon as possible.  (Complaint ¶ 21; Answer ¶ 21)

The next day, Dean King told Slane and Kaas that he had advised Vice President Kavanagh and President Lahey that Professor Slane's contracts had been "biased in favor of the college from the beginning" (Ex. 2, pp. 150-151), a comment that he characterized as an "admission against interest."  (Id.)  He also asked the plaintiff to provide QUSL with an estimate of her damages.  (Id.)

While neither Dean Cogan nor Interim Dean King undertook a systematic analysis of all law faculty salaries after Professors Slane and Kaas alerted them to their concerns (Ex. 8, pp. 23-24, 78; Ex. 9, p. 25; Ex. 10, p. 27), King did conduct an investigation that led him to conclude that the plaintiff was underpaid (Ex. 9, pp. 38, 57-58; Ex. 10, pp. 21, 25-27, 31)[3]  Based on his review of the salaries of other faculty, and before the plaintiff filed her complaint with the CHRO and the EEOC (Ex. 9, p. 43), King recommended what he believed to be a fair salary for the plaintiff to Edward Kavanagh.  (Ex. 9, pp. 39-43, 56-58; Ex. 10, pp. 30, 36, 40)  Both King and Kavanagh now claim that they cannot recall what that figure was.  (Ex. 9, pp. 42-44; Ex. 10, pp. 30, 48)  However, in January 2001, after the University filed its answer to plaintiff's CHRO complaint, the University proposed to increase the plaintiff's then-current salary to $70,000.  (Ex. 1, ¶ 45)

_____

[3]  Had King conducted a more systematic survey of the salaries for that year (2000-2001), he would have learned that the male member of the clinical faculty was being paid a salary that was $36,300 higher than the average of the salaries of the three female clinical faculty members, and that there was a disparity of nearly $9,000 between the salaries paid to males and females within the doctrinal faculty.  (Exhibit 11, Attachment A)

- 17 -

During the remaining weeks of the summer and the early weeks of the fall, the plaintiff continued to perform all of her externship duties, bar obligations, civic obligations (serving as Chair of Connecticut's Permanent Commission on the Status of Women), as she worked to gather the information necessary for the preparation of the damages analysis King and Kavanagh had requested. That information was used to construct the detailed damages analysis Slane provided King on or about October 24, 2000. (Ex. 1, ¶42, Attachment W; Ex. 9, pp. 38-39) In the letter, Slane also explained that, because of the limitations period for filing an administrative complaint, she would have to take action to protect her claim if she and QUSL could not resolve the outstanding issues within two weeks.

Dean King has confirmed that the plaintiff made him aware that the time pressure was a result of the statute of limitations issue. (Ex. 9, pp. 41-42) Nevertheless, the only communication the plaintiff received from the University during the two weeks after October 24th was an e-mail message from King asking for more time to evaluate the proposal. (Ex. 9, pp. 44-47, Ex. 1, ¶ 43, Attachment X) Slane responded by explaining that her preference would have been to enter into a tolling agreement, but that she did not believe that she could do so because her understanding was that the CHRO would not honor tolling agreements. (Id.) Therefore, on or about November 7, 2000, the plaintiff filed a complaint with the Commission on Human Rights and Opportunities (CHRO) and the Equal Employment Opportunities Commission (EEOC).

In early December, 2000, plaintiff wrote to King to follow up on her earlier request for a sabbatical during the spring 2002 semester in order to pursue various scholarly projects. (Ex. 1, ¶ 46, Attachment Z) In response to a follow-up inquiry by Slane during

- 18 -

the fall 2001, King notified her that her request for the spring-term sabbatical had been approved, but that only limited funding was available for coverage of the plaintiff's externship responsibilities. (Ex. 1, ¶ 46) Because of this budgetary constraint, Slane agreed that she would play her usual role in conducting intake and arranging placements for spring- and summer-term students (Ex. 2, pp. 224-228) and effectively would end it sometime in later March or early April, when she resumed intake and placement duties for hte summer 2002 term. (Ex. 1, ¶ 47)

During the approximately two-and-a-half months of her sabbatical, the plaintiff updated research and completed revisions to a lengthy and scholarly ethics committee opinion concerning lawyers' relationships with title insurance companies (Ex. 1, ¶ 48, Attachment AA); conducted extensive research and prepared a working outline for a proposed article that later evolved into a published article and conducted substantial research, prepared written testimony, and testified before the Connecticut General Assembly's Judiciary Committee. (Ex. 1, ¶¶ 48-49; Ex. 2, pp. 231-237)

Between 1994-95, when the plaintiff began her employment at the Law School, and May of 2000, when the plaintiff gave notice of her gender discrimination claim to Dean Cogan, the plaintiff's average raise had been 8.325%. (Ex. 1, ¶ 50) For example, the plaintiff's full-time base salary increased by 12.5% in 1995-96, by 6.67% in 1996-97, and by 11.1% in 1997-98. Beginning in 2000-01, though, just after plaintiff gave notice of her gender discrimination claim to Dean Cogan, and continuing through the current academic year, 2003-2004, the plaintiff's raises have averaged 2.26%. (Ex. 1, ¶ 51)

Despite the defendant's spring and summer 2000 admissions that the plaintiff's salary was unfair and should be corrected, the Law School has not adjusted the

- 19 -

plaintiff's salary to address the inequity.  For example, the defendant paid the plaintiff a salary of $60,651 for the academic year 2000-2001, reflecting only the general increase accorded all faculty. (Complaint ¶ 22; Answer ¶ 22)  That figure was approximately $20,000 less than Professor Book's salary for 1999-2000, the preceding year. (Complaint ¶ 22; Answer ¶ 22)  For the academic year 2001-2002, the plaintiff's salary was $62,590, again reflecting only the general increase accorded all faculty.  (Complaint ¶ 22; Answer ¶ 22)

    At the May 2002 CHRO factfinding conference that preceded the filing of this complaint, in response to a question from CHRO Investigator Carolyn Anderson, Dean King and Law School counsel John Zandy, in unison, explained why, despite admissions that the plaintiff's compensation was unfair, the Law School had not increased her salary to an appropriate level: "Because she hasn't settled her suit."  (Ex. 1, ¶ 52)  Seventeen months later, at his October 16, 2003 deposition, King testified that he did review faculty salaries after meeting with the plaintiff and Professor Kaas, and that he  advised Vice President Kavanagh in 2000 that his review indicated that the plaintiff was underpaid (Ex. 9, p. 38); that the Law School could have increased the plaintiff's compensation at any time without conditioning the increase on resolution of her gender claims (Ex. 9, p. 54, 69-70 (acknowledging QUSL's decision to rectify the summer compensation issue without requiring plaintiff to sign a release or waive any claims)); that no action was taken to adjust Slane's salary upward during King's interim deanship (Ex. 9, pp. 53-54); and that the Law School had decided not to correct the inequity "after consultation with counsel" (Ex. 9, p. 54) retained shortly after receipt of the plaintiff's CHRO complaint. (Id.)

- 20 -

On or about May 10, 2002, the plaintiff filed the complaint that initiated this federal lawsuit.  The salary increase pool for 2002-03 was 3%.  (Ex. 9, pp. 62-63)  On June 27, 2002, the defendant offered the plaintiff a salary of $63,216 for the 2002-2003 academic year, reflecting a 1% increase over her 2001-2002 salary.  (Ex. 9, p. 61)  This was the first time that the plaintiff did not receive at least the average raise.  (Complaint ¶ 25; Answer ¶ 25)

Only three other faculty members received raises as low as 1% in 2002-2003.  (Ex. 9, pp. 62-63)  In each of those cases, Dean King testified, serious deficiencies in one or more of the three factors the Law School takes into account in making salary determinations (teaching, scholarship, and service) (Ex. 9, p. 62) justified his salary decisions.  (Ex. 9, p. 63)  "For [Professor A], it was seriously substandard performance in all three areas; teaching – certainly teaching and research, and maybe average performance in service." (Id.)  "For [Professor B] it was seriously substandard performance in teaching.  Terrible teaching averages."  (Id.)  "And for [Professor C], it was also seriously substandard performance in teaching" based on evaluations and "some communications with [Professor C]."  (Id.)  By contrast, according to King, the plaintiff's teaching and service were both "very good."  (Ex. 9, pp. 78-79)  However, while he acknowledges receipt of Slane's 2001-2002 professional report and a supplemental memo explaining that, during her sabbatical, the plaintiff arranged spring and summer placements, conducted research and produced a working outline for an article, revised and updated an opinion on title insurance issues for the Ethics Committee, and prepared and presented testimony on a bill before the Connecticut Judiciary Committee (Ex. 9, pp. 18-19; Def's Ex. BB (Plaintiff's 2001-2002 Professional Report and Supplemental

- 21 -

Memo); see also Ex. 9, pp. 64-65 (acknowledging awareness that Slane still performed some duties with respect to student placements during her sabbatical)), he blames the plaintiff's "limited scholarly accomplishments during her spring 2002 sabbatical" for his decision to recommend only a 1% raise for her during the 2002-2003 academic year. (Def's Rule 56 Statement at ¶ 51)

Dean King also testified both that this lawsuit was pending when he set the plaintiff's 2002-2003 salary (Ex. 9, p. 21) and that he never expressed to the plaintiff his concerns about her productivity, either in writing or verbally, because "he was advised not to." (Ex. 9, p. 20)

For the academic year 2003-2004, the plaintiff's salary is $65,160, with the increase again reflecting the general increase accorded all faculty. (Ex. 1, ¶ 53) Had Slane's salary been adjusted to be equivalent to that paid to Professor Book, taking into consideration the plaintiff's three years of seniority over Professor Book, and had the plaintiff received the general increase accorded all faculty members, the plaintiff's 2003-2004 salary would have been $96,076.(Ex. 1, ¶ 55)

III.    ARGUMENT

A.    LEGAL STANDARD - SUMMARY JUDGMENT

Summary judgment may be granted only if the moving party is able to show that "there is no genuine issue as to any material fact," and that it is "entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c)  A "material fact" is one whose resolution will affect the ultimate determination of the case.  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248, 106 S. Ct. 2505 (1986).  A "genuine" issue as to such a material fact arises only "if the evidence would allow a reasonable jury to return a verdict for the non-moving

- 22 -

party." Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988); Anderson, 477 U.S. at 248.

The moving party bears the initial burden of proving that no genuine factual dispute exists. Carlton v. Mystic Transportation, Inc., 202 F.3d 129, 133 (2d Cir. 2000); Gallo v. Prudential Residential Services, 22 F.3d 1219, 1223 (2d Cir. 1994). The non-moving party must then "set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 106 S.Ct. 2505 (1986). In assessing the record, the Court must resolve all ambiguities and draw all inferences in the light most favorable to the non-moving party (Gallo, 22 F.3d at 1223), and "must disregard all evidence favorable to the moving party that the jury is not required to believe" (Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151, 120S.CT. 2097 (2000)). Because credibility is not an issue on summary judgment, the non-movant's evidence must be accepted as true. Gupta v. City of Norwalk, 221 F. Supp. 2d 282, 290 (D. Conn. 2002).

The trial court's task at summary judgment "is carefully limited to discerning whether there are any issues of material fact to be tried, not to deciding them." LaFond v. General Physics Services Corp., 50 F.3d 165, 171 (2d Cir. 1995). The Sescond Circuit has repeatedly recognized that summary judgment must be sparingly used in discrimination cases, where intent and state of mind are at issue, because "careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination." See Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

- 23 -

B.    GENUINE ISSUES OF FACT EXIST WHICH PRECLUDE SUMMARY
        JUDGMENT WITH RESPECT TO THE PLAINTIFF'S EQUAL PAY ACT
        CLAIM

        1.    The Legal Standard Applicable to The Plaintiff's EPA Claim

To survive summary judgment on her EPA claim, the plaintiff must establish that

a reasonable jury could find from the record evidence the following elements, which

constitute a *prima facie* case of discrimination:  (1) the employer pays different wages to

employees of the opposite sex; (2) the employees perform equal work on jobs requiring

equal skill, effort and responsibility; and (3) the jobs are performed under similar working

conditions.   29 U.S.C. §206(d)(1); Belfi v. Pendergast, 191 F.3d 129, 135 (2d Cir. 1999),

citing Tomka v. Seiler Corp., 66 F.3d 1295, 1310 (2d Cir. 1995) and Corning Glass

Works v. Brennan, 417 U.S. 188, 195 (1974).  Because the EPA is a strict liability

statute, the plaintiff need not prove any intent to discriminate, and establishment of the

elements of the *prima facie* case therefore shifts the burden of persuasion to the

employer to show that the wage disparity is justified by one of the recognized affirmative

defenses.  Belfi, 191 F.3d at 136.

        To establish the second prong of the *prima facie* case, the plainitff is not required

to demonstrate that her job is identical to that of the male comparator, but only that "the

two positions are 'substantially equal' in skill, effort and responsibility."  Lavin-McEleney

v. Marist College, 239 F.3d 476, 480 (2d Cir. 2001); Tomka, 66 F.3d at 1310.  The

determination of whether two positions are equal requires "an overall comparison of the

work, not its individual segments."  Kovacevich v. Kent State University, 224 F.3d 806,

826 (6th Cir. 2000).  Thus, for purposes of the *prima facie* case, it is sufficient to establish

that the plaintiff is "similarly situated in all material respects" – but not in all respects – to

- 24 -

the individuals to whom she compares herself: "their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances.  What is key is that they be similar in significant respects."  Medina v. New York City Department of Parks and Recreation, 2002 WL 31812681 *4 (S.D.N.Y. 2002) (discussing elements of unequal pay claim based on race under Title VII), citing Lizardo v. Denny's, Inc., 270 F. 3d 94, 101 (2d Cir. 2001); Shumway v. United Parcel Service, Inc., 118 F.3d 63, 64 (2d Cir. 1997).

The Second Circuit has left no doubt that this aspect of the EPA *prima facie* case is a question of fact to be determined by the jury.  Lavin-McEleveny, 239 F.3d at 480; see also, Tomka, 66 F.3d at 1311 ("[I]t is for the trier of fact to decide if [there] is significant enough difference in responsibility to make the jobs unequal.").  Moreover, the Court of Appeals has also emphasized that the burden of proof carried by an employment discrimination plaintiff to survive summary judgment with respect to establishment of her *prima facie* case is "minimal."  Belfi, 191 F. 3d at 139;

If the court finds that the record evidence is sufficient for a reasonable jury to conclude that plaintiff has established the elements of the *prima facie* case, the inquiry then turns to the question of whether QUSL has adduced evidence such that a reasonable jury would be compelled to find that the Law School has met its burden to prove that the pay disparity between Professors Slane and Book was based on factors other than sex. 29 U.S.C. § 206(d)(1)(iv).  To prevail on this affirmative defense, the employer must also prove "that a bona fide business-related reason exists for using the gender-neutral factor that results in a wage differential . . . ."  Aldrich v. Randolph Cent. Schl. Dist., 963 F.2d 520, 526 (2d Cir. 1992); Hernandez v. Kellwood Company, 2003

- 25 -

WL 22309326 *8 (S.D.N.Y. 2003); see also, Belfi, 191 F.3d at 136, citing EEOC v. J.C. Penney Co., Inc., 843 F.2d 249, 253 (6th Cir. 1288) ("[T]he 'factor other than sex' defense does not include literally *any* other factor, but a factor that, at a minimum, was adopted for a legitimate business reason.").

Even if the employer is able to sustain its burden of proof on this issue, the plaintiff will still prevail if she can show that "the reasons the defendant seeks to advance are actually a pretext for sex discrimination," which, in this context, is discerned by examining whether the factor cited by the employer as explanatory of the differential has in fact been used "reasonably in light of the employer's stated purpose as well as its other practices." Belfi, 191 F. 3d at 136; Aldrich, 963 F.2d at 526. In evaluating the question of pretext under the EPA, as is the case under Title VII, the jury may take into consideration circumstantial evidence in the form of inconsistent explanations from the employer as to the reasons for the wage disparity. Belfi, 191 F.3d at 139, citing EEOC v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir. 1994).

> 2.    A Reasonable Jury Could Find That The Plaintiff Has Established a
> *Prima Facie* Case Under the EPA

The first element of the EPA *prima facie* case is not disputed: QUSL concedes that Professor Book was paid a substantially higher wage than was Professor Slane, a disparity of $21,000 for 1997-1998, $20,750 for 1998-1999, and $21,750 for 1999-2000. The central disputed issue of fact is thus whether their positions were "substantially equal." The defendant points out in its brief that there are several areas in which Book and Slane's jobs did differ, but at the summary judgment stage the question is not whether some differences exist between the two jobs, but whether sufficient similarities

- 26 -

exist such that a reasonable jury could find that the positions are substantially equal. Based on the specific record in this case, this question can be answered only in the affirmative.

First, summary judgment would be inappropriate on this issue because the defendant itself has *admitted* that the positions are substantially equal. In the spring of 2000, Dean Cogan acknowledged that the differential in salaries between Slane and Book had been a mistake, that both Slane and Book were part of the clinical faculty and should have been treated the same, and that "while their titles were different, their duties and responsibilities were essentially the same," though he did note that Slane's responsibilities extended into the summer while Book's did not, and thus, arguably were greater. Because before Neil Cogan made these statements, he had litigated gender discrimination cases in Texas (Def's Rule 56(a)1 Statement ¶ 3), a jury could find that he was well-aware of the legal standards applicable to an unequal pay claim under the EPA and Title VII when he said that Slane's and Book's "duties and responsibilities were essentially the same." This admission by the then-current Dean, standing alone, is sufficient to establish the minimal *prima facie* case. The fact that in his later affidavit, submitted by the Law School to the CHRO, and, to a lesser extent in his deposition testimony, Dean Cogan attempted to draw distinctions between the positions does not obviate his pre-litigation statement, but only raises credibility issues to be resolved by the jury.

Second, there is abundant evidence from which the jury could conclude that Cogan's initial assessment was correct. While there are aspects of the jobs that were not identical, the defendant's brief ignores the significant ways in which the positions are

- 27 -

similar.  The facts establishing the fundamental similarity between the skill, effort and

responsibility between Slane's and Book's positions are set forth herein and in the

plaintiff's Local Rule 56(a)2 Statement at ¶¶ 31-34.

Some of the salient factors are as follows:

1.    Slane and Book worked in the same department, both held the rank of
      Assistant Clinical Professor, and both had directorial titles;

2.    The law school did not draw a distinction between in-house clinics and
      externship programs and in fact had established a set of shared
      educational goals and objectives;

3.    Both were responsible for supporting student skills development in
      conjunction with real-world experiences;

4.    Both reviewed and critiqued students' work product and were required to
      be knowledgeable in substantive areas of law;

5.    Both were responsible for teaching students about the rules of professional
      conduct and in recognizing and examining ethical issues as they arose;

6.    Both taught seminar courses and reviewed and responded to student
      journal entries;

7.    Because both were categorized as long-term contract clinicians, under the
      School's personnel policies neither was required to produce scholarship;
      and

8.    Both practiced law, were required to be admitted to the bar, and were
      covered by a general errors and omissions policy in lieu of malpractice
      insurance.

To support its argument on the "substantially equal" question, QUSL relies

primarily on two decisions from the 1980s in which Circuit Courts of Appeals upheld

district court findings that plaintiffs had offered insufficient evidence to demonstrate that

positions in different academic departments were substantially equal.  Spaulding v.

University of Washington, 740 F.2d 686 (9th Cir.), *cert. denied,* 469 U.S. 1036 (1984)

- 28 -

(rejecting comparison between the school of nursing and other schools within the university); Soble v. University of Maryland, 778 F.2d 164 (4th Cir. 1985) (rejecting comparison between plaintiff, who had academic degrees in Sociology and Social Work and other dental school faculty members, all but one of whom had dentistry degrees; the other had an MBA).  The defendant's reliance on these decisions is misplaced. Spaulding and Soble are readily distinguishable on their facts from the case at bar, in the first instance because, as their titles (Assistant Clinical Professors of Law) indicate, Professors Slane and Book did teach in the same department (in the law school's clinical program), and both hold Juris Doctorate degrees.[4]  Moreover, Dean Cogan admitted that "[t]he educational and practice credentials of [Slane and Book] were the same."  In addition, QUSL's mechanistic reference to these decisions as being determinative despite the obvious factual distinctions ignores the fact that the Second Circuit has rejected this approach, holding that faculty positions in different academic departments can be substantially equivalent, and requiring that factual disputes regarding such comparisons be submitted to the jury.  See Lavin-McEleney, 239 F.3d at 480-481; see also, Spaulding, 740 F.2d at 697-698 ("We disagree with the University's contention that jobs from different academic disciplines can never be substantially equal. The proper resolution of each case depends on the actual content of the jobs.").

---

[4]  Although Book also held an LLM degree in Tax, there is no evidence that this factor actually played any role in the setting of his salary, nor did having an LLM degree benefit Book's female successor.

- 29 -

3.    <u>A Reasonable Jury Would Not Be Compelled to Find that The</u>
<u>Defendant Has Met Its Burden of Demonstrating That The Salary</u>
<u>Difference Between The Plaintiff and Professor Book Was Based on</u>
<u>Factors Other Than Sex</u>

The record contains ample evidence that could lead a reasonable jury to reject

QUSL's affirmative defense that the salary differential between Slane and Book was

based on factors other than sex.  This defense must fail for two distinct reasons.

First,  the jury could find that Cogan's explanation for his "mistake" in setting

Slane's initial salary at an artificially low level was not gender-neutral.  When Professors

Slane and Kass approached Cogan about their concerns about gender-based pay

disparities in May 2000, Cogan claimed that he had mistakenly categorized Slane as a

Legal Skills instructor.  He later testified that he had pegged Slane's salary to that of the

Director of Legal Skills, whom he identified – incorrectly – as a female.  Legal Skills, or

legal writing, instruction is generally recognized as the "pink ghetto" of the legal

academy, a poorly compensated area of law teaching which Cogan himself testified was

(and is) primarily populated by women.  In discussing the Legal Skills faculty at QUSL

during his tenure, Cogan revealed his own views about gender as it relates to

compensation:

> Probably the great majority were women . . . . That remains the case in my shop.
> It provides an opportunity for people who don't want to practice in a law firm,
> practice where the hours are not as fixed as is the case in a law firm, but more
> fixed than a law school environment.  And it tends to attract more women than
> men.  And certainly the salary range . . . tends to attract more women than men."

(Cogan Depo. at p. 23.)  This reasoning constitutes sex stereotyping[5] and thus plainly

---

[5]  Given Cogan's views about the factors that motivate women who leave private
practice to teach Legal Skills or legal writing, and the level of compensation they are
willing to accept in trade-off for the more flexible hours academic positions offer, his

- 30 -

eviscerates QUSL's affirmative defense.

Secondly, contrary to the assertions contained in the defendant's brief, the factual circumstances surrounding the setting of Professor Book's initial salary are very much disputed.  (See Rule 56(a)2 Statement, ¶¶ 16-19)  Indeed, the numerous inconsistencies between the explanations provided by the Law School to the CHRO, those contained in Cogan's CHRO Affidavit and deposition testimony, and the descriptions of the relevant events contained in the deposition testimony of Professors Book, Robinson, and Ferarri are sufficient to preclude summary judgment on this question.  Some of those inconsistencies are as follows:

- In his May 2002 CHRO Affidavit, Cogan claims that the tax faculty (Professors Robinson, Wenig and Ferrari) told him "what it would take to get Book," and told him that he "couldn't lower the salary [for Book] to be more in keeping with the other groupings [below tenure track faculty, but above legal writing instructors] . . .", saying "You can't do it.  Then we will not get him, and we'll lose the clinic . . . ."  Robinson and Ferrari, however, testified in their depositions that they did not have any discussions with Cogan or Book about Book's salary.

- In the January 3, 2001 letter-brief filed with its answer to the plaintiff's CHRO complaint, QUSL asserted that Book's high salary was the product, in part, of "Book's advanced degree and expertise in the field of tax law."  QUSL, however, paid Book's female successor, who like Book holds an advanced degree in tax and had significant tax law practice experience before beginning her teaching career, over $11,000 less when she joined the faculty in 2000-2001 than Book had earned for performing the same job the year before.  QUSL also paid a male who provided tax clinic coverage in the fall of 1995 and taught one doctrinal tax course in the spring of 1996 over four times the salary it paid to a female who provided tax clinic coverage in the fall of 1994 and taught one doctrinal tax course in the spring of 1995, just one year earlier.

---

miscategorization of the plaintiff (who was a mother of three children leaving private practice for a teaching position), as a Legal Skills instructor rather than as a clinician, and his decision to pay her accordingly, were easy, albeit gender-based, "mistakes" to make.

- 31 -

- In its January 3, 2001 CHRO letter-brief, QUSL also argued that Book's high salary was the product, in part, of "the fact that Professor Book's position requires greater skill and responsibility than that of the Complainant." (Def's CHRO letter-brief at p. 5). During his May 30, 2000 meeting with Professors Kaas and Slane, however, Cogan stated that there was no basis for a difference in salary between in-house and externship clinicians. He also acknowledged, in his May 31, 2000 e-mail to Slane and Kaas, that Professor Book's and Professor Slane's "duties and responsibilities were "essentially the same; indeed Professor Slane's can reasonably be said to have been greater, because she worked into the summers, while Professor Book did not."

- In its January 3, 2001 CHRO letter-brief, QUSL asserted that Book's salary was the product, in part, of Cogan's "good faith belief at the time he hired Professor Book that it was necessary to offer him a high salary in order to secure his services for the Law School" (Def's CHRO letter-brief at p. 6). Book, though, has testified that he had already decided to leave private practice for quality-of-life reasons before he interviewed at QUSL, that he did not negotiate salary with Cogan or discuss his law-firm salary with Cogan or with anyone else on the QUSL faculty, and that his salary at Baker McKenizie was not a factor at all in his decision to accept the tax clinic position.

These inconsistent and contradictory statements would permit a reasonable jury to conclude that the defendant's purported explanations for the wage disparity are little more than rationalizations concocted in an effort to avoid liability for gender discrimination, and thus constitute evidence of pretext more than sufficient to preclude summary judgment. See, Belfi, 191 F.3d at 136, 139.

C.    GENUINE ISSUES OF FACT EXIST WHICH PRECLUDE SUMMARY JUDGMENT WITH RESPECT TO THE PLAINTIFF'S SEX DISCRIMINATION CLAIMS UNDER TITLE VII AND THE CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT

1.    The Legal Standard Applicable to The Plaintiff's Discrimination Claims

In order to succeed on a claim of sex and pregnancy discrimination under Title VII, the plaintiff must demonstrate that: (1) she is a member of a protected class

- 32 -

(female); (2) she was qualified for her job; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.  Weinstock v. Columbia University, 224 F. 3d 33 (2d Cir. 2000), cert denied, 124 S.Ct. 53 (2003) .  The plaintiff's burden at this stage is de minimus.  See, Howley v. Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2000); Gupta, 221 F.Supp. 2d at 295-296.  Courts reviewing claims brought pursuant to C.G.S. §46a-60(a)(1) generally apply the same standards as those applied to claims brought under Title VII.  See Levy v. Commission on Human Rights and Opportunities, 236 Conn. 96, 103, 671 A. 2d 349, 355 (1996).

The parties have important, substantive disagreements as to the proper elements of the prima facie case that apply to an assessment of the sufficiency of evidence under Title VII and the CFEPA.  The defendant argues that the elements of the prima facie case applicable to the plaintiff's discrimination claims are identical to the elements she must establish under the EPA, i.e., that Professor Slane must establish that her position is substantially equal to that of Professor Book.  (Def Brief at p. 21.)  This argument, however, is founded on dicta from the Second Circuit's decisions in Tomka and Belfi that is neither doctrinally correct, nor directly applicable to Professor Slane's discrimination claim.

The Second Circuit in Tomka stated that "A claim for unequal pay for equal work under Title VII . . . is generally analyzed under the same standards as in an EPA claim." 66 F.3d at 1312.  As QUSL points out, this language is quoted in a number of subsequent decisions where the plaintiff's Title VII claim rests on identical factual allegations as does her EPA claim, i.e., that she is paid less for doing a job that is substantially equivalent to that of a male comparator.  See, Def Brief, pp. 21-22.

- 33 -

However, several courts, including the Connecticut Superior Court in <u>Connecticut</u>

<u>Commission on Human Rights and Opportunities v. Connecticut Commission on Human</u>

<u>Rights and Opportunities</u>, 2001 WL 497089 *7 (Conn. Super. 2001), have noted that

Title VII is broader that the EPA, and that "[t]he nature of the proof needed to establish

that a job is similar is not the same under" the two statutes.  Rather, "Title VII

incorporates a more relaxed standard of similarity between male and female-occupied

jobs . . . [A] Title VII plaintiff is thus "not required to meet the exacting standard of

substantial equality of position set forth in the Equal Pay Act."  <u>See</u>, <u>Sprague v. Thorn</u>

<u>Americas, Inc.</u>, 129 F.3d 1355, 1362-1363 (10th Cir. 1997); <u>Lloyd v. Phillips Brothers,</u>

<u>Inc.</u>, 25 F.3d 518, 525 (7th Cir. 1994); <u>Klindt v. Honeywell International, Inc.</u>, 303

F.Supp.2d 1206, 1221-1222 (D. Kansas 2004); <u>Glover v. Kindercare Learnin Centers,</u>

<u>Inc.</u>, 980 F. Supp. 437, 446 (M.D. Ala. 1997); <u>Thompson v. City Of Albuquerque</u>, 950 F.

Supp. 1098, 1104 (D.N.M. 1996); <u>Noel v. Medtronic Electromedics, Inc.</u>, 973 F. Supp.

1206, 1212 (D.Colo. 1997).  Indeed, this distinction is mandated by the Supreme Court's

decision in <u>County of Washington v. Gunther</u>, 452 U.S. 161, 101 S.Ct. 2242 (1981), in

which the Court determined that a cause of action for discriminatory compensation

based on sex could arise under Title VII even where the plaintiff cannot show that she is

paid less than a man performing equal work as that term is used in the EPA.  <u>See</u> 452

U.S. at 178-181; <u>Sprague</u>, 129 F.3d at 1362; <u>Plemer v. Parsons-Gilbane</u>, 713 F.2d

1127, 1132 (5th Cir. 1983); <u>Miranda v. B&B Cash Grocery Stores, Inc.</u>, 975 F.2d 1518,

1527-1528 (11th Cir. 1992).

      Professor Slane's claim in the instant case is significantly broader than simply one

of equal pay for equal work: she contends that her salary was set at an artificially low

- 34 -

level when she was hired in 1994, at least in part, because she was a woman, but that the discriminatory salary-setting did not become apparent to her until she learned of Professor Book's salary in 2000.  Thus, the disparate treatment between Slane and Book is part of the evidence adduced in support of the plaintiff's *prima facie* case of sex discrimination; she does not assert merely an equal pay for equal work claim.

In such circumstances, it is sufficient for the plaintiff to show that minimal evidence exists from which a jury could infer that the plaintiff's sex may have been a factor in the determination of her salary.  The salary disparity between the plaintiff and Professor Book may provide evidentiary support for that inference if a reasonable jury could find that his situation is "sufficiently similar to plaintiff's to support at least a minimal inference that the difference in treatment may be attributable to discrimination." McGuinness v. Lincoln Hall, 263 F.3d 49, 53-54 (2d. Cir. 2001); Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir. 2001); see also Amro v. The Boeing Company, 232 F.3d 790, 798 (10th Cir. 2000) ("A person alleging a Title VII wage discrimination claim must show, as part of his *prima facie* burden, that he was paid less . . . than other similarly situated non-protected class employees."); Connecticut Commission on Human Rights & Opportunities v. City of Torrington, 2002 WL 1293315 (Conn. Super. 2002) ("[A] female Title VII plaintiff establishes a *prima facie* case of sex discrimination by showing she occupies a job similar to that of higher paid males . . . .").

Once the plaintiff makes out a *prima facie* case, a presumption arises that the employer unlawfully discriminated, and the burden shifts to the defendant to proffer a nondiscriminatory reason for the adverse employment action.  If the employer introduces such evidence, the  burden returns to the plaintiff to prove "that the legitimate reasons

- 35 -

offered by the defendant were not its true reasons, but were a pretext for discrimination."
Reeves v. Sanderson Plumbing Products Co., 530 U.S. 133, 143 120 S.Ct. 2097 (2000).
The ultimate question is whether a reasonable person could find that the adverse
employment action complained of was motivated at least in part by prohibited
discrimination.  Stratton v. Dept. for the Aging, 132 F.3d 869, 878 (2d Cir. 1997).

　　　The plaintiff is not required to prove that the prohibited motivation was the sole or
even the principal factor in the decision, or that the employer's proffered reasons played
no role in the employment decision, but only that those were not the only reasons and
that the plaintiff's protected status contributed to the employer's decision.  Holtz v.
Rockefeller & Co., 258 F.3d 62, 78-79 (2d Cir. 2001); Renz v. Grey Advertising, Inc., 135
F.3d 217, 220-222 (2d Cir. 1997); Stratton, 132 F.3d at 878; Cronin v. Aetna Life
Insurance Co., 46 F.3d 196, 203 (2d Cir. 1995).  Because direct evidence of
discrimination is seldom available with respect to an employer's mental processes,
plaintiffs in discrimination suits must rely on the cumulative weight of circumstantial
evidence.  Carlton v. Mystic Transport, Inc., 202 F.3d 129, 135 (2d Cir. 2000), cert.
denied, 530 U.S. 1261, 120 S.Ct. 2718 (2000).

　　　2.　　A Reasonable Jury Could Find That The Plaintiff Has Established A
　　　　　　*Prima Facie* Case Of Sex Discrimination and That The Law School's
　　　　　　Explanation For The Pay Differential Was A Pretext for
　　　　　　Discrimination

Because the plaintiff has carried her *prima facie* burden on her EPA claim, and
further, because the record contains abundant evidence of pretext, summary judgment
on the plaintiff's Title VII and CFEPA sex discrimination claims cannot enter: the
disputed issues of fact that preclude summary judgment on the EPA claim would also

- 36 -

allow a reasonable jury to find the ultimate fact that Slane's sex was a substantial

motivating factor in the determination of her salary.  See Belfi, 191 F.3d at 139.  The

record also contains substantial additional evidence that supports the conclusion that the

pay disparity between Professors Slane and Book was the result of sex discrimination,

including the following:

- The initial decision to set Slane's salary artificially low was infected with
  sex stereotyping, as described above.

- The individual who actually was serving as the Director of Legal Skills
  during the year Slane was hired, was a male who was paid a salary of
  $81,000 – more than double what the plaintiff was paid that year.  When
  that position was again assigned to a woman in 1997, her salary was only
  $56,000; her salary was increased to $60,000 for 1998-99.  By contrast,
  when a male again assumed the Director's role in 1999-2000, his salary
  was increased from $83,500 to $106,333.

- Slane's female colleague in the clinic, Professor Kaas, who was fully
  tenured and had been a member of the Law School faculty since 1989,
  was paid only $7,500 more than Book in 1997-98, despite the fact that
  Book had no prior teaching experience of any kind, and was in an entry-
  level, non-tenured track position.  Kaas, though, was paid substantially less
  than the other male clinician employed by QUSL.

- When a female visiting professor was hired to teach the Tax Clinic during
  the fall of 1994 and teach one doctrinal tax course during the spring of
  1995, she was paid $18,400 for the academic year.  One year later, in
  1995-96, the male visitor who directed the Tax Clinic during the fall term
  and taught one doctrinal course during the spring term, was paid $80,000,
  over four times what his female predecessor had been paid.

- Book had no prior teaching experience whatsoever before being hired by
  QUSL in 1997, while Slane had been teaching at the Law School since
  1994, and had taught in other settings for fifteen years before attending
  law school at Yale.

- As a law student, Slane participated in Yale's clinical education program
  for five semesters, had worked full-time in the clinic for one summer,
  served as a supervising student and student director in the clinic, and was
  awarded a prize for her clinical work, while Book had not participated in a
  clinic during law school.

- 37 -

- In 2000-2001 the lone male clinical faculty member was paid $36,300 more than the average salary of the three female clinical faculty members, and there was a disparity of nearly $10,000 between the average salaries of males and females within the doctrinal facility.

These facts, in combination with the *prima facie* case evidence and the overwhelming evidence of pretext discussed above, bar summary judgment on Counts II and IV of the Amended Complaint.

D.    A REASONABLE JURY COULD FIND THAT THE PLAINTIFF HAS BEEN SUBJECTED TO RETALIATION AS A RESULT OF FILING DISCRIMINATION COMPLAINTS WITH THE CONNECTICUT COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES, THE EEOC, AND THIS COURT

1.    The Legal Standard for Retaliation Under Title VII and the CFEPA

To establish a claim of retaliation, a plaintiff must plead and prove that: (1) she was engaged in an activity protected under Title VII;  (2) her employer was aware of her participation in the protected activity; (3) her employer took adverse action against her; and (4) a causal connection existed between her protected activity and the adverse activity taken by her employer.  Raniola v. Bratton, 243 F.3d 610, 624 (2d Cir. 2001); Gregory v. Daly, 243 F.3d 687, 700 (2d Cir. 2001; Bolick v. Alea Group Holdings, LTD, 278 F. Supp. 2d 278, 284 n.7 (D. Conn. 2003). This standard also is applied to retaliation claims brought pursuant to C.G.S. § 46a-60(a)(4).  Bolick, 278 F. Supp. 2d at 283.  "Protected activity" for purposes of a retaliation analysis includes internal, informal complaints to management, as well as filing formal charges of discrimination.  Gregory, 243 F.3d at 700-701; Bolick, 278 F. Supp. 2d at 284, n.7.  "[T]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action."  Cifra v. G.E. Co.,

- 38 -

252 F.3d 205, 217 (2d Cir. 2001) (internal citations omitted).  The causal connection can also be shown by evidence of retaliatory animus.  <u>Bolick</u>, 278 F. Supp. 2d at 284.

      2.     <u>The Record Contains Abundant Evidence From Which A Reasonable Jury Could Find That QUSL Has Failed To Adjust The Plaintiff's Salary To An Appropriate Level Since July 2000 Because She Filed A Complaint of Discrimination</u>

QUSL does not dispute the first elements of Slane's retaliation claim, that she engaged in protected activity by raising her concerns of gender-based salary discrimination to QUSL's Dean and Acting Dean and by filing formal discrimination complaints with the CHRO and EEOC, and that the employer was aware of her protected activities.  Instead the defendant contends that the plaintiff has not suffered an adverse employment action and that, even if she has suffered such an adverse action, there is insufficient admissible evidence to allow this claim to be submitted to a jury.  Both of these arguments are unavailing.

      a.     <u>Professor Slane Has Suffered Adverse Employment Actions</u>

The Second Circuit repeatedly has held that in determining whether an employer's action, or failure to act, constitutes a material adverse change in working conditions, is a flexible notion for which there exist no "bright-line rules," and that courts "must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'" <u>Richardson v. New York Dep't Corr.</u> Serv., 180 F.3d 426, 446 (2d Cir. 1999); <u>Wannamaker v. Columbia Rope Co.</u>, 108 F.3d 462, 466 (2d Cir. 1997); <u>Bolick</u>, 278 F. Supp. 2d at 283.  This analysis requires a case by case determination considering the specific circumstances at issue.

Here the plaintiff alleges that she has suffered two distinct types of reprisal as a

- 39 -

result of filing her discrimination claim: (1) The University has failed to adjust her salary since 2000-2001, despite the Law School's admission during the spring of 2000 that she was mistakenly being paid at a level that was not commensurate with the duties and responsibilities of her position,[6] and (2) That the 1% raise she received for the 2002-2003 academic year (the next year after she filed the discrimination complaint now pending in this court) was substantially below both her own previous raises and the average raise for her faculty colleagues in that year.  Unlike the decisions cited by the defendant (Def's Brief, at pp. 27-28), each of these claims involves issues of compensation, and therefore plainly involves a core aspect of a person's employment conditions.  The reasoning underlying those rulings is thus inapplicable to the particular circumstances of the instant case.

The fundamental question here is whether an employer's decision to refuse to adjust an employee's compensation at least to the level that the employer itself has acknowledged to be appropriate is an adverse employment action.  In other words, is the knowing withholding of an earned raise, commission, salary adjustment or other form of compensation an adverse employment action?  It is beyond cavil that, when phrased in this manner, the question must be answered in the affirmative.

The denial of an economic benefit to which an employee is otherwise entitled because the employee has filed a discrimination complaint is indisputably an adverse employment action within the meaning of Title VII.  See Carney v. American University,

---

[6]  In addition, during her first six years at QUSL, Slane received annual salary increases averaging 8.325%, but for the three years since she made her discrimination complaint, Slane's annual raises have averaged only 2.26%.

- 40 -

151 F.3d 1090, 1095 (D.C. Cir. 1998) (withholding extra severance pay in retaliation for plaintiff having signaled her intention to file discrimination suit). Such conduct is precisely what is at issue in the instant case. It would be fundamentally inconsistent with Title VII's anti-retaliation provisions to permit an employer to avoid liability by finding that its withholding of pay or benefits it knows – and has acknowledged – that the plaintiff is entitled to receive is not an adverse employment action.

>        b.    <u>QUSL has admitted that it has refused to adjust Slane's salary because she has chosen to pursue her gender discrimination claim</u>

The defendant's recitation of the "material" facts demonstrates a fundamental misunderstanding of the factual basis of Professor Slane's retaliation claim. In a nutshell, the plaintiff alleges that she brought her concerns about gender-based pay inequities to Dean Cogan, who denied gender discrimination, but admitted that the plaintiff's salary was unfair. He offered that he had mistakenly pegged her salary to that paid to new assistant professors of legal skills, rather than treating "her as a clinician, which she is", and volunteered both to raise her concerns with incoming Interim Dean King and to urge him to rectify the situation. Because there had been no adjustment to her salary during the last weeks of Cogan's tenure, Slane brought her concerns to Interim Dean King, who stated that he was "shocked" when he learned how low her salary was, and acknowledged to Quinnipiac's chief academic officer Kavanagh that Slane's contracts "had been biased in favor of the College from the beginning." After reviewing all faculty salaries, King recommended to Kavanagh that Slane's salary be increased to a sum that neither King nor Kavanagh can now recall. In January 2001, however, QUSL offered plaintiff a salary of $70,000.

- 41 -

Despite Cogan's and King's acknowledgment that the plaintiff's salary was unfair, and not commensurate with her duties and responsibilities, and despite King's recommendation that plaintiff's salary be increased, QUSL has not adjusted Slane's salary beyond the ordinary increases given to all faculty. The defendant has stated that, it decided not to increase Slane's salary to an appropriate level after she filed her discrimination complaint "after consultation with counsel," and "because she hasn't settled her suit." In other words, for the past three years the Law School has continued to pay Professor Slane what it knows to be an inappropriately low salary because she has chosen to pursue her gender discrimination claim.

        c.     <u>Plaintiff's claim is not founded on inadmissible evidence of conduct or statements made during the course of compromise negotiations</u>

As an initial matter, there can be no question but that the statements made by Cogan (in May 2000) and King (in July 2000) in response to Slane's assertion that she was being unfairly compensated were not made during compromise negotiations. Rather, they were made in response to the plaintiff's notice to Cogan and King of her concerns about gender-based pay disparities among the Law School's clinical faculty. Pre-negotiation exchange of information did not begin until October 24, 2000, when Slane delivered her statement of damages to King; settlement negotiations did not begin until January 2001, when King and Kavanagh met with the plaintiff and Professor Kaas to present the defendant's first settlement offer. In any event, the defendant's determination that Slane was being underpaid for the work she was performing and should be adjusted was made prior to the commencement of any settlement discussions.

- 42 -

Furthermore, even if the admissions regarding the plaintiff's inequitable

compensation had occurred during conversations about settling her sex discrimination

claims, it is axiomatic that Rule 408 is not a blanket rule of inadmissibility for any and all

statements made during the course of settlement discussions.  Rather, the exclusionary

rule is explicitly inapplicable where the evidence is offered for "another purpose," i.e.,

"for a purpose other than to prove or disprove the validity of the claims that the offers

were meant to settle." Trebor Sportswear Co. v. The Limited Stores, Inc., 865 F.2d 506,

510 (2d Cir. 1989); Starter Corporation v. Converse, Inc., 170 F.3d 286, 293 (2d Cir.

1999).  Statements of fact made in response to the assertion of a legal claim, even if

made during the course of settlement negotiations, are fully admissible.  See, Evans

Products Company v. Clinton Building Supply, Inc., 174 Conn. 157, 160-161, 391 A.2d

157 (Conn. 1978).

Applying these principles to precisely the same circumstances as in the instant

case – where the defendant challenged the admissibility of statements made in

response to a claim of discrimination to support a claim of retaliation – the Court of

Appeals for the D.C. Circuit held that such statements "can be used to establish an

independent violation (here, retaliation) unrelated to the underlying claim which was the

subject of the [statement] (race discrimination)." Carney v. American University, 151

F.3d 1090, 1095 (D.C. Cir. 1998) (statement in defendant's counsel's correspondence to

the effect that under certain interpretations of the defendant's manual, the plaintiff might

be entitled to an additional three months of pay, but that the University had denied the

request because the plaintiff had already been advised that the plaintiff intended to sue,

admissible on retaliation claim); see also Carr v. Health Insurance Plan of Greater New

- 43 -

York, Inc., 2001 WL 563722 (S.D.N.Y. 2001) (offer to rehire plaintiff contingent on signing release of legal claims is admissible evidence of retaliation).  Like the statements at issue in Carney and Carr, the statements made by Cogan and King in response to Slane's assertion regarding her salary and the explanations they provided during their deposition testimony are not offered to prove the validity of the plaintiff's underlying claim of discrimination, but rather to establish her independent claim of retaliation. Thus, they are outside the scope of Rule 408.

    3.    <u>The Record Contains Sufficient Evidence From Which A Reasonable Jury Could Find that The Plaintiff Was Denied a Reasonable Salary Increase For the 2002-2003 Academic Years Because She Had Complained About Gender Discrimination</u>

The facts supporting the plaintiff's retaliation claim concerning the 1% raise that she received for the 2002-2003 academic year are set forth in paragraphs 45-47 of the plaintiff's Rule 56(a)2 Statement.  The *prima facie* case is easily met based upon timing: This was the first opportunity the defendant had to adjust the plaintiff's salary since she had made her complaint of sex discrimination, and the offer letter came within six weeks of the filing of this lawsuit.  This marked the first time in her QUSL career that Slane did not receive at least the average raise afforded to the rest of the faculty.

The defendant asserts that the sole reason for its decision to give Slane a substandard raise was Acting Dean King's assessment that Slane had only "limited scholarly accomplishments during her spring 2002 sabbatical."  The record contains abundant evidence from which a jury could conclude that this explanation is pretextual, including: (1) no such concern was ever expressed to Slane by King during the plaintiff's brief sabbatical; (2) during the four months she was technically on sabbatical, Slane

- 44 -

continued to perform substantial duties with respect to the internship program which effectively left her with 2 ½ months to do scholarly work; (3) During her sabbatical Slane in fact did conduct research, completed and revised a scholarly ethics committee opinion, prepared a working outline for a proposed article that later evolved into a published article; and (4) only three other faculty members received raises as low as 1% for 2002-2003, and King described each of those other individual's performance as "seriously substandard" in the areas of teaching and/or service, while the plaintiff's performance in those categories was "very good."

From the foregoing record evidence, a reasonable jury could easily conclude that Professor Slane would have received a raise at least equal to the 3% pool average for the 2002-2003 academic year had she not filed and continued to pursue in court her claim of gender discrimination.

IV.    <u>CONCLUSION</u>

For all of the foregoing reasons, summary judgment is not appropriate in this case.  The plaintiff therefore requests that the defendant's motion for summary judgment be denied in its entirety.

Respectfully submitted,


By:    _____
       Gregg D. Adler ct05698
       Livingston, Adler, Pulda, Meiklejohn
         & Kelly, P.C.
       557 Prospect Avenue
       Hartford, CT 06105-2922
       (860) 233-9821

On the brief: Cindy R. Slane

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing the Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment has been mailed first-class, postage pre-paid on this 30th day of April, 2004 to the following counsel of record:


Stephen B. Harris
John G. Zandy
William J. Albinger
Wiggin & Dana, LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832


_____

Gregg D. Adler