# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____
                                                  :
CINDY SLANE,                           :        CIVIL ACTION NO.
          Plaintiff,                        :        3:02 CV 00821 (AWT)
                                                  :
v.                                             :
                                                  :
QUINNIPIAC UNIVERSITY       :
SCHOOL OF LAW                   :
          Defendant.                     :
_____:        April 30, 2004

## PLAINTIFF'S LOCAL RULE 56(a)2 STATEMENT
## IN SUPPORT OF MEMORANDUM OPPOSING SUMMARY JUDGMENT

The plaintiff provides the following statements of material facts in dispute,

pursuant to D. Conn. L. Civ. R. 56(a)2.

I.    PLAINTIFF'S RESPONSE TO DEFENDANT'S LOCAL RULE 56(a)(1)
      STATEMENT

1.    Admitted.

2.    Admitted.

3.    Admitted.

4.    Denied in part; substantial raises went only to the few legal writing faculty

      members who were appointed as Assistant Professors of Legal Skills under the

      new personnel policies adopted in April 1997. (QUSL Personnel Policies; Cogan

      Depo. at p. 22; e-mail from Cogan to Kaas and Slane dated May 31, 2000.)

5.    Admitted to the extent that Defendant's paragraph 5 presents an incomplete list

      of the responsibilities of the externship director's position.  (Slane Aff. ¶¶ 29-33,

      Attachment A (Memo from Curriculum/Skills Committee to Faculty dated

- 2 -

3/14/94); Slane Depo. at pp. 24-26, 31-38, 43-61, 69-70, 72-73 (describing

director's responsibilities).)

6.     Admitted.

7.     Admitted to the extent that paragraph 7 presents an incomplete list of the

plaintiff's responsibilities.  (Slane Aff. ¶¶ 29-33, Attachment A (Memo from

Curriculum/Skills Committee to Faculty dated 3/14/94); Slane Depo. at pp. 24-26,

31-38, 43-61, 69-70, 72-73 (describing director's responsibilities).)

8.     Denied in part, insofar as plaintiff's responsibilities with regard to soliciting

applications from students involve counseling students with respect to their

educational goals and the fit between those goals and the externship options

open to them, which involves teaching and advising them.  (Slane Depo. at p.

45.)

9.     Denied in part, as site visits vary in length, with some lasting less than an hour

and some lasting considerably more than an hour.   (Slane Depo. at p. 70.)

10.    Admitted.

11.    Denied.  Although the plaintiff does not appear as counsel-of-record in legal

matters, she does advise students as to how to conform their conduct to the

rules of ethics, which are "law;" she could not provide that advice were she not

admitted to the bar in the relevant jurisdiction.  (Slane Depo. at 218-221)

12.    Denied.  QUSL provides insurance coverage for all lawyers employed by the

University under a general errors and omissions policy.  (Slane Aff. ¶ 34,

Attachment Q (E-mail from James Trowbridge to Kaas, O'Connor, Stark and

Slane dated February 23, 2004).)

- 3 -

13.　Denied in part as to the characterization of commuting to and from placement sites to conduct visits with site supervisors as a "substantial portion" of the externship director's job, and as to the characterization of plaintiff's role in reviewing and responding to student journal entries as "critiquing" those documents (Slane Depo. at p. 58), and to the extent that paragraph 15 suggests that the enumerated functions are the externship director's primary responsibilities.  (Slane Aff. ¶¶ 29-33, Attachment A (Memo from Curriculum/Skills Committee to Faculty dated 3/14/94); Slane Depo. at pp. 24-26, 31-38, 43-61, 69-70, 72-73 (describing director's responsibilities).)

14.　Admitted.

15.　Admitted.

16.　Denied.  When Cogan proposed Slane's initial salary, the model Cogan recommended was not characterized as "temporary," but rather designated as a three-year experiment intended to bring the externship program into compliance with American Bar Association accreditation standards, with the expectation that, if the program was successful, it would be continued.  (Slane Aff. ¶ 6, Attachment A (Memo from Curriculum/Skills Committee to Faculty dated 3/14/94); King Depo. at pp. 21-22 (characterizing the externship program at the outset as "experimental".)  Cogan did not offer plaintiff a salary between that of legal writing instructors and tenured faculty members, but rather miscategorized her as a legal writing instructor instead of as a clinician (Slane Depo. at pp. 106-107; Kaas Depo. at pp. 27-31; e-mail from Cogan to Kaas and Slane dated May 31, 2000), and offered her a salary very close to what a female legal writing

- 4 -

instructor, later mistakenly identified by Cogan as the then-Director of the Legal

Skills program (Cogan Depo at pp. 42, 61-62, 90), was earning.  (Slane Aff. ¶ 22,

Attachment J)

17.    Admitted.

18.    Admitted.

19.    Admitted.

20.    Admitted.

21.    Admitted, but the statement is incomplete.  (See Plaintiff's Rule 56(a)2

Statement, Part II, ¶ 11.)

22.    Admitted.

23.    Admitted.

24.    Denied in part, insofar as Book had already decided to leave his position as a

lawyer in private practice in New York City, a move he characterized as a

"change-of-lifestyle decision," before he interviewed for the QUSL tax clinic job.

(Book Depo. at p. 10-11)

25.    Admitted.

26.    Admitted.

27.    Admitted, except with respect to the assertion that the reason for the small

number of students is "the caseload and the intensity of work."

28.    The plaintiff admits that this paragraph accurately reflects her deposition

testimony on this subject, but she would be unable to stipulate to the underlying

factual assertion because she does not have direct knowledge of the applicable

admission requirements.

- 5 -

29. Admitted.

30. Denied in part, in that Book received summer research stipends, $7,000 in 1998 and $6500 in 1999. (Book Depo. at 19, 20)

31. Denied in part, in that although Book did receive research grants for two summers, he doesn't have a firm recollection of presenting the results of his research after one of the two summers.  (Book Depo. at p. 26)

32. Admitted.

33. Admitted to the extent that Defendant's paragraph 33 presents only a partial list of the statements Cogan made during the May 30, 2000 meeting.  (Slane Depo. at pp. 104-108; Kaas Depo. at pp. 27-34; Kaas Handwritten Notes of May 30, 2000 meeting with Cogan.)

34. Denied in part, to the extent that Def's paragraph 34 suggests that, because Cogan later claimed to have been acting as an advocate when he drafted his proposed letter to King on May 31, 2000, his statement in that e-mail, asserting that Slane's and Book's duties and responsibilities were essentially the same, was not truthful when he made it.  In fact, in his deposition testimony, Cogan did not disclaim as untruthful or inaccurate any of the statements made in the May 31, 2000 e-mail to Slane and Kaas.  (Cogan Depo. at pp. 38-40.)

35. Admitted in part, except to deny the characterization of the document at issue as a letter; it was a memo.

36. Denied in part, in that Cogan's June 2, 2000 message to Slane disclaimed only some, but not all, of the arguments and conclusions set forth in the June 2, 2000 memo from Kaas and Slane.  For instance, Cogan did not disclaim his statement

- 6 -

that the plaintiff's and Book's duties and responsibilities were essentially the same, nor did he disclaim his statement that he had made a mistake in setting the plaintiff's salary, and in not treating her as a clinician from the outset.

37.    Admitted.

38.    Denied in part, insofar as, a) deposition testimony regarding the length of the meeting conflicts (Slane Depo. at p. 140; Kaas Depo. at p. 68; King Depo. at p. 29-30); b) King stated that, when he reviewed faculty salaries upon becoming interim dean, he was "shocked at . . . how low [the plaintiff's salary] was . . . ." (Slane Depo. at p. 141; Kaas Depo. at p. 67); and c) King informed the plaintiff and Kaas that he would raise their concerns with Kavanagh and that they would ultimately reach President Lahey. (Slane Depo. at p. 141; Kaas Depo. at p. 69.)

39.    Denied in part, in that King advised Kavanagh, not that the plaintiff was "somewhat underpaid," but that Slane's contracts had been "biased in favor of the college from the beginning"  (Slane Depo. at p. 150), a statement that he later reported to the plaintiff, characterizing it as an "admission against interest." (Slane Depo. at p. 150), and to the extent that Def's paragraph 39 suggests that King did not advise Kavanagh of his determination regarding a fair salary for Slane until after the plaintiff filed her complaint with the CHRO and the EEOC.  In fact, King made his recommendation to Kavanagh before Slane filed her complaint.  (King Depo. at p. 43.)

40.    Admitted in part, to the extent that Def's paragraph 40 describes only two of the many statements made by Dean King during the July 27, 2000 meeting.  (Slane Depo. at pp. 140-143; Kaas Depo. at pp. 67-69.)

- 7 -

41.   Denied in part, in that Def's paragraph 41 characterizes the plaintiff's October 24, 2000 letter as a "broad outline of her alleged damages," when in fact the letter provided a detailed analysis of the plaintiff's alleged damages  (October 24, 2000 Letter from Slane to King), and in that it omits reference to the letter's explanation that the two-week timetable she outlined was a function of the limitations period for filing an administrative complaint.  (<u>See</u>, Rule 56(a)2 Statement, Part II, ¶ 42.)

42.   Admitted.

43.   Admitted.

44.   Denied in part, to the extent that Def's paragraph 44 suggests that the reasons it enumerates were the only reasons for Slane's rejection of QUSL's January 2001 settlement proposal.  The plaintiff did reject the University's January 2001 settlement offer, in part because the salary QUSL proposed would not have established pay equity as between Book and Slane and in part because the proposal did not include a provision for a review of all clinical salaries to ensure that the salary structure was based on rank, seniority, responsibilities and qualifications.  (Slane Depo. at pp. 162-163)  However, Slane also rejected the proposal because it made no provision at all for back pay (Slane Depo. at p. 161), and because the proposed salary was the same as that QUSL was then paying Book's replacement, who was an entry-level clinician six years junior to the plaintiff.  (Slane Depo. at p. 161)

45.   Admitted.

46.   Admitted.

- 8 -

47.    Denied in part.  Although the plaintiff was on sabbatical during the spring 2002 semester and therefore did not teach any seminar classes during that period, she was not relieved of all of her teaching responsibilities, in that she arranged both spring 2002 and summer 2002 placements despite being on sabbatical, and, in January 2002, reviewed work submitted by her fall 2001 students and assigned  their grades for the fall 2001 term.  (Slane Depo. at pp. 45, 227; Slane Aff. ¶ 47)

48.    Denied in part, in that the plaintiff and QUSL actually reached their oral settlement agreement during the mediation conference, when Slane accepted QUSL's settlement offer of an $85,000 annual salary, retroactive to the beginning of the 2001-2002 academic year, with back pay to be computed according to the terms laid out in the May 7, 2001 letter from Zandy to the plaintiff, which had provided for back pay for the three years during which Book had been employed at the Law School.  The settlement agreement later forwarded to the plaintiff (Def's Ex. Z), however, did not accurately reflect the agreement reached by the parties at the CHRO mediation conference, because it provided for back pay for only two of the three years of Book's employment at QUSL.  Slane refused to accept QUSL's unilateral reformation of their agreement.

49.    Admitted.

50.    Admitted.

51.    Admitted.

52.    Admitted.

- 9 -

53.    Admitted.

54.    Admitted in part.  While faculty salaries for the 2000-2001 academic year were

initially frozen at 2000-2001 levels because of budgetary constraints during the

spring of 2002, QUSL announced that it would give the faculty a 1.5% raise,

retroactive to the beginning of the 2000-2001 academic year.  Consequently,

Slane's 2001-2002 salary was $60,650.  (Slane Aff. ¶ 11)


II.    PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE

1.    The plaintiff, Cindy Slane, graduated from Yale Law School in 1992, and

received her bachelor's degree in history/political science from Douglass College in

1974.  She holds a New Jersey secondary level social studies teaching certificate.  For

approximately fifteen years prior to entering law school, the plaintiff was employed as a

teacher, first of secondary-level social studies in the New Jersey public school system

(from 1974-1980), and then of preparatory courses for the Law School Admission Test

and the Scholastic Aptitude Test (from 1981-1989).  (Exhibit 2, Plaintiff's Deposition

dated January 23, 2003 and March 27, 2003, at p. 78-79;[1] Exhibit 1, Affidavit of Cindy

Slane, ¶ 1[2])

2.    As a law student, the plaintiff participated for five semesters in the Jerome

S. Frank Legal Services Organization ("LSO") Disabilities Clinic, first as a student intern,

and then as a supervising student and student director of the Clinic, and also worked as

---

[1] Hereinafter cited as "Slane Depo. at p. ___."

[2] Hereinafter cited as "Slane Aff. ¶ ___."

- 10 -

a full-time, paid intern during the summer between her first and second year of law school.  (Slane Depo. at pp. 19, 77; Slane Aff. ¶ 2)  In her final semester at Yale, the faculty of the Yale Law School awarded the plaintiff the Francis Wayland Prize, the clinical prize given annually to the student who shows the greatest proficiency in the preparation and presentation of a case in negotiation, arbitration, or litigation.  (Slane Aff. ¶ 3)

3.      After graduation from Yale, from 1992-1994, the plaintiff practiced law in the trial department of Day, Berry & Howard, a large, Connecticut-based, regional law firm, which at that time maintained offices in Hartford, Stamford and Boston.  (Slane Depo. at pp. 11-23; Slane Aff. ¶ 4)

4.      In late June or early July 1994, the plaintiff, who was also the mother of three children, the youngest then ten years old, applied for a one-year position as Director of Field Placement Programs advertised by QUSL.  (Slane Depo. at pp. 18-19.) She interviewed for the position with Professors Alexander Meikeljohn and John Morgan, members of the QUSL appointments committee.  (Slane Aff. ¶ 5; Slane Depo. at p. 28.)  During the interview period, Professor Meikeljohn provided the plaintiff with a copy of a memo to the Law School faculty describing the director's position.  (Slane Aff. ¶ 6, Attachment A, Memo from Curriculum/Skills Committee to Faculty dated 3/14/94.)

5.      In July 1994, QUSL Dean Neil Cogan offered the plaintiff a one-year appointment as Visiting Instructor of Law and Director of Field Placement Programs at the School of Law.  Slane Depo. at p. 24; Def's Ex. C ("Cogan Affidavit") ¶ 5.  She began her employment with the defendant in August 1994.  (First Amended Complaint

("Complaint") ¶ 6; Defendant's First Amended Answer and Affirmative Defenses to Plaintiff's First Amended Complaint ("Answer") ¶ 6)

6.      Three months later, the School of Law faculty voted to suspend the then-ongoing national search for a Director of Externships for the remaining two years of the trial period in order to consider first the plaintiff's candidacy, and to vote at the December meeting on whether to extend to the plaintiff a one- or two-year offer "to continue to head and develop the externship program."  (Slane Aff. ¶ 7; Attachment B, November 2, 1994 Faculty Meeting Minutes)  A month later, the faculty voted to extend the plaintiff's contract through May 1997.  (Complaint ¶ 7; Answer ¶ 7)

7.      In a May 2, 2002 Affidavit, Dean Cogan attested that after the plaintiff "had been in the position for a couple of years, [he] decided that the Law School should provide American Bar Association ("ABA") [Accreditation Standard] 405 security to the externship director, the legal skills instructors, and to the third clinic position" and that the faculty subsequently approved his request.  (Cogan Aff. ¶ 6)  In fact, in September 1996, Dean Cogan distributed to the Law School faculty a memo in which he announced that, at the October faculty meeting, he would propose *not* that the externship director be accorded Standard 405 job security, but rather "that a. the externship program be made permanent; b. the directorship of the program be a tenure-track position; and c. Professor Cindy Slane be hired to the position on a three-year contract, with renewal consideration in the fall of the third year." (Def's Rule 56 Statement at ¶ 18; Cogan Depo. p. 34, Ex. 1 (Memo from Cogan to faculty dated

- 12 -

September 16, 1996).)[3]

8.     The faculty did not resolve the issues of the status of legal skills faculty and the new tax clinician until six months later, in April 1997.  (Slane Aff. ¶ 9)  However, at the October 1996 meeting, the faculty voted to make the externship director's position permanent (Def's Rule 56 Statement at ¶ 19), and, breaking with established precedent for filling new, permanent positions (Slane Aff. ¶ 8), to forego a national search to fill the permanent position (Ex. 9, Deposition of David King dated October 16, 2003, at pp. 76-77),[4] instead offering the plaintiff a five-year, renewable appointment to the position, with the option to request that her position be converted to a tenure-track position. (Def's Rule 56 Statement ¶ 19)  Her title in the permanent position was Assistant Clinical Professor of Law and Director of Field Placement Programs. (Complaint ¶ 8; Answer ¶ 8)

9.     Throughout the plaintiff's employment at QUSL, the field placement programs consistently have received praise from colleagues and administrators at the School of Law, from counterparts at other law schools, and from ABA Site Inspectors. The field placement programs also have garnered national, and even international, recognition.  On many occasions, Dean Cogan publicly praised the plaintiff's performance and accomplishments.  Similarly, Interim Dean David King has also publicly praised her performance and accomplishments.  (Complaint ¶ 9; Answer ¶ 9)

_____

[3] In October 1996, tenured faculty members taught in both the Civil and the Tax Clinics; by special arrangement with their employers, full-time employees of the Public Defender's Service and Connecticut Legal Services taught in the Defense Appellate and Health Law Clinics, respectively.

[4] Hereinafter cited as "King Depo. at p. ___."

- 13 -

10.    The plaintiff's starting salary for 1994-95, when she was a Visiting Instructor of Law, was $40,000.  Her salary was increased to $45,000 for 1995-96, and to $48,500 for 1996-97.  Her anticipated salary for the first year of her permanent employment as Assistant Clinical Professor of Law and Director of Field Placement Programs (1997-98) was $54,000, although her salary was reduced because she was on a partial leave of absence during that academic year.  (Complaint ¶ 10; Answer ¶ 10)

11.    The School of Law hired an acting director of externships to assume some of the plaintiff's duties during the plaintiff's 1997-98 partial leave.  (Slane Aff. ¶ 56; Slane Depo. p. 82)  After interviewing several candidates for the position, the plaintiff recommended to Dean Cogan that he offer the position to a male candidate, a lawyer employed by the Public Defender Service who had been teaching in the Law School's Defense Appellate Clinic for the preceding two years.[5]  (Slane Aff. ¶ 56)  Dean Cogan both extended the offer of employment to this candidate and discussed the salary for the position with him in the plaintiff's presence, responding to the candidate's question about what the job paid by deferring the question to the plaintiff:  The plaintiff replied that her contract for the 1997-98 year was for $54,000; Dean Cogan responded, "Then I guess it pays $54,000."  (Slane Aff. ¶ 56)

---

[5] Because all salary information produced by the defendant in response to the plaintiff's discovery requests was produced under the terms of a protective order entered by this Court on April 15, 2003, the plaintiff will identify individuals other than Professors Slane, Book, and Kaas only by title and gender in her submissions.  All documents related to the compensation of other faculty members filed with the plaintiff's Local Rule 56 (a)2 Statement have been redacted to protect confidentiality.

- 14 -

12.    Professor Emanuel did not perform all of the plaintiff's duties during his year as acting director (Cogan Aff. ¶ 10; Slane Depo. at p. 82; Cogan Depo. at p. 66); rather, the plaintiff retained a number of those duties. (Cogan Depo. at p. 62.) Specifically, she arranged placements for all fall-term students; wrote the externship portion of the comprehensive Self-Study report prepared in connection with the fall 1997 ABA Site Inspection; met with the ABA Site Inspectors assigned to assess the Law School's clinical operations and arranged and hosted a luncheon for Site Inspectors and approximately two dozen field supervisors in the externship program (Cogan Depo. at p. 67; Slane Aff. ¶ 10); helped to develop the curriculum for and taught one section of a new, two-credit clinical prerequisite course (Introduction to Representing Clients); and presented on "Making Site Visits Worthwhile" at "Learning from Practice: Developments in Externship Pedagogy," a national conference for externship clinicians held at Catholic University in Washington, D.C., in March 1998. (Slane Aff. ¶ 10)  QUSL paid the plaintiff $10,000 during the period of her leave.

13.    The plaintiff's anticipated salary for 1998-99 was $58,000, although her salary was reduced again because she returned from her partial leave at a reduced course load.  (Complaint ¶ 11; Answer ¶ 11)

14.    In 1999-2000, the plaintiff's compensation for a full teaching/ administrative load was $59,750.  Her salary for the 2000-2001 academic year was $60,650 (Slane Aff. ¶ 11); for the 2001-2002 academic year, $62,590 (Complaint ¶ 22; Answer ¶ 22); for the 2002-2003 academic year, $63,216 (Complaint ¶ 25; Answer ¶ 25); and for the 2003-2004 academic year, $65,150.  (Slane Aff. ¶ 12, Attachment D, (Slane/QUSL 2003-2004 Letter Agreement dated June 12, 2003))

- 15 -

15.     On or about May 17, 2000, the plaintiff learned about the salaries of some of her colleagues.  (Slane Aff. ¶ 13)

16.     In 1997, Leslie Book, a male, had been hired as an entry-level Assistant Clinical Professor and Director of the Tax Clinic under a newly created personnel policy description for long-term-contract clinicians.  (Slane Aff. ¶ 14, Attachment P, (Memo from Cogan to Faculty dated April 24, 1997 with appended draft revisions to QUSL Personnel Policies ("QUSL Personnel Policies"))  Professor Book held a  Bachelor's degree from Franklin & Marshall College, a J.D. from Stanford Law School, and an LLM from New York University Law School.  (Exhibit 4, Affidavit of Leslie M. Book dated February 12, 2002,[6] ¶¶ 2-4)  He had practiced for approximately six years (Exhibit 5, Deposition of Leslie Book[7] dated 11/10/03, at pp. 6-7; Slane Aff. ¶ 14, Attachment E (Leslie M. Book Resume)) before joining the Quinnipiac faculty, but had no previous teaching experience at all (id. at p. 7; Book Aff. ¶ 10) , and had not participated in a clinic while in law school.  (Book Aff. ¶ 5; Book Depo. at pp. 7-8.)

17.     In fact, Professor Book already had decided to leave his firm (Baker and Mackenzie), a move he characterized as a "change-of-lifestyle decision," before he applied for the position at QUSL.  (Book Depo. at p. 10-11.)  And, although Dean Cogan contended that he "tried to get Book in the 50s," (Exhibit 6, Deposition of Carolyn Kaas,[8] at pp. 52-53, Ex. 1 (Handwritten Notes of May 30, 2000 Meeting with

_____

[6]  Hereinafter cited as "Book Aff. ¶ ___."

[7]  Hereinafter cited as "Book Depo. at p. ___."

[8]  Hereinafter cited as "Kaas Depo. at p. ___."

Cogan ("May 30th Meeting Notes"); Slane Depo. at p. 107), Professor Book himself

testified that he did not negotiate salary (Book Depo. at p. 21) with Dean Cogan, or

specify any minimum salary that would be necessary for him to accept the Tax Clinic

position (Book Depo. at p. 14) in 1997; rather, he accepted the first salary offer

proffered by the School of Law.  (Book Depo. at pp. 12-15)  Nor did Professor Book, at

any point during the interview process, discuss his salary at Baker & McKenzie with

Dean Cogan (Book Depo. at p. 14), or with any of the Law School tax faculty.  (Exhibit

6, Deposition of Toni Robinson,[9] at p. 10; Exhibit 7, Deposition of Mary Ferrari,[10] at p.

25)  Finally, although Dean Cogan testified that Professors Toni Robinson, Mary Ferrari

and Mary Wenig told him "what it would take to get [Book]" (Exhibit 8, Deposition of Neil

Cogan[11] at p. 100), Professors Robinson and Ferrari both have testified that they did not

discuss Book's salary with Dean Cogan, nor did they have any knowledge to suggest

that Professor Wenig, who passed away in January 2003, participated in setting

Professor Book's salary.  (Robinson Depo. at p. 10; Ferrari Depo. at p. 25.)

18.    When Professor Book joined the Law School faculty, the plaintiff was

entering her first year in her long-term contract position and held the same rank,

Assistant Clinical Professor, as did Professor Book.  (Slane Aff., ¶ 8)  However, the

plaintiff already had completed three successful years of teaching at the Law School.

Professor Book's initial appointment was for the nine-month, 1997-98 academic year.

---

[9]  Hereinafter cited as "Robinson Depo. at p. ___."

[10]  Hereinafter cited as "Ferrari Depo. at p. ___."

[11]  Hereinafter cited as "Cogan Depo. at p. ___."

- 17 -

His salary for that period was $75,000; his contract also provided for QUSL to pay Professor Book $5,000 for moving expenses.  Professor Book's salary in 1998-99 was $78,750, and his salary in 1999-2000 was $81,000.  (Complaint at ¶ 13; Answer at ¶ 13.)  Thus, the salary gaps between Professors Slane and Book during the three years Book was employed at the Law School were as follows: $21,000 in 1997-98; $20,750 in 1998-99; and $21,250 in 1999-2000.

19.    In addition, although Professor Book had no teaching responsibilities during the summer of 1998, he received a summer research stipend in the amount of $7000 in addition to his salary.  (Book Depo. at p. 19.)  During the summer of 1999, Professor Book likewise had no teaching responsibilities, and received a summer research stipend in the amount of $6500 in addition to his salary.  (Book Depo. at p. 20.)

20.    In May 2000, the plaintiff also learned that Professor Carolyn Kaas' salary for the 1997-98 academic year was $82,500.  (Complaint ¶ 14; Answer ¶ 14.) Professor Kaas had initially taught in the in-house Civil Clinic, but in the fall of 1999, switched to teaching in the externship program.  (Slane Aff. ¶ 15; Slane Depo. at p. 33; Kaas Depo. at pp. 57-58.)  In the fall of 2003, Kaas began teaching a section of in-house clinic students again, in a new evening clinic, but  retained her externship duties. (Slane Aff. ¶ 15)

21.    Notwithstanding the fact that Professor Kaas had been at the Law School since 1989, had been on the tenure track for six years, had been tenured for two additional years, and held the rank of Associate Professor of Law, her salary was only $7500 greater than that of Professor Book, her much junior, entry-level, long-term-

- 18 -

contract-status colleague.  (Complaint at ¶ 14; Answer at ¶ 14)

22.    During the three years that Professor Book worked at the Law School, he did not have sole responsibility for the Tax Clinic; rather, Professors Ferrari and Robinson remained involved with the Tax Clinic and retained their titles as co-directors. (Ferrari Depo. at pp. 9, 11, 17-18.)  In fact, Tax Clinic responsibility historically had been shared among several Law School faculty members  (Ferrari Depo. at pp. 9, 11); in the four years before it hired Professor Book, QUSL twice had hired visiting faculty members to teach in the Tax Clinic, with Professors Robinson and Ferrari retaining their titles as co-directors.  One visitor, a female, taught in the Tax Clinic for two summers (1994 and 1995) and during the fall 1994 term.  (Ferrari Depo. at pp. 12-14; Slane Aff. ¶ 16, Attachment F (Redacted Letters Agreements dated April 15, 1994 (Bates Nos. Def-0517 and  -0518); July 28, 1994 (Bates No. 0516); and April 21, 1995 (Bates No. Def-0514)))  She also taught a doctrinal course, Tax Procedure – Civil, during the spring 1995 term.  (Slane Aff. ¶ 16, Attachment F ( Redacted Letter Agreement dated December 16, 1994 (Bates No. Def-0515).)  Her salary for  providing one month of coverage in the Tax Clinic during the 1994-95 winter break and teaching one doctrinal course in Tax Procedure during the spring 1995 term was $3,400.  (Slane Aff. ¶ 16, Attachment F (Redacted Letter Agreement dated December 16, 1994 (Bates No. Def-0515).)  Her salary for teaching in the Tax Clinic during the fall 1994 term was $15,000. (Slane Aff. ¶ 16, Attachment F (Redacted Letter Agreement dated July 28, 1994 (Bates No. Def-0516)))  Her total compensation for the 1994-95 academic year, then – a year during which she taught in the Tax Clinic in the fall, covered the Tax Clinic during the winter break, and taught one doctrinal tax course in the spring -- was $18,400.  (Slane

Aff. ¶16)  On that basis, had she taught only in the Tax Clinic during both of the 1994-95 semesters, her annualized salary would have been $30,000.

23.    The second visitor who provided Tax Clinic coverage was a male.  He likewise directed the Tax Clinic during the fall term (in 1995), and taught one doctrinal course – "Taxation [of] Business Enterprises" – during the spring term (in 1996).  (Def's Rule 56 Statement ¶ 53; Slane Aff. ¶ 17)  His salary for the 1995-96 academic year was $80,000  (Slane Aff. ¶ 17, Attachment G (Redacted 1995-96 Letter Agreement dated June 5, 1995 (Bates No. Def-0519))), over four times the compensation the defendant paid to the female visitor who had directed the clinic during the fall 1994 term and taught one doctrinal course during the spring 1995 term, just one year earlier.  Book's entry-level salary in 1997-98, though slightly lower than that of his male predecessor, was still two-and-a-half times the annualized clinical-teaching salary paid to the female faculty member who taught in the Tax Clinic in 1994-1995.

24.    The Dean of the School of Law sets all salaries at Quinnipiac University School of Law (Cogan Depo. at pp. 17-20; Exhibit 9, Deposition of David King,[12] at p. 23; Exhibit 10, Deposition of Edward Kavanagh,[13] at p. 15), in consultation with the University's provost (Def's Rule 56 Statement ¶ 15) (later titled the Chief Academic Officer and then the Vice President for Academic Affairs (Kavanagh Depo at pp. 6, 7-8)) and the president of the University.  (Cogan Depo. at pp. 19-20)  John Lahey, Ph.D., has served as president of the University during all periods relevant to this litigation.

---

[12]  Hereinafter cited as "King Depo. at p. ___."

[13]  Hereinafter cited as "Kavanagh Depo. at p. ___."

- 20 -

(Slane Aff. ¶ 18)  John Bennett was the chief academic officer for the University for approximately ten years prior to 2000-2001; Edward Kavanagh served as chief academic officer during the 2000-2001 academic year; and Kathleen McCourt has been the University's chief academic officer since 2001.  (Kavanagh Depo. at pp. 7-8.)

25.    By letter dated May 26, 2000, the plaintiff and Professor Kaas brought their salary concerns to the attention of Dean Cogan.   Their letter to Dean Cogan expressly set forth their belief that the salary disparities at issue were based on gender, rather than merit, rank, or seniority.  (Cogan Depo. at pp. 68-69, Ex. 5 (Letter to Cogan from Slane and Kaas dated May 26, 2000 ("May 26th Letter")))  On or about May 30, 2000, Slane and Kaas met with Cogan to discuss the issues raised in their May 26th letter. (Cogan Depo. at p. 70; Slane Depo. at pp. 104-105; Kaas Depo. at pp. 26-27; Def's Rule 56 Statement at ¶ 33)  At the meeting, Cogan characterized his decisions with respect to the plaintiff's salary as "a mistake" resulting from his incorrect categorization of Slane as a Legal Skills Instructor, rather than as a clinician.  (Slane Depo. at pp. 106-107; Kaas Depo. at pp. 27-31)

26.    Dean Cogan testified that he initially saw the plaintiff's position as most like the position held by the Director of Legal Skills, a female faculty member he identified by name, and that he had set the plaintiff's entering salary accordingly. (Cogan Depo. at p. 42)  In fact, a male faculty member, not the female faculty member Dean Cogan named, was the Director of Legal Skills in 1994-95 (Cogan Depo. at pp. 61-62; Slane Aff. ¶ 20); that male faculty member's salary for 1994-95 was $81,095. (Slane Aff. ¶ 21, Attachment I (Redacted 1994-95 Letter Agreement dated May 19, 1994 (Bates No. Def-0779)).)  The female faculty member Cogan identified was a Legal

- 21 -

Skills Instructor, not the Director of Legal Skills (Cogan Depo. at p. 90; Slane Aff. ¶ 22),

and, like the majority of the Legal Skills instructors at the Law School (Cogan's Depo. at

pp. 22-23; Def's Rule 56 Statement ¶ 4), she was a woman. The defendant has not

produced 1994-95 salary information for this faculty member; her 1995-96 salary,

however, was $41,500. (Slane Aff. ¶ 22, Attachment J (Redacted QUSL Person's

Wages Summary (Bates No. Def-0639) at line 1))

     27.    In his deposition, Dean Cogan noted that most legal writing instructors are

women, and explained his view that, because legal writing positions do not pay very

well, they are more attractive to women than to men. (Cogan Depo. at p. 23.)

Teaching legal writing, he pointed out, "provides an opportunity for people who don't

want to practice in a law firm, practice where the hours are not as fixed as the case is in

a law firm but more fixed than the law school environment and it tends to attract more

women than men. And certainly the salary range . . . tends to attract more women than

men." Id.

     28.    Statistical studies reported by the American Bar Association in an article

entitled "Legal Writing Instruction: The Pink Ghetto of Academe" (Slane Aff. ¶ 23,

Attachment K) confirm a link between gender and compensation. The article reports,

too, that gender-based salary differentials exist even within the legal writing academy,

with male program directors at many law schools earning more than females in like

positions. (Id.) Such has been the case at QUSL as well: in November 1997, when the

male director of Legal Skills at QUSL announced his desire to resign that position to

devote all of his time to doctrinal teaching (Cogan Depo. at p. 62) and a  female faculty

member assumed his directorial responsibilities in addition to her existing duties, the

- 22 -

Law School did not increase her $56,000 annual salary at all, despite the significant increase in her workload.  (Slane Aff. ¶ 24, Attachment L (Redacted Person's Wage Summary (Bates No. Def-0565), at lines 1-2))  In the subsequent year, 1998-99, the female director's salary rose by only $4,000, or 7.14%.  (Slane Aff. ¶ 24, Attachment L (Redacted Person's Wage Summary (Bates No. Def-0566), at line 3))  In 2000-2001, though, when a male faculty member assumed the role of Director of Legal Skills, his salary jumped from $83,500 to $106,333, an increase of $22,833, or 27.35%.  (Slane Aff. ¶ 25, Attachment M (Redacted Person's Wages Summary (Bates Nos. Def-0568, at line 1; Def-0569, at line 1; Def-0570, at line 5)))

     29.    During the May 30th meeting with the plaintiff and Professor Kaas, Dean Cogan also stated that the plaintiff was a clinician, and that he should have treated the plaintiff as such from the beginning.  (Slane Depo. at p. 107; Kaas Depo. at pp. 28, 30, Ex. 1 (Kaas' Handwritten Notes from May 30th Meeeting ("May 30th Meeting Notes")))  Dean Cogan stated, too, that there was no basis for a distinction between in-house and externship clinical faculty.  (Slane Depo. at p. 106; Kaas Depo. at pp. 28, 30, 31; May 30th Meeting Notes)  He also offered to present the plaintiff's and Professor Kaas' concerns to Associate Dean David King, who would become Interim Dean on July 1, 2000, and to urge him to remedy the situation.  (Slane Depo. at p. 107; Kaas Depo. at p. 30; Cogan Depo. at pp. 70-71)

     30.    In an e-mail dated May 31, 2000, Dean Cogan forwarded to the plaintiff and Professor Kaas the text of a letter he proposed to send to incoming Interim Dean King.  In the text, he again admitted that he had made a mistake in setting the plaintiff's salary, and stated that Slane and Book's educational and practice credentials "were the

- 23 -

same." (Slane Depo. at pp. 109-110; Dep. Ex. 4, Cogan Depo. at pp. 37-38, Dep. Ex. 3 (e-mail from Cogan to Slane and Kaas dated May 31, 2000 ("May 31st Cogan e-mail")).) He went on to state that "[w]hile their titles were different, their duties and responsibilities were essentially the same; indeed, Professor Slane's can reasonably be said to have been greater, because she worked into the summer, while Professor Book did not." Id. He also stated that the plaintiff "should have been categorized as a clinician, which she is, and [that he] should have proposed to the Provost that she be treated the same way that [Cogan] was proposing to treat Professor Book." Id.

31. In fact, Professor Book's and Professor Slane's jobs, though not identical, were substantially the same. Both were Assistant Clinical Professors with directorial responsibilities (Slane Depo. at p. 33-40; Book Depo. at p. 8), though Book was responsible for only one clinical program (Book Depo. at p. 8; Slane Depo. at pp. 217-218), shared at least some directorial responsibilities with co-directors Robinson and Ferrari (Ferrari Depo. at pp. 17, 18), and reported to the Dean through Professor James Trowbridge, Director of Clinics. (Slane Aff. ¶ 27) Between 1994 and 1998, by contrast, the plaintiff reported directly to the dean (Slane Depo. at p. 218) and was responsible for five externship programs, four of which she taught herself and a fifth which she co-taught with an adjunct faculty member over whom she had supervisory responsibility. (Slane Depo. at pp. 24, 217) In 1998, when Professor Kaas began teaching externship courses, the plaintiff assumed supervisory responsibility for Kaas in that context, as well. (Slane Depo. at pp. 33-38, 217)

32. Both Professor Book and the plaintiff, though, were responsible for supporting students' skill development (Slane Depo. at p. 216; Book Depo. at pp. 8, 29)

- 24 -

and helping them to extract lessons about law and lawyering from real-world experience.  (Slane Aff. ¶ 29; Slane Depo. at pp. 56-57, 59-61)  In fact, in spring 2000, in recognition of their common enterprise as clinicians, Professors Trowbridge, Kaas, Book, Stark and the plaintiff met and agreed upon a set of shared goals applicable to all in-house clinics and externship programs.  (Slane Aff. ¶ 28, Attachment O (Shared Goals for All In-House Clinics & Externship Programs))  Both reviewed and critiqued students' work product.  (Slane Depo. at pp. 25, 41-42, 72-73, 217; Slane Aff. ¶ 29)  Both were required to be knowledgeable about substantive and procedural law (Slane Depo. at pp. 72, 217), Book about tax law and procedure, the plaintiff about the substantive and procedural law applicable in the multiple practice settings in which her students worked.  (Slane Depo. at p. 221)  Both helped students develop mastery of the rules of conduct that govern attorneys in Connecticut, and assisted students in recognizing and responding to ethical dilemmas.  (Slane Depo. at pp. 43, 217, 218-223; Slane Aff. ¶ 30)  Both taught seminar courses and reviewed and responded to student journal entries.  (Slane Depo. at pp. 34-35. 55-56; Book Depo. at p. 8; Slane Aff. ¶ 31)

33.    Both Book and the plaintiff also served on Law School committees (Slane Depo. at pp. 24, 72; Slane Aff. ¶ 31), although under the Law School's personnel policies, neither was required to produce scholarship.  (King Depo. at p. 17; Slane Aff. ¶ 32, Attachment P (QUSL Personnel Policies).)  Because both practiced law, Book as the supervisor of students representing Tax Clinic clients (Book Depo. at p. 8; Slane Depo. at p. 218) and Slane as advisor to students who came to her with questions about how Connecticut Rules of Professional Conduct applied to their conduct in their placements (Slane Depo. at p. 218-23), both were required to be admitted to the bar.

- 25 -

(Slane Aff. ¶ 33, Attachment P (QUSL Personnel Policies) at p. 6; Slane Depo. at pp. 218-23.)  In lieu of malpractice insurance, both were covered by a general errors and omissions policy maintained by Quinnipiac University.  (Slane Aff. ¶ 34, Attachment Q (E-mail message from James Trowbridge to Kaas, O'Connor, Stark and Slane dated February 23, 2004).)

34.    Instructively, the salary discrepancies that are the subject of this dispute notwithstanding, the Law School compensated faculty teaching in the in-house clinic and in the externship program identically for summer teaching – $10,400 for the seven-week summer term (Slane Aff. ¶ 35), and allowed Professor Kaas to move between in-house and externship teaching with no reduction in rank or diminution in compensation. (Slane Aff. ¶ 35)

35.    The plaintiff and Professor Kaas responded to the May 31st Cogan e-mail with a memo that included a revised version of the proposed letter to incoming Interim Dean King.  The revised version of the letter supplied the factual details Dean Cogan had requested (Slane Depo. at pp. 113-114, Slane Aff. ¶ 36, Attachment R (Memo from Kaas and Slane to Cogan dated June 2, 2000 ("June 2nd Memo")); Def's Rule 56 Statement at ¶ 34) and proposed a number of changes to the text to clarify certain facts.  (Def's Rule 56 Statement at ¶ 35.)  Slane and Kaas also suggested that Dean Cogan attach to his message to Dean King a copy of the May 26, 2000 letter from Professor Kaas and the plaintiff to Dean Cogan.  (Def's Rule 56 Statement at ¶ 35.)

36.    Dean Cogan responded to the June 2nd Memo with an e-mailed message that denied gender discrimination and asserted that "many neutral educational and business reasons" prevented him from recommending a substantial increase in the

- 26 -

plaintiff's salary when Professor Book was hired.  (Slane Depo. at pp. 115-116, Slane

Aff. ¶ 37, Attachment S (E-mail from Cogan to Slane dated June 2, 2000))

37.    Professor Kaas and the plaintiff responded to Dean Cogan's message

shortly thereafter, assuring him that they did not expect him to admit gender

discrimination (Def's Rule 56 Statement at ¶ 37), and explaining their reasoning in

requesting that Cogan attach a copy of their letter to his letter to Interim Dean King.

(Slane Aff. ¶ 38, Attachment T (Memo from Kaas and Slane to Cogan dated July 20,

2000).)[14]  Although Dean Cogan did respond to a subsequent 6/19/2000 e-mail

message from Kass, stating that he was "willing to talk to David about the equities"

(Slane Aff. ¶ 39, Attachment U (e-mail from Kaas to Cogan dated 6/19/2000; e-mail

from Cogan to Kaas dated 6/22/00)), Slane and Kaas did not talk again with Dean

Cogan about the salary issues before his deanship ended (Slane Depo. at pp. 137-138;

Kaas Depo. at p. 42), nor did Cogan reply to Professor Kaas' July 12, 2000  request for

update on the status of their matter in advance of a planned meeting with Dean King.

(Slane Depo. at p. 138; Kaas Depo. at p. 50; Slane Depo. at pp. 135-137, Slane Aff. ¶

40, Attachment V (e-mail from Kaas to Cogan dated July 12, 2000))  Based on his

silence, the plaintiff and Professor Kaas surmised that Dean Cogan had not sent the

proposed letter to Interim Dean King, and therefore concluded that they would have to

begin the process of addressing the salary inequities anew with King.  (Slane Depo. at

pp. 144-46; Kaas Depo. at p. 50.)

---

[14]  The date on this memo is incorrect, a function of an imbedded macro that
changed the date on the memo when the plaintiff opened the file to print it.

- 27 -

38.     In or about the last week in July, 2000, after Interim Dean King returned

from his vacation (Slane Aff. ¶ 41), the plaintiff and Professor Kaas provided King with a

copy of their May 26th letter to Dean Cogan, and met with King in his office to discuss

their concerns.  (Slane Depo. at pp. 138, 140-145; Kaas Depo. at p. 67; King Depo. at

pp. 33-37.)  During that meeting, King stated that he was "shocked" when he learned

what the plaintiff's salary was (Slane Depo. at pp. 140-141; Kaas Depo. at p. 67), and

said that he would bring the plaintiff's and Professor Kaas' concerns to University Vice

President Edward Kavanagh and University President John Lahey as soon as possible.

(Complaint ¶ 21; Answer ¶ 21.)

39.     The next day, Dean King told Slane and Kaas that he had advised Vice

President Kavanagh and President Lahey that Professor Slane's contracts had been

"biased in favor of the college from the beginning" (Slane Depo. at p. 150-151), a

comment that he characterized as an "admission against interest."  (Id.)  He also asked

the plaintiff to provide QUSL with an estimate of her damages.  (Id.; Def's Rule 56

Statement at ¶ 40.)

40.     While neither Dean Cogan nor Interim Dean King undertook a systematic

analysis of all law faculty salaries after Professors Slane and Kaas alerted them to their

concerns (Cogan Depo. at pp. 23-24, 78; King Depo. at p. 25; Kavanagh Depo. at p.

27), King did conduct an investigation that led him to conclude that the plaintiff was

underpaid (King Depo. at pp. 38, 57-58; Kavanagh Depo. at pp. 21, 25-27, 31; Def's

Rule 56 Statement at ¶ 39.)[15]  Based on his review of the salaries of other faculty, and

_____

[15] Had King conducted a more systematic survey of the salaries for that year
(2000-2001), he would have learned that the male member of the clinical faculty was

- 28 -

before the plaintiff filed her complaint with the CHRO and the EEOC (King Depo. at p. 43), King recommended what he believed to be a fair salary for the plaintiff to Edward Kavanagh. (King Depo. at pp. 39-43, 56-58; Kavanagh Depo. at pp. 30, 36, 40). Both King and Kavanagh now claim that they cannot recall what that figure was. (King Depo. at pp. 42-44; Kavanagh Depo. at pp. 30, 48.) However, in January 2001, after the University filed its answer to plaintiff's CHRO complaint, the University proposed to increase the plaintiff's then-current salary to $70,000. (Slane Aff. ¶ 45; Def's Rule 56 Statement at ¶ 44)

41.     During the remaining weeks of the summer and the early weeks of the fall, the plaintiff continued to perform all of her externship duties (placing students, teaching classes, meeting individually with students, visiting students and field supervisors at field placements, reading and responding to student journal entries, serving on Law School committees), bar obligations (serving on the Connecticut Bar Association's Ethics Committee), civic obligations (serving as Chair of Connecticut's Permanent Commission on the Status of Women), and family obligations (as spouse and mother) as she worked to gather the information necessary for the preparation of the damages analysis King and Kavanagh had requested. (Slane Aff. ¶ 42) She searched her files for relevant documents; sought information about the salaries paid to clinical faculty members at peer schools; developed an analysis by which she would be able to calculate, based on the salary paid to Professor Book in 1997-98, what her salary

---

being paid a salary that was $36,300 higher than the average of the salaries of the three female clinical faculty members, and that there was a disparity of nearly $9,000 between the salaries paid to males and females within the doctrinal faculty. (Exhibit 11, Affidavit of Corinne Collins, Attachment A)

- 29 -

should have been in 1994-95 and each successive year; and worked to draft a coherent statement of her position on the damages issue.  (Slane Aff. ¶ 42)

42.    By letter dated October 24, 2000, and accompanying spreadsheets, the plaintiff provided King with a detailed breakdown of her damages.  (King Depo. at p. 38-39, Slane Aff., ¶ 42, Attachment W (Letter from plaintiff to King dated October 24, 2000 ("October 24th Letter")))  In the letter, she also explained that, because of the limitations period for filing an administrative complaint, she would have to take action to protect her claim if she and QUSL could not resolve the outstanding issues within two weeks.  (Id.)

43.    Dean King has confirmed that the plaintiff made him aware that the time pressure was a result of the statute of limitations issue.  (King Depo. at pp. 41-42) Nevertheless, the only communication the plaintiff received from the University during the two weeks after October 24th was an e-mail message from King asking for more time to evaluate the proposal.  (King Depo. at pp. 44-47, Slane Aff., ¶ 43, Attachment X (e-mail messages between King and Slane dated October 30, 2000))  Slane responded by explaining that her preference would have been to enter into a tolling agreement, but that she did not believe that she could do so because her understanding was that the CHRO would not honor tolling agreements.  (Id.)

44.    On or about November 7, 2000, the plaintiff filed a complaint with the Commission on Human Rights and Opportunities (CHRO) and the Equal Employment Opportunities Commission (EEOC).

45.    In early December, 2000, plaintiff wrote to King to follow up on her earlier request for a sabbatical during the spring 2002 semester in order to pursue various

- 30 -

scholarly projects.  (Slane Aff. ¶ 46, Attachment Z (E-mail from plaintiff to King dated

December 11, 2000))  Because King had not responded to plaintiff's written request,

and the 2001-2002 list of faculty committee assignments did not indicate that the

plaintiff would be on sabbatical during the spring 2002 term, plaintiff contacted King

again during the fall of 2001 to inquire about his decision, expecting him to report that

he had denied her request.  (Slane Aff. ¶ 46)  Instead, King notified her that he and

Kathleen McCourt had approved the spring-term sabbatical, but that only limited

funding was available for coverage of the plaintiff's externship responsibilities.  (Slane

Aff. ¶ 46)  Because of this  budgetary constraint, Slane agreed that she would play her

usual role in conducting intake and arranging placements for spring- and summer-term

students with the result being that she would not begin her sabbatical until the end of

January 2002 (Slane Depo. at pp. 224-228), and effectively would end it sometime in

late March or early April, when she resumed intake and placement duties for the

summer 2002 term.  (Slane Aff. ¶ 47)

     46.    During the approximately two-and-a-half months of her sabbatical, the

plaintiff updated research and completed revisions to a lengthy and scholarly ethics

committee opinion concerning lawyers' relationships with title insurance companies

(Slane Depo. at 231-236; Slane Aff. ¶ 48, Attachment AA ("Revised Opinion No. 02 –

___: Lawyers' Relationships with Title Insurance Companies")); conducted extensive

research and prepared a working outline for a proposed article advocating mandatory

clinical education as a means of ensuring new lawyers' competence (Slane Depo. at

pp. 236-237); and conducted substantial research, prepared written testimony, and

testified before the Connecticut General Assembly's Judiciary Committee on a bill that

- 31 -

would have changed the definition of the word "person," wherever that term appears in Connecticut's criminal code, to include a viable fetus.  (Slane Aff. ¶ 48)

47.    In part as a result of work done by the plaintiff for two presentations at a national conference on externships at Catholic University in March 2003, the plaintiff's planned article advocating mandatory clinical education has morphed into the "competence" section of an article entitled *Ethics in Externships: Confidentiality, Conflicts, and Competence Issues in the Field and in the Classroom*, co-authored by the plaintiff and colleagues from Boston College Law School and Syracuse University School of Law.  In early summer of 2003, a few days after the article was accepted for publication in the Clinical Law Review, Slane advised Dean King of that fact.  (Slane Aff. ¶ 49; King Depo. at p. 65)

48.    Between 1994-1995, when the plaintiff began her employment at the Law School, and May of 2000, when the plaintiff gave notice of her gender discrimination claim to Dean Cogan, the plaintiff's average raise had been 8.325%.  (Slane Aff. ¶ 50) For example, the plaintiff's full-time base salary increased by 12.5% in 1995-96, by 6.67% in 1996-97, and by 11.1% in 1997-98.  (Id.)  Beginning in 2000-2001, though, just after plaintiff gave notice of her gender discrimination claim to Dean Cogan, and continuing through the current academic year, 2003-2004, the plaintiff's raises have averaged 2.26%.  (Slane Aff. ¶ 51)

49.    Despite the defendant's spring and summer 2000 admissions that the plaintiff's salary was unfair and should be corrected (Cogan May 31 e-mail; Slane Depo. at pp. 106-107, 140-141, 150; Kaas Depo. at pp. 27-31, 67; King Depo. at pp. 39-43, 58; Kavanagh Depo. at pp. 30, 36, 40), the Law School has not adjusted the plaintiff's

- 32 -

salary to address the inequity.  For example, the defendant paid the plaintiff a salary of $60,651 for the academic year 2000-2001, reflecting only the general increase accorded all faculty. (Complaint ¶ 22; Answer ¶ 22)  That figure was approximately $20,000 less than Professor Book's salary for 1999-2000, the preceding year. (Complaint ¶ 22; Answer ¶ 22)  For the academic year 2001-2002, the plaintiff's salary was $62,590, again reflecting only the general increase accorded all faculty. (Complaint ¶ 22; Answer ¶ 22)

     50.     At the May 2002 CHRO factfinding conference that preceded the filing of this complaint, in response to a question from CHRO Investigator Carolyn Anderson, Dean King and Law School counsel John Zandy, in unison, explained why, despite admissions that the plaintiff's compensation was unfair, the Law School had not increased her salary to an appropriate level: "Because she hasn't settled her suit." (Slane Aff. ¶ 52)  Seventeen months later, at his October 16, 2003 deposition, King testified that he did review faculty salaries after meeting with the plaintiff and Professor Kaas, and that he  advised Vice President Kavanagh in 2000 that his review indicated that the plaintiff was underpaid (King Depo. at p. 38); that the Law School could have increased the plaintiff's compensation at any time without conditioning the increase on resolution of her gender claims (King Depo. at p. 54; King Depo. at pp 69-70 (acknowledging QUSL's decision to rectify the summer compensation issue without requiring plaintiff to sign a release or waive any claims); that no action was taken to adjust Slane's salary upward during King's interim deanship (King Depo. at pp. 53-54); and that the Law School had decided not to correct the inequity "after consultation with

counsel" (King Depo. at p. 54) retained shortly after receipt of the plaintiff's CHRO complaint. (Id.)

51.    On or about May 10, 2002, the plaintiff filed the complaint that initiated this federal lawsuit. The salary increase pool for 2002-03 was 3%. (King Depo. at pp. 61-62) On June 27, 2002, the defendant offered the plaintiff a salary of $63,216 for the 2002-2003 academic year, reflecting a 1% increase over her 2001-02 salary. (King Depo. at p. 61) This was the first time that the plaintiff did not receive at least the average raise. (Complaint ¶ 25; Answer ¶ 25)

52.    Only three other faculty members received raises as low as 1% in 2002-2003. (King Depo. at pp. 62-63) In each of those cases, Dean King testified, serious deficiencies in one or more of the three factors the Law School takes into account in making salary determinations (teaching, scholarship, and service) (King Depo. at p. 62) justified his salary decisions. (King Depo. at p. 63) "For [Professor A], it was seriously substandard performance in all three areas; teaching – certainly teaching and research, and maybe average performance in service." (Id.) "For [Professor B] it was seriously substandard performance in teaching. Terrible teaching averages." (Id.) "And for [Professor C], it was also seriously substandard performance in teaching" based on evaluations and "some communications with [Professor C]." (Id.) By contrast, according to King, the plaintiff's teaching and service were both "very good." (King Depo. at pp. 78-79) However, while he acknowledges receipt of Slane's 2001-2002 professional report and a supplemental memo explaining that, during her sabbatical, the plaintiff arranged spring and summer placements, conducted research and produced a working outline for an article, revised and updated an opinion on title

- 34 -

insurance issues for the Ethics Committee, and prepared and presented testimony on a bill before the Connecticut Judiciary Committee (King Depo. at pp. 18-19; Slane Depo. at pp. 228-229; Def's Ex. BB (Plaintiff's 2001-2002 Professional Report and Supplemental Memo); see also King Depo. at pp. 64-65 (acknowledging awareness that Slane still performed some duties with respect to student placements during her sabbatical)), he blames the plaintiff's "limited scholarly accomplishments during her spring 2002 sabbatical" for his decision to recommend only a 1% raise for her during the 2002-03 academic year.  (Def's Rule 56 Statement at ¶ 51)

53.     Dean King also testified both that this lawsuit was pending when he set the plaintiff's 2002-2003 salary (King Depo. at p. 21), and that he never expressed to the plaintiff his concerns about her productivity, either in writing or verbally, because "he was advised not to." (King Depo. at p. 20)

54.     For the academic year 2003-2004, the plaintiff's salary is $65,160, with the  increase again reflecting the general increase accorded all faculty. (Slane Aff. ¶ 53, Attachment D (2003-04 QUSL/Slane Letter Agreement dated June 12, 2003))  Had Slane's salary been adjusted to be equivalent to that paid to Professor Book, taking into consideration her three years of seniority over Professor Book, and had she received the general increases accorded all faculty members, her 2003-2004 salary would have been $ 96, 076.  (Slane Aff. ¶ 55)

THE PLAINTIFF,

By: _____
Gregg D. Adler ct05698
Livingston, Adler, Pulda, Meiklejohn
  & Kelly, P.C.
557 Prospect Avenue
Hartford, CT 06105-2922
(860) 233-9821

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Plaintiff's Local Rule 56(a)2 Statement In Support of Memorandum Opposing Summary Judgment has been mailed first-class, postage pre-paid on this 30th day of April, 2004 to the following counsel of record:

Stephen B. Harris
John G. Zandy
William J. Albinger
Wiggin & Dana, LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832

_____
Gregg D. Adler