UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CINDY SLANE, | CIVIL ACTION NO. |
|     Plaintiff, | 3:02 CV 00821 (AWT) |
| v. | |
| QUINNIPIAC UNIVERSITY SCHOOL OF LAW | |
|     Defendant. | April 27, 2004 |

### AFFIDAVIT OF CINDY R. SLANE

I, Cindy R. Slane, being duly sworn, hereby depose and say:

1. During the spring term of 1974, I worked as a student teacher and short-term substitute teacher at Piscataway High School in Piscataway, New Jersey. From September 1974 through November 1980, I was employed as a certified, secondary-level, public-school social studies teacher in New Jersey, first on two one-semester, sabbatical-replacement contracts at Piscataway High School and Westfield High School (1974-75), then as a tenure-track and then tenured teacher responsible for developing and teaching a ninth-and-tenth-grade honors elective in the West Essex Regional School District (August 1975 – November 1980). Between September 1981 and August 1989, I taught Law School Admission Test and Scholastic Aptitude Test preparation courses for the Stanley H. Kaplan Educational Centers in New Jersey.

2. I began law school in September 1989. As a second-semester, first-year law student at the Yale Law School, I enrolled in the Jerome S. Frank Legal Service's Organization's Disabilities Clinic. I continued my enrollment in the Disabilities Clinic through my second and third years at Yale, first as a law student intern (Spring 1990 and Fall 1990), then as a supervising student (Spring 1991), and finally as both a supervising student and a student director of the Disabilities Clinic (Fall 1991 and Spring 1992). During the summer of 1990, between my first and second years at Yale, I was employed full-time as a law student intern in the Disabilities Clinic.

3. In the spring of 1992, at the close of my third year at Yale, the Yale Law School faculty voted to award me the Francis Wayland Prize, the clinical prize given annually to the student who shows the greatest proficiency in the preparation and presentation of a case in negotiation, arbitration, or litigation.

4. After graduation from Yale, from 1992-1994, I practiced law in the trial department of Day, Berry & Howard, a large, Connecticut-based, regional law firm, which at that time maintained offices in Hartford, Stamford, and Boston.

5. In late June or early July of 1994, I interviewed for the position of Director of Field Placement Programs at then-Quinnipiac College School of Law ("QUSL" or the "Law School") with Professors Alexander Meikeljohn and John Morgan, members of the Law School's appointments committee.

6. During the interview period, Professor Meikeljohn provided me with a copy of a memo from the Law School's Curriculum/Skills Committee to the faculty dated March 14, 1994, which described the director's position. That memo is appended hereto at Attachment A.

7. In November 1994, the Law School's faculty voted to suspend the ongoing national search for a Director of Externships for the remaining two years of the trial period for the position in order to consider first my candidacy, and to vote at the December 1994 faculty meeting on whether to extend to me a one- or two-year offer to continue in my position. The faculty actions were recorded in the minutes of the November 2, 1994 and December 9, 1994 faculty meetings, a copy of which is appended hereto as Attachment B.

8. In October 1996, the faculty voted first to make the externship position permanent, and then broke with established precedent for filling newly-permanent positions by voting to forego a national search to fill my position and to offer me a five-year, renewable appointment to the position with the option to request that the position be converted to the tenure track.

9. The faculty did not resolve the issues of the status of the legal skills faculty and the new tax clinician until six months later, in April 1997.

10. During the spring of 1997, I requested and was granted a partial leave of absence for the 1997-98 academic year. During the period of my partial leave, I performed a number of the duties of my position, including arranging placements for all fall-term externship students, writing the externship portion of the comprehensive self-study report prepared in connection with the fall 1997 ABA Site Inspection, meeting with ABA site inspectors assigned to assess the Law School's clinical operations, arranging and hosting a luncheon for ABA site inspectors and approximately two dozen field supervisors in the externship program, helping to develop the curriculum for and teaching one section of a new, two-credit clinical prerequisite course ("Introduction to Representing Clients"), and presenting on "Making Site Visits Worthwhile" at "Learning from Practice: Developments in Externship Pedagogy," a national conference for externship clinicians held at Catholic University in Washington, D.C., in March 1998. QUSL paid me $10,000 during the period of my leave.

11. My salary for the 2000-2001 academic year was $60,650. A copy of my QUSL wage summary card, which reflects this salary, is appended hereto as Attachment C (Bates No. Def-0638). My 2000-2001 Letter Agreement reflected a salary of $59,750 because salaries for 2000-2001 were originally frozen at 1999-2000 levels, but the University subsequently gave the law faculty a retroactive 1.5% raise which brought my salary for that year to $60,650.

12. My salary for the 2003-2004 academic year is $65,150. A copy of the 2003-2004 Letter Agreement between QUSL and myself, which reflects this salary, is appended hereto as Attachment D.

13. On or about May 17, 2000, I received what I believed to be reliable information about the salaries of some of my colleagues.

14. In 1997, Leslie Book, a male, had been hired as an entry-level Assistant Clinical Professor and Director of the Tax Clinic under a newly created personnel policy description for long-term-contract clinicians. Professor Book subsequently provided me with a copy of his resume, which is appended hereto as Attachment E.

15. From the time she began her employment at QUSL in the fall of 1989 until the fall of 1999, Professor Carolyn Kaas taught in the in-house Civil Clinic. In the fall of 1999, though, Professor Kaas switched to externship teaching. In the fall of 2003, Kaas again began teaching a section of in-house clinic students, in a new evening clinic, but she retained her externship duties. QUSL allowed her to switch from in-house to externship teaching in 1999 with no reduction in rank or diminution in compensation.

16. Appended hereto as Attachment F are Redacted Letter Agreements dated April 15, 1994 (Bates Nos. Def-0517 and -0518); July 28, 1994 (Bates No. Def-0516); December 16, 1994 (Bates No. Def-0515); and April 21, 1995 (Bates No. Def-0514). These Letter Agreements were produced by QUSL in response to my discovery requests. They set forth the agreements between QUSL and the female visitor who taught in the Tax Clinic during the summers of 1994 and 1995, during the fall 1994 term, and during winter break between the fall of 1995 and the spring of 1995, and who taught one doctrinal course in Tax Procedure during the spring 1995 term. The appended documents indicate that the female visitor's salary for teaching in the Tax Clinic during the fall of 1994 was $15,000, while her salary for providing winter break Tax Clinic coverage in December 1994 and January 1995 and for teaching a single doctrinal tax course – Tax Procedure – during the spring 1995 term, was $3400. Her total salary for the 1994-95 academic year, then, was $18,400.

17. Attached hereto as Attachment G is a Redacted Letter Agreement dated June 5, 1995 (Bates No. Def-0519). This Letter Agreement was produced by QUSL in response to my discovery requests. It sets forth the agreement between QUSL and the male visitor who taught in the Tax Clinic during the fall of 1995, and taught one doctrinal course ("Taxation of Business Enterprises") during the spring of 1996. The appended document indicates that the male visitor's total salary for the 1995-96 academic year – for teaching in the Tax Clinic during the fall of 1995 and teaching a single doctrinal tax course (Taxation of Business Enterprises) during the spring 1996 term, was $80,000.

18. John Lahey, Ph.D., has served as the president of Quinnipiac College/Quinnipiac University during all periods relevant to this litigation.

19. On May 26, 2000, Professor Carolyn Kaas and I mailed to Dean Neil Cogan a letter detailing the salary disparities of which we had become aware, and setting forth our belief that the salary disparities were based on gender, rather than merit, rank, or seniority. That letter is appended hereto as Attachment H.

20. In 1994, when I joined the QUSL faculty, the Director of Legal Skills was a male.

21. The redacted 1994-1995 Letter Agreement dated May 19, 1994 (Bates No. Def-0779), appended hereto as Attachment I, was produced by QUSL in response to my discovery requests. It indicates that, in 1994-95, QUSL paid the male director of Legal Skills an annual salary of $81,095.

22. The female faculty member that Dean Neil Cogan identified in his July 2003 deposition as having been the Director of Legal Skills in 1994 did not serve as the Director in that year. Rather, she was a Legal Skills Instructor. QUSL has not produced 1994-95 salary information for this female faculty member. However, the redacted Person's Wages Summary for that female faculty member produced by QUSL in response to discovery requests filed in connection with this litigation, which is appended hereto as Attachment J (Bates No. Def-0639), indicates that her salary for 1995-96 was $41,500.

23. The article "Legal Writing Instruction: The Pink Ghetto of Academe," appended hereto as Attachment K and posted on the American Bar Association's Website, last visited on 3/8/04, confirms a link between gender and compensation, and reports that gender-based salary differentials exist within the legal writing academy, with male program directors at many law schools earning more than females in like positions. This was the case when I began teaching at QUSL in 1994.

24. Redacted Person's Wage Summary sheets Bates Nos. Def-0565 and -0566, copies of which were produced by QUSL in response to discovery requests filed in connection with this litigation and are appended hereto as Attachment L, show the salary history of the female faculty member who assumed the position of Director of Legal Skills in November 1997, when the male director of Legal Skills announced his desire to resign that position in order to devote all of his time to doctrinal teaching. These Wage Summaries show that the female director received no interim increase when she assumed the additional responsibilities as Director of Legal Skills in November 1997, and received only a $4,000 (or 7.14%) increase for 1998-99.

25. The redacted Person's Wage Summary for the male faculty member who assumed the duties of the Director of Legal Skills as of 1999-2000 (Bates No. Def-0569 at line 1 and -0570 at line 5), produced by QUSL in response to discovery requests filed in connection with this lawsuit and appended hereto as Attachment M, indicate that in 1999-2000, that faculty member's salary jumped from $83,500 to $106,333, reflecting an increase of $22,833, or 27.35%.

26. On May 31, 2000, Dean Neil Cogan sent an e-mail message to Professor Kaas and me. A copy of that message is appended hereto as Attachment N.

- 4 -

27. During his tenure at QUSL, Professor Book, as Director of the Tax Clinic, reported to the Dean through Professor James Trowbridge, Director of Clinics.

28. In spring 2000, Professors Trowbridge, Kaas, Book, Stark and Slane met and agreed upon a set of shared goals applicable to all in-house clinics and externship programs, in recognition of their common enterprise as clinicians. (A copy of that document is appended hereto as Attachment O.)

29. Both Professor Book and I, as clinical teachers, were responsible for supporting law students' skill development and for helping them to extract lessons about law and lawyering from real-world legal experience. Both Professor Book and I, as clinical teachers, reviewed and critiqued students' legal work.

30. Both Professor Book and I, as clinical teachers, helped students to develop mastery of the rules of conduct that govern attorneys in Connecticut, and assisted students in recognizing and responding to ethical dilemmas.

31. Both Professor Book and I, as clinical teachers, taught seminar courses and reviewed and responded to student journal entries, and like all other faculty members, served on Law School Committees.

32. Under the Law School's personnel policies for Assistant Clinical Professors, a copy of which was produced by QUSL in response to discovery requests filed in connection with this litigation and is appended hereto as Attachment P, neither Professor Book nor I was required to produce scholarship.

33. Under the Law School's personnel policies for Assistant Clinical Professors, both Professor Book and I were required to be admitted to the bar.

34. On February 23, 2004, Professor James Trowbridge, Director of Clinics at QUSL, sent to me and other members of the clinical faculty an e-mail message, a copy of which is appended hereto as Attachment Q, noting that all lawyers employed by QUSL are covered by a general errors and omissions policy maintained by Quinnipiac University.

35. From 1994 through 2003, QUSL compensated faculty teaching in the in-house clinics and faculty teaching in the externship program identically for summer teaching – $10,400 for the seven-week summer term, and allowed Professor Kaas to move between in-house and externship teaching with no reduction in rank or diminution in compensation.

36. On June 2, 2000, Professor Kaas and I responded to Dean Cogan's May 31st e-mail with a memo that included a revised version of Cogan's proposed letter to incoming Interim Dean David King. A copy of that memo is appended hereto as Attachment R.

37. Dean Cogan responded to our June 2, 2000 e-mail with an e-mailed message dated June 2, 2000, a copy of which is appended hereto as Attachment S.

38. Professor Kaas and I responded to Dean Cogan's message with a memo, now incorrectly dated July 21, 2000 as a result of an imbedded macro that changed the date when I opened the memo to print it. A copy of that memo is appended hereto as Attachment T.

39. Between 6/19/2000 and 6/22/2000, Professor Kaas and Dean Cogan exchanged e-mail messages, copies of which are appended hereto as Attachment U.

40. Dean Cogan did not reply to an e-mail message dated July 12, 2000 from Professor Kaas, a copy of which is appended hereto as Attachment V.

41. Incoming Interim Dean David King took a vacation during the early part of July 2000. When he returned from vacation, Professor Kaas and I met with him in his office to discuss our pay equity concerns.

42. At the end of a second meeting in his office on the following day, Dean King told me that he and Edward Kavanagh would like me to prepare an analysis of my damages. During the remaining weeks of the summer and early weeks of the fall, I continued to perform all of my externship duties (placing students, teaching classes, meeting individually with students, visiting students and field supervisors at field placements, reading and responding to student journal entries, serving on Law School committees), bar obligations (serving on the Connecticut Bar Association's Ethics Committee), civic obligations (serving as Chair of Connecticut's Permanent Commission on the Status of Women), and family obligations (as a spouse and mother) as I worked to gather the information necessary for the preparation of the damages analysis King and Kavanagh had requested. I searched my files for relevant documents; sought information about the salaries paid to clinical faculty members at peer schools' developed an analysis by which I was able to calculate, based on the salary paid to Professor Book in 1997-98, what my salary should have been in 1994-95 and each successive year; and worked to draft a coherent statement of my position on the damages issue. By letter dated October 24, 2000, a copy of which is appended hereto as Attachment W, I communicated my damages analysis to Dean King.

43. The only response I received from Dean King over the next two weeks was an e-mail message dated October 30, 2000 asking for more time to evaluate my proposal. I responded with the e-mail message dated October 30, 2000 (copies of e-mails are appended hereto as Attachment X), explaining that although my preference would have been to enter into a tolling agreement, I did not believe that I could do so because it was my understanding that the CHRO would not honor tolling agreements.

44. Solely in order to preserve my claims in the face of a statute of limitations that I believed would run on or about November 13, 2000, on or about November 7, 2000, I filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the federal Equal Employment Opportunities Commission ("EEOC"). QUSL filed its answer to my CHRO complaint on January 3, 2001. A letter-brief from University counsel John Zandy to Ms. Femi

Bogle-Assegai accompanied the QUSL answer. A copy of the letter-brief is appended hereto as Attachment Y.

45. In January 2001, at a meeting with Dean King, Acting Chief Academic Officer for Quinnipiac University Edward Kavanagh, and Professor Kaas, King communicated to me the University's offer to increase my then-current salary to $70,000.

46. In early December, 2000, I wrote to Dean King via e-mail to follow up on my earlier request for a sabbatical during the Spring 2002 semester in order to pursue various scholarly pursuits. A copy of that e-mail message is appended hereto as Attachment Z. Because Dean King had not responded to that message, and because the 2001-2002 faculty committee list, which generally noted upcoming sabbaticals, did not indicate that I would be on sabbatical during the spring 2002 term, I contacted King again in the fall of 2001 to inquire about his decision. At that point, I expected him to report that he had denied my request. Instead, King told me that he and Kathleen McCourt had approved the spring-term sabbatical, but advised me that only limited funding was available for coverage of my responsibilities in my absence.

47. Because of the budgetary constraints, I agreed that I would arrange all placements for spring- and summer-term students, with the result being that I would not begin my sabbatical until the end of January 2002, and effectively would end it sometime in late March or early April, when I resumed intake and placement duties for the summer 2002 term.

48. During the approximately two-and-a-half months of the sabbatical, I updated research and completed revisions to a lengthy and scholarly ethics committee opinion concerning lawyers' relationships with title insurance companies. A copy of that draft opinion is appended hereto as Attachment AA. I also conducted extensive research and prepared a working outline for a proposed article advocating mandatory clinical education as a means of ensuring new lawyers' competence, and conducted substantial research, prepared written testimony, and testified before the Connecticut General Assembly's Judiciary Committee on a bill that would have changed the definition of the word "person," wherever it appears in Connecticut's criminal code, to include a viable fetus.

49. In part because of work I did in preparation for two presentations at a national conference on externships at Catholic University in March 2003, my planned article advocating mandatory clinical education has morphed into the "competence" section of an article entitled *Ethics in Externships: Confidentiality, Conflicts, and Competence Issues in the Field and in the Classroom*, which I co-authored with colleagues from Boston College Law School and Syracuse University School of Law. In the early summer of 2003, a few days after the article was accepted for publication in the Clinical Law Review, I advised Dean King of that fact.

50. Between 1994-95, when I began my employment at the Law School, and 1999-2000, when I gave notice of my gender claims to Dean Cogan, as evidenced by

the letter agreements between QUSL and myself for those years, my average raise had been 8.325%.

51. Beginning in 2000-2001, however, just after I gave notice of my gender discrimination claims to Dean Cogan, and continuing through the current academic year, 2003-2004, my raises have averaged just 2.26%.

52. At the May 2002 CHRO factfinding conference that preceded the filing of this complaint, in response to a question from CHRO Investigator Carolyn Anderson, Dean King and Law School counsel John Zandy, in unison, explained why, despite admissions that my compensation was unfair, the Law School had not increased my salary to an appropriate level. Without even a moment's hesitation, they replied, "Because she hasn't settled her suit."

53. For the academic year 2003-2004, my salary is $65,160. It is my understanding that the increase I received this year reflects the general increase accorded to all faculty.

54. According to the redacted letter agreement dated August 7, 2000 (Bates No. Def-0441) produced by QUSL in response to discovery requests in connection with this litigation (appended hereto as Attachment BB), when QUSL hired a female tax clinician for 2000-2001, to replace Professor Book after he resigned in May 2000, it paid her $11,000 less than Book had earned for performing the same job in the preceding year. That female faculty member holds an advance degree in tax and has significant practice experience in tax law.

55. Had my salary been adjusted to be equivalent to that paid to Professor Book, taking into consideration my three years of seniority over Professor Book, and had I received the general increase accorded all faculty members, my 2003-2004 salary would have been $96,076.

56. The School of Law hired an acting director of externships to assume some of my duties during my 1997-98 partial leave. After interviewing several candidates for the position, I recommended to Dean Cogan that he offer the position to a male candidate, a lawyer employed by the Public Defender Service who had been teaching in the Law School's Defense Appellate Clinic for the preceding two years. Dean Cogan both extended the offer of employment to this candidate and discussed the salary for the position with him in the plaintiff's presence, responding to the candidate's question about what the job paid by deferring the question to me: I replied that my contract for the 1997-98 year was for $54,000; Dean Cogan responded, "Then I guess it pays $54,000."

- 9 -

I have read the foregoing affidavit and swear that it is true and correct to the best of my knowledge and belief.

_____
Cindy R. Slane

Sworn and subscribed to before me on this 27th day of April, 2004.

_____
Commissioner of the Superior Court

- 9 -