UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CINDY SLANE,<br>　　　　Plaintiff, | ) ) ) | Civil No. 3:02 CV 00821 (AWT) |
| v. | ) ) ) | |
| QUINNIPIAC UNIVERSITY<br>SCHOOL OF LAW<br>　　　　Defendant. | ) ) ) ) | June 4, 2004 |

**DEFENDANT'S REPLY TO PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

Faced with compelling arguments for the dismissal of each and every one of her claims,

plaintiff has adopted the all too familiar strategy of raising numerous arguments and factual

contentions that are wholly irrelevant to the determination of the motion. For instance, with

respect to her claim under the Equal Pay Act, plaintiff devotes a substantial portion of her

opposition papers to a discussion of her educational background and prior work experience in a

misguided attempt to lend legitimacy to her claim that she was entitled to equal or greater

compensation than Leslie Book, a tax law specialist and former Director of the on-campus Tax

Clinic at Quinnipiac University School of Law.[1] However, plaintiff's credentials have absolutely

nothing to do with the sole legal issue under the EPA, which is whether plaintiff and Book held

positions of substantially equal skill, effort and responsibility. On this all important issue,

plaintiff relies heavily upon an e-mail message sent by former QUSL Dean Neil Cogan to

plaintiff on the eve of his departure from QUSL, and in response to her complaint about being

---

[1] Referred to hereafter as "QUSL" or the "Law School."

paid less than Book. In the e-mail, Cogan proposes language for a letter he might send to his successor to help plaintiff in her quest for higher compensation, in which he offers to say that plaintiff and Book performed similar jobs. However, this e-mail message is just another red herring because what is *material* to the EPA inquiry is the actual duties and responsibilities of the two positions, which are undisputed and speak for themselves. Despite plaintiff's valiant attempts to dress things up, there is no dispute that Book, as Director of the Tax Clinic, was engaged in the practice of law, representing clients (and supervising students representing clients) in tax proceedings in the courts and administrative agencies, while plaintiff, who placed students in externship opportunities outside the Law School, did not. This critical and undisputed difference, in and of itself, conclusively demonstrates that plaintiff and Book did not perform jobs of substantially equal skill, effort and responsibility, regardless of what Cogan may have offered to say in his conciliatory e-mail message.

Moreover, in apparent recognition of the weakness of her claim, plaintiff seeks to expand the scope of her gender discrimination claims under Title VII and Connecticut law by alleging, for the first time, that her claims are premised not merely upon her allegation that she was paid unfairly as compared with Book, but that Cogan *intentionally* discriminated against her when setting her salary and that gender discrimination is widespread at QUSL, as evidenced by her selective comparisons of the salaries paid to various male and female faculty. Plaintiff's comparisons are as predictable as they are disingenuous, based on information so incomplete that they can have no other effect than to mislead. However, when examined with additional relevant and undisputed facts (about which plaintiff is either unaware or that she simply chose not to disclose) no reasonable jury could conclude that this or any evidence presented by plaintiff supports her theory of *intentional* gender discrimination.

Plaintiff also continues to advance her absurd retaliation theory under which she attempts to hold QUSL liable for not unilaterally raising her salary to an amount it had proposed in settlement discussions, even though she unequivocally rejected those multiple, good faith proposals to resolve this dispute over her compensation.  As demonstrated in QUSL's original Memorandum of Law, and as reiterated below, all of the communications upon which plaintiff relies to support her retaliation claims were made by QUSL and its agents in the course of trying to negotiate a resolution of plaintiff's threatened (and later actual) claims that her compensation was the product of gender discrimination.  Consequently, the communications plaintiff relies upon are inadmissible to support her retaliation claims, which, by their very nature, are inextricably linked with her gender discrimination claims.  Even if they were admissible, these communications do not establish that plaintiff was entitled to an extraordinary salary adjustment other than as a means of resolving her claims of discrimination.

Plaintiff has failed to identify any genuine issue of *material* fact in this case, and summary judgment therefore should be granted to QUSL on each of plaintiff's claims.

### Argument

**A.    QUSL is Entitled to Judgment on Plaintiff's EPA claim.**

There is no dispute that plaintiff, in order to establish a *prima facie* case under the EPA, must prove that QUSL paid her less than a male employee for equal work on jobs requiring equal skill, effort and responsibility.  *See, e.g., Belfi v. Prendergast*, 191 F.3d 129, 135 (2d. Cir. 1999); *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974).[2]  Plaintiff relies principally upon a

---

[2] Plaintiff contends that the issue of whether two jobs are "substantially equal" under the EPA is always one of fact to be determined by a jury. (Pl.'s Memo of Law at p.24).  For this proposition, plaintiff relies upon two Second Circuit decisions, neither of which supports her overstated proposition.  In *Tomka v. Seiler Corporation*, 66 F.3d 1295, 1310 (2d Cir. 1995), the court actually upheld the lower court's grant of summary judgment on plaintiff's EPA claim as to three of the seven males against whom she compared herself, demonstrating that summary judgment is perfectly appropriate in EPA cases when there is no dispute as to the relative duties and responsibilities of the positions involved.  As to the other four positions in that case, the *Tomka* Court held only that an issue of fact

May 31, 2000 e-mail message from Cogan, which she characterizes as an "admission," to support her argument that she and Book performed "substantially equal" work within the meaning of the EPA. (Pl.'s Memo., at p. 26). Plaintiff's reliance, however, is misplaced. Even if it is assumed that Cogan's e-mail message represents his personal opinion concerning the similarity of plaintiff's and Book's jobs for purposes of her EPA claim (a contention which Cogan expressly disclaims),[3] that *opinion* does not raise a genuine issue of material *fact* for purposes of QUSL's summary judgment motion. What is material for the purposes of this motion for summary judgment is the respective duties and responsibilities of the two jobs which are undisputed and vastly different, not the conclusory label that plaintiff or Cogan or anyone else may ascribe to them. Notwithstanding Cogan's e-mail message, no reasonable jury, upon examination of the undisputed facts concerning plaintiff's and Book's respective job duties, could return a verdict for plaintiff on her EPA claim. *See, e.g., Pfeiffer v. Lewis County*, 308 F.Supp.2d 88, 98 (N.D.N.Y. 2004)(granting summary judgment to employer on EPA claim and excluding opinion of employee's expert witness concerning substantial equality of dispatcher/corrections officer positions; court capable of reviewing job descriptions and job functions and forming its own conclusions concerning equality of positions); *Angelo v. Bacharach Instrument Co.*, 555 F.2d 1164, 1171 (3rd Cir. 1977)(affirming trial court's decision

---

existed as to whether the shorter duration of plaintiff's supervisory responsibility over a client's employees, standing alone, was a "significant enough difference in responsibility" to make her job unequal to those of her male comparators who had the same supervisory authority over the same people, but for a longer period of time. *Id.* at 1311. By contrast, *Lavin-McEleney v. Marist College*, 239 F.3d 476, 480-81 (2d Cir. 2001) involved the review of an EPA claim after trial, and does not stand for the proposition that such claims can never be resolved on a motion for summary judgment, as plaintiff implies. Indeed, QUSL in its motion papers has cited several decisions in which summary judgment was granted to employers in EPA cases. These cases make plain (1) that summary judgment is appropriate where there is insufficient evidence for a reasonable jury to conclude that two positions are substantially equal in skill, effort and responsibility; and (2) that the standard for determining whether two positions are substantially equal is an exacting one. *See e.g. Heap v. Schenectady*, 214 F.Supp.2d 263, 272 (N.D.N.Y. 2002)(quoting *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 592 (11th Cir.), *cert. denied*, 513 U.S. 919 (1994)).

[3]  Significantly, it is undisputed that Cogan did not engage in any independent analysis of the two positions prior to drafting his conciliatory e-mail message but instead relied on plaintiff's representations concerning the similarity of the jobs. (QUSL Local Rule 56(a)(1) Statement, at ¶ 34; Pl.'s Local Rule 56(a) Statement at ¶ 34).

4

granting employer's motion for directed verdict on EPA claim notwithstanding testimony from employees and expert witness concerning substantial equality of compared positions; witnesses' testimony "provided little insight into the content of the positions . . . . And, for purposes of equating jobs under the Equal Pay Act, job content is controlling").

Plaintiff's argument that she and Book performed jobs which are "fundamentally similar[]" with respect to their skill, effort and responsibility is easily disproved by an examination of the undisputed facts concerning the nature of each job.  (Pl.'s Memo., at p. 27). It is undisputed that Book's principal job responsibility was to oversee the daily operation of QUSL's on-campus Tax Clinic and to handle legal matters and represent clients in tax controversies in judicial and administrative forums.  (Local Rule 56(a) Statements, at ¶¶ 26-29). It is further undisputed that the relationship between Book and his students was akin to that between a partner and associates in a law firm.  (Id. at ¶ 27).  Plaintiff, on the other hand, concedes, as she must, that she, unlike Book, does not assist students with substantive legal work nor does she represent clients.  (Id. at ¶¶ 10-11).  Thus, plaintiff cannot establish that she and Book performed jobs which are "substantially equal."  *See, e.g., Doria v. Cramer Rosenthal McGlynn, Inc.*, 942 F.Supp. 937, 942 (S.D.N.Y. 1996)("When the additional tasks of one job in comparison to another job are substantial, then jobs are not congruent and work is not equal").[4]

Even if one were to overlook the fundamental deficiencies inherent in plaintiff's EPA claim, and which foreclose her from establishing a *prima facie* case of pay discrimination, QUSL

---

[4]  Plaintiff's EPA claim is not supported by the existence of a set of "Shared Goals for All In-House Clinics and Externship Programs."  (Pl.'s Memo., at p. 27).  The fact that QUSL's in-house clinics and externship programs share similar "goals" (e.g., to "provide advanced and applied doctrinal instruction in substantive areas relevant to casework")(Attachment O to Pl.'s Affidavit) is irrelevant to the issue of the similarity of plaintiff's and Book's jobs as it is undisputed that the *manner* in which QUSL's in-house clinics and externship programs accomplished these shared goals is different.  In other words, Book imparted advanced and applied doctrinal instruction in tax law to QUSL students by personally supervising the work they performed for the Tax Clinic's clients whereas plaintiff assigned students to various legal jobs in the local community where they received legal instruction from their respective externship supervisors.

is still entitled to summary judgment on plaintiff's EPA claim because there is no genuine factual dispute that the disparities between plaintiff's and Book's salaries were the result of gender-neutral factors. For instance, there is no dispute concerning (1) the experimental nature of the position for which plaintiff was hired; (2) Cogan's inability to deviate significantly from the initial hire-in rate when proposing adjustments to a faculty member's salary; (3) the potential extinction of QUSL's Tax Clinic if Book was not hired; and (4) Book's disclosure to Cogan during the interview process that he had received a competing job offer with a corresponding salary in the high eighty-thousand dollar range. (Local Rule 56(a) Statements, at ¶¶ 15-16, 24-25).

Notwithstanding these undisputed facts, plaintiff attempts to cloud the issue and ascribe to Cogan a discriminatory motive when he established her initial salary. Specifically, plaintiff points to Cogan's testimony that, when recommending plaintiff's initial salary, he considered the salaries paid to QUSL's legal skills faculty, an area of legal education which plaintiff describes as the "pink ghetto of the legal academy." Plaintiff argues that her salary was the product of impermissible gender discrimination because, according to plaintiff, Cogan harbored discriminatory beliefs about legal skills faculty, which plaintiff assumes to mean that he also harbored a discriminatory animus against her. (Pl.'s Memo., at pp. 29-30). However, plaintiff's tortured reasoning does not square with the undisputed record evidence, which makes plain that Cogan consistently lobbied for improved status and salaries for legal skills faculty. (Local Rule 56(a) Statements, at ¶ 4). Indeed, the excerpt from Cogan's deposition testimony upon which plaintiff relies upon as evidence of Cogan's so-called discriminatory beliefs was part of larger discussion concerning Cogan's efforts to improve the compensation levels of legal skills faculty at QUSL. (Id.). Moreover, Cogan's testimony about the prevalence of women in legal writing

positions was in response to a direct question from plaintiff's attorney concerning whether, in

Cogan's experience, most legal writing instructors are female. (Id.). It is difficult to

comprehend how plaintiff can make the enormous leap to the conclusion that Cogan is guilty of

sex-stereotyping from his simple acknowledgement of the reality that, throughout legal

academia, legal writing instructor positions tend to attract more women than men.

Plaintiff's reliance upon the salaries paid to various individuals who worked in QUSL's

Tax Clinic to support her gender discrimination claims is similarly unavailing. (Pl.'s Memo., at

p. 30). Book's female successor in the Tax Clinic is paid through a grant from the Internal

Revenue Service ("IRS"), which initially constrained the amount of compensation QUSL could

offer her and explains her starting salary as compared with Book's. Significantly, despite this

unavoidable initial disparity that would have affected *any* replacement for Book, regardless of

gender, QUSL has been able to increase the salary of Book's female successor since then to a

level higher than Book was earning. (D. King's Affidavit, at ¶ 18(a) attached hereto). Likewise,

the fact that a prominent male tax lawyer with extensive tax litigation experience, who was hired

as a Visiting Professor of Law and who supervised QUSL's Tax Clinic and taught a doctrinal tax

course, was paid more than a female, who was hired as an adjunct professor "on a temporary

basis to cover the tax clinic" and who had little experience in tax litigation, does not further

plaintiff's claims of gender discrimination. (Pl.'s Memo., Exhibit 7, p. 12; Attachments F & G to

Pl.'s Affidavit; D. King's Affidavit, at ¶ 18(b)). Finally, plaintiff's attempt to characterize

Cogan's professed belief that it was necessary to offer Book a high salary in order to secure his

services for QUSL as "inconsistent" and "contradictory" because Book testified that he did not

"negotiate" his salary with Cogan (Pl.'s Memo., at p. 31) overlooks the undisputed record

evidence that Book advised Cogan of a competing job offer he had received with a

corresponding salary in the high eighty-thousand dollar range. (Local Rule 56(a) Statements, at ¶ 24).

**B.    A reasonable jury could not return a verdict for plaintiff on her gender discrimination claims under Title VII and C.G.S. § 46a-60 *et seq.***

Try as she may, plaintiff simply cannot avoid the line of Second Circuit precedent, which makes plain that claims of unequal pay for equal work under Title VII and analogous state laws are analyzed under the standards used in EPA cases. *See, e.g., Tomka*, 66 F.3d at 1312-13; *Belfi*, 191 F.3d at 139; *Heap*, 214 F.Supp.2d at 270-71; *Alfieri v. SYSCO Food Services – Syracuse*, 192 F.Supp.2d 14, 25 (W.D.N.Y. 2001); and *Gerbush v. Hunt Real Estate Corp.*, 79 F.Supp.2d 260, 262 (W.D.N.Y. 1999), *aff'd*, 234 F.3d 1261 (2d Cir. 2000). In accordance with the foregoing authority, plaintiff's Title VII and state law claims for gender discrimination fail for the same reasons as does her EPA claim (i.e., plaintiff and Book did not perform jobs that are substantially equal in skill, effort and responsibility).[5]

Apparently recognizing the weaknesses in her discrimination claims under Title VII and state law, plaintiff now seeks to expand the contours of those claims. That is, plaintiff contends that her salary was purposely "set at an artificially low level when she was hired in 1994, at least in part, because she was a woman, but that the discriminatory salary-setting did not become apparent to her until she learned of Professor Book's salary in 2000." (Pl.'s Memo., at pp. 33-34). Plaintiff's recently alleged, more expansive, discrimination claims, however, ultimately rest

---

[5] Plaintiff relies upon an unpublished decision of the Connecticut Superior Court which notes that "Title VII incorporates a more relaxed standard of similarity between male and female occupied jobs." *See CHRO v. CHRO*, 2001 WL 497089 **6 (Conn. Super. 2001). The subsequent history of that decision, however, makes clear that a plaintiff, in order to establish a *prima facie* case of pay discrimination under Title VII and Connecticut law, must show that she performed work that is "similar or comparable" to her male comparator and that "[s]imilarity depends on what people actually do on the job, not job titles or department designations. *Skill, effort, responsibility, and the general complexity of the work are the guideposts in determining job similarity*." *CHRO v. City of Torrington*, 2002 WL 1293315 **3 (Conn. Super. 2002)(Emphasis added). Accordingly, even if the Court were to analyze plaintiff's Title VII and state law claims under a more "relaxed" standard, she still cannot establish a *prima facie* case of gender discrimination.

on nothing more than a comparison of herself and Book, as well as comparisons of QUSL's treatment of various dissimilar male and female faculty members. For instance, plaintiff supports her gender discrimination claims by comparing: (1) her employment credentials with Book's; (2) the salaries paid to two male tenured faculty members who teach doctrinal legal courses with the salary paid to a female non-tenured legal writing specialist during the periods of time that each served as Director of QUSL's legal skills program; (3) the salaries paid to members of QUSL's clinical faculty; and (4) the "average salaries of males and females within the doctrinal faculty." (Id. at 36-37).

None of the foregoing so-called "substantial additional evidence," however, supports plaintiff's claims of *intentional* gender-based pay discrimination under federal and state law. First, with respect to plaintiff's and Book's respective academic and employment histories, it is apparent from the undisputed evidence concerning plaintiff's job duties that neither her background as a secondary school teacher and instructor of standardized test preparation courses prior to attending law school nor her participation in a clinical program during law school are relevant to her current position as Externship Director or would entitle her to additional compensation. On the other hand, Book's advanced legal degree in taxation and his experience as an associate in the tax department of a private law firm are directly relevant to his position as Tax Clinic Director. Second, with respect to plaintiff's reliance upon bare statistical information concerning the salary histories of various members of QUSL's faculty, the United States District Court for the District of Connecticut has made clear that the mere disparity between the salaries of male and female employees, standing alone, "is insufficient to establish gender based discrimination" and that "[d]iscriminatory intent may not be inferred from [the] existence of wage differences between jobs that are only similar." *Graham v. Texasgulf, Inc.*, 662 F.Supp.

9

1451, 1464 (D. Conn. 1987), *aff'd*, 842 F.2d 1287 (2d Cir. 1988). *See also Pollis v. New School for Social Research*, 913 F.Supp. 771, 784 (S.D.N.Y. 1996), *rev'd in part on other grounds*, 132 F.3d 115 (2d Cir. 1997)(plaintiff cannot support her gender discrimination claims with general statistical data "which simply demonstrate[s] that all male professors who worked between certain years were paid more than she"); *Spaulding v. University of Washington*, 740 F.2d 686, 703 (9th Cir.), *cert. denied*, 469 U.S. 1036 (1984)(statistics "can be exaggerated, oversimplified, or distorted to create support for a position that is not otherwise supported by the evidence and, thus, must be "properly authenticated [to] constitute an accepted form of circumstantial evidence of discrimination"). Accordingly, plaintiff has not adduced any evidence whatsoever to support an inference that her salary history was the product of *intentional* gender-based discrimination.[6]

**C.    No reasonable jury could enter a verdict for plaintiff on her retaliation claims under Title VII and C.G.S. § 46a-60 *et seq*.**

As a threshold matter, plaintiff cannot save her so-called evidence of retaliation from exclusion under Rule 408 of the Federal Rules of Evidence by relying upon an overly formalistic definition of "settlement discussions." (Pl.'s Memo., at p. 41). For instance, plaintiff attempts to distinguish between QUSL's statements made in response to her "notice to Cogan and King of her concerns about gender-based pay disparities among the Law School's clinical faculty," those made during "[p]re-negotiation exchange of information," and those made during "settlement negotiations." (Id.). As discussed in QUSL's motion papers, as early as May 26, 2000, plaintiff, after consulting with her attorney, wrote to Cogan concerning her belief that she had been discriminated against based upon her gender. (Local Rule 56(a) Statements, at ¶ 32). In her

---

[6] It is illuminating that plaintiff supports her retaliation claims by arguing that during Cogan's tenure as Dean of QUSL she consistently received substantial annual salary increases. (Pl.'s Memo., at p. 39 n. 6). Clearly, this evidence negates any inference that Cogan *intentionally* discriminated against plaintiff with regard to her compensation.

letter, plaintiff expressly stated that she did "not relish a public, judicial airing of the grievances"

but nonetheless is "determined . . . to demand compensation for past harm and to insist upon an

equitable salary structure for the future." (Id.). Because it is undisputed that all of QUSL's

salary-related discussions concerning plaintiff followed, and were in response to, plaintiff's

express warning of the potential for legal action in the event her salary concerns were not

resolved to her satisfaction, plaintiff's attempt to designate these discussions as something other

than settlement negotiations, is disingenuous.

Moreover, plaintiff's reliance upon two decisions, which held that statements made

during the course of settlement negotiations were admissible to support claims of retaliation, is

misplaced. In *Carney v. American University*, 151 F.3d 1090 (D.C. Cir. 1998), the court held

that a former employee could rely upon evidence of statements made by the employer's attorney,

during the course of settlement discussions concerning the employee's claims of racially

discriminatory refusal to hire and discharge, to support her claim that the employer retaliated

against her for asserting her discrimination claims by withholding additional severance pay to

which she was entitled. The court noted that "[a]lthough settlement letters are inadmissible to

prove liability or amount, they are admissible when the evidence is offered for another purpose. .

. . In particular, such correspondence can be used to establish an independent violation . . .

*unrelated to the underlying claim which was the subject of the correspondence. Id.* at 1095

(Citation and internal quotation marks omitted; emphasis added). *See also Carr v. Health*

*Insurance Plan of Greater New York, Inc.*, 2001 WL 563722 *4 (S.D.N.Y. 2001)("If evidence is

offered for another purpose apart from liability for (or damages resulting from) the claim under

settlement discussion, that evidence may be admitted"). Clearly, plaintiff's claim in this case

that QUSL retaliated against her by failing to adjust her salary to an appropriate level despite its

alleged admission that her salary was unfair, is not "unrelated" to her underlying gender

discrimination claims. Indeed, plaintiff's retaliation claims are inextricably bound with her

underlying compensation claims inasmuch as they are premised upon QUSL's alleged admission

that plaintiff's salary is unfair and inappropriate and should have been adjusted substantially.

Moreover, QUSL's alleged admissions concerning what constitutes an appropriate salary for

plaintiff could arguably act as a measure of damages for plaintiff's underlying discrimination

claims. Thus, the evidence upon which plaintiff relies to support her retaliation claims does not

fall within the narrow exception to Rule 408 for evidence "offered for another purpose."

Even if plaintiff is permitted to support her retaliation claims with evidence of statements

made by Cogan and King during settlement negotiations, it is undisputed that those claims rest

upon a faulty premise and are not supported by the undisputed facts. That is, plaintiff contends

that QUSL retaliated against her for asserting her claims of gender discrimination by "refus[ing]

to adjust [her] compensation at least to the level that [it] has acknowledged to be appropriate . . .

." (Pl.'s Memo., at p. 39). QUSL, however, has never made any such acknowledgment. Rather,

as discussed in QUSL's motion papers, it is undisputed that all of QUSL's communications with

respect to adjustments to plaintiff's salary were conditional in nature and made in the context of

attempting to resolve her claims of gender discrimination. (Local Rule 56(a) Statements, at ¶¶

32-34, 38-42, 44-46, 48; D. King's Affidavit, at ¶ 11 attached hereto).[7]  Moreover, neither Cogan

nor King, the two individuals whom plaintiff contends "admitted" her salary was unfair and

---

[7] Plaintiff mischaracterizes King's testimony during the administrative proceedings before the Connecticut
Commission on Human Rights and Opportunities and during his deposition by attributing to him the statements that
QUSL did not increase plaintiff's "salary to an appropriate level after she filed her discrimination complaint `after
consultation with counsel,' and `because she hasn't settled her suit.'" (Pl.'s Memo., at p. 41). King's deposition
testimony, however, makes plain that QUSL never acknowledged that plaintiff was entitled to an extraordinary
adjustment to her salary, other than as a means of resolving her discrimination claims. For instance, King's testified
at length regarding the manner in which he and Edward Kavanagh formulated QUSL's initial settlement proposal to
plaintiff and her rejection of same. (Local Rule 56(a) Statements, at ¶¶ 42 & 44).

should be adjusted, had the authority to make unilateral adjustments to plaintiff's salary. (Local Rule 56(a) Statements, at ¶¶ 15 & 51; D. King's Affidavit, at ¶¶ 4 & 7 attached hereto). Finally, there is no record evidence whatsoever that any of QUSL's agents with authority to approve adjustments to plaintiff's salary concurred with Cogan's and King's alleged opinion that she was underpaid.

Plaintiff's retaliation claim premised upon her salary increase for the 2002/2003 academic year is easily discredited. First, plaintiff's argument that her 2002/2003 salary increase represented "the first opportunity [QUSL] had to adjust [her] salary since she had made her complaint of sex discrimination, and the offer letter came within six weeks of the filing of this lawsuit" is thoroughly unconvincing. (Pl.'s Memo., at p. 43). It is undisputed that plaintiff first raised her claims of gender discrimination in May 2000 and that she filed an administrative complaint regarding those claims in November 2000. (Local Rule 56(a) Statements, at ¶ 32; Pl.'s Affidavit, at ¶ 44). Thus, QUSL had many opportunities to retaliate against plaintiff for raising her compensation claims prior to the commencement of the present lawsuit. The fact that it did not do so negates any inference that plaintiff's 2002/2003 salary adjustment was in any way related to her discrimination claims first raised more than two years earlier. Second, there is no genuine issue of material fact concerning plaintiff's limited scholarly accomplishments during her spring 2002 sabbatical. For instance, it is undisputed that plaintiff requested a sabbatical in order to "pursue scholarly interests," including an essay on mandatory clinical education in law schools, a legal interns' supervisor's manual and an article on ethical issues in student practice. (Local Rule 56(a) Statements, at ¶ 43). It is further undisputed that plaintiff did not accomplish any of these goals and that the only written work product she produced during her sabbatical related to what she said the sabbatical was for was a preliminary outline concerning mandatory

clinical education. (Id. at ¶ 50). Given these undisputed facts, no reasonable jury could find

QUSL's explanation for plaintiff's 2002/2003 salary to be pretextual.[8]

### Conclusion

For all of the foregoing reasons, and for the reasons set forth in QUSL's motion papers,

the facts concerning plaintiff's and Book's job duties and employment histories, as well as the

nature and circumstances of the salary-related discussions between plaintiff and QUSL following

her assertion of the gender discrimination claims that are the focus of this case, are undisputed.

Accordingly, no genuine issues of material facts exist in this case and the Court should grant

QUSL's motion for summary judgment with regard to each and every one of plaintiff's claims.

DEFENDANT
QUINNIPIAC UNIVERSITY
SCHOOL OF LAW

By:

Stephen B. Harris, ct13125
William J. Albinger, ct19861
Wiggin and Dana LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
(203) 498-4400
Its Attorneys

---

[8] Plaintiff's claim that King never expressed concern regarding her lack of productivity during her sabbatical (Pl.'s Memo., at p. 43) is refuted by the undisputed evidence that King, shortly after receiving plaintiff's professional report for the 2001/2002 academic year, requested that she supplement the report to include information regarding her scholarly accomplishments during her sabbatical. (Local Rule 56(a) Statements, at ¶ 49; D. King's Affidavit, at ¶ 14).

## CERTIFICATE OF SERVICE

This is to certify that on this 4th day of June, 2004, a copy of the foregoing has been

mailed, postage prepaid, to the following:

> Gregg D. Adler, Esq.
> Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.
> 557 Prospect Avenue
> Hartford, CT  06105-2922


_____
William J. Albinger

\7377\201\464777.4

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CINDY SLANE,<br>　　　　Plaintiff, | )<br>)<br>)<br>) | Civil No. 3:02 CV 00821 (AWT) |
| v. | )<br>) | |
| QUINNIPIAC UNIVERSITY<br>SCHOOL OF LAW<br>　　　　Defendant. | )<br>)<br>)<br>) | May 28, 2004 |

## <u>AFFIDAVIT OF DAVID S. KING</u>

　　　　I, David S. King, being duly sworn, hereby depose and say:

1.　　　　I am over the age of eighteen (18) and understand the obligation of an oath.

2.　　　　I make this affidavit based on my own personal knowledge.

3.　　　　I am presently employed as Associate Dean and Associate Professor of Law for the Quinnipiac University School of Law ("QUSL"). I served as Interim Dean of QUSL from approximately July 1, 2000 through June 2002.

4.　　　　During the period that I served as Interim Dean, all of my salary recommendations for QUSL faculty required approval from either Edward Kavanagh ("Kavanagh"), Quinnipiac University's Interim Chief Academic Officer, or Kathleen McCourt ("McCourt"), Quinnipiac University's Vice President for Academic Affairs.

5.　　　　Prior to assuming the role of Interim Dean, I was unaware of the salaries paid to QUSL's faculty.

6.　　　　In approximately June 2000, former QUSL Dean Neil Cogan ("Cogan") advised me that QUSL Professors Cindy Slane ("Slane") and Carolyn Kaas ("Kaas") had approached him to discuss their belief that they had been unfairly discriminated against because of their gender; specifically, that they were unfairly paid as compared with Leslie Book ("Book"), the former Director of QUSL's on-campus Tax Clinic. During the meeting, Cogan assured me that he would never discriminate against anyone on the basis of gender and stated that, because he was concluding his deanship, I would need to address the matter.

7.   On or about July 26, 2000, I met with Slane and Kaas in my office to discuss their concerns. During the meeting, they provided me with a copy of their May 26, 2000 letter to Cogan in which they first raised their gender discrimination claims. I advised them that I had no knowledge of what other QUSL faculty members were paid but that my initial impression was that Slane might be somewhat underpaid. I explained that I did not have authority to remedy their concerns myself and would need to involve Kavanagh.

8.   Shortly after meeting with Slane and Kaas, I spoke with Kavanagh regarding Slane's and Kaas's gender discrimination claims. I told Kavanagh that I did not believe the salaries of QUSL's faculty were gender-based but that it was my personal opinion that Slane was somewhat underpaid. Kavanagh asked me to meet with Slane and request that she provide an analysis of what she thought her salary should be, as well as an analysis of what she believed she was entitled to with regard to back pay.

9.   On or about July 27, 2000, I met with Slane and asked her to provide me with information concerning her alleged damages.

10.  Three months later, by letter dated October 24, 2000, Slane provided me with information concerning her alleged damages and also advised me that unless her concerns were resolved by QUSL within two weeks she would file a complaint with the Connecticut Commission on Human Rights and Opportunities ("CCHRO").

11.  Shortly after I received Slane's October 24, 2000 letter, I met with Kavanagh to discuss it. Kavanagh suggested that I formulate an appropriate settlement proposal. Based upon my review of Slane's damages analysis and the salary structure for QUSL's faculty, I concluded that an appropriate settlement offer would be for QUSL to adjust Slane's salary to $70,000.00 per year. My recommendation was based on the salaries paid to other clinical and doctrinal professors at QUSL (both tenured and non-tenured) and my perception of where Slane's position could fit within that structure. My recommendation was intended to address and resolve Slane's claims of gender discrimination. Although I had previously stated that I believed Slane's salary was somewhat low, I did not believe that her salary was so low as to be unfair or unreasonable; nor did I believe that she was entitled to a salary of $70,000.00 per year, other than as a way to resolve her claims.

12.  In December 2000, Slane requested a sabbatical leave during the spring 2002 semester to pursue various "scholarly interests." These included: an essay concerning mandatory clinical education in law schools; a legal interns' supervisor's manual; and an article (or series of articles) on ethical issues in student practice. I spoke with McCourt concerning Slane's request for a sabbatical leave and ultimately approved the request. Slane was on sabbatical leave during the spring 2002 semester.

13.  On or about January 9, 2001, Kavanagh and I met with Slane and Kaas to communicate QUSL's offer to adjust Slane's salary to $70,000.00 per year in order to resolve her gender discrimination claims, which were then pending with the CCHRO. Slane rejected the settlement proposal and did not make a counterproposal.

14.    In May 2002, Slane provided me with her annual self-evaluation report for the 2001/2002 academic year. Because the report did not describe Slane's scholarly accomplishments during her sabbatical leave, on May 19, 2002, I sent her an e-mail message requesting that she provide me with information concerning her scholarly accomplishments as soon as possible as I needed to submit my salary recommendations for all QUSL faculty to McCourt.

15.    One month later, on June 19, 2002, plaintiff provided me with a supplemental self-evaluation report. Based on the report, it was clear that Slane had accomplished virtually none of the goals she had proposed as bases for her sabbatical leave; nor had she accomplished much in the way of research or substantial writing.

16.    I then met with McCourt regarding Slane's salary for the 2002/2003 academic year. Based on Slane's limited scholarly accomplishments during her sabbatical leave, I recommended that she receive a salary increase of approximately one percent. McCourt agreed with my recommendation.

17.    None of my salary recommendations with respect to Slane were influenced by her claims of gender discrimination, which she first raised with Cogan in May 2000, and which were first brought to my attention in June 2000, approximately two years earlier.

18.    I have read Slane's "Memorandum of Law in Opposition to Motion for Summary Judgment," "Local Rule 56(a)2 Statement in Support of Memorandum Opposing Summary Judgment" and supporting Affidavit. In those documents, Slane makes observations about the salaries paid to various members of QUSL's faculty and relies upon those observations as evidence that her salary history was influenced by gender-based discrimination. However, Slane's observations about the salaries paid to QUSL faculty are disingenuous and misleading, because they are based upon incomplete information. The following additional information (of which Slane is either unaware and/or chose not to include in her opposition papers) is necessary to a proper understanding of the salaries paid to QUSL faculty and demonstrates that salary decisions are not based on gender:

    (a)    Slane alleges that QUSL "paid Book's female successor . . . over $11,000 less when she joined the faculty in 2000-2001 than Book had earned for performing the same job the year before." *See* Memo. of Law, p. 30; and Affidavit, at ¶ 54.

            Book was paid an annual salary of $81,100.00 during the 1999/2000 academic year. Slane has failed to mention that, at the time of Book's resignation, it was uncertain whether QUSL could afford to continue to operate the Tax Clinic. Fortunately, in approximately May 2000, QUSL was able to secure a grant from the Internal Revenue Service ("IRS") in the amount of $100,000.00. In accordance with Quinnipiac University President John Leahy's instructions, QUSL's Tax Clinic could continue the following year only if it was funded entirely through the IRS grant. Accordingly, the IRS grant money had to be

allocated to the Tax Clinic Director's salary and benefits, and to all of the other expenses associated with the operation of the Tax Clinic. Before the candidates to succeed Book as Tax Clinic Director even were identified, it had been determined based on the historical expenses of the clinic's operations and the cost of providing benefits, that only $70,000 of the IRS grant would remain to pay the Director's salary, no matter who might be selected. QUSL ultimately hired a female to succeed Book as Director of the Tax Clinic and paid her the $70,000.00 annual salary available under the IRS grant for the 2000/2001 academic year. In addition, Book's female successor was paid $1,500.00 for moving expenses. I explained to Book's successor at the time of her hire that the salary for the position was constrained by the amount of the IRS grant and she understood and agreed. She continues to this day as Director of the Tax Clinic and now earns a salary of over $85,000.

(b)     Slane alleges that QUSL "paid a male who provided tax clinic coverage in the fall of 1995 and taught one doctrinal tax course in the spring of 1996 over four times the salary it paid to a female who provided tax clinic coverage in the fall of 1994 and taught one doctrinal tax course in the spring of 1995, just one year earlier." *See* Memo. of Law, p. 30; Local Rule 56(a)2 Statement, at pp. 18-19; and Affidavit, at ¶¶ 16-17.

Slane has failed to mention that from approximately summer 1994 through summer 1995, the position of Tax Clinic Director was not filled by a permanent QUSL faculty member as it had in the past. Instead, an adjunct professor of law was hired on a series of short term appointments to cover the Tax Clinic during these academic terms. The woman QUSL hired also wound up teaching a 2-credit tax procedure course during the spring 1995 semester. Significantly, the appointment of adjuncts is not submitted to a vote of all QUSL faculty, as are permanent appointments, adjuncts are not required to participate on faculty committees, provide advice to students outside the scope of their courses, or produce scholarship. Moreover, the adjunct hired to cover the Tax Clinic during this period was assisted by QUSL tax professors Stuart Filler, Mary Ferrari, and Toni Robinson in her supervision of the Tax Clinic.

By contrast, during the fall 1995 semester, supervision of the Tax Clinic was taken over by a Visiting Professor of Law who was a prominent tax lawyer with extensive experience in tax litigation. Because of his expertise and extensive experience, this male visiting professor required little supervision from QUSL's tax professors. During the spring 1996 semester, he taught the course "Taxation and Business Enterprises." Unlike adjunct professors, Visiting Professors of Law are responsible for participating on faculty committees and advising students outside the scope of their courses. There is no standard rate of pay for Visiting Professors of Law.

(c)     Slane alleges that two male faculty members who served as Director of QUSL's Legal Skills program were paid more than the female faculty member who

performed that job. *See* Memo. of Law, at p. 36; Local Rule 56(a)2 Statement, at pp. 20-22; and Affidavit, at ¶¶ 21, 24-25.

Slane has failed to mention that the woman to whom she is referring was a non-tenured legal writing specialist who does not possess a law degree.

As to the two male employees against whom Slane seeks to make comparisons, the first was at the time an Associate Professor of Law, with tenure, who served as Director of QUSL's Legal Skills program during the 1994/1995 academic year. He is now a full professor. This tenured professor has been a member of QUSL's faculty since 1987 and teaches a variety of doctrinal legal courses including Torts, Civil Procedure, Evidence and a course which he designed called "Visual Persuasion in the Law." The second is a Professor of Law, with tenure, who served as Director of QUSL's Legal Skills program during the 1999/2000 academic year. This second tenured professor has been employed with QUSL since 1983 and is one of QUSL's most senior faculty members. He has taught many doctrinal legal courses, including Constitutional Law, Criminal Law, Evidence and a variety of courses concerning international law.

(d)      Slane alleges that "[i]n 2000-2001 the lone male clinical faculty member was paid $36,300 more than the average salary of the three female clinical faculty members." *See* Memo. of Law, at p. 37; and Local Rule 56(a)2 Statement, at pp. 27-28, n. 15.

Slane has failed to mention that the lone male member of QUSL's clinical faculty, unlike QUSL's other clinical faculty members, teaches a doctrinal legal course (i.e., Lawyers' Professional Responsibility), which is a prerequisite for graduation from QUSL. This male professor is fully tenured, has been employed with QUSL since 1980, and is one of QUSL's most senior faculty members.

I, David S. King, have read the foregoing Affidavit and swear that that it is true and correct to the best of my knowledge and belief.

David S. King

Subscribed and sworn to before me this 28 day of May, 2004.

Notary Public/Commissioner of the
Superior Court
My commission expires: May 2006

\7377\201\469271.1

-5-