## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CINDY SLANE,                           :

         Plaintiff,               :

         v.                         :          CASE No. 3:02CV00821 (AWT)

QUINNIPIAC UNIVERSITY        :
SCHOOL OF LAW,                :

         Defendant.            :          APRIL 9, 2007

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE INADMISSIBLE EVIDENCE

Pursuant to the Trial Memorandum Order entered by the Court on February 7, 2007, and Paragraph 14 of the Standing Order Regarding Trial Memoranda in Civil Cases, defendant Quinnipiac University School of Law ("defendant" or "QUSL") moves to exclude from admission at trial, (i) evidence of statements made by defendant's representatives in the context of compromise negotiations as barred by Fed. R. Evid. 408; (ii) raw data or a simple statistical analysis of faculty salaries as devoid of probative value, Fed. R. Evid. 401; and (iii) salary comparisons of other male and female faculty members as irrelevant and/or unduly prejudicial, Fed. R. Evid. 401, 403.

## I.     Background

Fundamentally, this is a wage discrimination case. Plaintiff Cindy Slane ("plaintiff") generally alleges, in the main, that defendant violated the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), Title VII of the Civil Rights Act of 1964 ("Title VII"), 29 U.S.C. §§ 2000e, *et seq.*, and the Connecticut Fair Employment Practices Act ("FEPA"), Conn. Gen. Stat. §§ 46a-60, *et seq.*, by compensating her at a lower rate than certain male colleagues. Plaintiff also purports to advance a claim for retaliation under Title VII and

the FEPA, averring that QUSL (i) has failed to increase her salary to a "fair" level, and (ii) awarded her a below-standard 1% salary increase in 2002, as retribution for pursuing her wage discrimination claims at the administrative level and in court.

Jury selection is slated for July 10, 2007, and trial is scheduled to commence the following day. The parties have estimated that five days will be sufficient to try this case. That estimate will prove woefully understated if the contested evidence is erroneously admitted.

## II.    Law and Argument

"'The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility of certain forecasted evidence.' The Supreme Court has explained that '[a]lthough the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials.' In ruling on a motion *in limine*, a court may exclude evidence which is 'clearly inadmissible on all potential grounds.'" Great Earth Int'l Franchising Corp. v. Milks Development, 311 F. Supp. 2d 419, 424 (S.D.N.Y. 2004)(Citations omitted).

The evidence we anticipate plaintiff will seek to introduce, as generally described in the opening paragraph, is, for the reasons that follow, plainly inadmissible and properly excluded.

## A.    Plaintiff's Proposed Evidence Regarding Statements Made In The Course Of Compromise-Related Discussions Is Barred By Fed. R. Evid. 408.

As alluded to above, one component of plaintiff's retaliation claim rests on the contention that despite ostensibly "acknowledg[ing] that the plaintiff's salary was unfair, and not commensurate with her duties and responsibilities, and despite [then-Interim

2

Dean] King's recommendation that plaintiff's salary be increased, QUSL has not adjusted Slane's salary beyond the ordinary increases given to all faculty ... because she has chosen to pursue her gender discrimination claim." (Pltf's Brief Opposing Def's Motion for Summary Judgment [Docket No. 43], hereinafter "Pltf's SJ Brief," at p. 41). As support for this contention, plaintiff relies on statements she attributes to Professor King and QUSL's attorney to the effect that the decision not to award her an *extra contractus* salary increase was made "'after consultation with counsel,' and 'because she hasn't settled her suit.'" (Id.).

Contextually, these statements are alleged to have been made during a fact-finding conference and mandatory mediation simultaneously conducted by the Connecticut Commission on Human Rights and Opportunities ("CHRO") on May 8, 2002 and, specifically, in response to an inquiry by the CHRO investigator as to why the dispute had not been settled. (Pltf's SJ Brief, at p. 19).[1] Over a year earlier, in January 2001, a couple of months after plaintiff filed her CHRO charge, QUSL offered to increase plaintiff's salary to $70,000.00 per annum. (Id. at p. 16). Plaintiff elected not to accept this offer. It is against this backdrop that defendant is alleged to have made the statements at issue, confirming that any increase in plaintiff's salary was conditioned on a waiver of her claims.

Plaintiff's theory, then, is that QUSL engaged in unlawful retaliation by refusing to increase her salary, outside the context of the annual review process, except in

---

[1] This inquiry was perfectly appropriate and consistent with the objective of a fact-finding conference generally, which is conducted "for the purpose of finding facts and *promoting voluntary resolution of complaints.*" Reg's of CT State Agencies § 46a-54-55a(a)(Emphasis added). Moreover, as noted above, and as reflected in the Notice of Fact Finding Subject to Mandatory Mediation and Penalty for Failure to Attend, dated October 29, 2001, and related correspondence annexed hereto as Exhibit A, an expressly stated purpose of the conference was "to encourage the parties to settle the complaint pursuant to the Commission's predetermination conciliation process."

connection with a resolution of her then-pending charge of discrimination before the CHRO. This is inherently a settlement posture. And, by virtue of Fed. R. Evid. 408, statements communicating a litigant's position on settlement are "not admissible to prove liability for ... the claim or its amount," as plaintiff endeavors to do.

### 1.    Scope and Purpose of Rule 408.

Rule 408 of the Federal Rules of Evidence provides in relevant part:

> Evidence of ... furnishing or offering or promising to furnish ... a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

Fed. R. Evid. 408.

The Second Circuit has observed that the rationale underlying Rule 408's ban on evidence regarding compromise negotiations is two-fold. First, such evidence is irrelevant as a party "may be motivated by a desire for peace rather than from any concession of weakness of position." Pierce v. F.R. Tripler & Co., 955 F.2d 820, 827 (2d Cir. 1992) (internal quotation marks omitted). Second, the rule is designed to "promot[e] the public policy favoring the compromise and settlement of disputes." Id. That is, "[s]ince parties may be inhibited in making offers of compromise by the fear that these will be used against them if the compromise efforts fail, the law alleviates that fear and encourages the making of offers of compromise by making them privileged." Wright & Graham, Federal Practice and Procedure: Evidence § 5302, at p. 170 (Footnote omitted).

To be sure, "[e]vidence of an offer to compromise, though otherwise barred by Rule 408, can fall outside the Rule if it is offered for another purpose, i.e., for a purpose other than to prove or disprove the validity of the claim the offers were meant to settle."

4

ESPN, Inc. v. Office of the Commissioner of Baseball, 76 F. Supp. 2d 383, 411 (S.D.N.Y. 1999), quoting Trebor Sportswear Co., Inc. v. The Limited Stores, Inc., 865 F.2d 506, 510 (2d Cir. 1989). "In applying the 'another purpose' exception to Rule 408, the trial judge should weigh the need for such evidence against the potentiality of discouraging future settlement negotiations." Starter Corp. v. Converse, Inc., 170 F.3d 286, 293 (2d Cir. 1999)(Citation and internal quotation marks omitted).

Here, the evidence in question plainly comes within the scope of Rule 408 and, contrary to plaintiff's contention, falls outside the parameters of the so-called "another purpose" exception.

**2.    The Statements at Issue Expressed Defendant's Settlement Position and Were Made in the Course of Compromise Negotiations.**

To reiterate, plaintiff apparently intends to proffer evidence that defendant refused to boost her salary, despite ostensibly believing it was the "fair" thing to do, except as part of a settlement of the CHRO claim pending at the time. The proposed evidence takes the form of "admissions" ostensibly made in the course of a CHRO fact-finding conference and mandatory mediation, and particularly in the context of a discussion about settlement.

Second Circuit precedent teaches that, "where[,] [as here,] a party is represented by counsel, threatens litigation and has initiated the first administrative steps in that litigation, any offer made between attorneys will be presumed to be an offer within the scope of Rule 408. The party seeking admission of an offer under those circumstances must demonstrate convincingly that the offer was not an attempt to compromise the claim." Pierce, 955 F.2d at 827. Plaintiff can make no such showing.

On the contrary, for at least two separate and independent reasons, the statements in question fall squarely within the contours of Rule 408. First, because Professor King and QUSL's counsel were responding to an inquiry from the CHRO investigator in the course of a mandatory mediation about resolving the case, the statements were by definition attendant to "compromise negotiations." Rubery v. Buth-Na-Bodhaige, Inc., __ F. Supp. 2d __, 2007 WL 186654, at *5 (W.D.N.Y. Jan. 23, 2007)(chart prepared by defendant's counsel and presented to FLSA plaintiff in the immediate aftermath of order tolling limitations periods to enable parties to pursue settlement ruled inadmissible as tied to compromise negotiations). Second, Professor King and counsel were clearly clarifying defendant's settlement position -- *to wit*, that any salary hike was conditioned on a waiver of claims -- a quintessentially taboo subject under Rule 408. Victor G. Reiling Associates and Design Innovation, Inc. v. Fisher-Price, Inc., 407 F. Supp. 2d 401, 402-03 (D. Conn. 2006)(evidence of party's threat to discontinue existing business relationship with adversary if pending dispute did not settle ruled inadmissible).

The evidence in question, moreover, is directly related to the merits of the retaliation claim -- indeed it is the primary evidence relied upon by plaintiff to establish defendant's liability. See Bear Stearns & Co., Inc. v. 1109580 Ontario, Inc., 318 F. Supp. 2d 199, 203 (S.D.N.Y. 2004)(evidence of legal discussion and conclusions made during settlement talks properly excluded where offered for "precise purpose of proving . . . *prima facie* case"). That the statements were uttered in connection with the discussion of a possible resolution of an existing charge of discrimination alleging gender-based wage discrimination, as opposed to the retaliation claim itself, is wholly immaterial.

The point is amply illustrated by the district court's decision in Pace v. Paris Maintenance Co., 107 F. Supp. 2d 251 (S.D.N.Y. 2000). In Pace, the plaintiff sought to

6

support his Title VII retaliation claim through evidence of a statement made by a manager, in the context of negotiations to settle a union grievance, that the plaintiff's lawsuit was costing the employer "thousands of dollars." The trial court determined that the alleged remark was inadmissible pursuant to Fed. R. Evid. 408, finding no merit to the plaintiff's contention that Rule 408 was inapposite because the "admission" was tethered to negotiations pertaining only to his union grievance and not to the subsequent litigation. Id. Significantly, the Pace court noted that resolution of the grievance "could very likely have ended the instant litigation in an amicable fashion" and, therefore, "[t]o the extent [the employer] was attempting to get [plaintiff] to understand [the employer's] position, admission of this evidence would be counter to the public policy of encouraging settlement." Id. at 265.

Likewise, in the matter *sub judice*, the settlement-related statements elicited by the CHRO investigator clarified that any salary increase was contingent on a global resolution of the parties' dispute; defendant was, quite simply, expressing its position on settlement of the underlying claims. These are precisely the sort of statements Rule 408 was designed to exclude. Coleman v. Quaker Oats Co., 232 F.3d 1271, 1291 (9th Cir. 2000)(trial court properly excluded evidence that defendant in age discrimination case "offered [plaintiff] additional medical benefits in exchange for a release of claims."); see also Ronda-Perez v. Banco Bilbao Vizcaya Argentaria-Puerto Rico, 404 F.3d 42, 47 (1st Cir. 2005)(evidence of "a simple offer of payment conditioned on settlement of an[] age discrimination claim ..., made in the context of an obviously contested investigation, fits within the spirit if not the letter of Fed. R. Evid. 408, which bars consideration of offers of compromise.").

Pace is in accord with a multitude of decisions holding that evidence concerning settlement offers made in other proceedings involving the same parties "may nonetheless implicate the same concerns of prejudice and deterrence of settlements which underlie Rule 408," Towerridge, Inc. v. T.A.O., Inc., 111 F.3d 758, 770 (10th Cir. 1997), so as to mandate exclusion.  See, e.g., Lo Bosco v. Kure Engineering Ltd., 891 F. Supp. 1035, 1039 (D.N.J. 1995)("The policy behind Rule 408 may be so strongly implicated in some situations that the spirit of the rule would be violated by allowing evidence of settlement negotiations in a prior case to be admitted into evidence.  The disincentive to engage in settlement negotiations may be no less real when there is a prospect that one's adversary may use them as evidence in later litigation."); Fiberglass Insulators, Inc. v. Dupuy, 856 F.2d 652, 655 (4th Cir. 1988)(statements made in course of settling prior related litigation between parties inadmissible under Rule 408); Branch v. Fidelity & Cas. Co. of New York, 783 F.2d 1289, 1294 (5th Cir. 1986)("The spectre of a subsequent use [of a settlement agreement] to prejudice a separate and discrete claim is a disincentive which Rule 408 seeks to prevent.").

Thus, defendant's articulation of its settlement position *vis a vis* the CHRO charge initially filed by plaintiff alleging wage discrimination is protected by Rule 408, and subject to exclusion, notwithstanding that the evidence is proffered in support of a subsequently hatched claim for retaliation.

### 3.    Rule 408's "Another Purpose" Exception is Inapposite.

Relying principally on the District of Columbia Circuit's decision in Carney v. American University, 151 F.3d 1090 (D.C. Cir. 1998), plaintiff seeks to invoke the "another purpose" exception to Rule 408, averring that the statements in question "are not offered to prove the validity of [her] underlying claim of discrimination, but rather to establish her independent claim of retaliation." (Pltf's SJ Brief, at p. 43). Careful analysis makes plain that plaintiff's reliance on Carney is misplaced and, in the end, the "another purpose" exception does not save the contested evidence from exclusion.

In Carney, also an employment discrimination case, the Court of Appeals found that "although settlement letters are inadmissible to prove liability or amount ... such correspondence can be used to establish an independent violation (here, retaliation) *unrelated to the underlying claim which was the subject of the correspondence* (race discrimination)." Id. at 1095-96 (Emphasis added). The plaintiff in the Carney case claimed she was denied "extra severance pay in retaliation for having signaled her intention to file suit" for discrimination. Carney, 151 F.3d at 1095. Ms. Carney, however, believed she was entitled to the additional severance pay under the terms of the University's personnel manuals and, significantly, the University did not disagree. In these circumstances, the Court of Appeals determined that, "Carney offered the settlement correspondence not to prove that the University discriminated against her, but to show that the University committed *an entirely separate wrong* by conditioning her [severance] benefits on a waiver of her rights." Id. at 1096 (Emphasis added).

Having placed the evidence in proper context, Carney now becomes readily distinguishable. Unlike Carney, the communications at issue in the matter *sub judice* were not "unrelated" to the underlying claim before the CHRO; on the contrary, the

statements were directly responsive to an inquiry about the prospects for settling *that very underlying claim*. Thus, unlike the defendant in <u>Carney</u>, QUSL did not deny plaintiff a distinct benefit she had a legitimate expectation of receiving in the ordinary course, wholly apart from the discussions about a possible resolution of her CHRO claim. Instead, QUSL's decision not to go ahead with the contemplated salary increase, in light of plaintiff's unwillingness to drop her CHRO claim as a *quid pro quo*, is necessarily dependent on, and not independent of, the claim that prompted the discussion of a salary increase in the first place.

Indeed, the very act alleged to be retaliatory is defendant's failure *sua sponte* to award plaintiff a significant portion of *exactly the same remedy* she was seeking to recover in the CHRO case, i.e., a salary hike and back pay. <u>See</u> <u>Duse v. International Business Machines Corp.</u>, 748 F. Supp. 956, 962 (D. Conn. 1990)(retaliation claim could not be based on evidence regarding employer's rejection of discrimination plaintiff's pre-litigation proposal to settle dispute in exchange for "$2.5 million in funding for the creation of a new venture" in that "documentation of the defendants' refusal to finance the plaintiff's business proposal would not be admissible as evidence under Rule 408 of the Federal Rules of Evidence.")[2]

---

[2] Aside from being predicated on inadmissible evidence, plaintiff's retaliation theory is inherently flawed as a matter of law. <u>See</u> <u>Lawrence v. National Westminster Bank New Jersey</u>, 98 F.3d 61, 72 (3d Cir. 1996)(where employer "never offered severance benefits to employees terminated for cause" the fact "[t]hat it offered [plaintiff] benefits as inducement to sign the termination agreement does not suggest the failure to tender benefits absent [plaintiff's] assent was retaliatory."); <u>Penny v. Winthrop-University Hospital</u>, 883 F. Supp. 839, 846-47 (E.D.N.Y. 1995)(letter offering to reinstate plaintiff on the condition she sign a waiver and release of her discrimination claims was non-actionable on a retaliation theory and inadmissible under Fed. R. Evid. 408 "as evidence of furnishing or offering or promising to furnish valuable consideration in compromising a disputed claim, and as evidence of statements made in compromise negotiations.").

Here then, as distinguished from the situation in <u>Carney</u>, there is no "separate wrong," detached from the claim under discussion at the CHRO fact-finding conference/mandatory mediation. Accordingly, plaintiff cannot invoke the "another purpose" exception to Rule 408, and defendant's statements relating to the proposal to adjust her salary in response to her wage discrimination complaints should be excluded at trial. Cf. <u>DeLuca v. Allied Domecq Quick Service Restaurants</u>, 2006 WL 2713944, at *1-2 (E.D.N.Y. Sept. 22, 2006)(where plaintiff applied to be a franchisee *subsequent to filing an EEOC charge* challenging earlier termination of employment, statement made by employer during EEOC mediation that "we're not in the process of giving out franchises to people that are suing us or made complaints" was admissible to prove distinct claim for retaliatory denial of franchise application).

**4.      Admission of the Evidence in Question Would Have a Chilling Effect on Settlement Negotiations and Thereby Contravene the Very Purpose of Fed. R. Evid. 408.**

Fundamentally, evidence of statements made by defendant to the effect that plaintiff's salary had not been increased because she refused to drop her wage discrimination claims as a *quid pro quo* must be excluded for the simple reason that admission "would undermine the 'public policy favoring the compromise and settlement of disputes' that underlies Rule 408." <u>Bruno v. Sonalysts, Inc.</u>, 2004 WL 2713239, at *10 (D. Conn. Nov. 23, 2004)(Citation omitted).

As the U.S. Court of Appeals for the Sixth Circuit recently explained, "Where, as here, a party has raised an issue going to the validity or amount of a claim, that is insufficient for admitting settlement offers *that go to the same issue* because to do so violates Rule 408 on its face. To argue otherwise would eviscerate Rule 408's protection

and undermine its clear purpose. It would be unreasonable to expect a party to ever make a settlement offer if doing so forced it into choosing between conceding one or more elements of liability or damages or having the offer admitted against it." Stockman v. Oakcrest Dental Center, P.C., __ F.3d __, 2007 WL 777497, at *5 (6th Cir. March 16, 2007)(Emphasis added).

This policy-based rationale is compelling, consistent with Second Circuit precedent,[3] and ultimately dispositive of the issue at hand. Because the statements alleged to signify retaliatory animus were made in a fact-finding conference and mandatory mediation convened by the CHRO to discuss the disputed issues raised by plaintiff's wage discrimination claim, and because those statements expressed defendant's settlement posture as "to the same issue," they are inadmissible. Any other result would fly in the face of the policy considerations underlying Fed. R. Evid. 408.

**5.    Admission of the Evidence in Question Would Necessarily Undermine Title VII's Preference for Conciliation Rather Than Litigation.**

"In Title VII, Congress expressed a preference for voluntary settlements of disputes through the conciliation process." Gulf Oil Co. v. Bernard, 452 U.S. 89, 101 n.14, 101 S. Ct. 2193, 2200 n.14, 68 L. Ed. 2d 693 (1981)(Citation omitted). "[T]o promote the congressional policy favoring unlitigated resolution of employment discrimination claims," Title VII contains a "prohibition on revealing statements made or actions taken in the [EEOC]'s conciliation efforts ..." Olitsky v. Spencer Gifts, Inc., 842 F.2d 123, 127 (5th Cir. 1988)(Citation and internal quotation marks omitted).

More specifically, Section 706(b) of Title VII provides that: "Nothing said or done during and as part of such informal methods of [conciliation] may be made public

---

[3] Indeed, the Sixth Circuit in Stockman adopted and applied the Second Circuit's construction of Fed. R. Evid. 408 as articulated in Pierce. Id. at *4.

12

by the Commission, its officers or employees, *or used as evidence in a subsequent proceeding without the written consent of the persons concerned.*" 42 U.S.C. § 2000e-5(b)(Emphasis added).   <u>See also</u> 29 C.F.R. § 1601.26(a).   Clearly, then, if the "admissions" attributed by plaintiff to Dean King and QUSL's counsel were made in the course of an EEOC fact-finding or conciliation conference, as opposed to the parallel CHRO proceeding, they would be inadmissible regardless of whether Fed. R. Evid. 408 applies.

Technically speaking, Section 706(b) is not directly controlling here, but only by virtue of the serendipitous fact that this particular Title VII claim was slated for initial processing by the CHRO pursuant to a work-sharing agreement with the EEOC.  The policy considerations embodied in Section 706(b), however, ought not be swept away merely because the settlement dialogue occurred in a CHRO, as opposed to an EEOC, office.  This is particularly so given that the FEPA, like Title VII, promotes voluntary settlement as the favored means of resolving disputes.  Conn. Gen. Stat. § 46a-83(f)(mandating that CHRO promptly attempt conciliation of any complaint found to be supported by reasonable cause).

As the Fifth Circuit explained in a like context:

> [The employer]'s supposed admission of liability to the EEOC investigator is exactly the kind of exchange among the parties and the EEOC that informal conciliation ought to encourage.  Admissions of partial liability tend to narrow the issues in the settlement discussions and therefore facilitate a resolution without litigation.  If we were to allow the use of such admissions in later litigation, we would attach a penalty to the candor and forthrightness that Congress obviously believed were necessary to the successful conciliation of disputes.

<u>Olitsky</u>, 842 F.2d at 127.

13

Surely, this reasoning applies with equal force to *all Title VII claims*, regardless of whether administrative processing falls to the EEOC or a state or local deferral agency. See <u>Coles v. Perry</u>, 217 F.R.D. 1, 8 (D.D.C. 2003)(proposed testimony of EEO counselor, to the effect that in the course of mandatory informal EEO process plaintiff's supervisor displayed retaliatory animus, was barred by Fed. R. Evid. 408). Indeed, the allegedly retaliatory statements were made in the course of a dual purpose fact-finding/mandatory mediation conference, the FEPA's functional equivalent of the conciliation process contemplated by Section 706(b) of Title VII. There is no principled reason why admissibility should turn on a consideration so inherently impertinent to the policy concerns at stake as the administrative forum where the "admissions" were uttered.

At a bare minimum, Section 706(b) warrants consideration and, if need be, must tilt the Rule 408 balance in favor of exclusion, lest the spirit and letter of that rule, as particularly applied in the Title VII context, be sullied. <u>EEOC v. Gear Petroleum, Inc.</u>, 948 F.2d 1542, 1544-45 (10th Cir. 1991)(although Section 706(b) of Title VII was inapplicable to ADEA case, communications by employer's counsel to EEOC "undertaken in the interest of persuading the defendant's cause ..." were properly excluded under Fed. R. Evid. 408).

**B.    Plaintiff Should Be Precluded From Introducing Raw Faculty Salary Information And/Or Simplistic Statistics Comparing Salaries Of Male And Female Faculty Members.**

In the course of discovery, plaintiff sought, and defendant was directed by the Court to produce, salary information for all QUSL faculty members. Plaintiff has since requested updated salary information for purposes of trial preparation; how plaintiff intends to use this raw information at trial remains unclear. Nevertheless, because plaintiff has not retained a statistical expert to properly analyze the salary data, and such

14

data in raw form or as part of an unsophisticated statistical presentation is innately irrelevant, and therefore inadmissible, an Order should enter *in limine* barring plaintiff's use of faculty salaries at trial for any purpose.

Although "[i]t is apodictic that 'statistical reports may be admissible to support an inference of discrimination,'" Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999)(Citations omitted), and courts "have previously held that an EPA plaintiff can rely upon statistical evidence of a gender-based disparity in pay when establishing a *prima facie* EPA case," Beck-Wilson v. Principi, 441 F.3d 353, 364 (6th Cir. 2006)(Citation omitted), "the analysis must still cross a threshold of dependability." Rathbun v. Autozone, Inc., 361 F.3d 62, 79 (1st Cir. 2004). To do so, the salary data must be subject to a regression analysis that accounts for at least the major variables considered by the employer in setting salaries. Bickerstaff, 196 F.3d at 449; see also Coleman v. Exxon Chemical Corp., 162 F. Supp. 2d 593, 620-21 (S.D. Tex. 2001)(statistical analysis of salaries was unreliable because, *inter alia*, experts based their calculations on erroneous assumptions about employer's use of seniority as a factor influencing compensation rates).

Thus, a "rudimentary analysis, conducted by ... counsel rather than by a qualified expert, [that] makes no attempt to ascertain the extent to which the apparent disparities may be attributable to factors other than gender" is necessarily tainted by "a significant shortcoming." Rathbun, 361 F.3d at 79 (Citations omitted). So much so that a salary study (along the lines proffered by plaintiff in opposition to defendant's motion for summary judgment) unaccompanied by a regression analysis is, by definition, "... 'so

incomplete as to be inadmissible as irrelevant.'"  Bickerstaff, 196 F.3d at 449, quoting

Bazemore v. Friday, 478 U.S. 385, 400 n.10, 106 S. Ct. 3000, 92 L. Ed. 2d 315 (1986).[4]

Because plaintiff has not retained an expert statistician qualified to perform an

appropriate regression analysis of the faculty salary data produced in discovery, any

proffer of this data, regardless of form, would be devoid of probative value, and hence

inadmissible for want of relevance.  Fed. R. Evid. 401.  Such evidence should therefore

be excluded.

**C.     Plaintiff Should Be Precluded From Introducing Evidence Comparing Salaries Of Other Male And Female Faculty Members.**

In opposing defendant's motion for summary judgment on her wage

discrimination claim under Title VII, plaintiff cited several examples of other female

faculty members ostensibly being paid less than male faculty members performing the

same or substantially equal tasks.  (Pltf's SJ Brief, at pp. 36-37).  Plaintiff relied on these

alleged disparities as evidence of intentional discrimination.  A similar proffer at trial

would invariably cause juror confusion and sidetrack the proceedings by focusing

attention on ancillary matters, thereby resulting in a monumental waste of time.  Such

evidence ought therefore be precluded.

Plaintiff's summary judgment opposition includes references to evidence that (i)

"a female colleague in the [tax] clinic, Professor Kaas, who was fully tenured and had

been a member of the Law School faculty since 1989, was paid only $7500 more than

[Professor] Book in 1997-98, despite the fact that Book had no prior teaching experience

of any kind, and was in an entry-level, non-tenured track position"; (ii) "Kaas ... was paid

---

[4] Plaintiff argued on summary judgment that, based on her lay review of doctrinal faculty salaries, male professors earned on average $10,000.00 more per annum than their female counterparts.  (Pltf's SJ Brief, at p. 37).  Bickerstaff teaches that this type of naked statistical analysis is inherently meaningless, not to mention misleading.

substantially less than the other male clinician employed by QUSL"; (iii) "a female visiting professor who was hired to teach the Tax Clinic during the fall of 1994 and teach one doctrinal tax course during the spring of 1995, ... was paid $18,400 for the academic year" whereas "[o]ne year later, in 1995-96, the male visitor who directed the Tax Clinic during the fall term and taught one doctrinal course during the spring term, was paid $80,000 ..."; (iv) "[i]n 2000-2001 the lone male clinical faculty member was paid $36,300 more than the average salary of the three female clinical faculty members ..."; and, as touched on above, (v) "there was a disparity of nearly $10,000 between the average salaries of males and females within the doctrinal facility [sic]."

None of these unadorned compensation comparisons, standing alone, "hav[e] any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Akin to salary statistics devoid of a regression analysis, which Bickerstaff tells us is inherently unreliable and hence inadmissible, there is absolutely nothing enlightening about a simple comparison of one professor's salary to another's, without regard to context or consideration of the myriad gender-neutral factors that might account for any discrepancy. Bickerstaff, 196 F.3d at 449 ("... because the regression analysis failed to account for the major factors that Vassar considers in evaluating salary increases, the district court did not abuse its discretion in according the regression analysis no probative weight.").

Moreover, the impact such evidence would have on the trial of this individual employment discrimination case, in terms of time and focus, cannot be understated, or discounted. To state the obvious, "the admission of this evidence would unfairly burden the defendant[] who would be required to explain the particular facts and circumstances

17

of those other cases." Rosa v. Town of East Hartford, 2005 WL 752206, at *3 (D. Conn. March 31, 2005). This is exactly what defendant was forced to do on summary judgment by way of an affidavit detailing the legitimate basis for each salary discrepancy cited by plaintiff in her opposition brief. (See Affidavit of David S. King, dated May 28, 2004 [Docket No. 52], at ¶ 18).

Title VII "case law has recognized consistently that evidence of discrimination against other employees is relevant only if the plaintiff is able to show that the action taken against the other employees was based on discrimination. Accordingly, ... when the evidence appears to be of slight probative value, district courts may exclude it under Rule 403 to avoid a series of collateral 'trials within the trial' which would result in confusion and undue delay." Stopka v. Alliance of American Insurers, 141 F.3d 681, 687 (7th Cir. 1998)(Citation omitted). Where, as here, there exists "significant evidence indicating that [other female faculty members'] salaries were unrelated to their gender" (as articulated in the aforementioned affidavit of Professor King), "the potential for jury confusion and undue delay outweigh[s] any probative value the evidence might have." Id.

"Even in the context of a jury trial, the court has considerable discretion to prevent delay or avoid cumulative evidence." U.S. v. Clarke, 390 F. Supp. 2d 131, 134 (D. Conn. 2005)(Citations and internal quotation marks omitted). As a practical matter, were the Court to allow a "me-too" proffer of other salary disparities, of the sort introduced by plaintiff on summary judgment, "[i]nevitably, the trial of the discrete claims in this case would spin off into mini-trials on all of [those other cases]." Thomas v. Metropolitan District Comm., 2004 WL 2549728, at *3 (D. Conn. Nov. 5, 2004). Without question, then, "the probative value, if any, of [this evidence], is far outweighed

18

by considerations of prejudice, confusion and time" such that exclusion is warranted under Fed. R. Evid. 403. Id., citing <u>Sanders v. New York City Human Resources Administration</u>, 361 F.3d 749, 758 (2d Cir. 2004).

**III.    <u>Conclusion</u>**

For the foregoing reasons, the Court should rule, *in limine*, that plaintiff is barred from introducing into evidence (i) statements allegedly made by defendant in the course of the CHRO fact-finding conference and mandatory mediation to the effect that the reason QUSL had not unilaterally increased plaintiff's salary, outside the annual review process, was because she refused to settle her wage discrimination claim; (ii) information concerning the salaries of other QUSL faculty members, be it in the form of simple statistics or otherwise; and (iii) other alleged salary disparities between male and female professors.

Respectfully submitted,

DEFENDANT,
QUINNIPIAC UNIVERSITY
SCHOOL OF LAW

By:_____
Lawrence Peikes (ct07913)
lpeikes@wiggin.com
Wiggin and Dana LLP
Its Attorneys
400 Atlantic Street
P.O. Box 110325
Stamford, CT  06911-0325
(203) 363-7600
(203) 363-7676 (fax)

## CERTIFICATE OF SERVICE

This is to certify that on this 9th day of April, 2007, a copy of the foregoing has been was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system.  Parties may access this filing through the court's CM/ECF System.

Gregg D. Adler, Esq.<br>
Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.<br>
557 Prospect Avenue<br>
Hartford, CT  06105

_____
Lawrence Peikes

\7377\201\641852.2