## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CINDY SLANE,<br>　　　Plaintiff, | : | CIVIL ACTION NO.<br>3:02 CV 00821 (AWT) |
| | : | |
| v. | : | |
| | : | |
| QUINNIPIAC UNIVERSITY<br>SCHOOL OF LAW<br>　　　Defendant. | : | |
| | : | May 21, 2007 |

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO MOTION IN LIMINE

I.　　INTRODUCTION

The defendant, Quinnipiac University School of Law (hereinafter "the defendant" or "QUSL")  has filed the instant motion in limine seeking to exclude from trial evidence of admissions that QUSL failed to adjust plaintiff Cindy Slane's (hereinafter "the plaintiff") salary because she would not accept QUSL's settlement offer with respect to her Equal Pay Act and Title VII claims.  QUSL contends that these admissions occurred in the context of settlement negotiations and are barred under Federal Rules of Evidence 408.

QUSL also seeks to exclude evidence of the salaries paid to various male and female faculty members.  QUSL contends that such evidence is inadmissible because the plaintiff has not disclosed an expert to explain the data and has not subjected the information to regression analysis.  In the alternative, QUSL objects to the evidence, claiming that any relevance is outweighed by the likelihood of confusion and undue delay.  As is explained in detail below, the defendant's claims ignore and/or mis-state

- 2 -

the facts and/or the applicable law, and the motion in limine as to these issues must be denied.[1]

II.    THE RELEVANT FACTS[2]

Cindy Slane was hired by then Quinnipiac College School of Law in July 1994 as Director of Field Placement (or Externship) Programs. She began her employment on August 1, 1994. Since the fall of 1997, Slane has held the title of Assistant Clinical Professor of Law and Director of Field Placement Programs. During the spring of 2000, Professor Slane learned that Professor Leslie Book, a man, who had been employed since 1997 as Assistant Clinical Professor of Law and Director of the Tax Clinic, was apparently being paid an annual salary over $25,000 greater than what she was receiving. After talking to Book to confirm what he was paid, Professors Slane and Carolyn Kaas wrote to QUSL's then-Dean, Neil Cogan, expressing their concerns about salary discrimination based on gender. Although Cogan, who was about to end his tenure as Dean, stated that he did not believe that he had engaged in sex discrimination, he acknowledged that he had erred by setting the plaintiff's salary lower than Professor Book's, stating that "while [the plaintiff's and Professor Book's] titles were different, their duties and responsibilities were essentially the same."

---

[1] QUSL also seeks to exclude, "raw data or a simple statistical analysis of faculty salaries." The plaintiff does not intend to introduce such statistical evidence of the salaries of the entire faculty and therefore does not object to this portion of the motion in limine.

[2] Unless otherwise noted, the record evidence supporting these facts was provided in connection with the Plaintiff's Memorandum in Opposition to Summary Judgment. (See: Plaintiff's Memorandum in Opposition to Summary Judgment, Exhibits 1-9)

- 3 -

Although Cogan had expressed his support for pay equity between Book and the plaintiff, he made no adjustment to the plaintiff's compensation during the remaining weeks of his deanship.  The plaintiff then raised her concerns with David King, who was serving as Interim Dean for the 2000-2001 academic year.  King admitted that he was shocked when he learned how little Professor Slane was being paid for the work she was performing (the plaintiff's 2000-2001 salary was $59,750), and promised to bring her concerns to QUSL administrators immediately.

The next day, Dean King told Slane and Kaas that he had advised Vice President Kavanagh and President Lahey that Professor Slane's contracts had been "biased in favor of the college from the beginning," a comment that he characterized as an "admission against interest."  He also asked the plaintiff to provide QUSL with an estimate of her damages.

While neither Dean Cogan nor Interim Dean King undertook a systematic analysis of all law faculty salaries after Professors Slane and Kaas alerted them to their concerns, King did conduct an investigation that led him to conclude that the plaintiff was underpaid.  Based on his review of the salaries of other faculty, and before the plaintiff filed her complaint with the Commission of Human Rights and Opportunities (CHRO) and the Equal Employment Opportunities Commission (EEOC), King recommended to Edward Kavanagh what he believed to be a fair salary for the plaintiff.[3]  On or about October 24, 2000, the plaintiff provided King with a detailed damages analysis.  Slane also explained that, because of the limitations period for filing a CHRO

---

[3]  Both King and Kavanagh have testified that they cannot recall what that figure was.

- 4 -

complaint, she would have to take action to protect her claim if she and QUSL could not resolve the outstanding issues within two weeks. King asked for more time to evaluate the proposal. Slane responded by explaining that her preference would have been to enter into a tolling agreement, but that she did not believe that she could do so because her understanding was that the CHRO would not honor tolling agreements.

On or about November 7, 2000, the plaintiff filed a complaint with the CHRO and the EEOC. In this complaint, the plaintiff alleged that she had been discriminated against because of her gender in violation of Conn. Gen. Stat. section 46a-60, *et seq.*, the Equal Pay Act of 1964, U.S.C. 206, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e and the Civil Rights Act of 1991. She did **not** complain of retaliation for having complained of gender discrimination.

On May 8, 2002 the CHRO held a Fact-Finding and Mandatory Mediation Conference with respect to the plaintiff's gender discrimination claims. (See Notice of Conference attached as Exhibit A to Defendant's Motion In Limine) While held on the same day, the mediation process was a completely separate proceeding from the fact-finding.[4] During the fact-finding portion of the conference, the parties were given an

---

[4] That these were entirely separate proceedings was made abundantly plain to the parties at the beginning of the conference. At the start of the tape, Investigator Anderson explained,

Ok, today's date is May 8, 2002 my name is Carolyn Anderson, I am the investigator for CHRO...to investigate the CHRO case 0130204, Cindy R. Slane vs. Quinnipiac University School of Law. Um, I have the parties present this morning for a fact finding subject to mandatory mediation. Miss Slane filed her complaint against the Quinnipiac University School of Law about November 6, 2002.... A few preliminary matters before we begin the fact finding. First of all there is no direct or cross examination allowed by the attorneys for either side. I will allow rebuttal by the witnesses if they hear something that they

- 5 -

opportunity to present evidence and witness testimony.  (See Affidavit of Attorney Mary
E. Kelly attached hereto as Exhibit 1)  This witness testimony was tape recorded for
later use in the CHRO proceedings.  (Ex. 1)  Dean King was one of the witnesses
interviewed by Investigator Carolyn Anderson, and his answers to her questions were
included on the tape recording.  (Ex. 1)  When the interviews were completed and the
parties had been given an opportunity to present evidence, the tape recorder was
turned off and Investigator Anderson conducted a mediation - attempting to resolve the
dispute.  (Ex. 1)  The mediation was unsuccessful.[5]  (Ex. 1)

    During the tape-recorded fact-finding portion of the conference, Dean King
acknowledged that he was aware that the plaintiff felt that her salary was unfair and that
she mentioned that she believed that her gender was a factor in the determination of
her salary.  (Ex. 1)  Dean King also acknowledged that he thought that the plaintiff's
salary was low, and that he had been surprised by the discrepancy between the
plaintiff's salary and Book's.  (Ex. 1)  In response to a comment about the salary not

--------------------------------

    would like to address or rebut.  I would ask the parties to please allow each
other to testify uninterrupted.  Uh, if you hear something and you would like
rebut, just drop a note please and give me a little wave and I will allow you
to do that.  You don't have to wait for, you know, my questions to be completed
or completely over, but just give me a wave and I will let you rebut what you
hear.  **Following the fact-finding will be the mandatory mediation.  At that
time, only those parties that are authorized to discuss settlement will be
allowed to remain in the room.  And that will take place shortly after the
fact-finding conference.  Any questions before we begin**?

(Ex. 1, emphasis added)

    [5] After the unsuccessful mediation, the plaintiff requested and received a copy of
the CHRO tape recording of the fact-finding portion of the conference from the agency.
(Ex. 1)

- 6 -

having been adjusted, Dean King and QUSL counsel John Zandy, in unison, stated that the Law School had not adjusted her salary because she hadn't settled her suit. (Ex. 1)

The plaintiff filed this law suit on May 13, 2002. She claimed that the University engaged in gender discrimination under Conn. Gen. Stat. section 46a-60, *et seq.*, the Equal Pay Act of 1964, U.S.C. 206, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e and the Civil Rights Act of 1991. In addition, the plaintiff alleged a new claim; that she was retaliated against by QUSL for having filed a claim with the CHRO. In particular, the plaintiff alleged that, "despite having previously acknowledged that the plaintiff's salary was unfair, the defendant has failed to correct the plaintiff 's salary in whole or in part as a result of the filing and pursuit of the administrative complaint." The defendant has denied these allegations.

At his October 16, 2003 deposition, Dean King testified that he had reviewed faculty salaries after meeting with the plaintiff and Professor Kaas, and that he advised Vice President Kavanagh in 2000 that his review indicated that the plaintiff was underpaid. He also admitted that QUSL could have increased the plaintiff's compensation at any time without conditioning the increase on resolution of her gender claims. He stated that QUSL had decided not to correct the inequity "after consultation with counsel." The plaintiff intends to offer the admissions of King during his deposition and the admissions of King and Attorney Zandy during the CHRO fact-finding as evidence of QUSL's retaliatory motive in failing to adjust the plaintiff's salary.

In the course of discovery in this litigation, the plaintiff  learned that the salary gaps between Professors Slane and Book during the three years Book was employed

- 7 -

at the Law School were as follows:  $21,000 in 1997-98; $20,750 in 1998-99; and

$21,250 in 1999-2000.[6]  The plaintiff also learned that there is a pattern of paying male

faculty more than female faculty when they have held the same or similar clinical or

other skills faculty positions.[7]  Specifically, the defendant has produced information

showing that the salaries paid to individuals occupying Director of Legal Skills positions

were:

```
1994-1995; Male    $ 81,000
1997-1998: Female $ 56,000
1998-1999: Female $ 60,000
1999-2000: Male    $106,333.
```

The salaries paid for the Director of the Tax Clinic were:

```
1994-1995: Female $ 30,000
1995-1996: Male    $ 80,000
1997-1998: Male    $ 75,000
1998-1999: Male    $ 78,500
1999-2000: Male    $ 81,000
2000-2001: Female $ 70,000.[8]
```

This information suggests that male employees consistently were paid

_____

[6]  In addition, although Professor Book had no teaching responsibilities during the summer of 1998, he received a summer research stipend in the amount of $7,000 in addition to his salary.  During the summer of 1999, Professor Book likewise had no teaching responsibilities, and received a summer research stipend in the amount of $6,500 in addition to his salary.

[7]  The plaintiff relied on some of this information in her Opposition to Defendant's Motion for Summary Judgment.

[8]  The plaintiff also intends to introduce certain salary information with respect to several other individual faculty, including:  Cindy Slane, Carolyn Kaas, James Trowbridge, Alexander Scherr (1995-1996), Carolyn Spencer (1995-1996), and possibly general data showing the difference in average pay for Legal Skills Instructors as compared to faculty as a whole for 1999-2000.   This evidence is relevant either to the issues of disparate treatment and/or pretext, or to provide context or explanation for other relevant issues of fact.

- 8 -

substantially higher salaries than were females holding the same or similar positions.

The plaintiff seeks to offer it as evidence with respect to the plaintiff's gender

discrimination claims.  QUSL does not question the accuracy of the information but has

claimed that there are reasons other than gender to explain the salary differences

between male and female clinic faculty. (See Defendant's Summary Judgment Reply

Brief, and attached Exhibit)

III.    ARGUMENT

A.    The Admissions of King and Zandy are Not Barred BY FRE 408

1.    Introduction

The plaintiff intends to offer the admissions of Dean King and Attorney Zandy

during the fact finding conference as evidence of the defendant's retaliatory motive in

not correcting or adjusting the plaintiff's salary.[9]   Retaliation claims under Title VII and

CFEPA are examined under the McDonnell-Douglas burden-shifting analysis.  Under

this analysis, the plaintiff bears the initial burden of establishing her *prima facie* case.[10]

McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973).  She must produce evidence

of:  (1) participation in a protected activity known to the defendant;[11] (2) that the

employer took action against the plaintiff; and (3) a causal connection between the

_____

[9] The plaintiff also intends to offer the admissions of Dean King during his deposition.  Based on the Defendant's Motion in Limine it appears that the defendant does not object to the admission of the deposition testimony.

[10] A plaintiff's burden in presenting *prima facie* evidence is *de minimis*. Abdu-Brisson v. Delta Airlines, 239 F.3d 456, 467 (2d Cir. 2001).

[11] "Protected activity" for purposes of a retaliation analysis includes internal, informal complaints to management, as well as filing formal charges of discrimination. Gregory, 243 F.3d at 700-701; Bolick, 278 F. Supp. 2d at 284, n.7.

- 9 -

protected activity and the action, *i.e.*, that a retaliatory motive played a part in the action.  Kessler v. Westchester County Dep't. of Social Services, 461 F.3d 199, 206 (2d Cir.2006).  "[T]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." Cifra v. G.E. Co., 252 F.3d 205, 217 (2d Cir. 2001) (internal citations omitted).  The causal connection also can be shown by evidence of retaliatory animus. Bolick v. Alea Group Holdings, LTD, 278 F. Supp. 2d 278, 284  (D. Conn. 2003).

If the plaintiff makes out a *prima facie* case, a presumption arises that the employer unlawfully retaliated, and the burden shifts to the defendant to proffer a nondiscriminatory reason for the adverse employment action.  If the employer introduces such evidence, the  burden returns to the plaintiff to prove "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000).  The ultimate question is whether a reasonable person could find that the adverse action was motivated at least in part by a retaliatory motive.[12] Stratton v. Department for the Aging for the City of New York, 132 F.3d 869, 878 (2d Cir. 1997).

---

[12] The plaintiff is not required to prove that the prohibited motivation was the sole or even the principal factor in the decision, nor that the employer's proffered reasons played no role in the employment decision, but only that those were not the only reasons and that the plaintiff's protected status contributed to the employer's decision. Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 78-79 (2d Cir. 2001); Renz v. Grey Advertising, Inc., 135 F.3d 217, 220-222 (2d Cir. 1997); Stratton, 132 F.3d at 878; Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir. 1995).

- 10 -

A plaintiff need not establish that the underlying complaint is meritorious in order to state a claim for retaliation under Title VII and CFEPA. <u>See</u>: <u>Manoharan v. Columbia University College of Physicians & Surgeons</u>, 842 F.2d 590, 593 (2d Cir. 1988) It is sufficient if the plaintiff can establish that she had a good faith, reasonable belief that the conduct violated Title VII. <u>Id</u>. Accordingly, a plaintiff may prove liability with respect to a Title VII retaliation claim even if the jury finds no violation of Title VII's prohibition on gender discrimination. <u>Id</u>.

QUSL has filed the instant motion in limine, claiming that the statements of King and Zandy cannot be used as evidence of the defendant's retaliatory motive because they are barred by Federal Rule of Evidence 408.[13] As is explained below, a review of

---

[13] The defendant also suggests that conditioning any adjustment in the plaintiff's low pay on her settling her gender discrimination claims could not be considered retaliatory. See: Defendant's Memorandum of Law at 10, citing <u>Lawrence v. National Westminster Bank New Jersey</u>, 98 F.3d 61, (3rd Cir. 1996) and <u>Penny v. Winthrop University Hospital</u>, 833 F. Supp. 839 (EDNY 1995). This argument is, of course, really about the merits of the plaintiff's claims, and thus more appropriate in the context of a Motion for Judgment as a Matter of Law, rather than in a Motion in Limine. In any event, QUSL's reliance on these cases is misplaced.

In <u>Lawrence</u>, 98 F.3d at 72, the Court found no retaliation explaining, "[T]he record evidence demonstrates that National Westminster Bank never offered severance benefits to employees terminated for cause... Lawrence offers no evidence for his contention that he was denied benefits because of his refusal to sign..." In this case, the plaintiff has produced evidence both that QUSL **would** have paid her more absent an alleged mistake in setting her salary, and that once QUSL was made aware of the purported mistake, it denied her any adjustment **because** of her refusal to settle.

In <u>Penny</u>, 833 F. Supp. at 845, the Court found that conditioning reinstatement upon settlement could not, as a matter of law, constitute an adverse action because it neither impacted upon the plaintiff's employment (as she was already terminated), nor deprived her of any ability to enforce her rights. However, since <u>Penny</u>, the Supreme Court has promulgated a new standard for determining the existence of an adverse employment action in retaliation claims. In <u>Burlington Northern & Santa Fe Ry. v. White</u>, ---U.S. ---- 126 S.Ct. 2405, 2415 (2006), the Supreme Court explained that for

- 11 -

the language of Rule 408, the facts and the relevant legal authority make plain that the

statements of King and Zandy are not barred by Rule 408.

1.     The Admissions of King and Zandy During the Fact-Finding Were Not
       Statements Made in Compromise Negotiations within the Meaning of
       FRE 408

Rule 408 of the Federal Rules of Evidence provides:

(a) Prohibited uses. - Evidence of the following is not admissible on behalf of
any party, when offered to prove liability for, invalidity of, or amount of a claim
that was disputed as to validity or amount, or to impeach through a prior
inconsistent statement or contradiction:

(1) furnishing or offering or promising to furnish - or accepting or offering
or promising to accept - a valuable consideration in compromising or
attempting to compromise the claim; and

(2) conduct or statements made in compromise negotiations regarding the
claim, except when offered in a criminal case and the negotiations related
to a claim by a public office or agency in the exercise of regulatory, investigative,
or enforcement authority.

---

purposes of a retaliation claim, an adverse employment action is one which "a
reasonable employee would have found [to be] materially adverse" and which would
"dissuade a reasonable worker from making or supporting a charge of discrimination."
Id., at 2415.  The Court expressly found that such actions need not affect the terms and
conditions of employment, stating,

an employer can effectively retaliate against an employee by taking
actions not directly related to his employment or by causing him harm
*outside* the workplace.... A provision limited to employment-related actions
would not deter the many forms that effective retaliation can take.  Hence,
such a limited construction would fail to fully achieve the anti-retaliation
provision's primary purpose, namely, maintaining unfettered access to
statutory remedial remedies.

Id. at 2412.

In the present case, a reasonable jury could find that refusing to correct the
alleged mistake by adjusting the plaintiff's salary in retaliation for her protected conduct
would deter an employee from reporting illegal discrimination.

- 12 -

(b) Permitted uses. - This rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a).  Examples of permissible purposes include proving a witness's bias or prejudice; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution.

Fed.R.Evid. 408.

Thus, Rule 408 applies **only** to offers or acceptance of settlement, or conduct and/or statements made in compromise negotiations regarding a claim.  (See: FRE 408(a)(1) and (a)(2))  The statements made by King and Zandy during the CHRO fact-finding conference are not barred by Rule 408 because these admissions were not made in the context of compromise negotiations regarding the plaintiff's sex discrimination claims.  In claiming otherwise, the defendant suggests that: (1) the admissions were made during a mandatory mediation; (2) the admissions were made in response to an inquiry about settlement; and (3) the admissions were made when the defendant was clarifying its settlement position.  (Defendant's Memorandum of Law at 2-8)  None of these claims are true.

First, the statements were not made in the course of a mandatory mediation as has been claimed.  As was explained above, the admissions were made during the fact-finding portion of the Fact Finding and Mandatory Mediation Conference, and not during the mediation session held after the fact-finding was completed.  CHRO fact-finding proceedings are separate and distinct from mediation.  The purpose of the fact-finding is to elicit reliable, probative evidence, including  testimony from the witnesses, which will be used by the Commission in determining whether there is reasonable cause to

- 13 -

believe that discrimination has occurred.[14]  See:  Adriani v. Commission of Human

Rights and Opportunities, 220 Conn 307. 319 (1991).  The testimony of witnesses

during this fact-finding process cannot reasonably be construed as having occurred

during mediation.[15]

---

[14] The power of the CHRO to make findings of material fact as part of the reasonable cause determination "is conditional upon the commission having conducted a thorough investigation of the claim and having relied only upon reliable, probative evidence in making those findings." Adriani v. Commission of Human Rights and Opportunities, 220 Conn 307, 319 (1991). The CHRO investigator must interview the relevant, corroborating witnesses identified by the Complainant. Hefti v. CHRO, 1993 WL 12137 (Conn. Super. 1994) (remanding case for a full investigation based in part on a failure to interview witnesses named by the complainant); Dufraine v. CHRO, 236 Conn. 250, 262-263 (finding investigation to be fatally flawed where investigator failed to interview similarly situated employees outside of the protected class to determine whether or not each was, in fact, treated the same as the complainant).

[15] The defendant cites a number of cases for the proposition that the testimony is inadmissible under Rule 408.  (See Defendant's Memorandum at 4-8)  However, not one of these cases involves witness testimony during an administrative proceeding. See: Pierce v. F.R. Tripler & Co., 955 F.2d 820 (2d Cir. 1992) (job offer conditional on waiver of legal claims made by employer's general counsel to plaintiff's lawyer governed by FRE 408); Trebor Sportswear Co. Inc. v. The Limited Stores Inc., 865 F.2d 506 (2d Cir. 1989) (draft settlement agreement and cover letter discussing need to reach agreement governed by FRE 408); ESPN Inc. v. Office of the Commissioner of Baseball, 76 F. Supp.2d 383 (SDNY 1999) (not resolving issue of whether letters were settlement materials); Starter Corp .v. Converse Inc., 170 F.3d 286 (2d Cir. 1999) (admission of settlement agreement and parol evidence of circumstances surrounding making of agreement to explain ambiguity in agreement governed by FRE 408); Rubery v. Buth-Na-Bodhaige Inc., 470 F. Supp.2d 273 (WDNY 2007) (chart prepared by paralegal in defendant's counsel's office and sent to plaintiff's counsel in the course of settlement negotiations governed by Rule 408); Victor G. Reiling Inc. v. Fisher Price Inc., 407 F. Supp.2d 401 (D. Conn. 2006) (statements made during settlement meetings governed by Rule 408); Bear Stearns & Co. Inc. v. Ontario, Inc., 318 F. Supp.2d 199, (SDNY 2004) (statements in Order Instituting Proceedings which included offer of settlement governed by Rule 408); Pace v. Paris Maintenance Co., 107 F. Supp.2d 251 (SDNY 2000) (statement at meeting to settle union grievance governed by Rule 408); Ronda-Perez v. Banco Bilbao Vizcaya Argentaria Puerto Rico, 322 F. Supp.2d 164 (D. Puerto Rico 2004) aff'd 404 F.3d 42 (1st Cir. 2005) (offer of payment for release of ADEA claims given to employee upon termination governed by Rule 408); Colman v. Quaker Oats Co., 232 F.3d 1271 (9th Cir. 2000) (offer of additional medical benefits in exchange for release of claims governed by Rule 408); Towerridge, Inc. v. T.A.O, Inc., 111 F.3d 758 (10th Cir. 1997) (evidence of claim and settlement of claim

- 14 -

Second, the testimony was not offered in response to a question as to why the Equal Pay Act and Title VII sex discrimination claims had not been settled.  The issue being discussed was why the defendant had failed to adjust the plaintiff's pay after acknowledging that the plaintiff's pay was low.  (Ex. 1)  The initial response from King was that the pay inequity had not been addressed because the plaintiff had rejected the settlement offer.  (Ex. 1)  Later when the issue was again raised as to the failure to adjust the pay, King and Zandy both stated that, "the case didn't settle."  (Ex. 1)  The inquiry, therefore, was not what it would take to resolve the sex discrimination claims, as QUSL suggests, but rather why QUSL had refused to correct a salary issue that it contended was a mistake.

Finally, QUSL was not merely clarifying its position as to the terms of any settlement of the plaintiff's Title VII sex discrimination and Equal Pay Act claims.  The admissions did not occur during a discussion of the possible resolution of the claims during the mediation session.  Instead, QUSL was explaining - as part of an investigatory hearing - why it had refused to correct the plaintiff's salary after learning that she was being underpaid.  Because the comments were not made in the course of settlement negotiations, they simply are not governed by Rule 408.

---

submitted to third party governed by Rule 408); Lo Bosco v. Kure Engineering Limited, 891 F. Supp. 1035 (D.NJ 1995) (offer to drop lawsuit if it would effect reconciliation could constitute settlement discussions in related divorce case); Fiberglass Insulators Inc. v. Dupuy, 856 F.2d 652 (4th Cir. 1988) (finding that statements by attorney were spoken during settlement discussions not clearly erroneous); Branch v. Fidelity & Casualty Co. of New York, 783 F.2d 1289 (5th Cir. 1986) (introduction of settlement agreement).

- 15 -

2.   <u>The Admissions of King and Zandy During the Fact-Finding are
Admissible under FRE 408 Because They Are Not Being Offered
To Prove QUSL's Liability for, or the Value of, the Plaintiff's Gender
Discrimination Claims</u>

Even if the statements **had** been made during compromise negotiations, a suggestion which is demonstrably untrue, the evidence still would be admissible under Rule 408.  Under an exception to Rule 408, statements made during settlement negotiations may be admissible if offered for a purpose other than proving the validity or amount of the claim being settled.  <u>See</u>:  <u>Urico v. Parnell Oil Co.</u>, 708 F.2d 852 (1st Cir. 1983) (offered for failure to mitigate); <u>Eisenberg v. Univ. of New Mexico</u>, 936 F.2d 1131 (10th Cir. 1991) (offered to show Rule 11 violation); <u>ESPN Inc. v. Office of the Commissioner of Baseball</u>, 76 F. Supp. 2d 383 (SDNY1999) (offered to show notice and intent); <u>Starter Corp. v. Converse Inc.</u>, 170 F.3d 286 (2d Cir. 1999) (offered to prove estoppel claim); <u>LoBosco</u>, 891 F. Supp. 1035 (offered to show bias, prejudice or state of mind in fraud case).  In this case, the statements of King and Zandy are not being offered to prove the defendant's liability for the gender discrimination claims or the value of such claims.  Instead, they are being offered to prove the defendant's motive in refusing to adjust the plaintiff's pay - a decision that the plaintiff contends was made in retaliation for her having pursued her sex discrimination claims.  Under these circumstances, Rule 408 does not prohibit the admission of the evidence.

It is black letter law that Rule 408 is "inapplicable when the claim is based on some wrong that was committed in the course of the settlement discussions."  <u>Scott v. Goodman</u>, 961 F. Supp. 424, 437 (EDNY 1997) quoting 21 Charles A. Wright & Kenneth W. Graham, *Federal Practice & Procedure:  Evidence* §5314 at 282 (1980).

- 16 -

Numerous cases have made clear that retaliation is such a wrong, and that Rule 408

therefore does not preclude the admission of evidence of retaliatory conduct or

comments made during compromise negotiations.

As the court explained in one case,

> [T]he General Counsel did not attempt to introduce evidence in order to
> prove the validity of the grievance which served as the subject of the
> negotiations.  Similarly, the General Counsel did not need to prove that
> the grievance was in fact a meritorious one in order to succeed on its unfair
> labor practices claims.  The General Counsel instead sought to introduce
> the evidence in order to demonstrate that, regardless of the legitimacy of the
> grievance, petitioner threatened, and subsequently retaliated against, the
> union for pursuing it.  Accordingly, we hold that Rule 408 does not exclude
> evidence of alleged threats to retaliate for protected activity when the
> statements occurred during negotiations focused on the protected activity
> and the evidence serves to prove liability either for making, or later acting
> upon, the threats.

Uforma/Shelby Business Forms, Inc. v. NLRB, 111 F.3d 1284, 1294 (6th Cir. 1997).

In DeLuca v. Allied Domecq Quick Service Restaurants, 2006 WL

2713944 (EDNY 2006), the Court rejected an argument strikingly similar to the

argument raised by QUSL.  In Deluca, the plaintiff filed a retaliation claim based on a

company response to a settlement demand during an EEOC mediation in an age

discrimination case.[16]  The defendant sought to have its admissions excluded from trial

under Rule 408.  The Court found that Rule 408 did not preclude admission, stating,

that,

> When the statement was made by [defendant], plaintiff had alleged
> discrimination based on his age, and retaliation based on defendant's

---

[16] In that case, the plaintiff had suggested that the case be resolved by providing
him with the franchise that he had applied for.  Id. at * 1.  The defendant allegedly
responded, "we're not in the habit of giving out franchises to people that are suing us or
made complaints."  Id.

- 17 -

pre-termination conduct.  There was no retaliation claim by plaintiff based on defendant's denial of plaintiff's franchise application.  Hence, the statement is not protected....

Id. at 3, citations omitted.[17]

Similarly, in Carr v. Health Ins. Plan of Greater New York Inc., 2001 WL 563722, *2 (SDNY 2001) the  court held that Rule 408 did not preclude testimony that the plaintiff was told that he would be rehired only if he dropped his race discrimination charges. The Court noted that,

even if the group members' statements were offers of settlement, they are nonetheless admissible because they are being introduced not to prove liability for the claims being settled, but for an entirely separate claim of retaliation.

Id. at *4.

In Carney v. American University, 151 F.3d 1090, 1095 (D.C. Cir. 1998), a statement by defendant's counsel to the effect that under certain interpretations of the defendant's manual, the plaintiff might be entitled to an additional three months of severance but that the University had denied the request because the plaintiff intended to sue for race discrimination was also found to be admissible under Rule 408.  The Court explained,

Carney offered the settlement correspondence not to prove that the University discriminated against her, but to show that the University committed an entirely separate wrong by conditioning her benefits on a waiver of her rights.  The letters were therefore admissible.

Id. at 1096.  See also:  Scott v. Goodman, 961 F. Supp. at 438 ("although Goodman's offer to settle would not be admissible as an admission of liability on the underlying anti-

---

[17] The Court, however, found that the statements had to be excluded based on a confidentiality agreement signed by the parties.  Id. at *3.

- 18 -

union claim, Rule 408's prohibition is inapplicable where, as here, the waiver-of-rights claim is based upon an alleged wrong, *i.e.,* the conditioning of Scott's reinstatement on the waiver of her First Amendment right to commence a lawsuit committed during the alleged settlement discussions"); Resolution Trust Corp v. Blasdell, 154 FRD 675, (D. Az. 1993) (Rule 408 inapplicable because evidence was not being introduced to prove liability, but rather to prove retaliatory motive).

The defendant attempts to distinguish these cases, arguing that in the present case there is no "separate wrong" and that the plaintiff's retaliation claim is "dependent on and not independent of" the plaintiff's discrimination claims.[18]  This contention simply is incorrect.  The plaintiff need not prove her Equal Pay Act claim or her Title VII sex discrimination claims in order to succeed on her retaliation claim.  See:  Manoharan v. Columbia University College of Physicians & Surgeons, 842 F.2d at 593.  A reasonable

---

[18]  The defendant also claims that Carney is distinguishable because in that case the defendant did not disagree that the plaintiff might be entitled to additional severance, and that the case therefore involved "a distinct benefit [the plaintiff] had a legitimate expectation of receiving in the ordinary course, wholly apart from the discussions about a possible resolution of her CHRO claim."  (Defendant's Memorandum at 9-10)  There are several problems with this argument.  First, it distorts the facts.  In Carney the defendant merely "acknowledged that under certain interpretations of its personnel manuals Carney might arguably be entitled to an additional three months pay."  Id. at 1095.  The defendant's statemetn in Carney was a far cry from agreeing that the plaintiff was entitled to the severance or that she had a reasonable legitimate expectation of such severance being paid absent settlement.  Second, in the present case, QUSL did not dispute that the plaintiff was being underpaid.  While QUSL claimed that the inequity was the result of a mistake rather than discrimination, there was no dispute as to whether the plaintiff was being underpaid.  A reasonable jury could find that under the circumstances, the plaintiff had a legitimate expectation of receiving an adjustment to her low pay, which allegedly resulted from a mistake in the ordinary course, wholly apart from the discussions about a possible resolution of her CHRO claim.  Thus, the defendant's attempts to distinguish Carney are unavailing.

- 19 -

jury could find that the defendant retaliated against the plaintiff by failing to adjust her pay, even if the jury found the gender discrimination claims to be meritless.  Thus, the claims are legally independent and distinct.  See:  Uforma/Shelby, 111 F.3d at 1294.

The defendant also argues that there can be no separate wrong because it merely refused voluntarily to award the plaintiff what she was seeking in her CHRO case.  (Defendant's Memorandum at 10)  It is true that a retaliation claim cannot be predicated on a mere refusal of a settlement demand.  See:  Duse v. International Business Machines, 748 F. Supp. 956, 962 (D. Conn. 1990).  However, as was explained above, this case does not involve the rejection of a settlement demand.  Instead, the issue is whether an employer's refusal to correct a mistake in setting an employee's salary inappropriately low may be unlawful if the reason for not making the adjustment is that the employee would not settle her sex discrimination claims.  This is an issue for the jury, and Rule 408 does not preclude the admission of the statements made by King and Zandy to prove the defendant's retaliatory motive.

3.    The Admissions of King and Zandy during the Fact-Finding Are Not Inadmissible for Reasons of Public Policy

QUSL also argues that the admissions of King and Zandy must be excluded for reasons of public policy.  Specifically, QUSL claims that the statements were made during the "functional equivalent" of the EEOC conciliation process and that admission of the statements will somehow subvert the purpose of both Title VII and Rule 408.  Again, these claims cannot withstand scrutiny.

First, the statements simply did not take place during the equivalent of the EEOC conciliation process.  The mediation and not the fact-finding would be the functional

- 20 -

equivalent of the EEOC conciliation process, and in this case the statements were made, not during the mediation, but during the fact-finding. Dean King and Attorney Zandy had no expectation that the statements would be treated as confidential. Indeed, they were aware that the testimony was being tape recorded for use in later proceedings in the case.

Second, Rule 408, on its face, does not apply to the admissions in this case, and the general policy favoring settlements does not justify applying Rule 408 under circumstances where it was never intended to be used. As one Court has explained,

> there is no question that both the drafters and the enacting Congress perceived the purpose of Rule 408 as the encouragement of negotiated settlements. . . . Courts, however, enforce rules, not simply the policy prompting their enactment, and Rule 408 cannot be extended beyond the reach its language will allow, regardless of the policy implications.

Armstrong v. HRB Royalty Inc., 392 F. Supp.2d 1302 (SD Ala. 2005).[19]

Finally, nothing in Rule 408 or in Title VII suggests a policy of permitting an employer to shield the motivation for actions taken in retaliation against an employee who has exercised rights protected under Title VII by declaring them to be part of a

---

[19]    The Court went on to note that,

> most rules of law are crafted to balance competing concerns, and their language is usually chosen carefully in an effort to strike the desired compromise among these concerns. Rule 408's policy of encouraging settlements is necessarily in tension with the policy behind Rule 402 of placing relevant evidence before the factfinder. Nothing would be less surprising than to learn that the "same claim" requirement of Rule 408 represents a deliberate balancing of these conflicting goals.

Id.. Because it is likely that the drafters of Rule 408 deliberately limited its scope, a decision on the defendant's motion should not ignore these limitations.

- 21 -

settlement position.  On the contrary, the policies underlying both Rule 408 and Title VII prohibit such conduct.

The Advisory Comments to the 2006 Amendments to Rule 408 unambiguously explain the drafters' intent.  These Comments state,

> the amendment retains the language of the original rule that bars compromise evidence **only** when offered as evidence of the "validity", "invalidity", or "amount" of the disputed claim.  The intent is to retain the extensive caselaw... Rule 408 is inapplicable when the claim is based upon a wrong that is committed during the course of settlement negotiations....

Federal Rules of Evidence Rule 408, Advisory Committee Notes, 2006 Amendment, (citations omitted, emphasis added).  Indeed, the policy, purpose, and intent of Rule 408 is to permit admission of evidence of misconduct during settlement discussions, including evidence of retaliatory conduct and statements.

The Supreme Court, in <u>Burlington Northern</u>, recently explained the policy rationale behind Title VII's anti-retaliation provision, noting that it was intended

> to secure [a workplace free from prohibited discrimination] by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees . . . a limited construction would fail to fully achieve the anti-retaliation provision's primary purpose, namely, maintaining unfettered access to statutory remedial mechanisms.

<u>Burlington Northern</u>, 126 S. Ct. at 2312.

To allow QUSL to condition correcting what it claims was an error in setting the plaintiff's salary on her waiver of access to Title VII's statutory remedial mechanisms would violate this policy.  While settlement is the favored means of resolving disputes, that general policy cannot insulate QUSL from liability for conduct which runs directly

- 22 -

contrary to the very purpose of Title VII's anti-retaliation provisions.  See:  Carney, 151 F.3d at 1096.

In the present case, the admissions of Dean King and Attorney Zandy during the CHRO fact-finding constitute critical evidence of the defendant's retaliatory motive in failing to adjust the plaintiff's salary.  The communications did not occur during settlement negotiations, and are not offered to prove the validity or value of the plaintiff's gender discrimination claims.  Accordingly, Rule 408 does not bar the admission of this relevant evidence.[20]

B.    The Evidence of Clinic Salary Information is Not Barred By FRE 401 or 403

The framework for establishing a *prima facie* case of discrimination under Title VII, and CFEPA is well-settled.  The plaintiff must establish "(i) that at the relevant time the plaintiff was a member of the protected class; (ii) the plaintiff was qualified for the position she held; (iii) the plaintiff suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001) citing O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 313, 116 S.Ct. 1307 (1996).

If the plaintiff makes out a *prima facie* case, a presumption arises that the employer unlawfully discriminated, and the burden shifts to the employer to proffer a nondiscriminatory reason for the adverse employment action.  If the employer does not introduce evidence, "which, taken as true, would permit the conclusion that there was a

---

[20] To the extent that the Court finds that any unfair prejudice could result from the admission of this evidence, any potential prejudice could be cured by a limiting instruction from the Court.  See:  Bruno v. Sonalysts Inc., 2004 WL 2713239 (D. Conn. 2004).

- 23 -

nondiscriminatory reason for the adverse employment action," the plaintiff is entitled to judgment as a matter of law. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509-510, 113 S.Ct. 2742 (1993). However, if the employer articulates a legitimate non-discriminatory explanation, the burden returns to the plaintiff to prove "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000). The ultimate question is whether a trier of fact could find that the adverse employment action complained of was motivated at least in part by prohibited discrimination. Stratton v. Department for the Aging for the City of New York, 132 F.3d 869, 878 (2d Cir. 1997); Fields v. New York State Office of Mental Retardation & Dev. Disabilities, 115 F.3d 116, 119 (2d Cir. 1997).

Because direct evidence of discrimination is seldom available with respect to an employer's mental processes, the plaintiff need not produce direct evidence in order to make out a case of discrimination. Carlton v. Mystic Transport, Inc., 202 F.3d 129, 135 (2d Cir. 2000); Banks v. Travelers, 180 F.3d 358, 367 (2d Cir. 1999); Danzer v. Norden Systems, Inc., 151 F.3d 50, 56-57 (2d Cir. 1998); Norton v. Sam's Club, 145 F.3d 114, 119 (2d Cir. 1998). "[S]moking guns are rarely left in plain view." Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn, 280 F.3d 98, 112 (2d Cir.2001) Therefore, the plaintiff may rely on the cumulative weight of circumstantial evidence. Carlton v. Mystic Transport, Inc., 202 F.3d 129, 135 (2d Cir. 2000); Banks v. Travelers, 180 F.3d 358, 367 (2d Cir. 1999); Danzer v. Norden Systems, Inc., 151 F.3d 50, 56-57 (2d Cir. 1998); Norton v. Sam's Club, 145 F.3d 114, 119 (2d Cir. 1998). In disparate treatment cases, like this one plaintiffs "often must build their cases from pieces of circumstantial

- 24 -

evidence which cumulatively undercut the credibility of the various explanations offered by the employer." Hollander v. American Cyanamid Co., 895 F.2d 80, 85 (2d Cir. 1990), aff'd by 172 F.3d 192 (1999), cert. denied, 528 U.S. 965 (1999).

In the present case, the plaintiff seeks to offer *inter alia*, evidence of the treatment of other members of the protected class working in clinical and other skills positions during the relevant time period, and evidence of the treatment of similarly situated men working in the clinics. This evidence shows that QUSL paid male employees much higher salaries than it paid the women who performed the same jobs. The plaintiff contends that this pattern of paying women faculty members less than men faculty members for the same clinical and other skills positions is circumstantial evidence of sex discrimination. In addition, the plaintiff contends that this evidence tends to show that QUSL's explanation for the large pay differential between Professor Book and herself - a mistake - is false and is a pretext for discrimination.

QUSL seeks to exclude this evidence under Rule 401 claiming that it is not relevant. QUSL claims that the evidence is "innately irrelevant" because the plaintiff has not retained a statistical expert to analyze the salary data and perform a regression analysis. (Defendant's Memorandum at 14-16.) In the alternative, QUSL claims that the evidence must be excluded under Rule 403 because any relevance is substantially outweighed by the evidence of unfair prejudice confusion of the issues and undue delay. These claims are without merit.

First, the plaintiff intends simply to offer the raw data as to the salaries paid by QUSL. No expert is necessary under such circumstances. See: Stratton, 132 F.3d at 877; Luciano v. Olsten Corp., 110 F.3d 210, 217 (2d Cir. 1997) Where, as here, the raw

- 25 -

data is reliable and the data offered is not of a scientific nature, neither an expert nor regression analysis is required. Id.[21]

Second, the evidence is abundantly relevant. Evidence of a pattern or practice of adverse treatment toward the members of the protected class is circumstantial evidence of discrimination. Maresco v. Evans Chandler, 964 F2d 106 (2d Cir. 1992); Udo v. Tomes, 54 F.3d 9 (1st Cir.1995). The fact that similarly situated employees who were not members of the protected class were treated in a more favorable manner can also serve as circumstantial evidence of discrimination. Hogan v. State of Connecticut, 220 F.Sup.2d 111, 119 (D. Conn. 2002), quoting Graham v. Long Island Rail Road, 230 F.3d 34, 43 (2d Cir. 2000). Such a difference in treatment between members of the protected class and similarly situated employees is compelling evidence that discriminatory animus may have played a role. Id. Indeed, "[p]roof of discriminatory motive. . . can in some situations be inferred from the mere fact of differences in treatment." Schwabenbauer v. Board of Education of City School District of Olean, 667 F.2d 305, 309 (2d Cir.1981).

While QUSL has claimed that this relevance will be outweighed by confusion and undue delay, it has not offered any support for these allegations. Instead, QUSL suggests that the Court should simply accept Dean King's affidavit denying that the salary differences were related to gender, and exclude the evidence. With all due

---

[21] The only Second Circuit case relied upon by the defendant in claiming that an expert is required is Bickerstaff v. Vassar College, 196 F.3d 435 (2d Cir. 1999). In that case, the issue was not whether or not an expert report was required, but rather whether the expert testimony produced was reliable. Id. at 449-449. The Court found that the expert's conclusions as to the cause of the salary differences was inadmissible because the expert had failed to control for non-discriminatory causes. Id. Bickerstaff is, therefore, inapposite.

- 26 -

respect to the Court, such findings of fact should be left to the jury in the absence of any facts showing a likelihood of undue prejudice, delay or confusion.

Here admission of the evidence should cause little, if any, delay. Once the information is introduced by the plaintiff, Dean King can provide QUSL's explanation for the substantial difference in pay between the male and female faculty, and can be cross-examined by the plaintiff. Dean King has already been identified as a witness in this matter, and adding this one issue to his testimony is unlikely to delay the trial in any meaningful way. QUSL has not identified any reasons that this evidence would confuse the jury or cause unfair prejudice. However, any potential unfair prejudice or confusion can readily be resolved with an appropriate cautionary instruction. See: Luciano, 110 F.3d at 218. Accordingly, QUSL's motion to preclude admission of the evidence of the salaries paid to other clinic faculty should be denied.

IV.    CONCLUSION

For all of the foregoing reasons, the plaintiff, Cindy Slane, respectfully requests that the Motion in Limine be denied with respect to: (1) the defendant's admissions that it failed to adjust her salary because she failed to settle her gender discrimination claims; and (2) the information concerning the gender and salaries paid by the defendant to other clinic faculty.

Respectfully submitted,

By: _____

Mary E. Kelly ct07419
Gregg D. Adler ct05698
Livingston, Adler, Pulda, Meiklejohn
  & Kelly, P.C.
557 Prospect Avenue
Hartford, CT 06105-2922
(860) 233-9821

## CERTIFICATE OF SERVICE

This is to certify that on May 21, 2007 a copy of the foregoing Plaintiff's

Memorandum of Law in Opposition to Defendant's Motion in Limine was filed

electronically. Notice of this filing will be sent by e-mail to all parties by operation of the

Court's electronic filing system. Parties may access this filing through the Court's

system.

Mary E. Kelly ct07419
Gregg D. Adler ct05698
Livingston, Adler, Pulda, Meiklejohn
 & Kelly, P.C.
557 Prospect Avenue
Hartford, CT 06105-2922
Phone: (860) 233-9821
Fax: (860) 232-7818
E-mail: gdadler@lapm.org
        mekelly@lapm.org