# TAB A

Slane vs Quinnipiac Univ. School of Law
1/23/2003
Cindy Slane

Page 156

1  come to a mutually satisfactory agreement by the first
2  week in November, I will have to take the necessary
3  steps to preserve my rights by filing a complaint with
4  the appropriate administrative agency. I will assume
5  that all of us would prefer to avoid that situation."
6  My first question question is, was that a threat?
7      A.  No. Not at all. It was a statement of the
8  facts in terms of the limitations period. Not at all a
9  threat.
10     Q.  The administrative agency you were referring
11 to the was Connecticut Commission on Human Rights &
12 Opportunities?
13     A.  Yes, it was.
14     Q.  Had you already been in contact with that
15 agency about how to file a complaint?
16     A.  No, I had not.
17     Q.  So am I correct that after waiting three
18 months to give Dean King the information he had asked
19 for to evaluate your claim, you, in this letter that we
20 marked as Exhibit 11, were stating that unless it could
21 be resolved in two weeks, you were going to file a
22 legal claim?
23     A.  That I would have to, yeah, because of the
24 limitations period.
25     Q.  If you recall, when was it going to run out?

Case 3:02-cv-00821-AWT   Document 73-2   Filed 06/04/2007   Page 3 of 12

Slane vs Quinnipiac Univ. School of Law
1/23/2003                                                      Cindy Slane

Page 157

1    A.   Early in November.  It's 180 days from when
2  we confirmed the information.
3    Q.   And I believe you have indicated that you
4  recall getting an e-mail from Dean King saying a family
5  situation prevented him from responding that quickly?
6    A.   Right.
7    Q.   So you went ahead and filed the claim?
8    A.   I had to, yeah.
9    Q.   Do you recall what that family situation was?
10   A.   I thought it was something to do with his
11 dad.  I don't remember specifically.  I think the
12 messages, it probably is in your documents, but I think
13 it was needing to close his father's house or needing
14 to move his father into a care facility or needing to
15 move his father here.  We had both had similar
16 experiences in that regard with parents.
17   Q.   So after Dean King responded that he could
18 not address your October 24 letter that quickly, you've
19 indicated you went ahead and filed the complaint so the
20 limitations period would not run out; is that correct?
21   A.   Yes.
22   Q.   What was the next you heard from Dean King
23 about the issue of your claims about your salary?
24   A.   I'm not sure whether Dean King was in
25 communication with me, but at some point over a month,

Case 3:02-cv-00821-AWT   Document 73-2   Filed 06/04/2007   Page 4 of 12

Slane vs Quinnipiac Univ. School of Law
1/23/2003                                                          Cindy Slane

Page 158

```
 1   two months, during the fall, I think it was, he said
 2   that, and, again, I don't recall whether it was by a
 3   telephone call or an e-mail or how he got in touch with
 4   me, he said that he and Ed Kavanagh wanted to meet with
 5   me to discuss settlement.
 6        Q.   And that was his exact words?
 7        A.   I don't remember his exact words.  It's been
 8   over two years.
 9        Q.   Is it your recollection that he used the word
10   "settlement"?
11        A.   I believe so, yes.
12        Q.   Did such a meeting occur?
13        A.   Yes, it did.
14        Q.   When did that happen?
15        A.   I don't recall the date.
16        Q.   Do you recall what month it might have been?
17        A.   I didn't need a coat to walk across the
18   campus so probably not December.
19        Q.   So you think it may have been sometime later
20   into November?
21        A.   Probably.  I can't recall.
22        Q.   It wasn't the following spring?
23        A.   No, no, I don't believe so.  Now, that you
24   say that, hmmm.
25        Q.   Was anyone else present at the meeting?
```

Case 3:02-cv-00821-AWT   Document 73-2   Filed 06/04/2007   Page 5 of 12

Slane vs Quinnipiac Univ. School of Law
1/23/2003                                                    Cindy Slane

Page 159

1   A.   Yes.

2   Q.   Who else?

3   A.   Well, Dean King and Ed Kavanagh and Carrie,
4   Carolyn Kaas, Professor Kaas.

5   Q.   And yourself?

6   A.   And myself, yes. That was the "else."

7   Q.   Your legal counsel did not attend with you?

8   A.   No, she did not.

9   Q.   At this point, had you disclosed to Dean King
10  or anyone else in the university administration that
11  you even had legal counsel?

12  A.   I don't remember exactly when I did, but I
13  did make it clear that at this point I was pro se in
14  the matter, you know, I didn't have -- an attorney's
15  appearance was not in the file. So at that point, I
16  was consulting with counsel. But I didn't have an
17  attorney, you know, who had an appearance in the file.

18  Q.   Even though Attorney Pulda may not have filed
19  an appearance in the commission proceeding, you still
20  considered her to be your legal counsel during this
21  period of time?

22  A.   I considered her to be consulting with me as
23  I proceeded pro se in the matter.

24  Q.   Had you signed a retention agreement with her
25  firm at that point?

Case 3:02-cv-00821-AWT    Document 73-2    Filed 06/04/2007    Page 6 of 12

Slane vs Quinnipiac Univ. School of Law
1/23/2003                                                                Cindy Slane

Page 160

1  A.  I don't remember.
2      THE WITNESS:  It was quite awhile,
3  right, you were consulting?
4      MS. PULDA:  I can't testify.
5  A.  Yeah, I don't know.  I'm trying to give you a
6  correct answer.  I don't recall the date.
7  Q.  At some point, you did?
8  A.  At some point we executed a retainer, yes.
9  Q.  So even though you understood the purpose of
10 this meeting among you, Professor Kaas, Dean King, and
11 Ed Kavanagh to be to discuss settlement, you didn't
12 have your legal counsel there with you?
13 A.  Right.
14 Q.  Where did that meeting occur?
15 A.  In one of the offices or conference rooms in
16 the administrative offices at the university.
17 Q.  Not at the law school?
18 A.  Not at the law school, no.
19 Q.  You've already told me who was there and that
20 it occurred, you think, sometime in November, how long
21 did it last?
22 A.  Again, 40 minutes, 45 minutes, I'm not
23 positive.
24 Q.  Do you recall any of the specific things that
25 Dean King said during this meeting?

Case 3:02-cv-00821-AWT   Document 73-2   Filed 06/04/2007   Page 7 of 12

Slane vs Quinnipiac Univ. School of Law
1/23/2003                                                    Cindy Slane

Page 161

```
 1      A.   Well, I think Dean King presented the
 2  university's offer, and he characterized it as the
 3  university's offer.  He said that the offer was to
 4  increase my current salary to $70,000 and no back pay.
 5      Q.   Do you recall anything else that Dean King
 6  specifically said during this meeting?
 7      A.   I think, you know, I expressed -- well, you
 8  asked what Dean King said.  He, we discussed Michelle
 9  O'Connor's compensation, she had taken Les Book's
10  place, and the fact that her salary for the year we
11  were in, the year 2000-2001, was $70,000, and Dean King
12  said that that was for a 12 month contract and that's
13  why it was okay for the entry level person to have a
14  salary that was the same as my salary in my seventh
15  year at the law school.  And I'm not sure, I'll try to
16  remember other things, right now I can't.  I remember
17  the sum being $70,000, no back pay and the distinction
18  was that Michelle's contract was for 12 months, which
19  would put us in okay arrangement in terms of the people
20  in the clinic.
21      Q.   Did Ed Kavanagh say anything that you recall
22  during this meeting?
23      A.   I think he said that the university thought
24  that was a fair offer, but beyond that, I don't recall
25  that he did a tremendous amount of talking.
```

Case 3:02-cv-00821-AWT    Document 73-2    Filed 06/04/2007    Page 8 of 12

Slane vs Quinnipiac Univ. School of Law
1/23/2003                                                            Cindy Slane

Page 162

1    Q.    You don't have any specific recollection of
2  anything else he said during that meeting?
3    A.    I think he was involved in the conversations
4  about Michelle's salary and whatnot, but I don't
5  remember what he said.
6    Q.    Do you have any specific recollection of what
7  you said during this meeting?
8    A.    I said that was unacceptable.
9    Q.    Anything else?
10   A.    Well, I didn't use any expletives.  I was
11 very polite in rejecting the offer, I'm sure, but it
12 was out of the question for me to consider an offer
13 that would not include back pay and that would not put
14 me at a salary above what Les would have been earning
15 had he stayed, because that was the point.
16   Q.    At that point, you were focused on a
17 comparison between yourself and Professor Book?
18   A.    Yes.  And I think, frankly, on having the
19 healthy salary structure within the clinic, not just
20 myself and Professor Book, because at that point, he
21 had left, but so that the salary structure with
22 Professor Trowbridge, most senior with the highest rank
23 to the entry level person was a structure that
24 reasonably rewarded rank and seniority and
25 responsibility.

Case 3:02-cv-00821-AWT   Document 73-2   Filed 06/04/2007   Page 9 of 12

Slane vs Quinnipiac Univ. School of Law
1/23/2003                                                    Cindy Slane

Page 163

```
 1      Q.    So is it your --
 2      A.    And qualifications.
 3      Q.    So is it your contention that in this meeting
 4   with Professor Kaas, Dean King and Ed Kavanagh you were
 5   advocating that the salary structure of the entire
 6   clinical faculty be reviewed?
 7      A.    Yeah, that it be fair.
 8      Q.    Do you recall anything else that you said
 9   during the course of this meeting?
10      A.    No, not at this moment.  If someone else
11   recalls something, I can tell you whether I said it or
12   not.
13      Q.    Did you, as you sit here today, have any
14   specific recollection of anything Professor Kaas said
15   during this meeting?
16      A.    She participated in the discussions of the
17   overall structure of the salary and of Michelle
18   O'Connor's contract and its term.  I don't remember the
19   moment at which she said she thought her contract term
20   wasn't 12 months, but Dean King assured us it was a 12
21   month contract.  As a matter of fact, I do think we
22   made the point at that point that it was really not, it
23   was a 10 and a half month contract, from the dates on
24   Michelle's, I guess Michelle had shown the contract to
25   Carrie, I don't have that, her first contract.  But it
```

Case 3:02-cv-00821-AWT    Document 73-2    Filed 06/04/2007    Page 10 of 12

Slane vs Quinnipiac Univ. School of Law
1/23/2003                                                    Cindy Slane

Page 164

1   was 10 and a half months, which is two weeks longer
2   than my contract.
3       Q.   Was there any discussion that you recall at
4   this meeting of the responsibility of your position
5   compared to the responsibilities of the director of the
6   tax clinic?
7       A.   I don't recall.
8       Q.   You don't recall that being discussed?
9       A.   We may have discussed the summer issue, the
10  issue of, you know, the work that I needed to do over
11  the summer, both to arrange summer placements and also
12  to arrange placements for fall students before they
13  started their fall semester, but I don't have specific
14  recollection of a direct conversation.
15      Q.   Anything else you remember about this meeting
16  with Ed Kavanagh, Dean King, and Professor Kaas?
17      A.   I believe that either Dean King or Ed
18  Kavanagh said that they would bring, I think they said
19  they were trying to figure out if there was a way that
20  we could find enough common ground so that we could
21  structure something differently so that the university
22  would find it acceptable and it would also satisfy our
23  requirements and that they would think about it and
24  bring my position back to the university, I believe.
25      Q.   So you didn't make any counter proposal --

Slane vs Quinnipiac Univ. School of Law
1/23/2003                                                      Cindy Slane

Page 165

1      A.    No.

2      Q.    -- at the meeting?

3      A.    I did not.

4      Q.    How were things left at the end of the
5   meeting?

6      A.    That Dean King and Ed Cavanagh would take the
7   concerns back to the university and tell them that I
8   had rejected this offer.

9      Q.    Was it your understanding that the ball was
10  in your court to come up with a new proposal or were
11  you expecting the university to come back with another
12  offer?

13     A.    I don't believe that I thought it was in my
14  court. I thought that the university would have to
15  come back with another offer because the one it had
16  made was completely unacceptable.

17     Q.    What happened after that in terms of the
18  discussions of your salary?

19     A.    I wish I had the chronology but.

20     Q.    So do I.

21     A.    At some point -- and I don't, I don't think
22  David King and I talked again about the issues, you
23  know, about a settlement, like a, any kind of
24  settlement negotiations. And at some point, John Zandy
25  sent me a letter making another settlement proposal,

Slane vs Quinnipiac Univ. School of Law
1/23/2003                                                              Cindy Slane

Page 166

1   and I did have a conversation with John Zandy on the
2   telephone about, I think it was about that letter, I
3   can't remember, though, if it was before the letter and
4   the letter was in response to the conversation or if it
5   was after the letter and the conversation discussed the
6   letter, but it was another communication between me and
7   John Zandy in which I -- I guess I did respond to a
8   letter that made another settlement offer at an
9   increased salary with some back pay but with a secrecy
10  requirement, which I believe that was in the letter
11  which was not palpable at all because that's how we got
12  to where we are.
13      Q.   This is a letter from John Zandy, you
14  believe?
15      A.   Yes.
16      Q.   You said spoke to John Zandy on the
17  telephone?
18      A.   On the telephone, yes.
19      Q.   Just one time?
20      A.   I think so.
21      Q.   When you spoke to John Zandy on the
22  telephone, did you disclose to him that you were and
23  had been represented by legal counsel for some time?
24      A.   I know at that point he knew --
25           MS. PULDA:  I'm going to object to the