# TAB B

1          A.    That's what Cindy told me.

2                MR. ADLER:  Let's go off the record.

3                (Discussion held off record.)

4    BY MR. ADLER:

5          Q.    Do you recall your next discussion with

6    Vice President Kavanagh after you forwarded him this

7    letter?

8          A.    Yes.

9          Q.    And when was that?

10         A.    I couldn't say exactly but sometime, I

11   think, very shortly after this letter.

12         Q.    And was that in person or on the phone?

13         A.    I don't remember.

14         Q.    And tell me as best you can recall what you

15   said and what he said in that meeting?

16         A.    I think we discussed the letter and Cindy's

17   analysis and her request.  And I think Ed said why

18   don't you look at this and come up with a

19   recommendation as to what a response should be,

20   whether by way of agreement or counterproposal or

21   something else.

22         Q.    And did you do that?

23         A.    Yes.

24         Q.    And did you then meet with Vice President

25   Kavanagh again to discuss your recommendation?

1      A.   We either met or discussed it on the phone.

2      Q.   Do you recall whether that discussion

3  occurred before or after Cindy filed her complaint

4  with the CHRO?

5      A.   I think it was before but I'm not sure.

6  I'm also certain it was before, as a matter of fact.

7      Q.   And tell me as best you can recall what you

8  said and what he said?

9      A.   I think we -- as I said, we just looked at

10  the letter and he asked me to come up with a

11  recommendation for the university.

12      Q.   I'm on to the next conversation.  Did you

13  have a conversation with him during which you made a

14  recommendation?

15      A.   Yes.

16      Q.   And was that conversation before or after

17  she filed her discrimination complaint?

18      A.   I'm almost certain it was before.

19      Q.   Just to make sure we are talking about the

20  same conversation.  So tell me what you recall about

21  the conversation during which you made your

22  recommendation?

23      A.   I made the recommendation, with some

24  discussion with Ed.

25      Q.   Do you recall what the recommendation was?

1        A.    I honestly don't.

2        Q.    Okay.

3        A.    But it was based on what we thought would

4    be an appropriate salary.  And we agreed that I

5    believe both of us would ask Cindy to meet with us to

6    present the proposal.

7        Q.    So meet together, the three of you?

8        A.    Yes.  And I'm not sure if -- I'm not sure

9    what Carrie was doing at this time, if she was asked

10   to come to that meeting or not.

11       Q.    And do you recall when that meeting took

12   place?

13       A.    Not specifically.  But, again, it would

14   have been fairly recently -- fairly shortly after

15   this letter, Exhibit 3.

16            MR. ADLER:  Let's mark this as

17            Exhibit 4 for identification.

18               (Plaintiff's Exhibit 4:  Marked for

19            identification.)

20   BY MR. ADLER:

21       Q.    I will show you what we have marked as

22   Exhibit 4 for identification, which is an e-mail from

23   Cindy to you dated October 30th -- actually, let me

24   withdraw that.

25            I am going to show you what we have marked

1    as Plaintiff's Exhibit 4 for identification, which is

2    a series of e-mails.  And as e-mails go, there are

3    two e-mails, the first one on the bottom of the page

4    from you to Cindy, and then her response on the top

5    of the page, both dated October 30th, 2000.  Can you

6    identify these?

7        A.    Yes.

8        Q.    And are these, in fact, e-mail messages

9    between you and Cindy regarding the salary adjustment

10   issue?

11       A.    Yes.

12       Q.    And if you look at your e-mail on the

13   bottom of the page, basically it indicates that you

14   passed the concerns on and there are going to be

15   timing problems getting a meeting together before her

16   statute of limitations date, correct?

17       A.    Correct.

18       Q.    And the last sentence says:  "I ask you

19   that you reconsider that request to give the

20   university more time to evaluate thoroughly the

21   information you provided."  Do you see that?

22       A.    Yes.

23       Q.    At this time, October 30th, can you recall

24   whether you had yet had your discussion with

25   Vice President Kavanagh when you made your

1   recommendation?

2          A.    At this point in time?  Apparently not.

3          Q.    Okay.  And so had you made Dean Kavanagh

4   aware -- withdraw that.

5                Did you make Vice President Kavanagh aware

6   of the statute of limitations issue that Cindy was

7   facing?

8          A.    I believe I did.

9          Q.    And were you aware that if she didn't file

10  by that time frame, at least in her mind she might be

11  waiving her right to bring legal claims over this?

12         A.    She told me that, yes.

13         Q.    And then if you look at Cindy's response,

14  in substance she indicates she would gladly extend

15  the time frame if she thought that she could do that

16  by agreement, but she had concerns about whether that

17  was possible, correct?

18         A.    That seems to be what it says, yes.

19         Q.    And you had no reason to disbelieve that,

20  correct?

21         A.    Correct.

22         Q.    And it was your understanding at this point

23  that Cindy would have preferred to get this resolved

24  than file any kind of legal action against the

25  school, correct?

1       A.    Yes.

2                     MR. ADLER:  Let's mark this as

3             Exhibit 5 for identification.

4                     (Plaintiff's Exhibit 5:  Marked for

5             identification.)

6       BY MR. ADLER:

7       Q.    Professor King, I'm showing you what we

8       have marked as Exhibit 5 for identification, which is

9       another e-mail message from Cindy to you dated

10      November 9th, 2000.  Do you recall receiving this

11      e-mail?

12      A.    Yes.

13      Q.    And, again, to summarize, Cindy is advising

14      you that she had to file with the CHRO two days

15      before that in order to preserve the statute of

16      limitations, correct?

17      A.    May I just read it?

18      Q.    Sure, read it.

19      A.    (Reviewing).  Okay, I've read it.  I don't

20      recall the question.

21      Q.    I don't either.  The question was in this

22      e-mail she was advising you that she had filed two

23      days earlier with the CHRO because she needed to to

24      preserve the statute of limitations?

25                    MR. HARRIS:  Objection to the form.

1                    MR. ADLER:  I'll withdraw the

2              question.

3    BY MR. ADLER:

4         Q.   When you got this e-mail from Cindy, you

5    became aware that she had, in fact, filed her

6    complaint with the CHRO in order to protect the

7    statute of limitations?

8         A.   Yes.

9         Q.   And in the second paragraph the e-mail

10   mentions Carrie mentioned that you said you had

11   talked to Ed Kavanagh.  Do you see that?

12        A.   Yes.

13        Q.   So would you conclude from that that at

14   this point, November 9th, that you had had your

15   conversation with Ed Kavanagh during which you

16   discussed your recommendation?

17        A.   Not necessarily.  I think I may have

18   referred to a conversation in which I was trying to

19   get Ed to work out a mutual schedule so we could meet

20   to discuss the matter, but I'm not sure.

21        Q.   Do you recall -- this e-mail is

22   November 9th.  As you sit here today, can you recall

23   whether or not your conversation with Ed -- I'll

24   withdraw that.

25                   As you sit here today, can you recall

1   whether in your own mind you had determined what your

2   recommendation would be as of the date you received

3   this e-mail?

4       A.   I don't recall.

5       Q.   And do you recall at some point having a

6   meeting with Dean Kavanagh, Cindy, and maybe Carrie

7   to discuss your recommendation for resolving this,

8   correct?

9       A.   Yes.

10      Q.   And do you recall how long after this

11  November 9th e-mail that meeting was?

12      A.   My impression was, right now, that it was

13  fairly soon afterwards, but I don't recall

14  specifically.

15      Q.   And do you recall where that meeting took

16  place?

17      A.   Yes.

18      Q.   Where did it take place?

19      A.   My recollection is that it took place in

20  the dean's conference room at the law school.

21      Q.   And do you have any contemporaneous notes

22  or records with respect to that meeting?

23      A.   Not that I know of.

24      Q.   And do you --

25      A.   Can I --

1          Q.    Yeah, go ahead.

2          A.    I think we communicated the offer to Cindy

3     both orally and in writing, but I couldn't say for

4     sure.

5          Q.    And when you say "we", that means you and

6     Vice President Kavanagh?

7          A.    Yes.

8          Q.    But you still don't recall exactly what the

9     offer was?

10         A.    I don't.

11         Q.    But it was an offer to increase her salary

12    from what it was to some specific amount that you

13    don't recall?

14         A.    Yes.

15         Q.    And did it also include an offer of some

16    compensation for back pay?

17         A.    I don't think so.

18         Q.    But you don't specifically recall?

19         A.    I don't.

20         Q.    Can you think of anything, any document,

21    that would help refresh your recollection as to that?

22         A.    If there was a document that I gave or

23    Ed Kavanagh gave or we both gave to Cindy at the

24    meeting, that would be it.

25         Q.    But other than the document that may have

1    been given to Cindy, can you think of any other

2    document where this would have been written down?

3        A.    No.

4        Q.    And tell me, as you sit here today, as best

5    you can recall, what was said and by whom at this

6    meeting?

7        A.    Either Ed or I or both of us communicated

8    the offer to Cindy and I think -- well, we

9    communicated the offer to her.  And my recollection

10   is that I think Cindy said at that point it was not

11   acceptable, although she may have said she would

12   consider it.  I don't recall.  She certainly didn't

13   accept it.

14       Q.    Do you remember whether you made any offer

15   to Carrie or not?

16       A.    I don't think so.

17       Q.    And do you recall roughly how long this

18   meeting lasted?

19       A.    Less than a half an hour, I would say.

20       Q.    Now, other than this meeting, do you recall

21   having any conversations, any one-on-one

22   conversations, with Cindy about your offer to

23   increase her salary and her response?

24       A.    I don't think so.

25       Q.    You don't recall any such conversations?

1    A.    I don't recall.

2    Q.    Is it possible that you had some

3  discussions with her separately?

4    A.    It's possible.

5    Q.    And at the time you had the meeting you're

6  now testifying about, Cindy had already filed her

7  complaint with the CHRO, correct?

8    A.    Based on the e-mail in Exhibit 5, that

9  would seem to be correct, yes.

10    Q.    Do you recall when you first saw her CHRO

11  complaint?

12    A.    No.

13    Q.    Do you remember the circumstances under

14  which you saw it?

15    A.    No.

16    Q.    But you were not named as a party, nor were

17  any other individual faculty members, correct?

18    A.    I think that's correct.

19    Q.    And at what point -- withdraw that.

20          Do you recall that -- withdraw that.

21  Sorry.

22          Would you agree with me that at no time

23  from when Cindy first made the university aware

24  of her complaint until today has any action been

25  taken by Quinnipiac to correct any inequity in her