**TAB A**

(Slip Opinion)          OCTOBER TERM, 2006                    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LEDBETTER *v.* GOODYEAR TIRE & RUBBER CO., INC.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE ELEVENTH CIRCUIT

No. 05–1074.  Argued November 27, 2006—Decided May 29, 2007

During most of the time that petitioner Ledbetter was employed by
respondent Goodyear, salaried employees at the plant where she
worked were given or denied raises based on performance evalua-
tions. Ledbetter submitted a questionnaire to the Equal Employment
Opportunity Commission (EEOC) in March 1998 and a formal EEOC
charge in July 1998.  After her November 1998 retirement, she filed
suit, asserting, among other things, a sex discrimination claim under
Title VII of the Civil Rights Act of 1964.  The District Court allowed
her Title VII pay discrimination claim to proceed to trial.  There,
Ledbetter alleged that several supervisors had in the past given her
poor evaluations because of her sex; that as a result, her pay had not
increased as much as it would have if she had been evaluated fairly;
that those past pay decisions affected the amount of her pay through-
out her employment; and that by the end of her employment, she was
earning significantly less than her male colleagues.  Goodyear main-
tained that the evaluations had been nondiscriminatory, but the jury
found for Ledbetter, awarding backpay and damages.  On appeal,
Goodyear contended that the pay discrimination claim was time
barred with regard to all pay decisions made before September 26,
1997—180 days before Ledbetter filed her EEOC questionnaire—and
that no discriminatory act relating to her pay occurred after that
date.  The Eleventh Circuit reversed, holding that a Title VII pay dis-
crimination claim cannot be based on allegedly discriminatory events
that occurred before the last pay decision that affected the employee's
pay during the EEOC charging period, and concluding that there was
insufficient evidence to prove that Goodyear had acted with discrimi-
natory intent in making the only two pay decisions during that pe-
riod, denials of raises in 1997 and 1998.

2          LEDBETTER *v.* GOODYEAR TIRE & RUBBER CO.

Syllabus

*Held:* Because the later effects of past discrimination do not restart the clock for filing an EEOC charge, Ledbetter's claim is untimely. Pp. 4–24.

   (a) An individual wishing to bring a Title VII lawsuit must first file an EEOC charge within, as relevant here, 180 days "after the alleged unlawful employment practice occurred." 42 U. S. C. §2000e–2(a)(1). In addressing the issue of an EEOC charge's timeliness, this Court has stressed the need to identify with care the specific employment practice at issue. Ledbetter's arguments—that the paychecks that she received during the charging period and the 1998 raise denial each violated Title VII and triggered a new EEOC charging period—fail because they would require the Court in effect to jettison the defining element of the disparate-treatment claim on which her Title VII recovery was based, discriminatory intent. *United Air Lines, Inc.* v. *Evans,* 431 U. S. 553, *Delaware State College* v. *Ricks,* 449 U. S. 250, *Lorance* v. *AT&T Technologies, Inc.,* 490 U. S. 900, and *National Railroad Passenger Corporation* v. *Morgan,* 536 U. S. 101, clearly instruct that the EEOC charging period is triggered when a discrete unlawful practice takes place. A new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination. But if an employer engages in a series of separately actionable intentionally discriminatory acts, then a fresh violation takes place when each act is committed. Ledbetter makes no claim that intentionally discriminatory conduct occurred during the charging period or that discriminatory decisions occurring before that period were not communicated to her. She argues simply that Goodyear's nondiscriminatory conduct during the charging period gave present effect to discriminatory conduct outside of that period. But current effects alone cannot breathe life into prior, uncharged discrimination. Ledbetter should have filed an EEOC charge within 180 days after each allegedly discriminatory employment decision was made and communicated to her. Her attempt to shift forward the intent associated with prior discriminatory acts to the 1998 pay decision is unsound, for it would shift intent away from the act that consummated the discriminatory employment practice to a later act not performed with bias or discriminatory motive, imposing liability in the absence of the requisite intent. Her argument would also distort Title VII's "integrated, multistep enforcement procedure." *Occidental Life Ins. Co. of Cal.* v. *EEOC,* 432 U. S. 355, 359. The short EEOC filing deadline reflects Congress' strong preference for the prompt resolution of employment discrimination allegations through voluntary conciliation and cooperation. *Id.,* at 367–368. Nothing in Title VII supports treating the intent element of Ledbetter's dispa-

Cite as: 550 U. S. ____ (2007)                    3

Syllabus

rate-treatment claim any differently from the employment practice
element of the claim. Pp. 4–13.

(b) *Bazemore* v. *Friday*, 478 U. S. 385 *(per curiam)*, which con-
cerned a disparate-treatment pay claim, is entirely consistent with
*Evans*, *Ricks*, *Lorance*, and *Morgan*. *Bazemore*'s rule is that an em-
ployer violates Title VII and triggers a new EEOC charging period
whenever the employer issues paychecks using a discriminatory pay
structure. It is not, as Ledbetter contends, a "paycheck accrual rule"
under which each paycheck, even if not accompanied by discrimina-
tory intent, triggers a new EEOC charging period during which the
complainant may properly challenge any prior discriminatory con-
duct that impacted that paycheck's amount, no matter how long ago
the discrimination occurred. Because Ledbetter has not adduced evi-
dence that Goodyear initially adopted its performance-based pay sys-
tem in order to discriminate based on sex or that it later applied this
system to her within the charging period with discriminatory animus,
*Bazemore* is of no help to her. Pp. 13–21.

(c) Ledbetter's "paycheck accrual rule" is also not supported by ei-
ther analogies to the statutory regimes of the Equal Pay Act of 1963,
the Fair Labor Standards Act of 1938, or the National Labor Rela-
tions Act, or policy arguments for giving special treatment to pay
claims. Pp. 21–24.

421 F. 3d 1169, affirmed.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J.,
and SCALIA, KENNEDY, and THOMAS, JJ., joined. GINSBURG, J., filed a
dissenting opinion, in which STEVENS, SOUTER, and BREYER, JJ., joined.

Cite as: 550 U. S. ____ (2007)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 05–1074

## LILLY M. LEDBETTER, PETITIONER *v.* THE GOODYEAR TIRE & RUBBER COMPANY, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[May 29, 2007]

JUSTICE ALITO delivered the opinion of the Court.

This case calls upon us to apply established precedent in a slightly different context. We have previously held that the time for filing a charge of employment discrimination with the Equal Employment Opportunity Commission (EEOC) begins when the discriminatory act occurs. We have explained that this rule applies to any "[d]iscrete ac[t]" of discrimination, including discrimination in "termination, failure to promote, denial of transfer, [and] refusal to hire." *National Railroad Passenger Corporation* v. *Morgan*, 536 U. S. 101, 114 (2002). Because a pay-setting decision is a "discrete act," it follows that the period for filing an EEOC charge begins when the act occurs. Petitioner, having abandoned her claim under the Equal Pay Act, asks us to deviate from our prior decisions in order to permit her to assert her claim under Title VII. Petitioner also contends that discrimination in pay is different from other types of employment discrimination and thus should be governed by a different rule. But because a pay-setting decision is a discrete act that occurs at a particular point in time, these arguments must be

2        LEDBETTER *v.* GOODYEAR TIRE & RUBBER CO.

Opinion of the Court

rejected.  We therefore affirm the judgment of the Court of Appeals.

I

Petitioner Lilly Ledbetter (Ledbetter) worked for respondent Goodyear Tire and Rubber Company (Goodyear) at its Gadsden, Alabama, plant from 1979 until 1998.  During much of this time, salaried employees at the plant were given or denied raises based on their supervisors' evaluation of their performance.  In March 1998, Ledbetter submitted a questionnaire to the EEOC alleging certain acts of sex discrimination, and in July of that year she filed a formal EEOC charge.  After taking early retirement in November 1998, Ledbetter commenced this action, in which she asserted, among other claims, a Title VII pay discrimination claim and a claim under the Equal Pay Act of 1963 (EPA), 29 U. S. C. §206(d).

The District Court granted summary judgment in favor of Goodyear on several of Ledbetter's claims, including her Equal Pay Act claim, but allowed others, including her Title VII pay discrimination claim, to proceed to trial.  In support of this latter claim, Ledbetter introduced evidence that during the course of her employment several supervisors had given her poor evaluations because of her sex, that as a result of these evaluations her pay was not increased as much as it would have been if she had been evaluated fairly, and that these past pay decisions continued to affect the amount of her pay throughout her employment.  Toward the end of her time with Goodyear, she was being paid significantly less than any of her male colleagues.  Goodyear maintained that the evaluations had been nondiscriminatory, but the jury found for Ledbetter and awarded her backpay and damages.

On appeal, Goodyear contended that Ledbetter's pay discrimination claim was time barred with respect to all pay decisions made prior to September 26, 1997—that is,

Opinion of the Court

180 days before the filing of her EEOC questionnaire.[1]
And Goodyear argued that no discriminatory act relating
to Ledbetter's pay occurred after that date.

The Court of Appeals for the Eleventh Circuit reversed,
holding that a Title VII pay discrimination claim cannot
be based on any pay decision that occurred prior to the
last pay decision that affected the employee's pay during
the EEOC charging period. 421 F. 3d 1169, 1182–1183
(2005). The Court of Appeals then concluded that there
was insufficient evidence to prove that Goodyear had acted
with discriminatory intent in making the only two pay
decisions that occurred within that time span, namely, a
decision made in 1997 to deny Ledbetter a raise and a
similar decision made in 1998. *Id.*, at 1186–1187.

Ledbetter filed a petition for a writ of certiorari but did
not seek review of the Court of Appeals' holdings regard-
ing the sufficiency of the evidence in relation to the 1997
and 1998 pay decisions. Rather, she sought review of the
following question:

> "Whether and under what circumstances a plaintiff
> may bring an action under Title VII of the Civil
> Rights Act of 1964 alleging illegal pay discrimination
> when the disparate pay is received during the statu-
> tory limitations period, but is the result of intention-
> ally discriminatory pay decisions that occurred out-
> side the limitations period." Pet. for Cert. i.

In light of disagreement among the Courts of Appeals as
to the proper application of the limitations period in Title
VII disparate-treatment pay cases, compare 421 F. 3d

---

[1] The parties assume that the EEOC charging period runs backwards
from the date of the questionnaire, even though Ledbetter's discrimina-
tory pay claim was not added until the July 1998 formal charge. 421
F. 3d 1169, 1178 (CA11 2005). We likewise assume for the sake of
argument that the filing of the questionnaire, rather than the formal
charge, is the appropriate date.

Opinion of the Court

1169, with *Forsyth* v. *Federation Employment & Guidance Serv.*, 409 F. 3d 565 (CA2 2005); *Shea* v. *Rice*, 409 F. 3d 448 (CADC 2005), we granted certiorari, 548 U. S. ___ (2006).

## II

Title VII of the Civil Rights Act of 1964 makes it an "unlawful employment practice" to discriminate "against any individual with respect to his compensation . . . because of such individual's . . . sex." 42 U. S. C. §2000e–2(a)(1). An individual wishing to challenge an employment practice under this provision must first file a charge with the EEOC. §2000e–5(e)(1). Such a charge must be filed within a specified period (either 180 or 300 days, depending on the State) "after the alleged unlawful employment practice occurred," *ibid.*, and if the employee does not submit a timely EEOC charge, the employee may not challenge that practice in court, §2000e–5(f)(1).

In addressing the issue whether an EEOC charge was filed on time, we have stressed the need to identify with care the specific employment practice that is at issue. *Morgan*, 536 U. S., at 110–111. Ledbetter points to two different employment practices as possible candidates. Primarily, she urges us to focus on the paychecks that were issued to her during the EEOC charging period (the 180-day period preceding the filing of her EEOC questionnaire), each of which, she contends, was a separate act of discrimination. Alternatively, Ledbetter directs us to the 1998 decision denying her a raise, and she argues that this decision was "unlawful because it carried forward intentionally discriminatory disparities from prior years." Reply Brief for Petitioner 20. Both of these arguments fail because they would require us in effect to jettison the defining element of the legal claim on which her Title VII recovery was based.

Ledbetter asserted disparate treatment, the central

Opinion of the Court

element of which is discriminatory intent. See *Chardon* v. *Fernandez*, 454 U. S. 6, 8 (1981) *(per curiam); Teamsters* v. *United States*, 431 U. S. 324, 335, n. 15 (1977); *Watson* v. *Fort Worth Bank & Trust*, 487 U. S. 977, 1002 (1998) (Blackmun, J., joined by Brennan, and Marshall, JJ., concurring in part and concurring in judgment) ("[A] disparate-treatment challenge focuses exclusively on the intent of the employer"). However, Ledbetter does not assert that the relevant Goodyear decisionmakers acted with actual discriminatory intent either when they issued her checks during the EEOC charging period or when they denied her a raise in 1998. Rather, she argues that the paychecks were unlawful because they would have been larger if she had been evaluated in a nondiscriminatory manner *prior to* the EEOC charging period. Brief for Petitioner 22. Similarly, she maintains that the 1998 decision was unlawful because it "carried forward" the effects of prior, uncharged discrimination decisions. Reply Brief for Petitioner 20. In essence, she suggests that it is sufficient that discriminatory acts that occurred prior to the charging period had continuing effects during that period. Brief for Petitioner 13 ("[E]ach paycheck that offers a woman less pay than a similarly situated man because of her sex is a separate violation of Title VII with its own limitations period, regardless of whether the paycheck simply implements a prior discriminatory decision made outside the limitations period"); see also Reply Brief for Petitioner 20. This argument is squarely foreclosed by our precedents.

In *United Air Lines, Inc.* v. *Evans*, 431 U. S. 553 (1977), we rejected an argument that is basically the same as Ledbetter's. Evans was forced to resign because the airline refused to employ married flight attendants, but she did not file an EEOC charge regarding her termination. Some years later, the airline rehired her but treated her as a new employee for seniority purposes. *Id.*, at 554–555.

Evans then sued, arguing that, while any suit based on the original discrimination was time barred, the airline's refusal to give her credit for her prior service gave "present effect to [its] past illegal act and thereby perpetuate[d] the consequences of forbidden discrimination." *Id.,* at 557.

We agreed with Evans that the airline's "seniority system [did] indeed have a continuing impact on her pay and fringe benefits," *id.,* at 558, but we noted that "the critical question [was] whether any present *violation* exist[ed]." *Ibid.* (emphasis in original). We concluded that the continuing effects of the precharging period discrimination did not make out a present violation. As JUSTICE STEVENS wrote for the Court:

> "United was entitled to treat [Evans' termination] as lawful after respondent failed to file a charge of discrimination within the 90 days then allowed by §706(d). A discriminatory act which is not made the basis for a timely charge . . . is merely an unfortunate event in history which has no present legal consequences." *Ibid.*

It would be difficult to speak to the point more directly.

Equally instructive is *Delaware State College* v. *Ricks,* 449 U. S. 250 (1980), which concerned a college librarian, Ricks, who alleged that he had been discharged because of race. In March 1974, Ricks was denied tenure, but he was given a final, nonrenewable one-year contract that expired on June 30, 1975. *Id.,* at 252–253. Ricks delayed filing a charge with the EEOC until April 1975, *id.,* at 254, but he argued that the EEOC charging period ran from the date of his actual termination rather than from the date when tenure was denied. In rejecting this argument, we recognized that "one of the *effects* of the denial of tenure," namely, his ultimate termination, "did not occur until later." *Id.,* at 258 (emphasis in original). But because

Opinion of the Court

Ricks failed to identify any specific discriminatory act "that continued until, or occurred at the time of, the actual termination of his employment," *id.*, at 257, we held that the EEOC charging period ran from "the time the tenure decision was made and communicated to Ricks," *id.*, at 258.

This same approach dictated the outcome in *Lorance* v. *AT&T Technologies, Inc.*, 490 U. S. 900 (1989), which grew out of a change in the way in which seniority was calculated under a collective-bargaining agreement. Before 1979, all employees at the plant in question accrued seniority based simply on years of employment at the plant. In 1979, a new agreement made seniority for workers in the more highly paid (and traditionally male) position of "tester" depend on time spent in that position alone and not in other positions in the plant. Several years later, when female testers were laid off due to low seniority as calculated under the new provision, they filed an EEOC charge alleging that the 1979 scheme had been adopted with discriminatory intent, namely, to protect incumbent male testers when women with substantial plant seniority began to move into the traditionally male tester positions. *Id.*, at 902–903.

We held that the plaintiffs' EEOC charge was not timely because it was not filed within the specified period after the adoption in 1979 of the new seniority rule. We noted that the plaintiffs had not alleged that the new seniority rule treated men and women differently or that the rule had been applied in a discriminatory manner. Rather, their complaint was that the rule was adopted originally with discriminatory intent. *Id.*, at 905. And as in *Evans* and *Ricks*, we held that the EEOC charging period ran from the time when the discrete act of alleged intentional discrimination occurred, not from the date when the effects of this practice were felt. 490 U. S., at 907–908. We stated:

8        LEDBETTER *v.* GOODYEAR TIRE & RUBBER CO.

Opinion of the Court

"Because the claimed invalidity of the facially nondis-
criminatory and neutrally applied tester seniority sys-
tem is wholly dependent on the alleged illegality of
signing the underlying agreement, it is the date of
that signing which governs the limitations period."
*Id.*, at 911.[2]

Our most recent decision in this area confirms this
understanding. In *Morgan*, we explained that the statu-
tory term "employment practice" generally refers to "a
discrete act or single 'occurrence'" that takes place at a
particular point in time.  536 U. S., at 110–111.  We
pointed to "termination, failure to promote, denial of
transfer, [and] refusal to hire" as examples of such "dis-
crete" acts, and we held that a Title VII plaintiff "can only
file a charge to cover discrete acts that 'occurred' within
the appropriate time period."  *Id.*, at 114.

The instruction provided by *Evans, Ricks, Lorance,* and
*Morgan* is clear.  The EEOC charging period is triggered
when a discrete unlawful practice takes place.  A new
violation does not occur, and a new charging period does

_____

[2] After *Lorance*, Congress amended Title VII to cover the specific
situation involved in that case. See 42 U. S. C. §2000e–5(e)(2) (allowing
for Title VII liability arising from an intentionally discriminatory
seniority system both at the time of its adoption and at the time of its
application).  The dissent attaches great significance to this amend-
ment, suggesting that it shows that *Lorance* was wrongly reasoned as
an initial matter.  *Post*, at 10–12 (opinion of GINSBURG, J.).  However,
the very legislative history cited by the dissent explains that this
amendment and the other 1991 Title VII amendments "'*expand[ed]* the
scope of relevant civil rights statutes in order to provide adequate
protection to victims of discrimination.'"  *Post*, at 11 (emphasis added).
For present purposes, what is most important about the amendment in
question is that it applied only to the adoption of a discriminatory
seniority system, not to other types of employment discrimination.
*Evans* and *Ricks*, upon which *Lorance* relied, 490 U. S., at 906–908, and
which employed identical reasoning, were left in place, and these
decisions are more than sufficient to support our holding today.

Opinion of the Court

not commence, upon the occurrence of subsequent non-discriminatory acts that entail adverse effects resulting from the past discrimination. But of course, if an employer engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed. See *Morgan, supra,* at 113.

Ledbetter's arguments here—that the paychecks that she received during the charging period and the 1998 raise denial each violated Title VII and triggered a new EEOC charging period—cannot be reconciled with *Evans, Ricks, Lorance,* and *Morgan.* Ledbetter, as noted, makes no claim that intentionally discriminatory conduct occurred during the charging period or that discriminatory decisions that occurred prior to that period were not communicated to her. Instead, she argues simply that Goodyear's conduct during the charging period gave present effect to discriminatory conduct outside of that period. Brief for Petitioner 13. But current effects alone cannot breathe life into prior, uncharged discrimination; as we held in *Evans,* such effects in themselves have "no present legal consequences." 431 U. S., at 558. Ledbetter should have filed an EEOC charge within 180 days after each allegedly discriminatory pay decision was made and communicated to her. She did not do so, and the paychecks that were issued to her during the 180 days prior to the filing of her EEOC charge do not provide a basis for overcoming that prior failure.

In an effort to circumvent the need to prove discriminatory intent during the charging period, Ledbetter relies on the intent associated with other decisions made by other persons at other times. Reply Brief for Petitioner 6 ("Intentional discrimination . . . occurs when . . . differential treatment takes place, even if the intent to engage in that conduct for a discriminatory purpose was made previously").

Ledbetter's attempt to take the intent associated with the prior pay decisions and shift it to the 1998 pay deci-

Opinion of the Court

sion is unsound. It would shift intent from one act (the act that consummates the discriminatory employment practice) to a later act that was not performed with bias or discriminatory motive. The effect of this shift would be to impose liability in the absence of the requisite intent.

Our cases recognize this point. In *Evans,* for example, we did not take the airline's discriminatory intent in 1968, when it discharged the plaintiff because of her sex, and attach that intent to its later act of neutrally applying its seniority rules. Similarly, in *Ricks,* we did not take the discriminatory intent that the college allegedly possessed when it denied Ricks tenure and attach that intent to its subsequent act of terminating his employment when his nonrenewable contract ran out. On the contrary, we held that "the only alleged discrimination occurred—and the filing limitations periods therefore commenced—at the time the tenure decision was made and communicated to Ricks." 449 U. S., at 258.

Not only would Ledbetter's argument effectively eliminate the defining element of her disparate-treatment claim, but it would distort Title VII's "integrated, multistep enforcement procedure." *Occidental Life Ins. Co. of Cal.* v. *EEOC,* 432 U. S. 355, 359 (1977). We have previously noted the legislative compromises that preceded the enactment of Title VII, *Mohasco Corp.* v. *Silver,* 447 U. S. 807, 819–821 (1980); *EEOC* v. *Commercial Office Products Co.,* 486 U. S. 107, 126 (1988) (STEVENS, J., joined by Rehnquist, C. J., and SCALIA, J., dissenting). Respectful of the legislative process that crafted this scheme, we must "give effect to the statute as enacted," *Mohasco, supra,* at 819, and we have repeatedly rejected suggestions that we extend or truncate Congress' deadlines. See, *e.g., Electrical Workers* v. *Robbins & Myers, Inc.,* 429 U. S. 229, 236–240 (1976) (union grievance procedures do not toll EEOC filing deadline); *Alexander* v. *Gardner-Denver Co.,* 415 U. S. 36, 47–49 (1974) (arbitral

Opinion of the Court

decisions do not foreclose access to court following a timely filed EEOC complaint).

Statutes of limitations serve a policy of repose. *American Pipe & Constr. Co.* v. *Utah*, 414 U. S. 538, 554–555 (1974). They

> "represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that 'the right to be free of stale claims in time comes to prevail over the right to prosecute them.'" *United States* v. *Kubrick*, 444 U. S. 111, 117 (1979) (quoting *Railroad Telegraphers* v. *Railway Express Agency, Inc.*, 321 U. S. 342, 349 (1944)).

The EEOC filing deadline "protect[s] employers from the burden of defending claims arising from employment decisions that are long past." *Ricks, supra,* at 256–257. Certainly, the 180-day EEOC charging deadline, 42 U. S. C. §2000e–5(e)(1), is short by any measure, but "[b]y choosing what are obviously quite short deadlines, Congress clearly intended to encourage the prompt processing of all charges of employment discrimination." *Mohasco, supra,* at 825. This short deadline reflects Congress' strong preference for the prompt resolution of employment discrimination allegations through voluntary conciliation and cooperation. *Occidental Life Ins., supra,* at 367–368; *Alexander, supra,* at 44.

A disparate-treatment claim comprises two elements: an employment practice, and discriminatory intent. Nothing in Title VII supports treating the intent element of Ledbetter's claim any differently from the employment practice element.[3] If anything, concerns regarding stale

---

[3] Of course, there may be instances where the elements forming a cause of action span more than 180 days. Say, for instance, an employer forms an illegal discriminatory intent towards an employee but does not act on it until 181 days later. The charging period would not

12    LEDBETTER *v.* GOODYEAR TIRE & RUBBER CO.

Opinion of the Court

claims weigh more heavily with respect to proof of the intent associated with employment practices than with the practices themselves. For example, in a case such as this in which the plaintiff's claim concerns the denial of raises, the employer's challenged acts (the decisions not to increase the employee's pay at the times in question) will almost always be documented and will typically not even be in dispute. By contrast, the employer's intent is almost always disputed, and evidence relating to intent may fade quickly with time. In most disparate-treatment cases, much if not all of the evidence of intent is circumstantial. Thus, the critical issue in a case involving a long-past performance evaluation will often be whether the evaluation was so far off the mark that a sufficient inference of discriminatory intent can be drawn. See *Watson,* 487 U. S., at 1004 (Blackmun, J., joined by Brennan and Marshall, JJ., concurring in part and concurring in judgment) (noting that in a disparate-treatment claim, the *McDonnell Douglas* factors establish discrimination by inference). See also, *e.g., Zhuang* v. *Datacard Corp.,* 414 F. 3d 849 (CA8 2005) (rejecting inference of discrimination from performance evaluations); *Cooper* v. *Southern Co.,* 390 F. 3d 695, 732–733 (CA11 2004) (same). This can be a subtle determination, and the passage of time may seriously diminish the ability of the parties and the factfinder to reconstruct what actually happened.[4]

----

begin to run until the employment practice was executed on day 181 because until that point the employee had no cause of action. The act and intent had not yet been joined. Here, by contrast, Ledbetter's cause of action was fully formed and present at the time that the discriminatory employment actions were taken against her, at which point she could have, and should have, sued.

[4]The dissent dismisses this concern, *post,* at 15–16, but this case illustrates the problems created by tardy lawsuits. Ledbetter's claims of sex discrimination turned principally on the misconduct of a single Goodyear supervisor, who, Ledbetter testified, retaliated against her when she rejected his sexual advances during the early 1980's, and did

Opinion of the Court

Ledbetter contends that employers would be protected
by the equitable doctrine of laches, but Congress plainly
did not think that laches was sufficient in this context.
Indeed, Congress took a diametrically different approach,
including in Title VII a provision allowing only a few
months in most cases to file a charge with the EEOC. 42
U. S. C. §2000e–5(e)(1).

Ultimately, "experience teaches that strict adherence
to the procedural requirements specified by the legisla-
ture is the best guarantee of evenhanded administration
of the law." *Mohasco,* 447 U. S., at 826. By operation of
§§2000e–5(e)(1) and 2000e–5(f)(1), a Title VII "claim is
time barred if it is not filed within these time limits."
*Morgan,* 536 U. S., at 109; *Electrical Workers,* 429 U. S.,
at 236. We therefore reject the suggestion that an em-
ployment practice committed with no improper purpose
and no discriminatory intent is rendered unlawful none-
theless because it gives some effect to an intentional
discriminatory act that occurred outside the charging
period. Ledbetter's claim is, for this reason, untimely.

### III

### A

In advancing her two theories Ledbetter does not seri-
ously contest the logic of *Evans, Ricks, Lorance,* and *Mor-
gan* as set out above, but rather argues that our decision
in *Bazemore* v. *Friday,* 478 U. S. 385 (1986) *(per curiam),*
requires different treatment of her claim because it relates
to pay. Ledbetter focuses specifically on our statement

---

so again in the mid-1990's when he falsified deficiency reports about
her work. His misconduct, Ledbetter argues, was "a principal basis for
[her] performance evaluation in 1997." Brief for Petitioner 6; see also
*id.,* at 5–6, 8, 11 (stressing the same supervisor's misconduct). Yet, by
the time of trial, this supervisor had died and therefore could not
testify. A timely charge might have permitted his evidence to be
weighed contemporaneously.

Opinion of the Court

that "[e]ach week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII." *Id.*, at 395. She argues that in *Bazemore* we adopted a "paycheck accrual rule" under which each paycheck, even if not accompanied by discriminatory intent, triggers a new EEOC charging period during which the complainant may properly challenge any prior discriminatory conduct that impacted the amount of that paycheck, no matter how long ago the discrimination occurred. On this reading, *Bazemore* dispensed with the need to prove actual discriminatory intent in pay cases and, without giving any hint that it was doing so, repudiated the very different approach taken previously in *Evans* and *Ricks.* Ledbetter's interpretation is unsound.

*Bazemore* concerned a disparate-treatment pay claim brought against the North Carolina Agricultural Extension Service (Service). 478 U. S., at 389–390. Service employees were originally segregated into "a white branch" and "a 'Negro branch,'" with the latter receiving less pay, but in 1965 the two branches were merged. *Id.*, at 390–391. After Title VII was extended to public employees in 1972, black employees brought suit claiming that pay disparities attributable to the old dual pay scale persisted. *Id.*, at 391. The Court of Appeals rejected this claim, which it interpreted to be that the "'discriminatory difference in salaries should have been affirmatively eliminated.'" *Id., at* 395.

This Court reversed in a *per curiam* opinion, 478 U. S., at 386–388, but all of the Members of the Court joined Justice Brennan's separate opinion, see *id.*, at 388 (opinion concurring in part). Justice Brennan wrote:

"The error of the Court of Appeals with respect to salary disparities created prior to 1972 and perpetuated thereafter is too obvious to warrant extended discussion: that the Extension Service discriminated with

Opinion of the Court

respect to salaries *prior* to the time it was covered by
Title VII does not excuse perpetuating that discrimi-
nation *after* the Extension Service became covered by
Title VII.  To hold otherwise would have the effect of
exempting from liability those employers who were
historically the greatest offenders of the rights of
blacks.  A pattern or practice that would have consti-
tuted a violation of Title VII, but for the fact that the
statute had not yet become effective, became a viola-
tion upon Title VII's effective date, and to the extent
an employer continued to engage in that act or prac-
tice, it is liable under that statute.  While recovery
may not be permitted for pre-1972 acts of discrimina-
tion, to the extent that this discrimination was per-
petuated after 1972, liability may be imposed." *Id.*, at
395 (emphasis in original).

Far from adopting the approach that Ledbetter ad-
vances here, this passage made a point that was "too
obvious to warrant extended discussion," *ibid.;* namely,
that when an employer adopts a facially discriminatory
pay structure that puts some employees on a lower scale
because of race, the employer engages in intentional dis-
crimination whenever it issues a check to one of these
disfavored employees.  An employer that adopts and inten-
tionally retains such a pay structure can surely be re-
garded as intending to discriminate on the basis of race as
long as the structure is used.

*Bazemore* thus is entirely consistent with our prior
precedents, as Justice Brennan's opinion took care to point
out.  Noting that *Evans* turned on whether "'any *present
violation* exist[ed],'" Justice Brennan stated that the
*Bazemore* plaintiffs were alleging that the defendants
"ha[d] not from the date of the Act forward made all their
employment decisions in a wholly nondiscriminatory way,"
478 U. S., at 396–397, n. 6 (emphasis in original; internal

quotation marks and brackets omitted)–which is to say that they had engaged in fresh discrimination. Justice Brennan added that the Court's "holding in no sense g[ave] legal effect to the pre-1972 actions, but, consistent with *Evans* . . . focuse[d] on the present salary structure, which is illegal if it *is a mere continuation of the pre-1965 discriminatory pay structure.*" *Id.,* at 397, n. 6 (emphasis added).

The sentence in Justice Brennan's opinion on which Ledbetter chiefly relies comes directly after the passage quoted above, and makes a similarly obvious point:

> "Each week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII, regardless of the fact that this pattern was begun prior to the effective date of Title VII." *Id.,* at 395.[5]

---

[5]That the focus in *Bazemore* was on a current violation, not the carrying forward of a past act of discrimination, was made clearly by the side opinion in the Court of Appeals:

"[T]he majority holds, in effect, that because the pattern of discriminatory salaries here challenged originated before applicable provisions of the Civil Rights Act made their payment illegal, any 'lingering effects' of that earlier pattern cannot (presumably on an indefinitely maintained basis) be considered in assessing a challenge to post-act continuation of that pattern.

"*Hazelwood* and *Evans* indeed made it clear that an employer cannot be found liable, or sanctioned with remedy, for employment decisions made before they were declared illegal or as to which the claimant has lost any right of action by lapse of time. For this reason it is generally true that, as the catch-phrase has it, Title VII imposed 'no obligation to catch-up,' i.e., affirmatively to remedy present effects of pre-Act discrimination, whether in composing a work force or otherwise. But those cases cannot be thought to insulate employment decisions that presently are illegal on the basis that at one time *comparable* decisions were legal when made by the particular employer. It is therefore one thing to say that an employer who upon the effective date of Title VII finds itself with a racially unbalanced work-force need not act affirmatively to redress the balance; and quite another to say that it may also

Cite as: 550 U. S. ____ (2007)              17

Opinion of the Court

In other words, a freestanding violation may always be charged within its own charging period regardless of its connection to other violations.  We repeated this same point more recently in *Morgan:* "The existence of past acts and the employee's prior knowledge of their occurrence . . . does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed." 536 U. S., at 113.[6]  Neither of these opinions stands for the proposition that an action not comprising an employment practice and alleged discriminatory intent is separately chargeable, just because it is related to some past act of discrimination.

Ledbetter attempts to eliminate the obvious inconsistencies between her interpretation of *Bazemore* and the *Evans/Ricks/Lorance/Morgan* line of cases on the ground that none of the latter cases involved pay raises, but the logic of our prior cases is fully applicable to pay cases.  To take *Evans* as an example, the employee there was unlawfully terminated; this caused her to lose seniority; and the loss of seniority affected her wages, among other things. 431 U. S., at 555, n. 5 ("[S]eniority determine[s] a flight

_____

continue to make discriminatory hiring decisions because it was by that means that its present work force was composed. It may not, in short, under the *Hazelwood/Evans* principle continue practices now violative simply because at one time they were not." *Bazemore* v. *Friday,* 751 F. 2d 662, 695–696 (CA4 1984) (Phillips, J., concurring in part and dissenting in part) (emphasis in original; footnotes omitted).

[6]The briefs filed with this Court in *Bazemore* v. *Friday,* 478 U. S. 385 (1986) *(per curiam),* further elucidate the point.  The petitioners described the Service's conduct as "[t]he continued use of a racially explicit base wage." Brief for Petitioner Bazemore et al. in *Bazemore* v. *Friday,* O. T. 1985, No. 85–93, p. 33.  The United States' brief also properly distinguished the commission of a discrete discriminatory act with continuing adverse results from the intentional carrying forward of a discriminatory pay system.  Brief for Federal Petitioners in *Bazemore* v. *Friday,* O. T. 1984, Nos. 85–93 and 85–428, p. 17.  This case involves the former, not the latter.

attendant's wages; the duration and timing of vacations; rights to retention in the event of layoffs and rights to re-employment thereafter; and rights to preferential selection of flight assignments"). The relationship between past discrimination and adverse present effects was the same in *Evans* as it is here. Thus, the argument that Ledbetter urges us to accept here would necessarily have com-manded a different outcome in *Evans.*

*Bazemore* stands for the proposition that an employer violates Title VII and triggers a new EEOC charging period whenever the employer issues paychecks using a discriminatory pay structure. But a new Title VII viola-tion does not occur and a new charging period is not trig-gered when an employer issues paychecks pursuant to a system that is "facially nondiscriminatory and neutrally applied." *Lorance,* 490 U. S., at 911. The fact that pre-charging period discrimination adversely affects the calcu-lation of a neutral factor (like seniority) that is used in determining future pay does not mean that each new paycheck constitutes a new violation and restarts the EEOC charging period.

Because Ledbetter has not adduced evidence that Good-year initially adopted its performance-based pay system in order to discriminate on the basis of sex or that it later applied this system to her within the charging period with any discriminatory animus, *Bazemore* is of no help to her. Rather, all Ledbetter has alleged is that Goodyear's agents discriminated against her individually in the past and that this discrimination reduced the amount of later pay-checks. Because Ledbetter did not file timely EEOC charges relating to her employer's discriminatory pay decisions in the past, she cannot maintain a suit based on that past discrimination at this time.

### B

The dissent also argues that pay claims are different.

Opinion of the Court

Its principal argument is that a pay discrimination claim is like a hostile work environment claim because both types of claims are "'based on the cumulative effect of individual acts,'" *post*, at 6–7, but this analogy overlooks the critical conceptual distinction between these two types of claims. And although the dissent relies heavily on *Morgan*, the dissent's argument is fundamentally inconsistent with *Morgan*'s reasoning.

*Morgan* distinguished between "discrete" acts of discrimination and a hostile work environment. A discrete act of discrimination is an act that in itself "constitutes a separate actionable 'unlawful employment practice'" and that is temporally distinct. *Morgan*, 536 U. S., at 114, 117. As examples we identified "termination, failure to promote, denial of transfer, or refusal to hire." *Id.*, at 114. A hostile work environment, on the other hand, typically comprises a succession of harassing acts, each of which "may not be actionable on its own." In addition, a hostile work environment claim "cannot be said to occur on any particular day." *Id.*, at 115–116. In other words, the actionable wrong is the environment, not the individual acts that, taken together, create the environment.[7]

Contrary to the dissent's assertion, *post*, at 6–7, what Ledbetter alleged was not a single wrong consisting of a succession of acts. Instead, she alleged a series of discrete discriminatory acts, see Brief for Petitioner 13, 15 (arguing that payment of each paycheck constituted a separate

_____

[7]Moreover, the proposed hostile salary environment claim would go far beyond *Morgan*'s limits. *Morgan* still required at least some of the discriminatorily-motivated acts predicate to a hostile work environment claim to occur within the charging period. 536 U. S., at 117 ("Provided that *an act contributing to the claim occurs within the filing period*, the entire time period of the hostile environment may be considered by a court" (emphasis added)). But the dissent would permit claims where no one acted in any way with an improper motive during the charging period. *Post*, at 7, 16.

20      LEDBETTER *v.* GOODYEAR TIRE & RUBBER CO.

Opinion of the Court

violation of Title VII), each of which *was* independently identifiable and actionable, and *Morgan* is perfectly clear that when an employee alleges "serial violations," *i.e.*, a series of actionable wrongs, a timely EEOC charge must be filed with respect to each discrete alleged violation. 536 U. S., at 113.

While this fundamental misinterpretation of *Morgan* is alone sufficient to show that the dissent's approach must be rejected, it should also be noted that the dissent is coy as to whether it would apply the same rule to all pay discrimination claims or whether it would limit the rule to cases like Ledbetter's, in which multiple discriminatory pay decisions are alleged. The dissent relies on the fact that Ledbetter was allegedly subjected to a series of discriminatory pay decisions over a period of time, and the dissent suggests that she did not realize for some time that she had been victimized. But not all pay cases share these characteristics.

If, as seems likely, the dissent would apply the same rule in all pay cases, then, if a single discriminatory pay decision made 20 years ago continued to affect an employee's pay today, the dissent would presumably hold that the employee could file a timely EEOC charge today. And the dissent would presumably allow this even if the employee had full knowledge of all the circumstances relating to the 20-year-old decision at the time it was made.[8] The dissent, it appears, proposes that we adopt a special rule for pay cases based on the particular charac-

---

[8] The dissent admits as much, responding only that an employer could resort to equitable doctrines such as laches. *Post*, at 16. But first, as we have noted, Congress has already determined that defense to be insufficient. *Supra*, at 13. Second, it is far from clear that a suit filed under the dissent's theory, alleging that a paycheck paid recently within the charging period was itself a freestanding violation of Title VII because it reflected the effects of 20-year-old discrimination, would even be barred by laches.