Opinion of the Court

teristics of one case that is certainly not representative of all pay cases and may not even be typical. We refuse to take that approach.

## IV

In addition to the arguments previously discussed, Ledbetter relies largely on analogies to other statutory regimes and on extrastatutory policy arguments to support her "paycheck accrual rule."

### A

Ledbetter places significant weight on the EPA, which was enacted contemporaneously with Title VII and prohibits paying unequal wages for equal work because of sex. 29 U. S. C. §206(d). Stating that "the lower courts routinely hear [EPA] claims challenging pay disparities that first arose outside the limitations period," Ledbetter suggests that we should hold that Title VII is violated each time an employee receives a paycheck that reflects past discrimination. Brief for Petitioner 34–35.

The simple answer to this argument is that the EPA and Title VII are not the same. In particular, the EPA does not require the filing of a charge with the EEOC or proof of intentional discrimination. See §206(d)(1) (asking only whether the alleged inequality resulted from "any other factor other than sex"). Ledbetter originally asserted an EPA claim, but that claim was dismissed by the District Court and is not before us. If Ledbetter had pursued her EPA claim, she would not face the Title VII obstacles that she now confronts.[9]

_____

[9]The Magistrate Judge recommended dismissal of Ledbetter's EPA claim on the ground that Goodyear had demonstrated that the pay disparity resulted from Ledbetter's consistently weak performance, not her sex. App. to Pet. for Cert. 71a–77a. The Magistrate Judge also recommended dismissing the Title VII disparate-pay claim on the same basis. *Id.*, at 65a–69a. Ledbetter objected to the Magistrate Judge's disposition of the Title VII and EPA claims, arguing that the Magis-

Opinion of the Court

Ledbetter's appeal to the Fair Labor Standards Act of 1938 (FLSA) is equally unavailing. Stating that it is "well established that the statute of limitations for violations of the minimum wage and overtime provisions of the [FLSA] runs anew with each paycheck," Brief for Petitioner 35, Ledbetter urges that the same should be true in a Title VII pay case. Again, however, Ledbetter's argument overlooks the fact that an FLSA minimum wage or over-time claim does not require proof of a specific intent to discriminate. See 29 U. S. C. §207 (establishing overtime rules); cf. §255(a) (establishing 2-year statute of limita-tions for FLSA claims, except for claims of a "willful viola-tion," which may be commenced within 3 years).

Ledbetter is on firmer ground in suggesting that we look to cases arising under the National Labor Relations Act (NLRA) since the NLRA provided a model for Title VII's remedial provisions and, like Title VII, requires the filing of a timely administrative charge (with the National Labor Relations Board) before suit may be maintained. *Lorance,* 490 U. S., at 909; *Ford Motor Co.* v. *EEOC,* 458 U. S. 219, 226, n. 8 (1982). Cf. 29 U. S. C. §160(b) ("[N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board").

Ledbetter argues that the NLRA's 6-month statute of limitations begins anew for each paycheck reflecting a prior violation of the statute, but our precedents suggest

---

trate Judge had improperly resolved a disputed factual issue. See Plaintiff's Objections to Magistrate Judge's Report and Recommenda-tion, 1 Record in No. 03–15246–G (CA11), Doc. 32. The District Court sustained this objection as to the "disparate pay" claim, but without specifically mentioning the EPA claim, which had been dismissed by the Magistrate Judge on the same basis. See App. to Pet. for Cert. 43a–44a. While the record is not entirely clear, it appears that at this point Ledbetter elected to abandon her EPA claim, proceeding to trial with only the Title VII disparate-pay claim, thus giving rise to the dispute the Court must now resolve.

Opinion of the Court

otherwise. In *Machinists* v. *NLRB*, 362 U. S. 411, 416–417 (1960), we held that "where conduct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor practice[,] the use of the earlier unfair labor practice [merely] serves to cloak with illegality that which was otherwise lawful." This interpretation corresponds closely to our analysis in *Evans* and *Ricks* and supports our holding in the present case.

### B

Ledbetter, finally, makes a variety of policy arguments in favor of giving the alleged victims of pay discrimination more time before they are required to file a charge with the EEOC. Among other things, she claims that pay discrimination is harder to detect than other forms of employment discrimination.[10]

We are not in a position to evaluate Ledbetter's policy arguments, and it is not our prerogative to change the way in which Title VII balances the interests of aggrieved employees against the interest in encouraging the "prompt processing of all charges of employment discrimination," *Mohasco*, 447 U. S., at 825, and the interest in repose.

Ledbetter's policy arguments for giving special treatment to pay claims find no support in the statute and are inconsistent with our precedents.[11] We apply the statute

---

[10] We have previously declined to address whether Title VII suits are amenable to a discovery rule. *National Railroad Passenger Corporation* v. *Morgan*, 536 U. S. 101, 114, n. 7 (2002). Because Ledbetter does not argue that such a rule would change the outcome in her case, we have no occasion to address this issue.

[11] Ledbetter argues that the EEOC's endorsement of her approach in its Compliance Manual and in administrative adjudications merits deference. But we have previously declined to extend *Chevron* deference to the Compliance Manual, *Morgan, supra*, at 111, n. 6, and similarly decline to defer to the EEOC's adjudicatory positions. The EEOC's views in question are based on its misreading of *Bazemore*.

Opinion of the Court

as written, and this means that any unlawful employment practice, including those involving compensation, must be presented to the EEOC within the period prescribed by statute.

\*    \*    \*

For these reasons, the judgment of the Court of Appeals for the Eleventh Circuit is affirmed.

*It is so ordered.*

_____

See, *e.g., Amft* v. *Mineta,* No. 07A40116, 2006 WL 985183, \*5 (EEOC Office of Fed. Operations, Apr. 6, 2006); *Albritton* v. *Postmaster General,* No. 01A44063, 2004 WL 2983682, \*2 (EEOC Office of Fed. Operations, Dec. 17, 2004). Agencies have no special claim to deference in their interpretation of our decisions. *Reno* v. *Bossier Parish School Bd.,* 528 U. S. 320, 336, n. 5 (2000). Nor do we see reasonable ambiguity in the statute itself, which makes no distinction between compensation and other sorts of claims and which clearly requires that discrete employment actions alleged to be unlawful be motivated "because of such individual's . . . sex." 42 U. S. C. §2000e–a(a)(1).

Ginsburg, J., dissenting

# SUPREME COURT OF THE UNITED STATES

―――――――

No. 05–1074

―――――――

## LILLY M. LEDBETTER, PETITIONER v. THE GOOD-YEAR TIRE & RUBBER COMPANY, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[May 29, 2007]

JUSTICE GINSBURG, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE BREYER join, dissenting.

Lilly Ledbetter was a supervisor at Goodyear Tire and Rubber's plant in Gadsden, Alabama, from 1979 until her retirement in 1998. For most of those years, she worked as an area manager, a position largely occupied by men. Initially, Ledbetter's salary was in line with the salaries of men performing substantially similar work. Over time, however, her pay slipped in comparison to the pay of male area managers with equal or less seniority. By the end of 1997, Ledbetter was the only woman working as an area manager and the pay discrepancy between Ledbetter and her 15 male counterparts was stark: Ledbetter was paid $3,727 per month; the lowest paid male area manager received $4,286 per month, the highest paid, $5,236. See 421 F. 3d 1169, 1174 (CA11 2005); Brief for Petitioner 4.

Ledbetter launched charges of discrimination before the Equal Employment Opportunity Commission (EEOC) in March 1998. Her formal administrative complaint specified that, in violation of Title VII, Goodyear paid her a discriminatorily low salary because of her sex. See 42 U. S. C. §2000e–2(a)(1) (rendering it unlawful for an employer "to discriminate against any individual with respect to [her] compensation . . . because of such individual's . . . sex"). That charge was eventually tried to a jury, which

GINSBURG, J., dissenting

found it "more likely than not that [Goodyear] paid [Ledbetter] a[n] unequal salary because of her sex." App. 102. In accord with the jury's liability determination, the District Court entered judgment for Ledbetter for backpay and damages, plus counsel fees and costs.

The Court of Appeals for the Eleventh Circuit reversed. Relying on Goodyear's system of annual merit-based raises, the court held that Ledbetter's claim, in relevant part, was time barred. 421 F. 3d, at 1171, 1182–1183. Title VII provides that a charge of discrimination "shall be filed within [180] days after the alleged unlawful employment practice occurred." 42 U. S. C. §2000e–5(e)(1).[1] Ledbetter charged, and proved at trial, that within the 180-day period, her pay was substantially less than the pay of men doing the same work. Further, she introduced evidence sufficient to establish that discrimination against female managers at the Gadsden plant, not performance inadequacies on her part, accounted for the pay differential. See, *e.g.*, App. 36–47, 51–68, 82–87, 90–98, 112–113. That evidence was unavailing, the Eleventh Circuit held, and the Court today agrees, because it was incumbent on Ledbetter to file charges year-by-year, each time Goodyear failed to increase her salary commensurate with the salaries of male peers. Any annual pay decision not contested immediately (within 180 days), the Court affirms, becomes grandfathered, a *fait accompli* beyond the province of Title VII ever to repair.

The Court's insistence on immediate contest overlooks common characteristics of pay discrimination. Pay disparities often occur, as they did in Ledbetter's case, in small increments; cause to suspect that discrimination is

---

[1] If the complainant has first instituted proceedings with a state or local agency, the filing period is extended to 300 days or 30 days after the denial of relief by the agency. 42 U. S. C. §2000e–5(e)(1). Because the 180-day period applies to Ledbetter's case, that figure will be used throughout. See *ante*, at 3, 4.

GINSBURG, J., dissenting

at work develops only over time. Comparative pay information, moreover, is often hidden from the employee's view. Employers may keep under wraps the pay differentials maintained among supervisors, no less the reasons for those differentials. Small initial discrepancies may not be seen as meet for a federal case, particularly when the employee, trying to succeed in a nontraditional environment, is averse to making waves.

Pay disparities are thus significantly different from adverse actions "such as termination, failure to promote, . . . or refusal to hire," all involving fully communicated discrete acts, "easy to identify" as discriminatory. See *National Railroad Passenger Corporation* v. *Morgan*, 536 U. S. 101, 114 (2002). It is only when the disparity becomes apparent and sizable, *e.g.*, through future raises calculated as a percentage of current salaries, that an employee in Ledbetter's situation is likely to comprehend her plight and, therefore, to complain. Her initial readiness to give her employer the benefit of the doubt should not preclude her from later challenging the then current and continuing payment of a wage depressed on account of her sex.

On questions of time under Title VII, we have identified as the critical inquiries: "What constitutes an 'unlawful employment practice' and when has that practice 'occurred'?" *Id.,* at 110. Our precedent suggests, and lower courts have overwhelmingly held, that the unlawful practice is the *current payment* of salaries infected by gender-based (or race-based) discrimination—a practice that occurs whenever a paycheck delivers less to a woman than to a similarly situated man. See *Bazemore* v. *Friday*, 478 U. S. 385, 395 (1986) (Brennan, J., joined by all other Members of the Court, concurring in part).

I

Title VII proscribes as an "unlawful employment prac-

GINSBURG, J., dissenting

tice" discrimination "against any individual with respect to his compensation . . . because of such individual's race, color, religion, sex, or national origin." 42 U. S. C. §2000e–2(a)(1). An individual seeking to challenge an employment practice under this proscription must file a charge with the EEOC within 180 days "after the alleged unlawful employment practice occurred." §2000e–5(e)(1). See *ante,* at 4; *supra,* at 2, n. 1.

Ledbetter's petition presents a question important to the sound application of Title VII: What activity qualifies as an unlawful employment practice in cases of discrimination with respect to compensation. One answer identifies the pay-setting decision, and that decision alone, as the unlawful practice. Under this view, each particular salary-setting decision is discrete from prior and subsequent decisions, and must be challenged within 180 days on pain of forfeiture. Another response counts both the pay-setting decision and the actual payment of a discriminatory wage as unlawful practices. Under this approach, each payment of a wage or salary infected by sex-based discrimination constitutes an unlawful employment practice; prior decisions, outside the 180-day charge-filing period, are not themselves actionable, but they are relevant in determining the lawfulness of conduct within the period. The Court adopts the first view, see *ante,* at 1, 4, 9, but the second is more faithful to precedent, more in tune with the realities of the workplace, and more respectful of Title VII's remedial purpose.

### A

In *Bazemore,* we unanimously held that an employer, the North Carolina Agricultural Extension Service, committed an unlawful employment practice each time it paid black employees less than similarly situated white employees. 478 U. S., at 395 (opinion of Brennan, J.). Before 1965, the Extension Service was divided into two

GINSBURG, J., dissenting

branches: a white branch and a "Negro branch." *Id.*, at
390. Employees in the "Negro branch" were paid less than
their white counterparts. In response to the Civil Rights
Act of 1964, which included Title VII, the State merged
the two branches into a single organization, made adjust-
ments to reduce the salary disparity, and began giving
annual raises based on nondiscriminatory factors. *Id.*, at
390–391, 394–395. Nonetheless, "some pre-existing salary
disparities continued to linger on." *Id.*, at 394 (internal
quotation marks omitted). We rejected the Court of Ap-
peals' conclusion that the plaintiffs could not prevail be-
cause the lingering disparities were simply a continuing
effect of a decision lawfully made prior to the effective date
of Title VII. See *id.*, at 395–396. Rather, we reasoned,
"[e]ach week's paycheck that delivers less to a black than
to a similarly situated white is a wrong actionable under
Title VII." *Id.*, at 395. Paychecks perpetuating past dis-
crimination, we thus recognized, are actionable not simply
because they are "related" to a decision made outside the
charge-filing period, cf. *ante*, at 17, but because they dis-
criminate anew each time they issue, see *Bazemore*, 478
U. S., at 395–396, and n. 6; *Morgan*, 536 U. S., at 111–112.

Subsequently, in *Morgan*, we set apart, for purposes of
Title VII's timely filing requirement, unlawful employ-
ment actions of two kinds: "discrete acts" that are "easy to
identify" as discriminatory, and acts that recur and are
cumulative in impact. See *id.*, at 110, 113–115. "[A]
[d]iscrete ac[t] such as termination, failure to promote,
denial of transfer, or refusal to hire," *id.*, at 114, we ex-
plained, "'occur[s]' on the day that it 'happen[s].' A party,
therefore, must file a charge within . . . 180 . . . days of the
date of the act or lose the ability to recover for it." *Id.*, at
110; see *id.*, at 113 ("[D]iscrete discriminatory acts are not
actionable if time barred, even when they are related to
acts alleged in timely filed charges. Each discrete dis-
criminatory act starts a new clock for filing charges alleg-

6      LEDBETTER *v.* GOODYEAR TIRE & RUBBER CO.

ing that act.").

"[D]ifferent in kind from discrete acts," we made clear, are "claims . . . based on the cumulative effect of individual acts." *Id.,* at 115. The *Morgan* decision placed hostile work environment claims in that category. "Their very nature involves repeated conduct." *Ibid.* "The unlawful employment practice" in hostile work environment claims, "cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Ibid.* (internal quotation marks omitted). The persistence of the discriminatory conduct both indicates that management should have known of its existence and produces a cognizable harm. *Ibid.* Because the very nature of the hostile work environment claim involves repeated conduct,

> "[i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.,* at 117.

Consequently, although the unlawful conduct began in the past, "a charge may be filed at a later date and still encompass the whole." *Ibid.*

Pay disparities, of the kind Ledbetter experienced, have a closer kinship to hostile work environment claims than to charges of a single episode of discrimination. Ledbetter's claim, resembling Morgan's, rested not on one particular paycheck, but on "the cumulative effect of individual acts." See *id.,* at 115. See also Brief for Petitioner 13, 15–17, and n. 9 (analogizing Ledbetter's claim to the recurring and cumulative harm at issue in *Morgan*); Reply Brief for Petitioner 13 (distinguishing pay discrimination

GINSBURG, J., dissenting

from "easy to identify" discrete acts (internal quotation marks omitted)). She charged insidious discrimination building up slowly but steadily. See Brief for Petitioner 5–8. Initially in line with the salaries of men performing substantially the same work, Ledbetter's salary fell 15 to 40 percent behind her male counterparts only after successive evaluations and percentage-based pay adjustments. See *supra*, at 1–2. Over time, she alleged and proved, the repetition of pay decisions undervaluing her work gave rise to the current discrimination of which she complained. Though component acts fell outside the charge-filing period, with each new paycheck, Goodyear contributed incrementally to the accumulating harm. See *Morgan*, 536 U. S., at 117; *Bazemore*, 478 U. S., at 395–396; cf. *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, 392 U. S. 481, 502, n. 15 (1968).[2]

## B

The realities of the workplace reveal why the discrimination with respect to compensation that Ledbetter suffered does not fit within the category of singular discrete acts "easy to identify." A worker knows immediately if she is denied a promotion or transfer, if she is fired or refused employment. And promotions, transfers, hirings, and firings are generally public events, known to co-workers. When an employer makes a decision of such open and definitive character, an employee can immediately seek out an explanation and evaluate it for pretext. Compensation disparities, in contrast, are often hidden from sight.

---

[2] *National Railroad Passenger Corporation* v. *Morgan*, 536 U. S. 101, 117 (2002), the Court emphasizes, required that "an act contributing to the claim occu[r] within the [charge-]filing period." *Ante*, at 19, and n. 7 (emphasis deleted; internal quotation marks omitted). Here, each paycheck within the filing period compounded the discrimination Ledbetter encountered, and thus contributed to the "actionable wrong," *i.e.*, the succession of acts composing the pattern of discriminatory pay, of which she complained.

8         LEDBETTER *v.* GOODYEAR TIRE & RUBBER CO.

GINSBURG, J., dissenting

It is not unusual, decisions in point illustrate, for management to decline to publish employee pay levels, or for employees to keep private their own salaries. See, *e.g.*, *Goodwin* v. *General Motors Corp.*, 275 F. 3d 1005, 1008–1009 (CA10 2002) (plaintiff did not know what her colleagues earned until a printout listing of salaries appeared on her desk, seven years after her starting salary was set lower than her co-workers' salaries); *McMillan* v. *Massachusetts Soc. for the Prevention of Cruelty to Animals*, 140 F. 3d 288, 296 (CA1 1998) (plaintiff worked for employer for years before learning of salary disparity published in a newspaper).[3] Tellingly, as the record in this case bears out, Goodyear kept salaries confidential; employees had only limited access to information regarding their colleagues' earnings. App. 56–57, 89.

The problem of concealed pay discrimination is particularly acute where the disparity arises not because the female employee is flatly denied a raise but because male counterparts are given larger raises. Having received a pay increase, the female employee is unlikely to discern at once that she has experienced an adverse employment decision. She may have little reason even to suspect discrimination until a pattern develops incrementally and she ultimately becomes aware of the disparity. Even if an employee suspects that the reason for a comparatively low raise is not performance but sex (or another protected ground), the amount involved may seem too small, or the employer's intent too ambiguous, to make the issue immediately actionable—or winnable.

Further separating pay claims from the discrete em-

---

[3]See also Bierman & Gely, "Love, Sex and Politics? Sure. Salary? No Way": Workplace Social Norms and the Law, 25 Berkeley J. Emp. & Lab. L. 167, 168, 171 (2004) (one-third of private sector employers have adopted specific rules prohibiting employees from discussing their wages with co-workers; only one in ten employers has adopted a pay openness policy).

GINSBURG, J., dissenting

ployment actions identified in *Morgan*, an employer gains from sex-based pay disparities in a way it does not from a discriminatory denial of promotion, hiring, or transfer. When a male employee is selected over a female for a higher level position, someone still gets the promotion and is paid a higher salary; the employer is not enriched. But when a woman is paid less than a similarly situated man, the employer reduces its costs each time the pay differential is implemented. Furthermore, decisions on promotions, like decisions installing seniority systems, often implicate the interests of third-party employees in a way that pay differentials do not. Cf. *Teamsters* v. *United States*, 431 U. S. 324, 352–353 (1977) (recognizing that seniority systems involve "vested . . . rights of employees" and concluding that Title VII was not intended to "destroy or water down" those rights). Disparate pay, by contrast, can be remedied at any time solely at the expense of the employer who acts in a discriminatory fashion.

### C

In light of the significant differences between pay disparities and discrete employment decisions of the type identified in *Morgan*, the cases on which the Court relies hold no sway. See *ante*, at 5–10 (discussing *United Air Lines, Inc.* v. *Evans*, 431 U. S. 553 (1977), *Delaware State College* v. *Ricks*, 449 U. S. 250 (1980), and *Lorance* v. *AT&T Technologies, Inc.*, 490 U. S. 900 (1989)). *Evans* and *Ricks* both involved a single, immediately identifiable act of discrimination: in *Evans*, a constructive discharge, 431 U. S., at 554; in *Ricks*, a denial of tenure, 449 U. S., at 252. In each case, the employee filed charges well after the discrete discriminatory act occurred: When United Airlines forced Evans to resign because of its policy barring married female flight attendants, she filed no charge; only four years later, when Evans was rehired, did she allege that the airline's former no-marriage rule was

GINSBURG, J., dissenting

unlawful and therefore should not operate to deny her seniority credit for her prior service. See *Evans*, 431 U. S., at 554–557. Similarly, when Delaware State College denied Ricks tenure, he did not object until his terminal contract came to an end, one year later. *Ricks*, 449 U. S., at 253–254, 257–258. No repetitive, cumulative discriminatory employment practice was at issue in either case. See *Evans*, 431 U. S., at 557–558; *Ricks*, 449 U. S., at 258.[4]

*Lorance* is also inapposite, for, in this Court's view, it too involved a one-time discrete act: the adoption of a new seniority system that "had its genesis in sex discrimination." See 490 U. S., at 902, 905 (internal quotation marks omitted). The Court's extensive reliance on *Lorance*, *ante*, at 7–9, 14, 17–18, moreover, is perplexing for that decision is no longer effective: In the 1991 Civil Rights Act, Congress superseded *Lorance*'s holding. §112, 105 Stat. 1079 (codified as amended at 42 U. S. C. §2000e–5(e)(2)). Repudiating our judgment that a facially neutral seniority system adopted with discriminatory intent must be challenged immediately, Congress provided:

> "For purposes of this section, an unlawful employment practice occurs . . . when the seniority system is adopted, when an individual becomes subject to the

---

[4]The Court also relies on *Machinists* v. *NLRB*, 362 U. S. 411 (1960), which like *Evans* and *Ricks*, concerned a discrete act: the execution of a collective bargaining agreement containing a union security clause. 362 U. S., at 412, 417. In *Machinists*, it was undisputed that under the National Labor Relations Act (NLRA), a union and an employer may not agree to a union security clause "if at the time of original execution the union does not represent a majority of the employees in the [bargaining] unit." *Id.*, at 412–414, 417. The complainants, however, failed to file a charge within the NLRA's six-month charge filing period; instead, they filed charges 10 and 12 months after the execution of the agreement, objecting to its subsequent enforcement. See *id.*, at 412, 414. Thus, as in *Evans* and *Ricks*, but in contrast to Ledbetter's case, the employment decision at issue was easily identifiable and occurred on a single day.

GINSBURG, J., dissenting

seniority system, or when a person aggrieved is in-
jured by the application of the seniority system or
provision of the system." *Ibid.*

Congress thus agreed with the dissenters in *Lorance* that
"the harsh reality of [that] decision," was "glaringly at
odds with the purposes of Title VII." 490 U. S., at 914
(opinion of Marshall, J.). See also §3, 105 Stat. 1071 (1991
Civil Rights Act was designed "to respond to recent deci-
sions of the Supreme Court by expanding the scope of
relevant civil rights statutes in order to provide adequate
protection to victims of discrimination").

True, §112 of the 1991 Civil Rights Act directly ad-
dressed only seniority systems. See *ante*, at 8, and n. 2.
But Congress made clear (1) its view that this Court had
unduly *contracted* the scope of protection afforded by Title
VII and other civil rights statutes, and (2) its aim to gen-
eralize the ruling in *Bazemore*. As the Senate Report
accompanying the proposed Civil Rights Act of 1990, the
precursor to the 1991 Act, explained:

"Where, as was alleged in *Lorance,* an employer
adopts a rule or decision with an unlawful discrimina-
tory motive, each application of that rule or decision is
a new violation of the law. In *Bazemore* . . ., for ex-
ample, . . . the Supreme Court properly held that each
application of th[e] racially motivated salary struc-
ture, *i.e.,* each new paycheck, constituted a distinct
violation of Title VII. Section 7(a)(2) generalizes the
result correctly reached in *Bazemore*." Civil Rights
Act of 1990, S. Rep. No. 101–315, p. 54 (1990).[5]

See also 137 Cong. Rec. 29046, 29047 (1991) (Sponsors'
Interpretative Memorandum) ("This legislation should be
interpreted as disapproving the extension of *[Lorance]* to

---

[5] No Senate Report was submitted with the Civil Rights Act of 1991,
which was in all material respects identical to the proposed 1990 Act.

12      LEDBETTER *v.* GOODYEAR TIRE & RUBBER CO.

GINSBURG, J., dissenting

contexts outside of seniority systems."). But cf. *ante,* at
18 (relying on *Lorance* to conclude that "when an em-
ployer issues paychecks pursuant to a system that is
facially nondiscriminatory and neutrally applied" a new
Title VII violation does not occur (internal quotation
marks omitted)).

Until today, in the more than 15 years since Congress
amended Title VII, the Court had not once relied upon
*Lorance.* It is mistaken to do so now. Just as Congress'
"goals in enacting Title VII . . . never included conferring
absolute immunity on discriminatorily adopted seniority
systems that survive their first [180] days," 490 U. S., at
914 (Marshall, J., dissenting), Congress never intended to
immunize forever discriminatory pay differentials unchal-
lenged within 180 days of their adoption. This assessment
gains weight when one comprehends that even a relatively
minor pay disparity will expand exponentially over an
employee's working life if raises are set as a percentage of
prior pay.

A clue to congressional intent can be found in Title VII's
backpay provision. The statute expressly provides that
backpay may be awarded for a period of up to two years
before the discrimination charge is filed. 42 U. S. C.
§2000e–5(g)(1) ("Back pay liability shall not accrue from a
date more than two years prior to the filing of a charge
with the Commission."). This prescription indicates that
Congress contemplated challenges to pay discrimination
commencing before, but continuing into, the 180-day filing
period. See *Morgan,* 536 U. S., at 119 ("If Congress in-
tended to limit liability to conduct occurring in the period
within which the party must file the charge, it seems
unlikely that Congress would have allowed recovery for
two years of backpay."). As we recognized in *Morgan,* "the
fact that Congress expressly limited the amount of recov-
erable damages elsewhere to a particular time period [*i.e.,*
two years] indicates that the [180-day] timely filing provi-

GINSBURG, J., dissenting

sion was not meant to serve as a specific limitation . . . [on] the conduct that may be considered." *Ibid.*

### D

In tune with the realities of wage discrimination, the Courts of Appeals have overwhelmingly judged as a present violation the payment of wages infected by discrimination: Each paycheck less than the amount payable had the employer adhered to a nondiscriminatory compensation regime, courts have held, constitutes a cognizable harm. See, *e.g., Forsyth* v. *Federation Employment and Guidance Serv.,* 409 F. 3d 565, 573 (CA2 2005) ("Any paycheck given within the [charge-filing] period . . . would be actionable, even if based on a discriminatory pay scale set up outside of the statutory period."); *Shea* v. *Rice,* 409 F. 3d 448, 452–453 (CADC 2005) ("[An] employer commit[s] a separate unlawful employment practice each time he pa[ys] one employee less than another for a discriminatory reason" (citing *Bazemore,* 478 U. S., at 396)); *Goodwin* v. *General Motors Corp.,* 275 F. 3d 1005, 1009–1010 (CA10 2002) ("*[Bazemore]* has taught a crucial distinction with respect to discriminatory disparities in pay, establishing that a discriminatory salary is not merely a lingering effect of past discrimination—instead it is itself a continually recurring violation. . . . [E]ach race-based discriminatory salary payment constitutes a fresh violation of Title VII." (footnote omitted)); *Anderson* v. *Zubieta,* 180 F. 3d 329, 335 (CADC 1999) ("The Courts of Appeals have repeatedly reached the . . . conclusion" that pay discrimination is "actionable upon receipt of each paycheck."); accord *Hildebrandt* v. *Illinois Dept. of Natural Resources,* 347 F. 3d 1014, 1025–1029 (CA7 2003); *Cardenas* v. *Massey,* 269 F. 3d 251, 257 (CA3 2001); *Ashley* v. *Boyle's Famous Corned Beef Co.,* 66 F. 3d 164, 167–168 (CA8 1995) (en banc); *Brinkley-Obu* v. *Hughes Training, Inc.,* 36 F. 3d 336, 347–349 (CA4 1994); *Gibbs* v. *Pierce County Law*

14      LEDBETTER *v.* GOODYEAR TIRE & RUBBER CO.

Ginsburg, J., dissenting

*Enforcement Support Agency,* 785 F. 2d 1396, 1399–1400 (CA9 1986).

Similarly in line with the real-world characteristics of pay discrimination, the EEOC—the federal agency responsible for enforcing Title VII, see, *e.g.,* 42 U. S. C. §§2000e–5(f), 2000e–12(a)—has interpreted the Act to permit employees to challenge disparate pay each time it is received. The EEOC's Compliance Manual provides that "repeated occurrences of the same discriminatory employment action, such as discriminatory paychecks, can be challenged as long as one discriminatory act occurred within the charge filing period." 2 EEOC Compliance Manual §2–IV–C(1)(a), p. 605:0024, and n. 183 (2006); cf. *id.,* §10–III, p. 633:0002 (Title VII requires an employer to eliminate pay disparities attributable to a discriminatory system, even if that system has been discontinued).

The EEOC has given effect to its interpretation in a series of administrative decisions. See *Albritton* v. *Potter,* No. 01A44063, 2004 WL 2983682, *2 (EEOC Office of Fed. Operations, Dec. 17, 2004) (although disparity arose and employee became aware of the disparity outside the charge-filing period, claim was not time barred because "[e]ach paycheck that complainant receives which is less than that of similarly situated employees outside of her protected classes could support a claim under Title VII if discrimination is found to be the reason for the pay discrepancy." (citing *Bazemore,* 478 U. S., at 396)). See also *Bynum-Doles* v. *Winter,* No. 01A53973, 2006 WL 2096290 (EEOC Office of Fed. Operations, July 18, 2006); *Ward* v. *Potter,* No. 01A60047, 2006 WL 721992 (EEOC Office of Fed. Operations, Mar. 10, 2006). And in this very case, the EEOC urged the Eleventh Circuit to recognize that Ledbetter's failure to challenge any particular pay-setting decision when that decision was made "does not deprive her of the right to seek relief for discriminatory paychecks she received in 1997 and 1998." Brief of EEOC in Support

GINSBURG, J., dissenting

of Petition for Rehearing and Suggestion for Rehearing En Banc, in No. 03–15264–GG (CA11), p. 14 (hereinafter EEOC Brief) (citing *Morgan*, 536 U. S., at 113).[6]

## II

The Court asserts that treating pay discrimination as a discrete act, limited to each particular pay-setting decision, is necessary to "protec[t] employers from the burden of defending claims arising from employment decisions that are long past." *Ante*, at 11 (quoting *Ricks*, 449 U. S., at 256–257). But the discrimination of which Ledbetter complained is *not* long past. As she alleged, and as the jury found, Goodyear continued to treat Ledbetter differently because of sex each pay period, with mounting harm. Allowing employees to challenge discrimination "that extend[s] over long periods of time," into the charge-filing period, we have previously explained, "does not leave employers defenseless" against unreasonable or prejudicial delay. *Morgan*, 536 U. S., at 121. Employers disadvantaged by such delay may raise various defenses. *Id.*, at 122. Doctrines such as "waiver, estoppel, and equitable tolling" "allow us to honor Title VII's remedial purpose without negating the particular purpose of the filing requirement, to give prompt notice to the employer." *Id.*, at 121 (quoting *Zipes* v. *Trans World Airlines, Inc.*, 455 U. S. 385, 398 (1982)); see 536 U. S., at 121 (defense of laches may be invoked to block an employee's suit "if he unrea-

---

[6]The Court dismisses the EEOC's considerable "experience and informed judgment," *Firefighters* v. *Cleveland*, 478 U. S. 501, 518 (1986) (internal quotation marks omitted), as unworthy of any deference in this case, see *ante*, at 23–24, n. 11. But the EEOC's interpretations mirror workplace realities and merit at least respectful attention. In any event, the level of deference due the EEOC here is an academic question, for the agency's conclusion that Ledbetter's claim is not time barred is the best reading of the statute even if the Court "were interpreting [Title VII] from scratch." See *Edelman* v. *Lynchburg College*, 535 U. S. 106, 114 (2002); see *supra*, at 4–14.

16    LEDBETTER *v.* GOODYEAR TIRE & RUBBER CO.

GINSBURG, J., dissenting

sonably delays in filing [charges] and as a result harms the defendant"); EEOC Brief 15 ("[I]f Ledbetter unreasonably delayed challenging an earlier decision, and that delay significantly impaired Goodyear's ability to defend itself . . . Goodyear can raise a defense of laches. . . .").[7]

In a last-ditch argument, the Court asserts that this dissent would allow a plaintiff to sue on a single decision made 20 years ago "even if the employee had full knowledge of all the circumstances relating to the . . . decision at the time it was made." *Ante,* at 20. It suffices to point out that the defenses just noted would make such a suit foolhardy. No sensible judge would tolerate such inexcusable neglect. See *Morgan,* 536 U. S., at 121 ("In such cases, the federal courts have the discretionary power . . . to locate a just result in light of the circumstances peculiar to the case." (internal quotation marks omitted)).

Ledbetter, the Court observes, *ante,* at 21, n. 9, dropped an alternative remedy she could have pursued: Had she persisted in pressing her claim under the Equal Pay Act of 1963 (EPA), 29 U. S. C. §206(d), she would not have encountered a time bar.[8] See *ante,* at 21 ("If Ledbetter had pursued her EPA claim, she would not face the Title VII obstacles that she now confronts."); cf. *Corning Glass Works* v. *Brennan,* 417 U. S. 188, 208–210 (1974). Nota-

---

[7] Further, as the EEOC appropriately recognized in its brief to the Eleventh Circuit, Ledbetter's failure to challenge particular pay raises within the charge-filing period "significantly limit[s] the relief she can seek. By waiting to file a charge, Ledbetter lost her opportunity to seek relief for any discriminatory paychecks she received between 1979 and late 1997." EEOC Brief 14. See also *supra,* at 12–13.

[8] Under the EPA 29 U. S. C. §206(d), which is subject to the Fair Labor Standards Act's time prescriptions, a claim charging denial of equal pay accrues anew with each paycheck. 1 B. Lindemann & P. Grossman, Employment Discrimination Law 529 (3d ed. 1996); cf. 29 U. S. C. §255(a) (prescribing a two-year statute of limitations for violations generally, but a three-year limitation period for willful violations).

GINSBURG, J., dissenting

bly, the EPA provides no relief when the pay discrimination charged is based on race, religion, national origin, age, or disability. Thus, in truncating the Title VII rule this Court announced in *Bazemore*, the Court does not disarm female workers from achieving redress for unequal pay, but it does impede racial and other minorities from gaining similar relief.[9]

Furthermore, the difference between the EPA's prohibition against paying unequal wages and Title VII's ban on discrimination with regard to compensation is not as large as the Court's opinion might suggest. See *ante*, at 21. The key distinction is that Title VII requires a showing of intent. In practical effect, "if the trier of fact is in equipoise about whether the wage differential is motivated by gender discrimination," Title VII compels a verdict for the employer, while the EPA compels a verdict for the plaintiff. 2 C. Sullivan, M. Zimmer, & R. White, Employment Discrimination: Law and Practice §7.08[F][3], p. 532 (3d ed. 2002). In this case, Ledbetter carried the burden of persuading the jury that the pay disparity she suffered was attributable to intentional sex discrimination. See *supra*, at 1–2; *infra*, this page and 18.

III

To show how far the Court has strayed from interpretation of Title VII with fidelity to the Act's core purpose, I return to the evidence Ledbetter presented at trial. Ledbetter proved to the jury the following: She was a member of a protected class; she performed work substan-

---

[9] For example, under today's decision, if a black supervisor initially received the same salary as his white colleagues, but annually received smaller raises, there would be no right to sue under Title VII outside the 180-day window following each annual salary change, however strong the cumulative evidence of discrimination might be. The Court would thus force plaintiffs, in many cases, to sue too soon to prevail, while cutting them off as time barred once the pay differential is large enough to enable them to mount a winnable case.

18    LEDBETTER *v.* GOODYEAR TIRE & RUBBER CO.

GINSBURG, J., dissenting

tially equal to work of the dominant class (men); she was
compensated less for that work; and the disparity was
attributable to gender-based discrimination. See *supra*, at
1–2.

Specifically, Ledbetter's evidence demonstrated that her
current pay was discriminatorily low due to a long series
of decisions reflecting Goodyear's pervasive discrimination
against women managers in general and Ledbetter in
particular. Ledbetter's former supervisor, for example,
admitted to the jury that Ledbetter's pay, during a par-
ticular one-year period, fell below Goodyear's minimum
threshold for her position. App. 93–97. Although Good-
year claimed the pay disparity was due to poor perform-
ance, the supervisor acknowledged that Ledbetter received
a "Top Performance Award" in 1996. *Id.,* at 90–93. The
jury also heard testimony that another supervisor—who
evaluated Ledbetter in 1997 and whose evaluation led to
her most recent raise denial—was openly biased against
women. *Id.,* at 46, 77–82. And two women who had previ-
ously worked as managers at the plant told the jury they
had been subject to pervasive discrimination and were
paid less than their male counterparts. One was paid less
than the men she supervised. *Id.,* at 51–68. Ledbetter
herself testified about the discriminatory animus conveyed
to her by plant officials. Toward the end of her career, for
instance, the plant manager told Ledbetter that the "plant
did not need women, that [women] didn't help it, [and]
caused problems." *Id.,* at 36.[10] After weighing all the
evidence, the jury found for Ledbetter, concluding that the
pay disparity was due to intentional discrimination.

Yet, under the Court's decision, the discrimination
Ledbetter proved is not redressable under Title VII. Each

---

[10]Given this abundant evidence, the Court cannot tenably maintain
that Ledbetter's case "turned principally on the misconduct of a single
Goodyear supervisor." See *ante,* at 12–13, n. 4.

GINSBURG, J., dissenting

and every pay decision she did not immediately challenge wiped the slate clean. Consideration may not be given to the cumulative effect of a series of decisions that, together, set her pay well below that of every male area manager. Knowingly carrying past pay discrimination forward must be treated as lawful conduct. Ledbetter may not be compensated for the lower pay she was in fact receiving when she complained to the EEOC. Nor, were she still employed by Goodyear, could she gain, on the proof she presented at trial, injunctive relief requiring, prospectively, her receipt of the same compensation men receive for substantially similar work. The Court's approbation of these consequences is totally at odds with the robust protection against workplace discrimination Congress intended Title VII to secure. See, *e.g., Teamsters* v. *United States*, 431 U. S., at 348 ("The primary purpose of Title VII was to assure equality of employment opportunities and to eliminate . . . discriminatory practices and devices . . . ." (internal quotation marks omitted)); *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 418 (1975) ("It is . . . the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination.").

This is not the first time the Court has ordered a cramped interpretation of Title VII, incompatible with the statute's broad remedial purpose. See *supra*, at 10–12. See also *Wards Cove Packing Co.* v. *Atonio*, 490 U. S. 642 (1989) (superseded in part by the Civil Rights Act of 1991); *Price Waterhouse* v. *Hopkins*, 490 U. S. 228 (1989) (plurality opinion) (same); 1 B. Lindemann & P. Grossman, Employment Discrimination Law 2 (3d ed. 1996) ("A spate of Court decisions in the late 1980s drew congressional fire and resulted in demands for legislative change[,]" culminating in the 1991 Civil Rights Act (footnote omitted)). Once again, the ball is in Congress' court. As in 1991, the Legislature may act to correct this Court's parsimonious reading of Title VII.

20        LEDBETTER *v.* GOODYEAR TIRE & RUBBER CO.

Ginsburg, J., dissenting

\*      \*      \*

For the reasons stated, I would hold that Ledbetter's claim is not time barred and would reverse the Eleventh Circuit's judgment.