## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CINDY SLANE, | : | CIVIL ACTION NO. |
|     Plaintiff, | : | 3:02 CV 00821 (AWT) |
| | : | |
| v. | : | |
| | : | |
| QUINNIPIAC UNIVERSITY | : | |
| SCHOOL OF LAW | : | |
|     Defendant. | : | |
| | : | August 31, 2007 |

## PLAINTIFF'S TRIAL BRIEF RE: STATUTE OF LIMITATIONS ISSUES

I.    INTRODUCTION

    In this case, the plaintiff Cindy Slane (hereinafter "the plaintiff" or "Slane") claims that the defendant, Quinnipiac University School of Law (hereinafter "the defendant" or "QUSL"), engaged in gender discrimination by paying the plaintiff a salary that was and is substantially lower than the compensation paid to similarly situated male faculty members. On or about June 8, 2007, QUSL filed a Second Amended Answer in which it raised for the first time statute of limitations affirmative defenses to Slane's claims that she was subjected to gender discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e and the Civil Rights Act of 1991 (Count II); and the Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. section 46a-60, et seq. (Count IV). In doing so, QUSL claimed that the recent Supreme Court decision in Ledbetter v. Goodyear Tire & Rubber Co. Inc., 127 S. Ct. 2162 (May 29, 2007), established the viability of this statute of limitations defense.

    By order dated June 27, 2007, the Court reopened discovery limited to the  issues concerning the statute of limitations defense, and directed that the parties file trial briefs addressing the statute of limitations issues in light of the Supreme Court's decision in Ledbetter,

including the legal and factual basis for tolling any applicable statute of limitations.

Procedurally, the issue before the Court must be treated as a motion for judgment as a matter of law: only if a reasonable jury would be compelled to find that the plaintiff's claims are barred by the applicable statute of limitations could the Court dismiss Counts II and IV pursuant to QUSL's affirmative defense.  As will be demonstrated below, the record evidence establishes that a reasonable jury could find that the plaintiff's cause of action under Title VII did not accrue until the plaintiff discovered -- in 2000 -- that her pay was discriminatorily low, particularly as compared to similarly situated male faculty members and that Slane's Title VII gender discrimination claims  therefore were  timely filed with the EEOC and the CHRO on November 7, 2000.   In the alternative, a reasonable jury could find that  the plaintiff's Title VII gender discrimination claims were timely filed because the running of the statute of limitations was equitably tolled until she learned of the defendant's disparate pay practices.    Finally, a reasonable jury could find that the plaintiff's  CFEPA gender discrimination claims were timely filed with the CHRO on November 7, 2000, under applicable Connecticut law.

II.     THE RELEVANT FACTS[1]

In July 1994, Cindy Slane was hired by then Quinnipiac College School of Law as Visiting Instructor of Law and Director of Field Placement (or Externship) Programs.  She began her employment on August 1, 1994.  At the time of her hire, Professor Slane was not aware of the salaries of male and female faculty performing substantially similar duties.  (Affidavit of Cindy Slane attached hereto as Exhibit A.)

At the time of her hire, Professor Slane was informed by the then-Dean Neil Cogan that

---

[1]  Unless otherwise noted, the record evidence supporting these facts was provided in connection with the Plaintiff's Memorandum in Opposition to Summary Judgment.  (See  Plaintiff's Memorandum in Opposition to Summary Judgment, Exhibits 1-9)

she was- being paid at the top of the School's salary scale for entry-level clinicians. (Id.) She had no reason to doubt the truth or accuracy of that statement. (Id.) She had no reason to believe that her salary had been set at a lower level than it would have been had she been male, nor that gender discrimination had infected the decision. (Id.)

Dean Cogan set faculty salaries after discussion with the provost. (Relevant portions of the deposition of Dean Cogan, attached hereto as Exhibit B at 7; Relevant portions of the deposition of Dean King, attached hereto as Exhibit C at 7.) David King, who held the post of Associate Dean from 1990 -- 2000 has explained that, Cogan "was very circumspect about all the law schools financial information"; that he, "kept it all to himself... he did not share,"; and that even as Associate Dean, King was not provided with any information about the salaries paid to any other faculty members. (Ex. C at 3-4; 9.) QUSL concedes that Dean Cogan did not share information about the salaries paid to individual faculty members with other members of the law school faculty, with the associate dean, or even with the executive committee.[2] (Ex. B. at 8-15; Ex. C at 7; Defendant's Interrogatory Responses and Supplemental Responses, attached hereto as Exhibit D, Response to 8.)

QUSL has had a longstanding policy of keeping the salaries paid to each member of faculty confidential. (Ex. B. at 8; Ex. C at 8; Responses to Requests for Admission, attached hereto as Exhibit E; Relevant portions of the Deposition of Dean Saxton, attached hereto as Exhibit F at 73-75.) QUSL admits that it complies with this policy. (Ex. E.) It does not publish the salary paid to each individual faculty member and does not provide any mechanism by which a faculty member -- like the plaintiff -- could learn the salaries being paid to similarly situated faculty members. (Ex. B at 8-15; Ex. D, Response 8; Ex. C at 7-8.) The current Dean, Brad

---

[2] The only exception to this was the annual raise percentages. (Exhibit D, Response 8.) Dean Cogan did announce the mean percentage increase for the faculty each year. (Id.)

Saxton, has explained that if he were asked by a member of the faculty, what a co-worker was

being paid, he would refuse to give such information.[3]  (Ex. F at 79.)  He has testified that,

> I view that as confidential information, and our policies make it confidential
> information; that we don't publish individual faculty's salary information.

(Ex. F at 79.)  Dean Cogan, who served as dean from the time of the plaintiff's hire through

2000, stated that he did not recall **ever** disclosing specific professors' salaries to other members

of the faculty, explaining that doing so would have violated QUSL's policies.  (Ex. B at 14-15;

19.)  David King, who served as interim dean from 2000 through 2002, explained that he would

have been in "big trouble" if he published salary information.  (Ex. C at 14-15.)

Faculty members, like the plaintiff, understand that salary information about other

members of the faculty is confidential and is not available to them.  (Ex. A; Ex. C at 8-9;

Affidavit of Carolyn Kaas, attached hereto as Exhibit G.) Guidelines provided by the

administration to faculty members in 1996  (1996 Guidelines attached hereto as Ex. H.)

informed the faculty that the security of payroll and other financial information was, "the

responsibility of each member of the faculty and staff."  (Ex. H.)

While there apparently is no written policy prohibiting a member of the faculty from

sharing his or her own salary information,[4] no such written directive is  necessary because the

culture at QUSL is one of privacy with respect to salary information.  (Ex A; Ex. G, Ex. F at 75-

---

[3] Dean King similarly explained if a faculty member had asked what another member of the law
school faculty was being paid, the information would probably not have been disclosed by QUSL.  (Ex. C
at 14-15.) Dean King admitted that even if a faculty member asked for the information,  explaining that
there was reason to believe that there was a violation of law occurring, he was not sure that the salary
information would have been disclosed. (Id. at 15-16.)

[4] It is hardly surprising that there is no such written policy, as it would violate the National Labor
Relations Act.  See 29 U.S.C. § 157 and § 158(a)(1). See also: NLRB v. Vanguard Tours, Inc., 982 F.2d.
62 (2.d. Cir. 1992).

76.) The practice at QUSL is that law school faculty members do not discuss their own salary information with other faculty members, and do not ask what other faculty members are being paid by QUSL. (Ex. A; Ex. F at 75-76; Ex. G.) Faculty members do not consider it appropriate to share salary information. (Ex. A; Ex. G.) Because of the QUSL policies, practices and culture, the plaintiff did not learn the salaries of any similarly situated male employees between her hire in 1994 and 1996. (Ex. A; Ex. D, response 5,6.)

Professor Slane received significant salary increases in 1995 and 1996. (Ex. A.) Her raises were considerably larger than the average raise percentage that Dean Cogan announced for each of those years. (Ex. A.) In fact, while the mean raise was generally between 3-5%, the plaintiff's first raise was 12.5%.[5] (Ex. A.) When Dean Cogan told the plaintiff about her raises in 1995 and 1996, he also told her how pleased he was with her performance. (Ex. A.) Because she had been informed that she was being paid at the top of the pay scale, at the date of her hire and had received better than average raises in the two subsequent years, the plaintiff did not suspect that she was being paid in a discriminatory manner. (Ex. A.)

In 1997, Dean Cogan offered the plaintiff a permanent position as Assistant Clinical Professor of Law and Director of Field Placement Programs. (Ex. A.) She accepted this position. (Ex. A.) Her anticipated salary for this position for year 1997/1998 was $54,000, although this salary was reduced because she was on a partial leave of absence during that academic year. (Ex. A.) Through the time that he offered the plaintiff this new position, Dean Cogan continued to praise her performance. (Ex. A.) In view of Dean Cogan's consistent praise, and because each of her raises had been well above average raise percentage, the plaintiff continued to believe that she was paid at the top of the salary range for assistant clinical professors. (Ex. A.) This, however,

---

[5] The plaintiff's starting salary for 1994-1995, when she was a Visiting Instructor of Law, was $40,000. (Ex. A.) Her salary was increased to $45,000 for 1995-1996, and to $48,000 for 1996-97. (Ex. A.)

was not the case.

In 1997, Dean Cogan offered Carmino Santaniello, a male, a position as an assistant clinical professor of law and a clinic director at a starting salary of $75,000. (Ex. A; Affidavit of Santaniello attached hereto as Exhibit I.)  This salary was $21,000 more than the plaintiff was being paid after three years of employment.    In conveying the offer, Dean Cogan told Santaniello that salaries were not a matter of public record. (Ex. I.)  Cogan also specifically requested that Santaniello not divulge the salary amount. (Ex. I.) Santaniello refused the position. At the time, he did not divulge the salary he had been offered to the plaintiff. (Ex. A.)

In 1997, after Santaniello turned down the position, Cogan hired Professor Leslie Book, a male, as Assistant Clinical Professor of Law and Director of the Tax Clinic. When Professor Book joined the Law School faculty, the plaintiff was entering her first year in her long-term contract position and held the same rank, Assistant Clinical Professor, as did Professor Book. Professor Book's initial appointment was for the nine-month, 1997-1998 academic year. His salary for that period was $75,000; his contract also provided for QUSL to pay Professor Book $5,000 for moving expenses. In addition, although Professor Book had no teaching responsibilities during the summer of 1998, he received a summer research stipend in the amount of $7,000 in addition to his salary. Thus, Book was paid significantly more than the plaintiff was being paid, despite his lesser seniority.

Neither QUSL, nor Book, informed the plaintiff what Professor Book, or any other male clinic faculty member, was being paid. (Ex. A.)  Professor Slane was completely unaware that she was being paid substantially less than a similarly situated male. (Ex. A.)    Her ignorance was not surprising.  Even then - Associate Dean King was not aware of this differential or of Book's salary. (Ex. C at 9-11; 17; 23-24.)

Between 1997 and 2000, the plaintiff continued to receive increases that were greater than the faculty mean percentage increase. (Ex. A.) Dean Cogan also continued to praise her, both publicly and privately, for the job she was doing. (Ex. A.) She, therefore, had no reason to

6

suspect that she was being paid substantially less than Professor Book.

In the Spring of 2000, Carolyn Kaas, a co-worker of Professor Slane's, was part of a team working on a proposal for the renewal of a grant from the IRS for the Tax Clinic for 2000-2001. (Ex. G.) In the course of the grant -writing process, Professor Book, who had announced his intention of leaving employment at QUSL, disclosed to Kaas his approximate salary for the 1999-2000 academic year. (Ex. G) This disclosure occurred in May 2000. (Ex. G.) Because Professor Book's approximate salary was substantially higher than she would have expected, Professor Kaas informed Professor Slane of Book's salary. (Ex. A; Ex. G: Ex. D, Response 5.) This conversation took place in mid-May 2000, while the two were attending a conference in New Mexico. (Ex. G)

On or about May 17, 2000 Professors Slane and Kaas went to Professor Book to verify the salary difference. (Ex. A) He confirmed that he was being paid about $25,000 a year more than the plaintiff - despite her greater seniority. (Ex. A)

At no time before May 17, 2000, was the plaintiff aware of the disparity between her salary and the salary being paid to Professor Book. (Id.) Prior to 2000, the plaintiff did not suspect that QUSL paid female clinic faculty less than male clinic faculty, except as appropriate based on rank and seniority or that QUSL discriminated on the basis of gender in paying faculty. (Ex. A.)

After talking to Book to confirm what he was paid, Professors Slane and Kaas wrote to QUSL's then-Dean, Neil Cogan, expressing their concerns about salary discrimination based on gender. (Ex. A) Although Cogan, who was about to end his tenure as Dean, stated that he did not believe that he had engaged in sex discrimination, he acknowledged that he had erred by setting the plaintiff's salary lower than Professor Book's, stating that "while [the plaintiff's and Professor Book's] titles were different, their duties and responsibilities were essentially the same." Despite Cogan's expression of support for pay equity between Book and the plaintiff, he made no adjustment to the plaintiff's compensation during the remaining weeks of his deanship.

The plaintiff ultimately received a 1.5% increase in salary for 2000-2001.  (Letter attached hereto as Exhibit J.) This increase did not provide her with pay equity with respect to similarly situated males.

The plaintiff then raised her concerns at the meeting with David King, who was serving as Interim Dean for the 2000-2001 academic year.  King admitted that he was shocked when he learned how little Professor Slane was being paid for the work she was performing (the plaintiff's 2000-2001 salary was $59,750), and promised to bring her concerns to QUSL administrators immediately.  The next day, Dean King told Slane and Kaas that he had advised Vice President Kavanagh and President Lahey that Professor Slane's contracts had been "biased in favor of the college from the beginning," a comment that he characterized as an "admission against interest." He also asked the plaintiff to provide QUSL with an estimate of her damages.

On or about October 24, 2000, the plaintiff provided King with a detailed damages analysis.  Slane also explained that, because of the limitations period for filing a CHRO complaint, she would have to take action to protect her claim if she and QUSL could not resolve the outstanding issues within two weeks.  King asked for more time to evaluate the proposal. Slane responded by explaining that her preference would have been to enter into a tolling agreement, but that she did not believe that she could do so because her understanding was that the CHRO would not honor tolling agreements.

On or about November 7, 2000, the plaintiff filed a complaint with the CHRO and the EEOC.  In this complaint, the plaintiff alleged that she had been discriminated against because of her gender in violation of Conn. Gen. Stat. section 46a-60, *et seq.*; the Equal Pay Act of 1964, U.S.C. 206;, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e and the Civil Rights Act of 1991.  The plaintiff filed this law suit on May 13, 2002.

In the course of discovery in this litigation, the plaintiff learned that the salary gaps between Professors Slane and Book during the three years Book was employed at the Law School

8

were as follows: $21,000 in 1997-1998; $20,750 in 1998-1999; and $21,250 in 1999-2000.[6]

During the course of discovery in this litigation, the plaintiff also learned that there is a pattern of

paying male faculty more than female faculty when they have held the same or similar clinical or

other skills faculty positions.[7]  Specifically, the defendant has produced information showing that

the salaries paid to individuals occupying Director of Legal Skills positions were:

1994-1995: (Male)      $  81,000
1997-1998: (Female)   $  56,000
1998-1999: (Female)   $  60,000
1999-2000: (Male)      $106,333.

The salaries for the Director of the Tax Clinic were:

1994-1995: (Female)   $  30,000
1995-1996: (Male)      $  80,000
1997-1998: (Male)      $  75,000
1998-1999: (Male)      $  78,500
1999-2000: (Male)      $  81,000
2000-2001: (Female)   $  70,000.

III.    THE PLAINTIFF'S TITLE VII CLAIMS ARE TIMELY FILED

A.    INTRODUCTION

Title VII of the Civil Rights Act of 1964 makes it an,"unlawful employment practice" to

discriminate "against any individual with respect to his compensation... because of such

individual's ... sex." 42 U.S.C. §§ 2000e-2(a)(1). An individual wishing to challenge an

employment practice under this provision must first file a charge with the EEOC. §§ 2000e-

5(e)(1).  Because Title VII seeks to avoid, "the pressing of stale claims," it requires aggrieved

persons to file any such charge within certain specified periods after the allegedly unlawful

_____

[6]  In addition, although Professor Book had no teaching responsibilities during the summer of 1998, he received a summer research stipend in the amount of $7,000 in addition to his salary.  During the summer of 1999, Professor Book likewise had no teaching responsibilities, and received a summer research stipend in the amount of $6,500 in addition to his salary.

[7]  The plaintiff relied on some of this information in her Opposition to Defendant's Motion for Summary Judgment.

conduct occurred. <u>Zipes v. Trans World Airlines, Inc.</u>, 455 U.S. 385, 394, (1982).   Such a charge

generally must be filed within  300 days after the alleged unlawful employment practice accrues.

See: 42 U.S.C. §§ 2000e-5(e)(1).

     The date of accrual is the date on which the statutory time limits begin to run.   See <u>Cada v.</u>

<u>Baxter Health Care Corp</u>, 920 F.2d. 446, 450 (7th Cir. 1991).  In a federal question case, like the

present one, the court must look to federal common law to determine when the federal claim is

considered to have *accrued*.  <u>Guilburt v. Gardner</u>, 480 F.3d. 140,149 (2d. Cir. 2007).   Until the

Supreme Court's May 29, 2007, decision in <u>Ledbetter</u>, 127 S. Ct. 2162, the Second Circuit had

consistently  followed the paycheck accrual rule, under which a new cause of action for gender

discrimination accrues with the issuance of each discriminatory paycheck.  <u>Forsyth v. Federation &</u>

<u>Employment Guidance Service</u>, 409 F.3d. 565, 572-573 (2d. Cir. 2005).  See also  <u>Elmenayer v.</u>

<u>ABF Freight System, Inc.</u>, 318 F.3d 130 (2d Cir, 2003)(an employer performs a separate

employment practice each time it takes adverse action against an employee, even if that action is

simply a periodic implementation of an adverse decision previously made.");  <u>Pollis v. New School</u>

<u>for Social Research</u>, 132 F.3d 115, 119 (2d Cir.1997)(noting that, "each continuation or repetition

of the wrongful conduct may be regarded as a separate cause of action for which suit must be

brought within the period beginning with its occurrence.").  In  <u>Ledbetter</u>, the United States

Supreme Court limited the application of the paycheck accrual rule, holding that a new Title VII

charging period is not triggered when an employer issues a paycheck, in the absence of: (1)

evidence of a new discrete discriminatory act accompanied by intent or (2) evidence of ongoing

intentional structural discrimination. <u>Id.</u>.

     The defendant contends that after <u>Ledbetter</u>, the plaintiff's gender discrimination claims

10

must be found to be untimely.    This is not the case.  Under federal law, a claim generally does not

accrue until such time as the plaintiff, "knows or has reason to know of the injury which is the

basis for his action". Ormiston v. Nelson, 117 F.3d. 69, 71 (2d. Cir. 1997), quoting Singleton v.

City of New York, 632 F.2d. 185, 191 (2d. Cir. 1980), cert. denied,. 450 US 920 (1981).   This

principle is referred to  as the "discovery rule" of accrual.  The Court, in Ledbetter, did not

consider whether the application of the discovery rule would delay accrual of the statute of

limitations  where, as here, the plaintiff was unaware of the wage disparity, and the Court's ruling

did not displace the existing precedent recognizing and applying the discovery rule.  See 127 S. Ct.

2177 at fn 10.

Moreover, because the filing deadline for the formal complaint is not jurisdictional,  the

filing requirement, "like a statute of limitations, is subject to waiver, estoppel, and equitable

tolling." Zipes, 455 US at 393; Irwin v. Department of Veterans Affairs, 498 US 89 (1990).

Indeed, "it is hornbook law that limitations periods are `customarily subject to equitable tolling',

[and].... Congress must be presumed to draft limitations periods in light of this background

principle".  Young v. United States, 535 US 43 49-50 (2002)(citations omitted).  Generally, such

equitable principles stop the time limits from running even though the accrual period has passed.

See: Cada, 920 F.2d. at 450-451.  The Court, in Ledbetter, did not consider whether equitable

tolling applied if the plaintiff was unaware of the disparate treatment.   As is explained below, the

discovery rule and/ or equitable principles make plain that the plaintiff's claims are timely. [8]

---

[8]  Moreover, as is explained below, the Ledbetter decision simply is not determinative as to the
plaintiff's claims under CFEPA.

B.   A REASONABLE JURY COULD FIND THAT THE PLAINTIFF'S
     TITLE VII CLAIMS ARE TIMELY DUE TO THE APPLICATION OF
     THE DISCOVERY RULE OF CLAIM ACCRUAL

     1.   The Discovery Rule Applies to Title VII Claims

The "discovery rule" is a longstanding principle of accrual that was recognized by the

Supreme Court prior to the enactment of Title VII, in the 1949 case of Urie v. Thompson, 337 US

163 (1949).   In Urie, a case concerning the accrual of a cause of action under the Federal

Employers Liability Act (FELA), the plaintiff claimed that he had developed silicosis as a result of

breathing silica dust during his more than thirty years of employment as a fireman on a steam

locomotive. Id. FELA provided that such tort claims were barred unless presented, "within three

years after such claim accrues". 28 U.S.C. §2401(b).

     The Plaintiff filed suit in 1941, and the defendant claimed the action was untimely, arguing

that,

> Urie, having been exposed to silica dust since approximately 1910 must unwittingly
> have contracted silicosis long before 1938, and hence that his cause of action must
> be deemed to have accrued longer than three years before the institution of this action...

337 US at 169.

     The Court was, therefore, required to determine when the cause of action accrued.   In

doing so, the Court considered and rejected a continuing violation theory, under which each

inhalation of silica dust was deemed a fresh violation giving rise to a new cause of action. Id. at

169. The Court also considered and rejected the theory that the claim accrued on the date that the

plaintiff unknowingly contracted silicosis. Id.   In rejecting this theory, the Court relied on the

remedial purpose of the Act and the fact that the plaintiff could not reasonably have discovered his

injury at the time that he developed silicosis, explaining that:

> If Urie were held barred from prosecuting this action.... it would be clear that the
> federal legislation afforded Urie only a delusive remedy.  It would mean that at some
> past moment in time, unknown and inherently unknowable, even in retrospect, Urie
> was charged with the slow and tragic disintegration of his lungs; under this view
> Urie's failure to diagnose within the applicable statute of limitations a disease whose
> symptoms had not yet obtruded on his consciousness would constitute waiver of his right
> to compensation at the ultimate day of discovery....  We do not think the humane legislative
> plan intended such consequences to attach to blameless ignorance.  Nor do we think
> those consequences can be reconciled with the traditional purposes of statutes of
> limitations, which conventionally require the assertion of claims within a specified period
> of time **after notice of the invasion of legal rights**....

337 US at 169-170 (emphasis added).

The Court in Urie, therefore, rejected the argument that a cause of action must be found to

have accrued at the time of actual injury, and held that the cause of action accrued at the time that

the plaintiff learned of his injury.  The Court, in selecting this date noted specifically that, "there is

no suggestion that Urie should have known that he had silicosis at any earlier date".  Id.

The Court expounded on the "discovery rule" in United States v. Kubrick, 444 US 111,

(1970).  In that case, the plaintiff knew of his injury and its probable cause in January 1969, but

did not bring suit until 1972.  Id.  The district court found for Kubrick and awarded damages, and

the Third Circuit Court of Appeals affirmed this verdict, holding that Kubrick's claim did not

accrue until he knew or should have known that his treatment  constituted medical malpractice.

444 US at 118.


The Supreme Court,  noting that the plaintiff had learned the **cause** of his injury but had

failed, for over two years, to determine if the injury was the result of malpractice, rejected this rule

of accrual.  444 US  at f.n. 10. The Court explained that the statute of limitations begins to run

when the plaintiff knows or has reason to know that he has been injured- even if the plaintiff is

13

unaware that the injury constitutes a legal wrong.[9]  This principle has become known as the discovery rule of accrual.

Federal courts generally apply the discovery accrual rule whenever a statute is silent on the issue.[10]  See: Rotella v. Wood, 528 US 549, 555 (2000). The United States Supreme Court has not explicitly stated  that the discovery rule applies to Title VII claims. See:  Ledbetter, 127 S. Ct. at fn 10, (noting that, "[b]ecause Ledbetter does not argue that such a rule would change the outcome in her case, we have no occasion to address this issue"); National Railroad Passenger Corporation  v. Morgan, 536 U.S. 101, at fn 7 (2002)(same).   However,  the federal courts have implicitly accepted the discovery rule and have applied it to determine the accrual date in  Title VII claims.

In Delaware State College v. Ricks, 449 U.S. 250 (1980), the Court had to consider when a cause of action accrued under Title VII.   In that case, the plaintiff had been denied  tenure, but had been given a final, one-year nonrenewable contract. 449 US at 253-254.   Ricks did not file a charge with in 300 days of having learned that he had been denied tenure, but did file within 300

---

[9]As the Court explained,

We thus cannot hold that Congress intended that "accrual" of a claim must await  awareness by the plaintiff that his injury was negligently inflicted.  A plaintiff, such as Kubrick, armed with the facts about the harm done to him, can protect himself by seeking advice in the medical and legal community.  To excuse him from promptly doing so by postponing the accrual of his claim would undermine the purpose of the limitations statute, which is to require the reasonably diligent presentation [of claims].

444 US at 122-123.

[10]  Virtually every circuit has found that the discovery rule applies in federal question cases in the absence of a contrary directive from Congress. See Connors v. Hallmark & Son Coal Co., 935 F.2d. 336 (DC Cir. 1991); Torres v. Superintendant of Police of Puerto Rico, 893 F.2d 404, 405 (1st Cir. 1990 ); Cullen v. Margiotta, 811 F.2d. 698, 725, (2d. Cir. 1987) cert. denied 483 US 1021 (1987); Keystone Insurance Co. v. Houghton, 863 F.32d. 1125, 1127 (3rd Cir. 1988); Jensen v. Snellings, 841 F.2d. 600, 606 (5th Cir. 1988); Dixon v. Anderson, 928 F.2d 212, 215 (6th Cir. 1991);  Cada v. Baxter Healthcare Corp, 920 F.2d. 446 (7th Cir. 1990); Alcorn v. Burlington Northern RR. Co., 878 F.2d. 1105, 1108 (8th Cir. 1989); Alexopululos v. San Francisco Unified School Dist., 817 F.2d. 551,555 (9th Cir. 1987); Corn v. Lauderdale Lakes, 904 F.2d. 85, 588 (11th Cir. 1990). But see Hamilton v. 1st Source Bank, 928 F.2d. 86, 87-90(4th Cir. 1990)(en banc).

days of his termination.  Id.    He claimed that his claim was timely, arguing that the EEOC

charging period for his termination claim ran from the date of his actual termination. 449 US at

254.   The majority rejected this argument, finding that the termination was a, "delayed but

inevitable consequence of the denial of tenure".  Id.  at 257-258.

> The Court explained that in determining when a cause of action accrues,

> the proper focus is on the time of the *discriminatory acts,* not upon the time at which
> the *consequences* of the acts became most painful... The emphasis is not upon the effects
> of earlier employment decisions; rather it is [upon] whether any present *violation* exists....
> In this case the only alleged discriminatory act is the denial of tenure sought by a college
> professor, with the termination of employment not occurring until a later date.

Id. at 258, citations omitted.

However,  the Court did not suggest that the cause of action accrued **solely** upon the

occurrence of the  illegal act.    Instead, the Court found that the statute of limitations began to run

at the time that the allegedly discriminatory decision, "was made and **communicated to Ricks**".

449 US at 258 (emphasis added).   Thus, the Court applied the discovery rule,  implicitly

concluding that the claim accrued when the plaintiff discovered his injury.   In doing so,  the Court

noted,

> the limitations periods should not commence to run so soon that it becomes difficult
> for a layman to invoke the protection of the civil rights statutes..... But, for the reasons
> we have stated, there can be no claim here that Ricks was not abundantly forewarned.

449 U.S. at fn 16, citations omitted.

The Court reiterated this discovery requirement in Chardon v. Fernandez, 454 US 6 (1981).

The plaintiffs in that case argued that the cause of action accrued on the date of termination, and

not on the earlier date that they were notified of the impending  termination.    In a per curiam

decision,  the Court rejected this argument, explaining that  the cause of action accrued when, "the

operative decision was made --**and notice given...**". Id. at 8 (emphasis added).

In National Railroad Passenger Corp. v. Morgan, 536 US 101, (1990) the Supreme Court again considered the question of when a Title VII cause of action accrued. In Morgan, the plaintiff alleged both that he had been subjected to a hostile environment and that he had been subjected to continuing retaliatory and discriminatory discipline from the time of his hire in August 1990 through to his filing of a claim in February 1995. 536 US at 105-106. While some of the allegedly illegal acts occurred within the 300 days prior to his filing with the EEOC, many did not. Id. The plaintiff claimed that the claim was timely based a continuing violation theory. Id. at 107.

The Court unanimously rejected the continuing violation theory with respect to discrete acts of discrimination. 536 US at 109-110. The Court noted that a "discrete" act, such as a termination, failure to promote, denial of transfer, or refusal to hire, is independently actionable as an "unlawful employment practice" under Title VII and will generally "occur" on the day that it happens.[11] Id. However, the Court acknowledged that,

> [t]here may be circumstances where it will be difficult to determine when the time period should begin to run. **One issue that may arise in some circumstances is whether the time begins to run when the injury occurs as opposed to when the injury reasonably should have been discovered...**

---

[11] The Court distinguished between discrete acts of discrimination and a hostile work environment. The Court explained that a hostile work environment, consists of a series of harassing acts, each of which "may not be actionable on its own." 536 US at 115-116. The Court explained that a hostile environment claim would, therefore, be considered timely as long as at least one of the individual harassing acts occurred within the charging period. Id. at 117.

The Court found that, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.... The existence of past acts and the employees prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim....". 536 US at 114.

536 US at fn 7[12] (emphasis added)   Noting that  the plaintiff did not claim that he was unaware of the discrete acts of which he complained, the majority opinion did not explicitly adopt a discovery rule of accrual for Title VII claims.   Id.   However,  Justice O'Connor, joined by Chief Justice Rehnquist and Justice Breyer, indicated in a separate opinion that,

> some version of the discovery rule applies to discrete-act claims... In my view... the charge-filing period precludes recovery based on discrete actions that occurred more than 180 or 300 days after the employee had, or should have had, notice of the discriminatory act.

536 US at 124.

The Second Circuit, and virtually every other Federal Court of Appeals  that has considered the issue, has applied the discovery rule of accrual to employment discrimination and civil rights cases.[13]   In Harris v. City of  New York, 198 F.3d. 243, 247-248, (2d. Cir. 1999), for example, the

---

[12]  The Court also  explained that the time period for filing a charge of discrimination is subject to equitable tolling and estoppel. 536 US at 113.

[13]    See Harris v. City of  New York, 198 F.3d. 243, 247, (2d. Cir. 1999)(applying discovery rule to ADA and Title VII claims); Cornwall v. Robinson, 23 F.3d. 694, 703 (2nd Cir. 1994);  Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1385-1386 (3rd Cir. 1994)(applying discovery rule to Title VII claim); Pobodnik v. U.S.P.S., 409 F.3d 584, 590 (3rd Cir. 2005)(applying discovery rule to ADEA claim); Merrill v. Southern Methodist University, 806 F.2d. 600, 604-605 (5th Cir. 1986)(applying discovery rule to Title VII claim); Jones v. Alcoa, 339 F.3d. 359, 364 (5th Cir. 2003)(applying discovery rule to §1981 claim); Sharpe v. Cureton, 310 F3d. 259, 266 (6th Cir. 2002)(applying discovery rule to §1983 claim); Cada v. Baxter Healthcare Corp., 920 F.2d. 446, 450 (7th Cir. 1990)(applying discovery rule to ADEA claim); Tolle v. Carroll Touch Inc., 977 F.2d. 1129, 1140-1141 (7th Cir. 1992)(applying discovery rule to ERISA claim, "[b]ecause the purpose of Section 510, like intentional employment discrimination cases, is to prevent actions taken for an unlawful purpose, it is the decision and the participants discovery of this decision that dictates accrual"); Galloway v. General Motors Service Parts Operation, 78 F.3d. 1164 (7th Cir. 1996)(noting that discovery rule applies to Title VII claims); Dring v. McDonnell Douglas Corp., 58 F.3d. 1323, 1328 (8th Cir. 1995)(noting that accrual date for ADEA purposes is the date on which the plaintiff is given notice of the adverse action); Norman- Bloodsaw v. Lawrence Berkely Laboratory, 135 F.3d. 1260 (9th Cir. 1998)(applying discovery rule to Title VII and ADA claims); Hulsey v. Kmart, Inc.43 F.3d. 555, 557 (10th Cir. 1994)(accrual date for ADEA is date that employee is notified of adverse action); Davidson v. America Online Inc., 337 F.3d. 1179 (10th Cir. 2003)(accrual date for ADA is date that employee is notified of adverse action); Stafford v. Muscogee County Board of Education, 688 F.2d. 1383, 1390 (11th Cir. 1982). But see Hamilton, 928 F.2d. at 87-90 (rejecting discovery rule but noting that, "to the extent notice enters the analysis, it is notice of the employer's actions, and not notice of a discriminatory effect or motivation" ).  See also Clark v. Sears Roebuck & Co., 816 F. Supp. 1064, 1068-1069 (applying discovery rule to §1981 and Title VII wage discrimination claims); Rolax v. Whitman, 175 F. Supp.2d 720 (DNJ 2001)(noting that under discovery rule the cause of action accrued when plaintiff received sufficient notice of injury to alert her of need to investigate); Inglis v. Buena Vista University, 235 F. supp.2d. 1009 (ND

17

Second Circuit Court of Appeals unambiguously applied the discovery rule of accrual to Title VII and ADA claims, explaining that the cause of action in an employment discrimination case accrues when the plaintiff, "knew or had reason to know of the injury serving as the basis for his claim".[14] 198 F.3d. at 247-248 (citations omitted). See also <u>Pearl v. City of Long Beach</u>, 296 F.3d. 76, 80 (2d. Cir. 2002) (discussing discovery rule in context of §1983 claims); <u>Carrion v. Coca- Cola Bottling Co. of New England</u>, 2006 WL 3526748 (D. Conn. 2006); <u>Heins v. Potter</u>, 271 F. Supp. 2d. 545 (SDNY 2003).  Thus, there is overwhelming authority supporting the application of the discovery rule to Title VII claims.[15]

> ### 2.    The Supreme Court's Decision in *Ledbetter* Does Not Address Whether the Discovery Rule Would Delay Accrual of the Plaintiff's Claims

The defendant may argue that the Supreme Court's decision in  <u>Ledbetter</u>, conclusively establishes that the plaintiff's claims in this case are untimely-- even if the discovery rule is applied. However, a close examination of the facts and holding of <u>Ledbetter</u> shows this argument to be

_____

Iowa 2001)(applying discovery rule to Title VII wage discrimination claim).

[14] In <u>Harris</u>, 186 F.3d. at 248, the Court applied the discovery rule to, *inter alia* claims that the plaintiff had been discriminatorily denied an opportunity to earn extra vacation days, and had been denied a promotion.  The Court did not dismiss the claim that the plaintiff had been denied the ability to earn vacation days because of his gender, noting that the critical inquiry would be, "when Harris discovered he was not permitted to earn extra vacation days and when he learned that female officers were". <u>Id.</u> However, the Court found that the promotion claim was untimely based on the date that the plaintiff should have- with reasonable diligence- discovered the injury.   The Court explained,

> a Personnel Bureau memo... stated that the Police department's policy was that it would, not promote any officer on less than full duty.  That policy statement, combined with the normal expiration date [4 years] of the sergeant eligibility list, should at least have triggered Harris' inquiry about his status by or immediately after [the list expired].... Because Harris did not file his first EEOC charge until August 31 1994, which was more than 300 days after he should have known he was passed over for promotion to sergeant, his ADA claim based on that injury is time barred.

<u>Id.</u> at 247-248.

[15]   In addition, applying the discovery rule is consistent with the Supreme Court's  admonition that Title VII is a remedial statute which should be construed in favor of those whom the statute was designed to protect.  <u>Zipes</u>, 455 US at 397-398; <u>Love v. Pullman Co.</u>, 404 US 522, 527 (1972).

specious.[16]

Lilly Ledbetter worked for Goodyear Tire and Rubber Company from 1979 until 1998. Ledbetter, 127 Sup. Ct. at 2165. During much of this time, salaried employees at the plant were given or denied raises based on their supervisors' yearly evaluation of their performance. Id. In early 1992,[17] Ledbetter was selected to be part of a start-up team for a new section of the Tire Assembly business center. Ledbetter, 421 F.3d. at 1173. From the summer of 1992 until the beginning of 1996, Ledbetter was supervised by Mike Tucker, who generally ranked Ledbetter at or near the bottom of her co-workers in terms of performance.[18] Id. In 1996, Ledbetter was transferred to the ARF room under supervisor Jerry Jones. Id. at 1174. Jones told Ledbetter that the transfer was due to her substandard performance.[19] Id. Ledbetter remained in this position through 1997. 421 F.3d. at 1174 She did not receive any salary increases during this period.[20] 421 F.3d. at 1174.

Throughout 1997, Jones spoke to Ledbetter about her performance, and suggested that she seek a transfer. Id. Eventually Ledbetter did seek and receive a transfer, beginning in a new position in January 1998. 421 F.3d. at 1174. Her performance for year 1997 was evaluated by

---

[16] The Supreme Court decision does not include a detailed discussion of the relevant facts. See Ledbetter, 127 Sup. Ct. at 2162. The plaintiff, therefore, relies in large part on the appellate court decision, Ledbetter v. Goodyear Tire & Rubber Co. Inc., 421 F.3d. 1169 (11th Cir. 2005), and the Joint Appendix submitted by the parties to the Court. (Joint Appendix 2006 WL 2612645 (2006), attached hereto as Attachment 1).

[17] The record discloses very little about Ledbetter's comparative pay during the first dozen years of her employment. Ledbetter, 421 F3d. 1169 at 1173 (11th Cir. 2005); The record is silent as to how Ledbetter's salary or the merit-based raises she received compared to her male peers prior to 1992. Id.

[18] Ledbetter did not, at that time, file charges with the EEOC complaining about the poor evaluations or the poor raises that resulted from these evaluations.

[19] Ledbetter did not file charges with the EEOC at that time about the transfer.

[20] According to the defendant, Ledbetter did not receive an evaluation or an increase for year 1996, because she- along with male employee Jimmy Todd- was slated for layoff. 421 F.3d. at 1174. Ledbetter did not file a charge with the EEOC in 1997 over the denial of the evaluation and increase.

supervisor Kelly Owen.  Id. at 1174-1175.  Owen rated her 23rd out of 24 employees,  and in

February 1998 decided against recommending her for a raise.  Id. at 1174-1175, 1180.    In  July

1998,  Ledbetter filed charges with the EEOC, claiming, *inter alia,* that her pay was discriminatorily

low due to pervasive discrimination against female managers at Goodyear.  Id. at 1175.

At trial, Goodyear asserted that only the claim related to the 1998 pay decision made by

Owen was timely.  421 F.3d. at 1180.  However, the trial court permitted Ledbetter to introduce

evidence of allegedly discriminatory decisions made over a nineteen year period.  Id. at 1175.  In

particular, Ledbetter was permitted to introduce testimony about the discriminatory animus that she

believed tainted her evaluations and pay during the 1990's.

Ledbetter testified that during the 1990's, auditor Michael Maudsley  had input into her

evaluations. (Joint App. 2006 WL 2612645 at page 21, *46)   She explained that while working for

Goodyear in the 1980's she had been subjected to sexual harassment by Maudsley,  then her

manager.[21]    (Joint App. 2006 WL 2612645 at page 19, *40)   According to Ledbetter, she

confronted Maudsley when he  began to treat her unfairly in the 1990's, and he once again subjected

her to sexual harassment and gender  discrimination.   (Joint App. 2006 WL 2612645 at page 21,

*46)  She explained,

> I went to Mike and asked him why did he continue to downgrade my department and
> downgrade my reports when he know that they was there and it was– it's good and better
> then (sic) most.  And he said, well, hell, it's a lot easier to downgrade you.  He said, you're
> just a little female and these big old guys, I mean, they're going to beat up on me and push
> me and cuss me.   And said, I know you're not going to cuss back.  He said, hell, it's a lot
> easier to write you up..... He continued to ask me out, go out with him.  And I finally told

---

[21]  Ledbetter testified that during the early 1980's Maudsley told her that he would give her a
better evaluation if she would meet him at a Ramada Inn.  (Joint App. 2006 WL 2612645 at page 19, *40)
Ledbetter filed  a sexual harassment charge with the EEOC that was resolved in 1982 or 1983.  (Joint
App. 2006 WL 2612645 at page 19-20,  *42)  As part of this resolution, Ledbetter was transferred away
from Maudsley.  Id.

him no.  And then from that standpoint, my evaluations, the audits got worse.

Id.

Ledbetter also testified that Jerry Jones, her supervisor in 1996 and 1997, had a history of gender discrimination.   She testified that during the 1980's she had reported Maudsley's harassment to Jones, then a human resources official. (Joint App. 2006 WL 2612645 at page19, *41-42)  She testified that he responded by telling her that the defendant would "get rid of her" and that the defendant did not  need "troublemakers" like her.  (Joint App. 2006 WL 2612645 at page19, *41-42)  Thus, Ledbetter claimed that the poor evaluations and poor increases that she received in the 1990's were based, in relevant part, on her gender.   It was undisputed that Ledbetter was aware of this injury and it's cause at the time of the events.

After  the jury found  the plaintiff's favor as to the pay discrimination claims, Goodyear appealed, claiming that because Ledbetter had not filed a timely claim over the poor raises between 1992 and 1997, Ledbetter's claims were restricted to Owen's denial of a raise in 1998. (421 F.3d. at 1177)  Goodyear  argued that no reasonable jury could have found that the 1998 denial of a raise was discriminatory. (Id.)  The Eleventh Circuit agreed with Goodyear on both points and Ledbetter appealed to the Supreme Court.

On appeal, Ledbetter argued that she had been subjected to ongoing pay discrimination. Specifically, Ledbetter argued that she had received poor reviews because of her gender, and that as a result her  raises were poorer than they should have been.   127 Sup. Ct. at 2167.   However, she did not claim  that she had been unaware of the poor reviews or the poor raises at the time of the events. Id.  Nor did she contend that her claims were timely because she had been  unaware that similarly situated males had been treated more favorably.    Instead, she argued that her claims were timely

21

because the receipt of each paycheck triggered a new charging period.  127 Sup. Ct. at 2167.

In a five to four decision, the Court rejected this argument.  The majority - Justices Alito, Roberts, Scalia, Kennedy, and Thomas -- found that  Ledbetter's claims of sex discrimination, "turned principally on the misconduct of a single Goodyear supervisor, who allegedly retaliated against her when she rejected his sexual advances during the early 1980's, and did so again in the mid-1990's when he falsified deficiency reports about her work."  127 Sup. Ct. at fn 4.  Because the Court found that Ledbetter was merely complaining about the continued effects or consequences of acts taken with discriminatory intent in the early 1990's, and had not produced evidence of either ongoing structural discrimination or a discrete discriminatory act within the charging period, the Court held the claim to be untimely.  127 Sup. Ct. at 2167, 2174.

Justices Ginsberg, Stevens, Souter and Breyer dissented, arguing  that pay cases were inherently different from other types of discrimination.[22]    127 Sup. Ct. at 2179.   The dissent suggested that the remedial purposes of Title VII would be better served by treating  each paycheck

---

[22]  The dissent noted that,

[t]he realities of the workplace reveal why the discrimination with respect to compensation that Ledbetter suffered does not fit within the category of singular discrete acts "easy to identify." A worker knows immediately if she is denied a promotion or transfer, if she is fired or refused employment. And promotions, transfers, hirings, and firings are generally public events, known to co-workers. When an employer makes a decision of such open and definitive character, an employee can immediately seek out an explanation and evaluate it for pretext. Compensation disparities, in contrast, are often hidden from sight. It is not unusual, decisions in point illustrate, for management to decline to publish employee pay levels, or for employees to keep private their own salaries.... Tellingly, as the record in this case bears out, Goodyear kept salaries confidential; employees had only limited access to information regarding their colleagues' earnings....

The problem of concealed pay discrimination is particularly acute where the disparity arises not because the female employee is flatly denied a raise but because male counterparts are given larger raises. Having received a pay increase, the female employee is unlikely to discern at once that she has experienced an adverse employment decision. She may have little reason even to suspect discrimination until a pattern develops incrementally ....

127 Sup. Ct. at 2181-2182.

that was infected by discriminatory animus as an unlawful employment practice.

The Court rejected this argument, explaining that not every pay discrimination case involves cumulative injuries or hidden pay disparities, and noting that under the rule proposed by the dissent,

> if a single discriminatory pay decision made 20 years ago continued to affect an employee's pay today, the dissent would presumably hold that the employee could file a timely EEOC charge today. And the dissent would presumably allow this even if the employee had full knowledge of all of the circumstances relating to the 20-year-old decision at the time it was made.

Id. at 2175.

While the majority unambiguously rejected the idea that every discriminatory pay decision should be deemed to be continuing for as long as the employee continued to receive a paycheck tainted by discriminatory animus, it left open the question of whether or not the discovery rule could apply in cases where the plaintiff was unaware of the discriminatory conduct at the time of the events. 127 Sup. Ct. at 2177, fn 10. Noting that Ledbetter made, "no claim that intentionally discriminatory conduct occurred during the charging period or that discriminatory decisions that occurred prior to that period were not communicated to her," and that, "Ledbetter does not argue that [the discovery rule] would change the outcome in her case", the Court declined to address the question of when and how the discovery rule would apply to pay discrimination claims under Title VII. 127 Sup. Ct. at 2169, and at fn 10.

The issue in the present case is when, under the discovery rule, a disparate pay claim accrues. The Supreme Court. in deciding Ledbetter simply did not address this issue. However, as is explained below, it is apparent that under the discovery rule, the plaintiff's claims did not accrue until she learned that she was being subjected to disparate treatment with respect to pay.

2.    A Reasonable Jury Could Find that Under the Discovery Rule
the Plaintiff's Claims are Timely

The, "polestar of the discovery rule is not the plaintiff's actual knowledge of injury but rather whether the knowledge was known or through the exercise of reasonable diligence knowable to the plaintiff". Carrion, 2006 WL 3526748 at *2-3, quoting Oshiver, 38 F.3d at 1386.  A cause of action does not accrue when a person has a, "hunch, hint, suspicion or rumor" of an injury. Heins, 271 F. Supp.2d at 545, quoting Kronisch v. United States, 150 F.3d. 112, 121 (2d. Cir. 1998). Instead, the claim accrues when the plaintiff either discovered, or with the exercise of reasonable diligence should have discovered,  the critical facts of the injury and its cause.   Heins, 271 F. Supp.2d at 545.

The discovery rule is concerned with the date of awareness of injury- and not the date on which the plaintiff became aware that the injury was the result of a legal wrong. See Heins, 271 F. Supp.2d at 545; Carrion, 2006 WL 3526748 at *3, and citations therein.   Once the plaintiff discovers or should have discovered the fact of the injury and its cause, the cause of action accrues, even if  it would have been *impossible* for the plaintiff to know that the injury was the result of discrimination.[23] Heins, 271 F. Supp.2d at 545;  Carrion, 2006 WL 3526748 at *3.  "[D]iscovery of the injury, not discovery of the other elements of a claim, is what starts the clock".  Rotella, 528 US at 555.

Consequently, the plaintiff's claims are untimely, as the defendant contends, only if she knew, or with reasonable diligence should have known, of the critical facts concerning her injury more than 300 days prior to the filing of her CHRO claim.    In the employment context, the fact of

---

[23] However, as is explained below, the cause of action may be subject to equitable tolling under such circumstances.

24

an injury is usually readily apparent to an aggrieved employee, with only the allegedly illegal motive hidden.  An employee who is informed that  he will be terminated knows at that moment that he will eventually  suffer a detriment.  Similarly, the employee who is  denied a promotion, training, or an increase to which the employee believes he is entitled will know at once that there has been or will be an injury.  Under the discovery rule, therefore, the cause of action in such situations accrues when the employee learns or should have learned of the impending termination, the denial of the promotion, or the denial of the increase- even if the discriminatory motive for the decision remains unknown.  See Harris, 186 F.3d. at 251.

The setting and subsequent receipt of a salary, however, would not be perceived by a reasonable, diligent employee as an *injury*.  Being paid is simply not a detriment- particularly where, as here, the plaintiff was under the reasonable impression that her pay was comparable or better than  that of her peers.  The plaintiff would not,  merely by being paid, be, "armed with the facts about the harm done to [her]," sufficient to put her on notice that she should, "protect [herself] by seeking advice in the ... legal community".  See Kubrick, 444 US at 122-123.

This is not a case like Ledbetter in which the injury complained of is a negative evaluation, resulting in a poor raise; in such a case, the employee will know of the harm upon receiving the evaluation.   Nor is this a case in which the plaintiff was denied  a raise or  hired at a salary which she-- at the time-- believed to be improper.   The diligent employee, in those circumstances, would also be aware of an injury.   Instead, the decision at issue is the defendant's decision to pay similarly situated males more than the plaintiff.   The discrete acts complained of are the defendant's actions in paying male and female clinical faculty differently.  The injury, therefore,  is the disparity between the pay received by the plaintiff and that received by others.  Under the discovery rule, it is not until the plaintiff knew or should have known of that disparity that the cause of action can be deemed to

have accrued.[24] See <u>Clark v. Sears Roebuck & Co.</u> 816 F. Supp. 1064, (ED PA. 1993); <u>Harris.</u>, 186 F.3d. at 251.  See also <u>O'Connor v. Viacom, Inc.</u>, 1994 WL 273378 at *2 (SDNY 1994).

     In the non-precedential case of <u>Adams v. CBS Broadcasting</u>, 61 Fed. Appx. 285 (7th Cir. 2003) the Court addressed similar facts and explained,

> We agree with Adams that the district court should have applied the discovery rule, and that she filed her charge within Title VII's 300 day limit.  Adams could not have known on the day she was hired that she was being paid less than other employees with the same level of experience.  To the contrary, she could have reasonably believed just the opposite after WBBM offered her a salary higher than she was entitled to under the CBA.   She would not have suspected that better paid technicians had no more experience than she until co-workers told her in March 1999 that she was underpaid.  Therefore, her claim accrued in March 1999, and her EEOC charge was filed no more than 294 days later.

<u>Id.</u> at 288.


     Prior to May 2000, the plaintiff did not know  that she was being injured with respect to her pay.   On the contrary, because Professor Slane had been told by  Dean Cogan that her starting salary was at the top of the salary range for newly hired clinical faculty members,  and because she knew that her raises were well above the reported  average raises, Professor Slane reasonably believed that her pay was comparable to her peers.   It is undisputed that it was not until after  May 2000, that the plaintiff knew that her pay was substantially lower than that of Professor Book, and that it was not until after she filed the instant litigation in federal court that she learned of the defendant's pattern of paying female clinical and skills faculty less than male clinical and skills faculty for similar work.   Thus, a reasonable jury could find that Slane filed her claim within 300 days of learning the critical facts of her injury.

---

    [24] Of course,  once the plaintiff  knew or should have known of the disparity- the injury- the cause of action would accrue, even if the discriminatory motive for the disparity in pay remained unknown. <u>Harris</u>, 186 F.3d. at 251.

Furthermore, a reasonable jury could find that Professor Slane could not, with the exercise of reasonable diligence, have learned of her injury prior to May 2000.   QUSL does not publish individual faculty salaries.  It is undisputed that QUSL treats such information as confidential.  It is also undisputed that Dean Cogan did not share faculty salary information with other faculty, with his Associate Dean, or even with the executive committee. (Ex. B at 8-15; Ex. D, Response 8.)   As Associate Dean King  has explained, Cogan, "kept [financial and salary information] all to himself... He did not share". (Ex. C at 3-4,; 9.)    King, himself, did not know the salary information when he served as Associate Dean, and testified that had he known he would not have published the information because doing so would have caused, "big trouble".  (Ex. C. at 14-15.)   Current Dean Saxton likewise admits that if asked he would refuse to share such information.  (Ex. F at 79.) Thus, it would not have been possible for the plaintiff  to learn the salaries of her male peers from QUSL.

The defendant may argue that the plaintiff could have asked each individual co-worker what he or she earned.   As an initial matter, a diligent employee would simply not have suspected disparate pay, and would therefore not have been on notice of any need to inquire.   Moreover, even if the plaintiff  had had a hunch or a hint that she was being injured and had sought salary information from each of her co-workers,  it is unlikely that the law school faculty members would have agreed to share such confidential  information.  The culture at QUSL was to keep this information private.   In fact, the faculty members had been instructed by  QUSL that it was their responsibility to keep such  financial information secure.   Dean Cogan had also asked at least one applicant not to share  information about the salary he had been offered with his peers. Consequently, a jury could find that a reasonably diligent employee in the plaintiff's position could not have discovered QUSL's  disparate salary decisions until May 2000.

Viewing the facts in the light most favorable to the plaintiff, a jury also could find that the plaintiff did not know the critical facts of injury and causation until May 2000, and could not have learned these critical facts earlier with the exercise of reasonable diligence. The plaintiff, therefore, respectfully requests that this Court find that the discovery rule applies to the plaintiff's Title VII claims, and instruct the jury at trial so that the jury may determine as a matter of fact when the cause of action accrued.

C.    A REASONABLE JURY COULD FIND THAT THE PLAINTIFF'S TITLE VII CLAIMS ARE TIMELY DUE TO THE APPLICATION OF EQUITABLE TOLLING

Even if the discovery rule did not apply, the case is timely filed under principles of equitable tolling.[25]  Filing limitations under Title VII are subject to equitable modifications, such as tolling. Zipes, 455 US at 393.  While Title VII's filing requirements are subject to equitable tolling, these time limits may not be disregarded for reasons of sympathy.  See Baldwin v. County Welcome Center, 466 US. 147 (1984) The burden of demonstrating the applicability of equitable tolling is on the party seeking such tolling.  Boos v. Runyon, 201 F.3d. 178, 185 (2d. Cir. 2000); Miller v. International Tel. & Tel. Corp., 755 F.2d. 20,24 (2d. Cir. 1985).

> The essence of the [equitable tolling] doctrine is that a statute of limitations does not run against a plaintiff who is unaware of his cause of action.

---

[25] There are three terms used to described the equitable principles used to toll statutes of limitations:  equitable estoppel, equitable tolling and fraudulent concealment.  See Pearl, 296 F.2d. at 81. These terms are used interchangeably, are often confused,  and appear to have different meanings in different jurisdictions.  Because of this, reliance on case law outside of this circuit is of limited utility.   The Second Circuit has explained that equitable estoppel applies when a plaintiff knows of his cause of action, but the defendant's conduct causes the plaintiff to delay in filing the claim.  Cerbone v. International Ladies Garment Workers Union, 768 F.2d. 45, 49-50 (2nd. Cir. 1985).  Equitable estoppel, therefore, does not apply in this case.   Equitable tolling applies where the plaintiff is ignorant of the cause of action, and tolling is deemed appropriate as a matter of fairness.  Id. at  48.  Fraudulent concealment of a cause of action is a term sometimes used to describe a particular type of equitable tolling.  Id. at 49.  However, other cases have disapproved of the use of this term. See Caputo v. Pfizer, 267 F.3d. 181, 188-189 (2d. Cir. 2001).  In the present action,  the plaintiff claims that if the Title VII cause of action accrued prior to May 2000, it was equitably tolled.

<u>Dillman v. Combustion Engineering Inc.</u>, 784 F.2d. 57, 60 (2d. Cir. 1986), quoting <u>Cerbone v. International ladies' Garment Workers Union</u>, 768 F.2d. 45, 48 (2d. Cir. 1985).

The  discovery rule and the principles of equitable tolling are related and are sometimes confused.  <u>Pearl</u>, 296 F.3d. at 80.   As was explained above, when a plaintiff could not through reasonable diligence discover that she has been injured, the discovery rule applies and the cause of action has not accrued.   However,

> when a plaintiff knows or should have known of his injury- i.e.  his claim has accrued-but the defendant's wrongful, affirmative acts prevent him from learning about other facts that might support a cause of action, then tolling may apply.  In other words, tolling only applies once a claim has accrued....

<u>Heins</u>, 271 F. Supp. 2d.  at 554.

The filing deadline for a discrimination claim may be subject to equitable tolling if:  (1) the plaintiff has acted with reasonable diligence during the period she seeks to have tolled; and (2) the plaintiff has shown that the circumstances are so extraordinary that the doctrine should apply. <u>Zerilli-Edelglass v. New York City Transit Authority</u>, 333 F.3d 74, 80-81 (2d Cir.2003), citing <u>Smith v. McGinnis</u>, 208 F.3d 13, 17 (2d Cir.2000) and <u>Johnson v. Nyack Hosp.</u>, 86 F.3d 8, 12 (2d Cir.1996); see also <u>Warner v. Asplundh Tree Expert Co.</u>. 2003 WL 22937718 (D. Conn. 2003). Extraordinary circumstances justifying equitable tolling may exist if the plaintiff can show that, "it would have been impossible for a reasonably prudent person to learn that his discharge was discriminatory".  <u>Pearl</u>, 296 F.3d 76, at 85; <u>Miller v. Int'l Tel. & Tel. Corp.</u>, 755 F.2d 20, 24 (2d Cir.1985).  See Also: <u>Cerbone</u>, 768 F.2d. at 49; <u>Kennedy v. Saint Francis Hospital</u>, 225 F. Supp.2d. 128, 134-135 (D. Conn. 2002);   <u>O'Connor</u>, 1994 WL 273378.   Alternatively, extraordinary circumstances may exist if the plaintiff can show that the defendant's misleading or fraudulent

conduct  prevented the plaintiff from learning the  facts that would support a cause of action.[26]

Miller v. Int'l Tel. & Tel. Corp., 755 F.2d 20, 24 (2d Cir.1985).  See also Cerbone, 768 F.2d. at 49;

Carrion, 2006 WL 3526748 at *4; Zenobi v. Exxon Corp, 577 F. Supp. 514, 517 (D. Conn. 1983);

Heins, 271 F. Supp.2d. at 554-555.   Equitable tolling will defer the start of the filing period from the

time of the discriminatory action to the time the employee, "should have discovered the action's

discriminatory motive".  Dillman. 784 F.2d. at 60, citing Cerbone, 768 F.2d. at 49.

     Equitable tolling would apply, where, as here, the plaintiff was misled about her pay and

would have been unable, with reasonable diligence to learn that she was the victim of discrimination.

As was explained by one court,

> [t]he rationale underlying application of this principle [equitable tolling] to pay
> discrimination cases is obvious: it would be unfair to require a plaintiff to file a charge
> of discrimination when she has no knowledge of and could not have reasonably ascertained
> what similarly situated male coworkers were earning.   Not until a discriminatory pay
> claimant knows she is earning less than similarly situated males does she know she is
> being discriminated against and is on notice of the need to assert her rights.  If equitable
> tolling did not apply, maintaining strict  salary confidentiality policies in most circumstances
> would isolate employers from Title VII liability because the filing period would pass before
> a victim of discrimination learned that she was being discriminated against.....

Inglis v. Buena Vista University,[27] 235 F. Supp. 2d. 1009, 1025 (ND Iowa, 2002).  See also  Warner,

2003 WL 22937718 at *2, (denying motion to dismiss on statute of limitations grounds where

---

[26] This second type of tolling is sometimes referred to as fraudulent concealment.  Cerbone, 768
F.2d. at 49; Carrion, 2006 WL 3526748 at *4; Zenobi v. Exxon Corp, 577 F. Supp. 514, 517 (D. Conn.
1983); Heins, 271 F. Supp.2d. at 554-555.

[27]The Court went on to explain that,

Equitable tolling in pay discrimination cases, which starts the limitations clock running when
a pay discrimination claimant knows or should know that she ids being discriminated against,
is, in this court's view, the best reading of Morgan and of its impact on pay discrimination
claims.  This is so because this interpretation is faithful to the Morgan Court's holding
that discrete discriminatory acts are not actionable if time-barred, as well as is faithful to the
Bazemore Court's holding in pattern-or-practice pay discrimination cases.

235 F. Supp.  at 1025-1026.

plaintiff claimed that he had been told that layoff was result of lack of work and that he would be rehired, noting, "[i]f, as plaintiff alleges, he was not aware of the discrimination until January, he acted with reasonable diligence, and the circumstances of his being allegedly misled are so unusual that equitable tolling applies"); Paneccasio v. Unisource Worldwide, Inc., 2003 WL 1714085 (D. Conn. 2003)(denying motion to dismiss on equitable tolling grounds, where plaintiff alleged that defendant fraudulently concealed the facts that formed the basis of his age discrimination claim); O'Connor, 1994 WL 273378,  (permitting leave to amend complaint to add age discrimination claim where plaintiff learned of disparate salary during pretrial discovery, noting that doctrine of equitable tolling could save claim from defeat on  statute of limitations grounds); Oshiver, 38 F.3d at 1392 (reversing district court's dismissal of claim, explaining that claim could be equitably tolled until date that plaintiff learned that she had been replaced by a male,  where defendant misled plaintiff about reason for discharge).

In this case, a reasonable trier of fact could find the following: (1) the defendant misled the plaintiff about her starting salary; (2) the defendant established policies and practices which made it impossible for the plaintiff to learn the specific salaries of her peers from QUSL or from any published source; (3) the defendant instructed  its law school faculty to keep financial information secure; (4) the law school faculty did not discuss salaries amongst themselves; and (5) on at least one occasion when QUSL offered to pay a male prospective clinic faculty member  more than a female, QUSL told the male that the salary was confidential and asked him not to share his salary information.  Based on these facts, a reasonable jury could find that QUSL's misleading conduct prevented Professor Slane from learning that she was being subjected to gender discrimination with respect to pay.  In the alternative, a reasonable jury could conclude from this evidence that  it would have been impossible for a reasonably prudent person to learn that the plaintiff had been subjected to

gender discrimination with respect to pay.

For all of these reasons, the plaintiff respectfully requests that should the Court find that the discovery rule does not apply to the Title VII claims, the Court hold that the principles of equitable tolling apply, and so instruct the jury at trial.

IV.     THE PLAINTIFF'S CFEPA CLAIMS ARE TIMELY FILED

The Connecticut Fair Employment Practices Ac, (CFEPA), §46a-60 et. seq. prohibits discriminatory employment practices on , *inter alia*, the basis of gender. §46a-82(e) provides that, "any complaint filed pursuant to this section must be filed within one hundred and eighty days after the alleged act of discrimination...." This filing requirement is not jurisdictional, and is subject to equitable tolling. Vollemans v. Town of Wallingford, 103 Conn.App. 188, 2007 WL 2263916, (Conn.App. 2007), citing Williams v. Commission on Human Rights and Opportunities, 257 Conn. 258 (2001). As was explained supra, a reasonable jury, applying principles of equitable tolling could find the plaintiff's claims to be timely. This reason alone requires that the CFEPA claim be retained and the jury permitted to resolve the question of timeliness.

Moreover, while Connecticut has, "often looked to federal employment discrimination law for guidance", State v. CHRO, 211 Conn. 464, 470 (1989)(citations omitted), the Connecticut Supreme Court has explained that, "federal law defines the beginning and not the end of our approach to the subject". Id., quoting Evening Sentinel v. National Organization of Women, 168 Conn. 26, 34-35 (1975). See also Vollemans, 103 Conn.App. 188. As the Connecticut Supreme Court has stated,.

> on occasion, we have interpreted our statutes even more broadly than their federal counterparts, to provide greater protections to our citizens, especially in the area of civil rights.

Commission on Human Rights & Opportunities v. Savin Rock Condominium Assn., Inc., 273 Conn. 373, 386, fn 11 (2005).

The interpretation of filing deadlines in disparate pay cases is one of the areas in which Connecticut has provided greater protection to its citizens.  In Veeder-Root Co. v. Commission on Human Rights & Opportunities,, 165 Conn. at 318, 334 (1973), a case predating the United States Supreme Court's decisions in United Air Lines, Inc. v. Evans, 431 U.S. 553,(1977), Ricks, Lorance v. AT & T Technologies, Inc., 490 U.S. 900, (1989), and Morgan, the Connecticut Supreme Court interpreted its own statute of limitations in a disparate pay case. In Veeder-Root, a female employee claimed that she was paid less than her male counterparts for doing the same work in the same department. 165 Conn. at 323-334.  The CHRO found for the plaintiff and ordered the employer to cease and desist from maintaining all discriminatory classifications, and to pay the plaintiff damages, retroactive to the effective date of the anti-discrimination statute.  Id. at 323.  On appeal, the Connecticut Supreme Court affirmed the judgement, but limited the period of recovery of back pay to ninety days prior to the filing of the complaint.[28] 165 Conn. at 331.

In State v. Commission on Human Rights & Opportunities, 211 Conn. 464 (1989), the Court interpreted the filing deadlines in a case involving the use of gender-based tables to calculate retirement benefits.  The employer had appealed, claiming that the plaintiff's complaint was untimely because he had failed to file it with the commission within 180 days of learning of his benefits amount. 211 Conn. at 468.  The Connecticut Supreme Court found the claim to be timely

---

[28] The filing deadline at the time that the plaintiff had filed her complaint had been ninety days.  It is currently 180 days, so any pre-filing backpay under CFEPA would be limited to that period.  The backpay for Title VII purposes is, of course, two years prior to the filing of the claim in court. See 42 U.S.C. § 2000e (a)(i).

stating that each pension check received constituted a new act of discrimination.  Id.

The Court did not rely on federal precedent for this finding, instead noting that the, claim of error is largely controlled by our decision in Veeder-Root Co. v. Commission
on Human Rights & Opportunities,....  In that case, we addressed the limitation period
of General Statutes (1969 Sup.) §§ 31-127, which at that time was ninety days....
[W]e held that the complainant was entitled to back pay dating from ninety days prior
to the filing of her complaint.... Veeder-Root Co. therefore established that the limitation
period  ... acted as a limitation on the remedy rather than a limitation on the time one
can bring a cause of action. Thus,... the maximum period for which one can recover for past
acts of discrimination is 180 days preceding the filing of the complaint.  Naturally, where
the only past discriminatory act within the limitation period occurred less than 180 days
before the complaint, the period of recovery is shortened to the time following the date
that act occurred.  Our holding in Veeder-Root Co. clearly contemplated a continuing
violation theory....

The tacit recognition of the continuing violation principle in Veeder-Root Co. became
express in Board of Education v. Commission on Human Rights & Opportunities, 177 Conn.
75 (1979).... In Board of Education, we expressly recognized that discrete incidents
occurring during a continuum of discriminatory employment practices may constitute fresh
violations....We reject plaintiff's argument that the payment of retirement benefits pursuant to
a discriminatory pension plan simply reflects the "present effect of a past act of
discrimination.

211 Conn. at 471-474 (citations omitted).  See Williams,  257 Conn. at 275-278) (discussing State v.

CHRO).  See also Fleming v. Asea Brown Boveri Inc., 2006 WL 224161 at *10 (denying statute of

limitations defense because plaintiff was "subject to continuing discrimination with each paycheck

he received).

City of Hartford v. Commission on Human Rights & Opportunities, 2004 WL 424197 (Conn

Super. 2004) applied this Connecticut interpretation to allow a plaintiff who had filed a claim on

February 1, 2000, alleging that she had been denied promotions and attendant pay increases for

several years to rely on the continuing violation theory to avoid a statute of limitations defense.

The Court explained that a long term, consistent discriminatory practice may mask discrimination as

much as an apparently neutral seniority list, actuarial table, pay scale or promotional test. Id. at 12.

34

Dismissing the City's appeal, the Court noted, *inter alia*,

> [w]hile the promotions of other workers in 1995 and 1998 were acts which occurred more than 180 days previous to the date of her CHRO complaint, acts occurred within that period, including the November 1999 meeting in which Ford continued to discourage Haley from seeking reclassification, **and Haley continued to be paid less than others for equal work**.

Id. at *11 (emphasis added).

Thus, Connecticut has chosen not to follow United States Supreme Court precedent with respect to continuing violations and with respect to the treatment of disparate pay claims. In the present case, the plaintiff was subjected to disparate pay for many years. There is accordingly, "a continuum of discriminatory employment practices". In June or early July 2000, after the plaintiff had learned of the defendant's disparate pay practices and had complained, the defendant provided the plaintiff with an increase; an increase that left the plaintiff still receiving a salary substantially less than the salary paid to similarly situated males. The plaintiff continued to receive paychecks reflecting QUSL's disparate pay practices up through the date that she filed with the CHRO. Under Connecticut law, therefore, the plaintiff's claims are timely.

There is also no reason to believe that in interpreting the CFEPA filing requirements, the Connecticut courts will ignore controlling Connecticut precedent, and follow Ledbetter. In fact, the Connecticut Appellate Court recently interpreted the filing requirements under §§ 46a-82 (e) and in doing so rejected federal precedent, explaining that the policies underlying CFEPA require a more generous reading of the filing requirements. Vollemans, 103 Conn.App. at 196-198.

In Vollemans, the Court held that a claim for discriminatory termination does not accrue until the employee's last day of employment- even if he had been informed of the impending termination on a prior date. 103 Conn.App. at 218-219. The Court noted that although the notice accrual rule

35

adopted by the United States Supreme Court in Ricks and Chardon, "is the law of the land in regard to federal claims of discriminatory discharge, it is not a fortiori the appropriate standard for claims arising under Connecticut law". Id. at 209-210.[29]

The Appellate Court then explained that rather than simply follow federal precedent, it was required to determine the intent of the Connecticut legislature. Id. at 213.   Among the factors  that the Court considered in determining legislative intent with respect to  §§ 46a-82(e) were the following:

> [ C]ourts must be mindful that it is often laymen, not lawyers, who initiate the complaint process. Ricks v. Delaware State College, supra, 605 F.2d 713. The United States Supreme Court itself acknowledged that point, noting that "the limitations periods should not commence to run so soon that it becomes difficult for a layman to invoke the protection of the civil rights statutes." Delaware State College v. Ricks, supra, 449 U.S. 262 n. 16.....
>
> The fact that the entirety of the termination process is within the control of the employer presents a further concern. Were we to hold that the filing period of §§ 46a82 (e) commences upon unequivocal notification of termination, the cunning employer could foreclose any and all complaints to the commission ... Plainly, that is not what the General Assembly intended in enacting this remedial legislation. Yet, should we adopt the Ricks-Chardon rule, the evisceration of an employee's statutory right under CFEPA may result....
>
> As we have noted, Connecticut law favors a determination on the merits of the dispute whenever possible. The legislative history of §§ 46a82 (e) indicates that the legislature sought to avoid the dismissal of complaints under §§ 46a-82 (e) due to late filing. Our interpretation of §§ 46a-82 (e) must be mindful of that legislative policy....

---

[29]The Court went on to  explain,

In reviewing precedent that has considered the question before us, we agree with the observation of the Appellate Division of the New Jersey Superior Court that neither Ricks nor Chardon, nor any of the decisions that followed them contains a persuasive analysis as to why we should adopt the Ricks-Chardon rule. See Homlin v. TRW, Inc., supra, 330 N.J.Super. 46. To the contrary, we find most compelling the rationales set forth by those jurisdictions that have rejected that rule. They relate directly to both the stated legislative policy of avoiding the dismissal of potentially meritorious claims due to late filing and the remedial nature of our antidiscrimination statutes.

103 Conn. App. at 213.

> Finally, the fact that §§ 46a-82 (e) is part of a remedial statutory scheme cannot be disregarded.   Accordingly, §§ 46a-82 (e) must be liberally construed in favor of those whom the legislature intended to benefit.

103 Conn. App. at 214-218.

These policies suggest that Connecticut would not follow the restrictive Ledbetter decision, and would instead continue to maintain the paycheck accrual rule for discriminatory pay cases. Moreover, these same principles would dictate that, even if Ledbetter were adopted by the Connecticut Courts, the discovery rule would be applied to circumstances such as those at issue here.

Viewing the facts in the light most favorable to the plaintiff, a jury could find that the plaintiff's CFEPA claims are timely.   The plaintiff, therefore, respectfully requests that this Court deny QUSL's motion for judgment as a matter of law with respect to these claims.

V.    CONCLUSION

For all of the foregoing reasons, it is respectfully requested that the Court find that the Title VII and CFEPA claims set forth in Counts II and IV of the Amended Complaint are not barred as a matter of law, by the applicable statute of limitations, and that these claims must be submitted to the jury.

RESPECTFULLY SUBMITTED,

Gregg D. Adler ct05698
Mary E. Kelly ct07419
Livingston, Adler, Pulda,
Meiklejohn & Kelly, P.C.
557 Prospect Avenue
Hartford, CT 06105-2922
(860) 233-9821

## CERTIFICATE OF SERVICE

This is to certify that on August 31, 2007 a copy of the foregoing Plaintiff's Trial Brief Re: Statute of Limitations Issues was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Gregg D. Adler ct05698
Mary E. Kelly ct07419
Livingston, Adler, Pulda,
Meiklejohn & Kelly, P.C.
557 Prospect Avenue
Hartford, CT 06105-2922
Phone: (860) 233-9821
Fax: (860) 232-7818
E-Mail: gdadler@lapm.org
        mekelly@lapm.org