UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CINDY SLANE,<br>　　　Plaintiff,<br>v.<br><br>QUINNIPIAC UNIVERSITY<br>SCHOOL OF LAW<br>　　　Defendant. | CIVIL ACTION NO.<br>3:02 CV 00821 (AWT)<br><br><br><br><br>August 29, 2007 |

### AFFIDAVIT OF CINDY R. SLANE

I, Cindy R. Slane, being duly sworn, hereby depose and say:

1. When Quinnipiac College School of Law originally hired me into my initial, one-year position as Visiting Instructor of Law and Director of Field Placement Programs in July 1994, I was not aware of the salaries of any of the faculty members then employed by the defendant.

2. At the time I was hired, then-Dean Neil Cogan told me that the highest salary he could offer me was $40,000, because that was the top of the range that he could pay to an entry-level clinical faculty member.

3. I had no reason to doubt the accuracy of Dean Cogan's statement about the salary scale. Further, I had no reason to believe that my salary was set at a level lower than it would have been had I been a male, or that gender discrimination had infected the decision with respect to my salary.

4. I received salary increases of $5,000 (12.5%) and $3,000 (6.7%) in 1995 and 1996, respectively. Both of these increases were significantly larger than the raise pools Dean Cogan announced to the faculty for those years, which were between 3% and 3.5%.

5. When Dean Cogan informed me of my 1995 and 1996 raises, he also told me that he was very pleased with my performance.

6. Because when he called me from Israel in 1994 to communicate the law school's offer of employment, Dean Cogan informed me that he was offering me a salary at the top of the pay range for entry-level clinical faculty, and because I had received significantly better-than-average raises in 1995 and 1996, I had no

reason, in 1997, to suspect – and I did not suspect – that gender had been a factor in my initial salary determination or that I was being paid in a discriminatory manner.

7. In 1997, the law school offered me – and I accepted – a permanent position as Assistant Clinical Professor of Law and Director of Field Placement Programs at then-Quinnipiac College School of Law. My anticipated salary for that position for 1997-1998 was $54,000 (a 12.5% increase over my 1996-97 salary), although my actual compensation for the 1997-98 academic year was reduced because I took a partial leave of absence during that year. Again, the raise for 1997-98, as announced by Dean Cogan, was between 3% and 3.5%.

8. Prior to and through the time he offered me this newly created clinical faculty position, Dean Cogan continued to praise my performance, both publicly and in private conversations with me, and I continued to believe that I was being paid at an appropriate level as compared to other, similarly situated clinical faculty members. Between 1997 and May 2000, Dean Cogan also continued to praise me and the externship programs I had developed, both publicly and in private conversations,

9. I was aware, in 1997, that Dean Cogan had offered Carmino Santaniello an Assistant Clinical Professor of Law position. I was aware, too, that Attorney Santaniello refused the position, which subsequently was filled by Les Book. However, at that time, Attorney Santaniello did not divulge to me the salary that Dean Cogan had offered to him.

10. When Les Book joined the faculty in 1997, I had no knowledge of what he was being paid, but based upon what I had been told by Dean Cogan in 1994 about the salary range for entry level clinical faculty, and on my knowledge that my raises in the two succeeding years had been significantly above the average faculty raise-pool percentages, I had no reason to believe that Book was being paid more than I was for the 1997-1998 academic year. Moreover, I had no reason to believe that Dean Cogan or Quinnipiac College School of Law had set my salary for 1997, or for any other year before 2000-2001, at a level lower than it would have been had I been a male, or that gender discrimination had infected any decision with respect to my salary.

11. Between 1997 and 2000, I continued to receive salary increases that were significantly greater than the average increases Dean Cogan announced as the available faculty raise-pool percentages. During this period, Dean Cogan also continued to praise me, both publicly and in private conversations, for my job performance. Therefore, during this time I had no reason to suspect, nor did I suspect, that the law school was paying me less than it was paying Professor Book.

12. In May 2000, after Professor Book announced that he had decided to leave QUSL and the process of determining whether (and if so with what funding and faculty staffing) the Tax Clinic would operate during the 2000-2001 academic year had begun, Professor Book disclosed his approximate salary to another clinical faculty member, Professor Carolyn Kaas. Shortly thereafter, while Professor Kaas and I were attending an Association of American Law Schools Clinical Section conference, Professor Kaas shared the salary information that Professor Book had disclosed to her with me. When we returned from the conference, Professor Kaas and I attempted to confirm this information – and to determine whether the number Book had disclosed to Professor Kaas included employee benefits, or merely salary – during a conversation with Professor Book on or about May 17, 2000. During this conversation, Book reported that that his 1999-2000 salary was $84,000, and that his starting salary in 1997 had been $80,000. He may also have told us that his 1998-99 salary had been $82,000.

13. At no time prior to mid-May 2000 was I aware of the disparity between my salary and Professor Book's salary.

14. Before May 2000, I did not suspect that QUSL paid female clinical faculty less than male clinical faculty, except where such a differential was based appropriately on rank and/or seniority, nor that QUSL discriminated on the basis of gender with respect to faculty salaries.

15. At no time did Dean Cogan ever share with me any information regarding the salary of any other faculty member, with the single exception of the salary that was paid to the individual who was hired to cover many of my responsibilities during a leave of absence in 1997-1998. Prior to May 2000, I was not aware of the salary paid to any other individual law school faculty member.

16. To the best of my knowledge and belief, between my hire in 1994 and May 2000, when I learned of Les Book's salary, QCSL/QUSL administrators – as a matter of both policy and practice – did not disclose to the faculty the salaries the law school paid to individual faculty members.

17. The culture and custom among the faculty at QUSL is, and has been during the time I have been employed at the law school, to treat salary information as confidential.

18. The standard practice at QUSL is that faculty members do not discuss their own salary information with other faculty members, and do not ask other faculty members what they are being paid by QUSL.

19. At no time before May 2000 did I share my salary information with any other member of the QUSL faculty, and, given the policies and practices in force at the law school, I would not have considered it appropriate to do so.

I have read the foregoing affidavit and swear that it is true and correct to the best of my knowledge and belief.

_____
Cindy R. Slane


Sworn and subscribed to before me on this 29th day of August, 2007.

_____
Commissioner of the Superior Court