UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

COPY

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
```
                                  *
CINDY SLANE,                      *
         Plaintiff,               *
                                  *  CIVIL ACTION NO.
VS.                               *  3:02CV00821(AWT)
                                  *
QUINNIPIAC UNIVERSITY SCHOOL OF   *  AUGUST 2, 2007
LAW,                              *
         Defendant.               *
                                  *
```
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**TELEPHONIC DEPOSITION OF NEIL COGAN**

Taken on behalf of the Plaintiff in the above-entitled cause, before Patricia Tyszka, Registered Merit Reporter, Notary Public, in and for the State of Connecticut, on Thursday, August 2, 2007, at 12:32 p.m., at the offices of Livingston, Adler, Pulda, Meiklejohn & Kelly, 557 Prospect Avenue, Hartford, Connecticut, pursuant to the Federal Rules of Civil Procedure.

*TYSZKA COURT REPORTING SERVICES*
*189 Old Forge Road*
*West Hartland, Connecticut  06091*
*pat7995@charter.net   Phone/Fax (860)379-7955*

1  of 2000 or the end of the 2000 school year when you left
2  on your sabbatic. Okay? And actually, forget -- when did
3  you start at -- what was your first year as dean?
4      A    I think I -- I believe it was July 1 of 1993. I
5  believe I stopped being dean June 30 of 2000, and then I
6  was on a one-year sabbatical.
7      Q    I think that's right.
8           With respect to hiring faculty members who you
9  hired while you were dean, I have some questions about
10 salary issues. As I understand it, and tell me if that's
11 correct, that the salaries to be offered to newly hired
12 faculty were set by you in consultation with the provost;
13 is that correct?
14     A    That's correct, to the best of my memory.
15     Q    Okay.
16     A    I would -- I would set the salary at that time,
17 my best memory is '93, '94, probably through '95, when the
18 A.B.A. reached a settlement with the D.O.J. in the
19 antitrust suit by the United States against the A.B.A.
20 There were what we call take-offs -- t-a-k-e, hyphen,
21 o-f-f-s -- and these are summaries of data that the A.B.A.
22 produced from questionnaires that each law school, each
23 A.B.A. law school completes each year. And through I
24 think '95 -- I don't think longer; it may be a tad
25 shorter -- the A.B.A. collected salary information. So

1  that was something that we as deans used, you know, to get
2  a gauge of what salaries were in the United States in
3  A.B.A. law schools. So that informs me of -- you know, of
4  some of what I would use.
5      Plainly, deans also talk to one another. That
6  is, if deans are honest with one another, we get some
7  information about what the so-called going rate is for
8  various positions. And I'm sure that I had some such
9  information, but at this stage I can't remember to whom I
10 talked and, quite frankly, whether I talked about
11 externship directors or clinic directors and so on and so
12 forth. But I know that I did talk with other deans and
13 looked at the A.B.A. materials as well. So I would, you
14 know, with that, input set salaries. But I would always
15 talk with John Bennett, who is my provost, about what
16 salary I wanted to offer. I needed, best of my memory,
17 always to have approval from the provost with regard to
18 the salary that would be offered and, indeed, likewise
19 with regard to increases --
20     Q    We'll get to --
21     A    -- from year to year.
22     Q    We'll get to increases. We'll get to that.
23     A    I don't remember now whether it stopped with John
24 Bennett, my provost, or whether John Lahey, the president,
25 ever also, you know, would look over the offers and/or

```
 1    increases.  So let me stop at that point.
 2        Q   Okay.  The A.B.A. survey that you mentioned that
 3    was discontinued, I just want to follow up on that a
 4    little bit.
 5        A   Sure.
 6        Q   Now, that survey information, as I understand it,
 7    would give you data about kind of salary ranges for
 8    positions at other institutions.  Correct?
 9        A   That's correct.
10        Q   And Quinnipiac also participated in that survey
11    with its own data, correct?
12        A   That's correct.
13        Q   But that survey would not provide you any
14    information about what any individually identified faculty
15    member was being paid, correct?
16        A   Well, plainly it depends.  And again, I don't --
17    at this point it's probably 12 or 13 years since the
18    A.B.A. did that, since I've looked at those take-offs on
19    salaries.  If a school had just a few people or, indeed,
20    even one or two, you could pretty much tell who was making
21    what.  Or the easy case, of course, is they reveal deans'
22    salaries, so we obviously knew what the dean was making.
23    Likewise, associates, I think -- associate deans or
24    associate assistant deans were lumped together.  Again, I
25    can't remember.  But it did, the best of my memory, also
```

1  have other kinds of positions. And so you sometimes could
2  tell individual salaries if you -- if the school only had
3  one or two people in that category.
4     Q   Right. But in terms of the listings, they were
5  listed by category, not by individual?
6     A   That's right. That's right. And my best
7  memory -- I'm pretty sure of this -- in terms of the
8  professors, people who, you know, had that designation,
9  they divided it up by assistant, associate, and full. I'm
10 very sure of that.
11    Q   Okay. So you could look at it and tell what the
12 average pay was for people who are full professors at an
13 institution, or associates or assistants; but it wouldn't
14 tell you what some individual associate professor was
15 being paid?
16    A   Right. With the exception, again, if --
17    Q   Right. If they only had one --
18    A   Say at UConn -- and let's assume UConn had an
19 assistant level -- I could just locate the teachers
20 directory and say, wow, if somebody, one person, you know,
21 is an assistant at UConn, then I would know his or her
22 salary. But once you got beyond, you know, one or two,
23 then obviously you couldn't figure out whose salary was
24 which.
25    Q   All right. Let's get back to Quinnipiac. Once

```
 1   you had your discussions with the provost or the president
 2   about what you would -- you know, the range you could
 3   offer somebody, am I correct that the exact amounts that
 4   you offered to a potential new hire were not shared with
 5   other existing faculty members?
 6        A    I've thought about that since the deposition's
 7   been set.  And I guess you or someone sent me the request
 8   for admissions?
 9        Q    Yes.  I think I sent you two documents to look
10   at.  I sent you the law school's response to the request
11   for admissions, and I also had sent you the university's
12   manual of institutional academic and personnel policies.
13        A    It's -- I'm sorry to say it's a little bit more
14   complex.  It's hard to give a "yes" or "no."  Let me
15   approach it this way:  I'm confident that at some point
16   early on in my tenure at Quinnipiac, I said to the faculty
17   that it was my intent to raise salaries to a higher level
18   than they were.  My recollection is salaries were fairly
19   low, and it was my intent to increase it significantly.  I
20   have no memory as to how much I might have said or what
21   percentage I might have used.  So that's one thing.
22             Another thing is that we were bringing on
23   laterals, people who were being hired from other
24   institutions; not new to teaching, but experienced in
25   teaching.  And at their institutions they were making
```

```
 1    salaries significantly higher than the faculty members
 2    were making at that time, and I did say to the faculty, I
 3    remember very clearly, that while we have to bring these
 4    people on, we can't ask them to come at a lower salary.
 5    Nonetheless, I would as quickly as I could -- and I
 6    probably used something like two or three years -- try to
 7    raise salaries so that these new people were not making,
 8    you know, more or significantly more than existing
 9    faculty.  So that's another thing that certainly went on.
10              I had an executive committee that was -- I don't
11    remember now whether it was elected or selected in some
12    fashion.  I know in my institution it's elected, but I'm
13    not remembering the Quinnipiac method.  But I would share
14    not individual salaries, as I recall, but I'm sure that
15    we talked about salaries and proposed increases in terms
16    of percentages.  And I'm not remembering now whether we
17    talked about levels of assistant, associate pool,
18    obviously extern, clinic, et cetera.  So that's another
19    point.
20         Q    Okay.
21         A    One additional point that I've thought of is that
22    there's a survey that's done each year, and I just don't
23    remember when it began.  I know it's been going on for
24    quite some time.  And were I to -- I know you're not
25    supposed to guess at a deposition; I've been a litigator
```

 1   as well.  But nonetheless, if I were to guess, it's been
 2   at least 10 years, perhaps more.  It's done by the Society
 3   of American Law Teachers, known at SALT.  And SALT's
 4   interest has been to let people who are teaching know what
 5   others are making so that they can bargain, go to their
 6   deans and try to get higher salaries.  And it may be if
 7   SALT began what it was doing when the A.B.A. stopped --
 8   and I wouldn't be surprised if that's not the history of
 9   it -- if the A.B.A. stopped in '95, SALT began in '95.
10   But a school would contribute, to SALT, information about
11   what assistant, associate, and full professors were
12   making.  And although in Whittier we don't do that because
13   Whittier doesn't want us to do it, my best memory is that
14   maybe not every year, but I think for a number of years I
15   did contribute to the SALT newsletter so that SALT would
16   include on its newsletter and make available to all of its
17   membership nationwide, ours as well as, you know, whoever
18   else contributed to the survey.  And it varies from year
19   to year.  We now have 190 A.B.A. schools.  Back then there
20   were probably more like 150 to 160 schools, until you got
21   into the '90s.  And it would vary.  Sometimes a third of
22   the schools, sometimes half of the schools would
23   participate in the survey, and in more recent years it's
24   been fewer schools.  Today I would say probably a quarter
25   to a third participate.  But that would be available as

```
 1   well.
 2       Q    Okay.  Let me just -- does that complete your
 3   answer?
 4       A    That's --
 5       Q    That's enough.
 6       A    Those are the four things that I remember in
 7   terms of --
 8       Q    Okay.
 9       A    -- any disclosure.
10       Q    Okay.  That's fair.  Let me just break it down a
11   little bit.
12            The information that Quinnipiac disclosed to
13   SALT, again, that was information by job category, not by
14   individual professor?
15       A    That's right.
16       Q    Okay.  So is it fair to say that you did not
17   disclose individual salary information to other faculty at
18   Quinnipiac?
19       A    I think the answer is -- that would be yes.  I
20   don't remember now disclosing to the executive committee,
21   to SALT or anyone else, obviously, other than my
22   superiors, individual salary levels.  My only hesitancy
23   there is that I probably said to some of the people that
24   lateraled in -- I'm thinking of Steve Gillis, for example,
25   Leonard Long, for example, who came from institutions with
```

1  particularly significant salaries compared to what was
2  being paid at Quinnipiac -- I might have said to one or
3  the other, or perhaps even another of the laterals, you
4  know, "Your salary is 5 or 10 or 15,000 more than somebody
5  comparable is being paid here. You can't expect the kind
6  of increases you had back in Chicago or USC, and I'm going
7  to have to get others, you know, up to your level as
8  quickly as I can." I might have said something like that.
9  But short of that, I don't remember discussing salaries
10 with faculty members.
11     Q    And even in that circumstance you wouldn't
12 disclose what some individual identif --
13     A    Puts us back to Steve Gillis or Leonard Long or
14 any of the other laterals: "Look, your salary from
15 Chicago is" -- let's say, 15 more than -- let's take
16 someone not involved in this litigation. Let's say Sandy
17 Meiklejohn. I would not have said to Steve, "Yours is 15
18 or 20 higher than Sandy's." I would not have said that.
19     Q    Okay. Is the same true with respect to what you
20 offer a new faculty member? You would not share the
21 specific dollar amount that was offered with other faculty
22 members? Is that true?
23     A    That's true. I would have said to -- well,
24 again, I didn't hire any persons fresh out of -- fresh to
25 the -- to teaching. My habit, because we do hire people

Case 3:02-cv-00821-AWT    Document 91-3    Filed 08/31/2007    Page 11 of 12

15

```
 1   new to teaching, is to say that, "You're beginning at the
 2   same salary level as X who was hired last year, because we
 3   have a bottom. That's where all assistants start." I do
 4   that now. But we didn't do that at -- now, I'm talking,
 5   of course, about assistant associates.
 6       Q   Right.
 7       A   We call them classroom teachers.
 8           Regarding clinic and externship, I don't
 9   remember what I would have said to Les, who was new, and
10   I don't remember what I -- I have no memory of what I
11   said to Cindy, who was new, too, because -- I don't know
12   if I -- I just don't remember saying it.
13       Q   So just to follow up on that, you don't remember
14   specifically what you said to Cindy about her salary as
15   compared to others when you hired her?
16       A   I have no present memory. Clearly, I haven't
17   seen my 2003 depo to see if I remembered then; but sitting
18   here today, 2007, I have no memory of -- I have no memory
19   of that.
20       Q   All right. And in terms of the way raises were
21   handled, I think I understand it, but I just want to make
22   sure we're clear. Basically the provost and the president
23   would, in negotiations with you, give you a percentage
24   pool of increase over one year to the next that you could
25   use basically as you felt appropriate to distribute among
```

TYSZKA COURT REPORTING SERVICES
(860)379-7955

```
 1   new to teaching, is to say that, "You're beginning at the
 2   same salary level as X who was hired last year, because we
 3   have a bottom. That's where all assistants start." I do
 4   that now. But we didn't do that at -- now, I'm talking,
 5   of course, about assistant associates.
 6       Q   Right.
 7       A   We call them classroom teachers.
 8           Regarding clinic and externship, I don't
 9   remember what I would have said to Les, who was new, and
10   I don't remember what I -- I have no memory of what I
11   said to Cindy, who was new, too, because -- I don't know
12   if I -- I just don't remember saying it.
13       Q   So just to follow up on that, you don't remember
14   specifically what you said to Cindy about her salary as
15   compared to others when you hired her?
16       A   I have no present memory. Clearly, I haven't
17   seen my 2003 depo to see if I remembered then; but sitting
18   here today, 2007, I have no memory of -- I have no memory
19   of that.
20       Q   All right. And in terms of the way raises were
21   handled, I think I understand it, but I just want to make
22   sure we're clear. Basically the provost and the president
23   would, in negotiations with you, give you a percentage
24   pool of increase over one year to the next that you could
25   use basically as you felt appropriate to distribute among
```

```
 1   the members of the tax faculty were urging me to do this
 2   or that regarding the hiring, and how much we had to pay
 3   in order to get someone to come out of a practice or
 4   whatever position he or she were in to take on that
 5   position.
 6        Q    Right.  But I guess my question is do you recall
 7   telling any of those people specifically what you actually
 8   hired Les Book at?
 9        A    I have no present memory.  My only memory is
10   that -- and I'm thinking of the late Mary -- is her name
11   Mary Moers?
12        Q    I'm forgetting her name, too.  I know there's
13   Mary Ferrari, there's Tony Robinson, and there's --
14             MS. BURNS:  Wenig?
15             MR. ADLER:  Wenig, yes.
16        A    But what was it -- didn't she have a middle name
17   of Moers?  M-o-e-r-s.
18             MS. BURNS:  I'm not sure.
19        A    Yeah, I think -- yeah, I always remember because
20   there was three names to it.  Yeah.  Professor Wenig.
21             Again, I don't have -- it's been so long now,
22   but somewhere in my memory there is a recollection that I
23   was told what Les -- and then there was another person
24   from the Hartford area, and I think he had a third
25   person, all of whom were urged upon, you know, me, upon
```