UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

EX. C

------------------------

CINDY SLANE                    :

         Plaintiff            :        CIVIL ACTION NO.

VS.                           :        3:02CV00821 (AWT)

QUINNIPIAC UNIVERSITY  :
SCHOOL OF LAW                          JULY 16, 2007

         Defendant           :
------------------------


DEPOSITION OF DAVID KING

APPEARANCES:

         LIVINGSTON, ADLER, PULDA, MEIKLEJOHN & KELLY
         Attorney for the Plaintiff
         557 Prospect Avenue
         Hartford, Connecticut 06105
         BY:  GREGG D. ADLER, ESQ.
         (860) 233-9821

         WIGGIN & DANA, LLP
         Attorney for the Defendant
         One Century Tower
         Post Office Box 1832
         New Haven, Connecticut 06508-1832
         BY:  MEGHAN D. BURNS, ESQ.
         (860) 297-3700


Also present:  Cindy Slane




ROSEMARY BRENNAN
LICENSED COURT REPORTER # 59


NIZIANKIEWICZ AND MILLER REPORTING SERVICE
972 Tolland Street
East Hartford, Connecticut 06108-1533

1                                                                           3

2      DAVID KING, being duly sworn, was examined under oath

3      and testified as follows:

4    BY MR. ADLER:

5            Q    Mr. King, is your current position at

6      Quinnipiac University School of Law still

7      associate dean?

8            A    That's correct.  I'm also an

9      associate professor of law.

10           Q    Let's clarify time frames.  Maybe

11     it's a little repetitive but it's going to

12     relate to the questions I want to ask.

13                When did you first come to the law

14     school?

15           A    I first came to the law school when

16     it was affiliated with the University of

17     Bridgeport in 1978.

18           Q    When did the law school become

19     affiliated with Quinnipiac College?

20           A    Sometime in March of 1992.

21           Q    When did you first take on the role

22     of associate dean?

23           A    I was first associate dean when the

24     law school started at University of Bridgeport

25     from 1983 to 1985.  And my current term as

1    associate dean began in the fall of 1990.                    4

2          Q    So you were the associate dean during

3    the entire period that Neil Cogan was the dean,

4    correct?

5          A    That's correct.

6          Q    And then you were the interim dean

7    from July 2000 until the end of June 2002?

8          A    That's correct.

9          Q    Then after that you resumed your role

10   as associate dean?

11         A    Yes.

12         Q    I'm really going to focus primarily

13   on the period of 1994 to 2000, which is when

14   the plaintiff was hired in 1994 and that was

15   during Dean Cogan's deanship, okay.  So you

16   understand that?

17         A    Yes.

18         Q    During that period of time, am I

19   correct, you didn't play any role in the

20   setting of faculty salary?

21         A    That's correct.

22         Q    When did you first become aware of

23   Professor Slane's salary?

24         A    I think, the best of my recollection,

25   it was sometime around May of 2000 when

5

1    Professor Slane came to see me to discuss her

2    salary.

3          Q    Did she come alone, or did she come

4    with Professor Kaas?

5          A    I think she came with Professor Kaas,

6    but I couldn't say for sure.

7          Q    Prior to learning from Professor

8    Slane what her salary was you had no knowledge

9    of what she was being paid?

10          A    That's correct.

11          Q    Similar, with respect to Professor

12    Les Book who is the director of the tax clinic,

13    when did you first become aware of what his

14    compensation was?

15          A    I think Professor Slane told me what

16    Professor Book had told her his salary was.

17    But I'm not absolutely positive.

18          Q    As best as you can recall prior to

19    learning of the salary discrepancy from

20    Professor Slane you weren't aware that you

21    recall what Professor Book was being paid, is

22    that correct?

23          A    That's correct.

24          Q    When Neil Cogan was dean he did not

25    share salary information with you at all?

6

1    A    That's correct.

2    Q    And he did not share with you in

3    general what salaries he was offering people?

4    A    That's correct.

5    Q    To your knowledge did he share salary

6    information with any other faculty?

7    A    Not to my knowledge.

8    Q    Are you familiar with the executive

9    committee?

10    A    Yes.

11    Q    Did you participate in the executive

12    committee when Neil was the dean?

13    A    I may have in some meetings.  I

14    really don't remember.

15    Q    Do you remember whether you were

16    copied on communications of any kind?

17    A    I couldn't say.

18    Q    To your knowledge did Dean Cogan

19    share salary information about other faculty

20    members with the executive committee?

21    A    Not to my knowledge.

22    Q    Were you aware -- withdrawn.

23         Was it your understanding that Dean

24    Cogan had certain parameters for setting

25    salaries that were communicated to him through

1    the larger university?

2        A    I'm not sure what you mean by

3    "parameters."

4        Q    Let me ask you a different question.

5            Was it your understanding that the

6    faculty salaries were set by Dean Cogan with

7    consultation with the provost during the time

8    he was dean?

9        A    I don't know that for sure.  That's

10   generally the procedure.  It was the procedure

11   while I was interning, so I would think so.

12       Q    Did you ever ask Dean Cogan about

13   salary information?

14       A    Not that I can recall.

15       Q    Is it fair to say that the university

16   had a policy of keeping salary information

17   confidential?

18       A    In general, yes.  It wasn't printed

19   and sent to everyone.

20       Q    Let's break it down a little.

21           Neither the law school nor the

22   university published faculty salary information

23   to the faculty at large?

24       A    In general that's right.  Neither the

25   university, nor the dean, or the law school,

1    published or made generally available a list of    8

2    faculty salaries.

3         Q    Did you ever have a situation while

4    were you associate dean that a faculty member

5    asked about the salaries of others?

6         A    Not that I can recall.

7         Q    Did the university have a written

8    policy that personnel information is to be kept

9    confidential?

10        A    I believe that's correct.

11        Q    Salary information would be part of

12   that?

13        A    I would think so.

14        Q    To your knowledge did faculty

15   understand that salary information was

16   confidential?

17        A    I don't know what faculty understood.

18        Q    But you understood it?

19        A    Yes.

20        Q    As a faculty member?

21        A    Yes.

22        Q    You didn't ask anybody else what they

23   were paid, did you?

24        A    No, I didn't.

25        Q    Would you agree with me that, at

NIZIANKIEWICZ AND MILLER REPORTING SERVICE
972 Tolland Street
East Hartford, Connecticut 06108-1533

1    interim dean, is that correct?                    10

2         A    That's correct.

3         Q    After Professor Slane and Professor

4    Kaas brought their issues to your attention

5    that's when you then looked at the salaries of

6    others?

7         A    It would have been sometime after

8    that, yes.

9         Q    You didn't play any role whatsoever

10   in setting salaries for the 2000-2001 academic

11   year, correct?

12        A    That's right.  Dean Cogan would have

13   set those salaries.

14        Q    Do you recall that prior to when Les

15   Book was hired to be director of the tax clinic

16   were you aware that an offer had been made to

17   another individual for that job?

18        A    Offhand I can't say yes or no.  If

19   you could name the person I could probably say

20   yes or no.

21        Q    It was a I.R.S. lawyer whose name is

22   Carmino or Carm Santanello, who I believe had

23   been offered that position before, just before,

24   Les Book was offered it.  Does that ring a bell

25   to you?

1          A   Yes.                                              14

2          Q   Do you have any recollection of

3    having any discussion about Mr. Lahey's issues

4    concerning salary confidentiality with Cindy

5    and --

6          A   I don't recall.

7          Q   When you say you don't recall, you

8    just don't recall whether or not it came up in

9    this meeting?

10         A   That's correct.

11         Q   If I suggested to you that you may

12   have said something about President Lahey being

13   very strict about keeping individual salary

14   information confidential, you're not saying

15   that didn't happen, you just don't remember

16   whether it's something that was said or not

17   said?

18         A   Right.  I'm not saying it didn't

19   happen.  I just don't remember.

20         Q   Do you recall whether it's true that

21   the president, the president of the university,

22   felt it important to keep salary information

23   strictly confidential at that time?

24         A   I'm honestly not sure.  I'm not sure.

25         Q   Let me ask this way.  Was it your

1    understanding that it was the university's                15

2    policy that individual salary information be

3    kept confidential?

4         A    I think so, yes.

5              Maybe I could illustrate it.  If I

6    sent an E-mail to the faculty listing

7    everybody's salary I think I would have been in

8    big trouble.

9         Q    Okay.  Especially since you didn't

10   have access to it?

11        A    Well, yes.  Bigger trouble.

12        Q    Would you agree that the plaintiff

13   wouldn't have had means available to learn what

14   other faculty members were being paid other

15   than somebody happened to tell her?

16        A    I wouldn't necessarily agree with

17   that.

18        Q    Because you think -- and why?

19        A    Because I think if the plaintiff had

20   had a concern that the institution were somehow

21   violating the law in setting salaries, that the

22   dean might very well have looked at the salary

23   structure and, to the extent appropriate,

24   disclosed it.

25        Q    How would she have access to the

1    here.  Can we sit down and discuss this," I'm        17

2    not sure what would have happened.

3         Q    You certainly wouldn't have been in a

4    position to give her that information at that

5    time?

6         A    At the time I was associate dean I

7    didn't have the information.  So that's

8    correct.  I wouldn't have been in a position to

9    give it to her.

10        Q    Let's take her, the plaintiff, and

11   Les Book.  When Les Book was hired in 1997,

12   there was no announcement as to what he was

13   going to be paid, correct?

14        A    Correct.

15        Q    So the plaintiff would have no reason

16   to believe that he was being paid substantially

17   more than she was at that time, correct?

18        A    I'm not sure.

19        Q    Do you have any reason to believe

20   that Professor Slane would have had -- withdraw

21   that.

22             Do you have any reason to believe

23   that Professor Slane should have known about

24   the disparity between her pay and Les Book's

25   pay at the time he was hired?

```
1        consulted you about the salary or potential        23

2        salary of any given faculty member that you can

3        recall?

4               A    That's correct.

5               Q    Other than the provost, or whoever

6        Dean Cogan's contact was with the university,

7        you're not aware of him discussing those

8        subjects with anybody else at the law school?

9               A    I am not.

10              MR. ADLER:   Off the record.

11              (There was a break at this point)

12       BY MR. ADLER:

13              Q    I just want to follow up on a couple

14       things.

15              When Cindy and Carrie met with you,

16       expressed their concerns, about the salary

17       discrepancy they had uncovered, am I correct

18       that you subsequently, either that day or the

19       next day, met with the acting vice president,

20       Mr. Cavanaugh, then met with Cindy and Carrie

21       again the following day or shortly thereafter?

22              A    I'm not sure of how close in time

23       these meetings were, but the order is correct.

24       I met with them.  Then I'm pretty sure I spoke

25       to Cavanaugh and I'm pretty sure I spoke to
```

1      them again.                                                24

2                Q    You went and then looked at the

3      faculty salaries at that point and kind of

4      reported back to Mr. Cavanaugh, correct?

5                A    I think that's right.

6                Q    Did you share any of the individual

7      faculty salary information that you learned

8      about with Cindy or Carrie?

9                A    I don't recall.

10               Q    Did you express to them -- withdraw

11     that.  I don't want to go back over prior

12     testimony.

13               But were you surprised by the

14     difference between, or the extent of the

15     difference between, Miss Slane's salary and

16     Professor Book's salary?

17               MS. BURNS:  I have to object.  I

18          think that's off the topic of what the

19          court granted.  It's not in the discovery

20          period.

21               MR. ADLER:  I don't really need to go

22          back over that.  Why don't I do it this

23          way --

24     BY MR. ADLER:

25               Q    You yourself were not aware of the

NIZIANKIEWICZ AND MILLER REPORTING SERVICE
972 Tolland Street
East Hartford, Connecticut 06108-1533

1    extent of the difference between Professor    25

2    Slane's salary and Professor Book's salary

3    until the meeting you had with Professor Kaas

4    and Professor Slane?

5         A    Correct.

6         Q    And you were not party to any

7    conversations or communications between

8    Professor Slane and Dean Cogan with respect to

9    her salary from the date that it was set until

10   you became responsible for her salary, correct?

11        A    Correct.

12        Q    So you wouldn't have any way of

13   knowing what she was led to believe about her

14   salary as compared to others, correct?

15        A    That's correct.

16            MR. ADLER:   I have nothing further.

17            MS. BURNS:   I have no questions.

18        (Deposition concluded at 4:10 P.M.)

19

20

21

22

23

24

25