UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CINDY SLANE,<br>    Plaintiff,<br>v.<br><br>QUINNIPIAC UNIVERSITY<br>SCHOOL OF LAW<br>    Defendant. | CIVIL ACTION NO.<br>3:02 CV 00821 (AWT)<br><br><br><br><br><br>August 29, 2007 |

### AFFIDAVIT OF CAROLYN WILKES KAAS

I, Carolyn Wilkes Kaas, being duly sworn, hereby depose and say:

1.  I have been a member of the faculty at Quinnipiac University School of Law ("QUSL") and its predecessor institutions since 1989. I am currently employed in the positions of Associate Professor of Law, Director of the Family & Juvenile Law Concentration, Co-director of the Center on Dispute Resolution, and Director of the Legal Clinic.

2.  In May 2000, after Professor Leslie Book had announced that he had decided to leave QUSL I was part of a team working on a proposal for the renewal of a grant from the IRS for the Tax Clinic for 2000-2001. In the course of that process, Professor Book disclosed to me his approximate salary for the 1999-2000 academic year.

3.  Because Professor Book's salary was substantially higher than I would have expected, shortly thereafter I shared the information I had learned with my colleague, Professor Cindy Slane. My conversation with Professor Slane occurred while we were attending an Association of American Law Schools Clinical Section conference in Albuquerque, New Mexico, in approximately mid-May, 2000.

4.  When we returned from the conference, Professor Slane and I attempted to confirm the accuracy of the information Book had disclosed to make sure it was a straight salary figure as opposed to an amount that included employee benefits. During our conversation with Professor Book on or about May 17, 2000, we also asked him what he recalled his initial salary was when he was hired in 1997. He reported that his salary for 1999-2000 was about $84,000 and that his initial salary in 1997 had been about $80,000.

5. At no time prior to May 2000 was I aware of the salary of Professor Book. As a result of being involved in the decision to establish the externship program in 1994, I did have a general idea of what Professor Slane's salary might have been when she was first hired, so I had a sense of what she likely was being paid in 2000. However, Professor Slane had never shared with me any information about her salary at any time before May 2000.

6. At no time prior to the date that Professor Slane and I informed then-Dean Neil Cogan of our concerns about gender discrimination in late May 2000 did Dean Cogan ever share with me any information regarding the salary of any other faculty member.

7. To the best of my knowledge and belief, QUSL administrators do not discuss the salaries of individual faculty members with other faculty members, nor otherwise disclose the salaries paid to individual faculty members.

8. The culture and custom among the faculty at QUSL is, and has been during the time I have been employed at the law school, to treat salary information as confidential.

9. The standard practice at QUSL is that faculty members do not discuss their own salary information with other faculty members, and do not ask other faculty members what they are being paid by QUSL.

10. Except in the context of salary discussions and negotiations with administrators (who are also members of the law faculty), at no time before May 2000 did I share my salary information with any other member of the QUSL faculty. Given the policies and practices in force at the law school, I would not have considered it appropriate to do so.

I have read the foregoing affidavit and swear that it is true and correct to the best of my knowledge and belief.

_____
Carolyn Wilkes Kaas

Sworn and subscribed to before me on this 29th day of August, 2007.

_____
Commissioner of the Superior Court
Notary Public

Carmela S. Livolsi
Notary Public, Connecticut
My Commission Expires July 31, 2011