Westlaw.                          Att. 1(a)

2006 WL 2612645                                                    Page 1

2006 WL 2612645 (U.S.)


For opinion see 127 S.Ct. 2162, 127 S.Ct. 617, 126 S.Ct. 2965

Supreme Court of the United States.
Lilly M. Ledbetter, Petitioner,
v.
Goodyear Tire and Rubber Company, Inc., Respondent.
No. 05-1074.
September 7, 2006.
On Writ of Certiorari to the United States Court of Appeals for the Eleventh Circuit

Glen D. Nager, (Counsel of Record), Jones Day, 51 Louisiana Avenue, N.W., Washington, DC 20001, (202) 879-3939, Counsel for Respondent

Kevin K. Russell, (Counsel of Record), Howe & Russell, P.C., 4607 Asbury Pl., NW, Washington, DC 20016, (202) 237-7543, Counsel for Petitioner

JOINT APPENDIX
Petition for Certiorari filed February 17, 2006
Certiorari granted June 26, 2006

*i TABLE OF CONTENTS

District Court Docket Sheet ... 1

Court of Appeals Docket Sheet ... 9

Complaint ... 13

Answer ... 22

Trial Transcript Excerpts ... 33

Plaintiff's Exhibit 3 ... 103

Plaintiff's Exhibit 4 ... 106

Plaintiff's Exhibit 7 ... 110

Plaintiff's Exhibit 8 ... 112

Plaintiff's Exhibit 9 ... 113

Plaintiff's Exhibit 16 ... 114

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                    Page 2

2006 WL 2612645 (U.S.)

Plaintiff's Exhibit 17 ... 124

Plaintiff's Exhibit 83 ... 143

Plaintiff's Exhibit 84 ... 147

Plaintiff's Exhibit 201 ... 151

Plaintiff's Exhibit 206 ... 153

Plaintiff's Exhibit 207 ... 156

Plaintiff's Exhibit 210 ... 159

Plaintiff's Exhibit 211 ... 162

Defendant's Exhibit 1 ... 165

Defendant's Exhibit 2 ... 174

Defendant's Exhibit 3 ... 175

Defendant's Exhibit 6 ... 176

Defendant's Exhibit 17 ... 178

Defendant's Exhibit 19 ... 188

Defendant's Exhibit 48 ... 189

Defendant's Exhibit 57 ... 193

Defendant's Exhibit 61 ... 194

Defendant's Exhibit 62 ... 200

Defendant's Exhibit 63 ... 206

Defendant's Exhibit 64 ... 213

*ii Defendant's Exhibit 65 ... 219

Defendant's Exhibit 66 ... 224

Plaintiff's Back Pay Submission ... 225

Ledbetter Deposition Excerpts ... 228

*1 U.S. District Court
Northern District of Alabama (Eastern)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                    Page 3

2006 WL 2612645 (U.S.)

CIVIL DOCKET FOR CASE #: 1:99-cv-03137-UWC

| Date Filed | | #Docket Text |
|---|---|---|
| 11/24/1999 | 1 | COMPLAINT filed, amount paid $150.00, receipt # 200145166 (PGS) (Entered: 11/24/1999) |
| 02/28/2000 | 5 | ANSWER by defendant Goodyear Tire & Rub w/appear by atty(s) Jay D St Clair filed cs (PGS) (Entered: 02/28/2000) |
| 02/05/2001 | 15 | MOTION by defendant Goodyear Tire & Rub for summary judgment filed cs (PGS) (Entered: 02/06/2001) |
| 02/05/2001 | 16 | SUBMISSION of discovery by defendant Goodyear Tire & Rub in support of motion for sj (See separate folder- Vols I & II too large for file) filed cs (PGS) (Entered: 02/06/2001) |
| 02/06/2001 | 17 | BRIEF by defendant Goodyear Tire & Rub in Support of Motion for Summary Judgment filed cs (PGS) (Entered: 02/06/2001) |
| 02/27/2001 | 21 | SUBMISSION of discovery by plaintiff Lilly M Ledbetter filed (Vols I & II) [see separate folder] cs (PGS) (Entered: 02/28/2001) |
| 02/27/2001 | 22 | BRIEF by plaintiff Lilly M Ledbetter in opposition to dft's motion for summary judgment filed cs (PGS) (Entered: 02/28/2001) |
| 01/31/2002 | 26 | BRIEF (Reply) by defendant Goodyear Tire & Rubbber in support of the motion for summary judgment w/exhs att filed cs (Received in Judge Ott's chambers on 3/13/01) (PGS) Modified on 01/31/2002 (Entered: 01/31/2002) |
| 04/03/2002 | 28 | Report and Recommendation that the motion for summary judgment be granted in part and denied in part as set out filed (by Magistrate-Judge John E. Ott) motion for summary judgment cm (PGS) (Entered: 04/03/2002) |
| 04/03/2002 | 29 | ORDER Case reassigned to Chief Judge U W. Clemon filed (by Magistrate-Judge John E. Ott) cm (PGS) (Entered: 04/03/2002) |
| 04/24/2002 | 30 | MOTION by pla to extend time to w/i (10) days of 4/23/02 to file objection to the RR filed cs (DWC) (Entered: 04/24/2002) |
| 05/07/2002 | 32 | OBJECTIONS by pla to RR [28-1] filed cs (DWC) (Entered: 05/07/2002) |
| 07/31/2002 | 33 | MEMORANDUM opinion on objections to the Magistrate Judge's Report & Recommendation filed (by Chief Judge U W. Clemon) cm (DWC) (Entered: 07/31/2002) |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645 (U.S.)

```
----------------------------------------------------------------
```
07/31/2002  34  ORDER, in conformity w/ the Memorandum Opinion on objections to
                the Magistrate Judge's R&R, SUMMARY JUDGMENT is GRANTED in
                favor of dft on certain claims as stated & DENIED on other
                claims [15-1] filed by Chief Judge U W. Clemon) cm (DWC)
                (Entered: 07/31/2002)
```
----------------------------------------------------------------
```
08/26/2002  35  ORDER on pre-trial hearing; PTC held 1:30 8/19/02; jury trial
                set 12/9/02, Anniston, AL filed (by Chief Judge U W. Clemon)
                cm (DWC) (Entered: 08/26/2002)
```
----------------------------------------------------------------
```
01/21/2003      COURTROOM NOTES: JURY TRIAL at Anniston, AL - before the
                Honorable U. W. Clemon, CUSDJ - opening remarks of the court
                - juror Inzer and Heacock excused for cause -jury selected
                and sworn - opening remarks of the court to the jury -
                opening statements of counsel - plaintiffs testimony - daily
                adj. - (Penny Enoch, rptr.) (DGS) (Entered: 01/24/2003)
```
----------------------------------------------------------------
```
01/22/2003      COURTROOM NOTES: JURY TRIAL (UWC) - trial resumed - plaintiffs
                testimony resumed - plaintiff rests - defendant's testimony -
                defendant rests - daily adj. - (Penny Enoch) (DGS) (Entered:
                01/24/2003)
```
----------------------------------------------------------------
```
01/22/2003  56  MOTION by defendant Goodyear Tire & Rub for judgment as a
                matter of law on the plaintiff's pay claim - filed cs (DGS)
                (Entered: 01/24/2003)
```
----------------------------------------------------------------
```
01/22/2003  59  56 - ORDER denying dft's motion for judgment as a matter of law
                [56-1] (by Chief Judge U W. Clemon) entered cm (DWC)
                (Entered: 01/28/2003)
```
----------------------------------------------------------------
```
01/23/2003      COURTROOM NOTES: JURY TRIAL (UWC) - trial resumed - closing
                arguments of counsel - court's oral charge to the jury - jury
                deliberations begin - daily adj. - (Penny Enoch, rptr.) (DGS)
                (Entered: 01/24/2003)
```
----------------------------------------------------------------
```
01/24/2003      COURTROOM NOTES: JURY TRIAL (UWC) - trial resumed - jury
                deliberations continued - written response of the court to
                the jury - jury verdict filed this day - written order to be
                entered by the court - (Penny Encoh, rptr.) (DGS) (Entered:
                01/24/2003)
```
----------------------------------------------------------------
```
01/24/2003  58  VERDICT for plaintiff Lilly M Ledbetter against defendant
                Goodyear Tire & Rub filed (DGS) (Entered: 01/24/2003)
```
----------------------------------------------------------------
```
01/28/2003  60  ORDER (Judgment) filed: based solely on the Special Verdict of
                the Jury, JUDGMENT in the amt $3,843,014.93 ENTERED in favor
                of pla & against dft; a reasonable atty's fee & costs are
                taxed against dft (by Chief Judge U W. Clemon) to dismiss
                case cm (DWC) (Entered: 01/28/2003)

       © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                    Page 5

2006 WL 2612645 (U.S.)

--------------------------------------------------------------
02/07/2003   63   RENEWED MOTION by dft for judgment as a matter of law, and, in
                  the alternative, for new trial or remittitur filed cs (DWC)
                  (Entered: 02/10/2003)
--------------------------------------------------------------
02/07/2003   65   BRIEF by dft in support of its Renewed motion for judgment as a
                  matter of law w/attachments filed cs (DWC) (Entered:
                  02/10/2003)
--------------------------------------------------------------
05/09/2003   73   OPPOSITION by pla to dft's motion for judgment as a matter of
                  law [63-1], motion for new trial or remittitur [63-2] filed
                  cs [bound filed in expandable folder] (DWC) (Entered:
                  05/12/2003)
--------------------------------------------------------------
06/02/2003   76   NOTICE of compliance (pla's lost wages submission) by pla with
                  the court's 5/30/03 hearing w/exhs atta filed cs (DWC)
                  (Entered: 06/03/2003)
--------------------------------------------------------------
06/03/2003   77   OBJECTIONS by dft to pla's lost wages submission [76-1] filed
                  cs (DWC) (Entered: 06/04/2003)
--------------------------------------------------------------
06/04/2003   78   REPLY by pla to dft's objection to lost wage submission [77-1]
                  filed cs (DWC) (Entered: 06/05/2003)
--------------------------------------------------------------
09/24/2003   79   MEMORANDUM opinion on post-trial motions filed (by Chief Judge
                  U W. Clemon) cm (KWC) (Entered: 09/24/2003)
--------------------------------------------------------------
09/24/2003   80   ORDER on post-trial motions; denying pla's motion for attorney
                  fees & expenses [62-1], without prejudice to its automatic
                  reinstatement in event that pla agrees to remittitur;
                  granting motion for judgment as a matter of law [63-1] solely
                  to entent that jury's award of 328,597.93 in backpay is
                  VACATED; in all other respects, motion for judgment as a
                  matter of law is DENIED; dft's alternative motion for a
                  remittitur is GRANTED; jgmt previously entered in case is
                  hereby REDUCED to $360,000.00 conditioned on pla's filing her
                  assent to remittitur w/in 15 days of this order; denying
                  motion for new trial [63-2] on condition that pla assents to
                  remittittur. Should pla fail to assent to remittitur w/in
                  time fixed, court will reconsider motion sua sponte and GRANT
                  it on issue of damages only; filed ( by Chief Judge U W.
                  Clemon) cm (KWC) (Entered: 09/24/2003)
--------------------------------------------------------------
10/14/2003   87   NOTICE of appeal by defendant Goodyear Tire & Rub from District
                  Court decision [80-1]; notice of appeal, order appealed from
                  and court copy of docket entries w/transmittal letter mailed
                  cm (BST) (Entered: 10/15/2003)
--------------------------------------------------------------
10/24/2003        NOTIFICATION by Circuit Court of Appellate docket number
                  #03-15264-G (KWC) (Entered: 10/24/2003)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                    Page 6

2006 WL 2612645 (U.S.)


------------------------------------------------------------------------
11/04/2005  96  USCA JUDGMENT as to 87 Notice of Appeal; It is hereby ORDERED
                that the attached Opinion is entered as Judgment, the USDC
                judgement is REVERSED and INSTRUCTED to Dismiss plaintiff
                Ledbetter's complaint with prejudice, Issued As Mandate
                11/03/2005 (SRJ,) (Entered: 11/07/2005)
------------------------------------------------------------------------
11/21/2005  97  ORDER OF DISMISSAL with prejudice w/costs hereby taxed against
                plaintiff consistent with U.S. Court of Appeals-11th
                Circuit's Mandate 11/2/2005. Signed by Judge U W Clemon on
                November 21, 2005. (SRJ,) (Entered: 11/21/2005)
------------------------------------------------------------------------


                            *9 General Docket
             United States Court of Appeals for the Eleventh Circuit
                              No. 03-15264-GG
                 Lilly M. Ledbetter v. Goodyear Tire & Rubber


| File Date | Entry | Party | Pending |
|---|---|---|---|
| 10/21/2003 | DKT2 (Docketing - Regular Notice) issued. cc: Perry D. Mathis To: St. Clair, Jay Daniel cc: Estes, Kathy H. cc: Kent, Ronald H., Jr. cc: Quinn, C. Michael cc: Goldfarb, Jon Craig cc: Weiner, Maury Steven | | No |
| 10/24/2003 | Civil Appeal Statement Form: | Goodyear Tire and Rubber Company, Inc. | No |
| 01/15/2004 | Record Excerpts: (Atty: Jay Daniel St. Clair) | Goodyear Tire and Rubber Company, Inc. | No |
| 01/16/2004 | E-Brief Tendered: Appellant by Kelly H. Estes for Goodyear Tire and Rubber Company, Inc. | Goodyear Tire and Rubber Company, Inc. | No |
| 01/20/2004 | Appellant Brief Filed: (Atty: Jay Daniel St. Clair) | Goodyear Tire and Rubber Company, Inc. | No |
| 02/26/2004 | E-Brief Tendered: Appellee by Jon Craig Goldfarb for Lilly M. Ledbetter | Lilly M. Ledbetter | No |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                    Page 7

2006 WL 2612645 (U.S.)


| Date | Description | Party | |
|------|-------------|-------|---|
| 02/26/2004 | Certificate of Readiness Appellee Brief Filed: | | No |
| 03/01/2004 | (Atty: C. Michael Quinn) | Lilly M. Ledbetter | No |
| 03/12/2004 | Record on Appeal | | No |
| 03/12/2004 | Exhibits: (Atty: Jay Daniel St. Clair) | Goodyear Tire and Rubber Company, Inc. | No |
| 03/15/2004 | E-Brief Tendered: Reply by Kelly H. Estes for Goodyear Tire and Rubber Company, Inc. | Goodyear Tire and Rubber Company, Inc. | No |
| 03/16/2004 | Reply Brief Filed: (Atty Jay Daniel St. Clair) | Goodyear Tire and Rubber Company, Inc. | No |
| 09/16/2004 | Oral Argument Scheduled: 09/16/04 | | No |
| 08/23/2005 | Judgment Entered | | No |
| 08/23/2005 | Opinion Issued-REVERSED | | No |
| 09/13/2005 | Petition for Rehearing En Banc: (Atty: C. Michael Quinn) | Lilly M. Ledbetter | No |
| 09/15/2005 | Motion to File Amicus Petition for Rehearing from EEOC | | No |
| 10/26/2005 | Motion of the EEOC for leave to file a brief as amicus in support of petition for rehearing en banc filed by the appellee, Ledbetter is GRANTED. GBT/JFD/WHP | | No |
| 10/26/2005 | The Petition(s) for Rehearing are DENIED and no Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, the Petition(s) for Rehearing En Banc are DENIED. | | No |
| 10/26/2005 | Amicus brief of EEOC in support of | Equal | No |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                    Page 8

2006 WL 2612645 (U.S.)

|  |  |  |  |
|---|---|---|---|
|  | Appellee.: | Employment Opportunity Commission |  |
| 11/03/2005 | CASE CLOSED-Mandate Issued |  | No |
| 01/17/2006 | Ext. for Filing Certiorari Granted: to 2/17/06 App#05A633 | Lilly M. Ledbetter | No |
| 02/27/2006 | Notice of Filing Certiorari: #05-1074(Atty: Jay Daniel St. Clair) | Goodyear Tire and Rubber Company, Inc. | No |
| 07/03/2006 | Certiorari Granted: SC# 05-1074 | Goodyear Tire and Rubber Company, Inc. | No |

**\*13** IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION
LILLY M. LEDBETTER Plaintiff,
vs.
GOODYEAR TIRE AND RUBBER COMPANY, INC., Defendant.
CIVIL ACTION NO:
JURY DEMAND

1. The jurisdiction of this Court is invoked pursuant to the Act of Congress known as 28 U.S.C. §§ 1331, 1334(4), 2201, 2202, 42 U.S.C. § 2000e et seq., 29 U.S.C. §206(d) and 29 U.S.C §621 et seq. This suit is authorized and instituted pursuant to Title VII of the Act of Congress known as the "Civil Rights Act of 1964," as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e et seq., the "Equal Pay Act" of the "Fair Labor Standards Act", 29 U.S.C. §206(d) and 29 U.S.C. 215(a)(3) and the "Age Discrimination in Employment Act", 29 U.S.C. §621 et seq. The jurisdiction of this Court is invoked to secure protection of and redress deprivation of rights secured by 42 U.S.C. § 2000 et seq., providing for injunctive and other relief against sex discrimination, and by 29 U.S.C. §206(d) providing for relief for sex discrimination in compensation, and by 29 U.S.C. §621 et seq. providing for injunctive and other relief against age discrimination.

**\*14** 2. The plaintiff timely filed her charge of sex discrimination with the Equal Employment Opportunity Commission (E.E.O.C.) within 180 days after the last discriminatory treatment and has timely filed this complaint within 90 days of receiving her Right-To-Sue Letter from the E.E.O.C.

3. The plaintiff, Lilly M. Ledbetter, hereinafter "Plaintiff", is a female born on April 14, 1938. She is a resident of the State of Alabama and a citizen of the United States and was so during the relevant time period of this complaint.

4. The defendant, Goodyear Tire and Rubber Company, hereinafter "Defendant", is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                    Page 9

2006 WL 2612645 (U.S.)

an entity subject to suit under Title VII of the Act of Congress known as the
"Civil Rights Act of 1964," as amended by the Civil Rights Act of 1991, 42 U.S.C. §
2000e et seq. The defendant is an entity subject to suit under the "Equal Pay
Act", 29 U.S.C. §206(d). The defendant is an entity subject to suit under the
ADEA, 29 U.S.C. §621, et seq. The defendant employs at least twenty (20) persons.

5. The plaintiff was employed by defendant from February 5, 1979, until October
31, 1998, when the defendant forced her into early retirement.

6. The plaintiff worked as an Area Manager in the Tire Room at the Gadsden
Goodyear plant from November 1, 1985, until January 3, 1998, and was the only
female manager out of sixteen managers.

*15 7. In June of 1998, the defendant required the plaintiff to transfer to the
position of Technical Engineer.

8. On October 31, 1998, the defendant forced the plaintiff into early retirement.

IV. COUNT I - Equal Pay Act

9. The plaintiff re-alleges and incorporates by reference paragraphs 1-8 above
with the same force and effect as if fully set out in specific detail herein below.

10. As an Area Manager, the plaintiff was similarly situated with her male
co-workers and was doing equal work in the same establishment.

11. However, the plaintiff's male co-workers who were doing identical work were
paid at a higher rate than she.

12. The plaintiff was involuntarily transferred to the position of Technical
Engineer in June of 1998. After her transfer, the plaintiff was again paid at a
lower rate than similarly situated male Technical Engineers doing identical work
in the same establishment.

13. The defendant willfully and maliciously discriminated against the plaintiff
in pay because of her sex.

V. Count II - Title VII Disparate Treatment

A. Discrimination in Wages

14. The plaintiff performed work equal or substantially equal to that of the male
Area Managers, but received less pay for a substantially similar job.

*16 15. The defendant had a practice of offering overtime work first to male Area
Managers. The defendant offered overtime to the plaintiff only after each male
turned down the offer, even though the plaintiff expressed interest in working
overtime.

B. Discrimination in Evaluation

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                    Page 10

2006 WL 2612645 (U.S.)

16. In January of 1998, the plaintiff received a discriminatory evaluation in which she received a low score while men performing the same job in the same manner as she received a higher evaluation score.

C. Discrimination in Terms and Conditions of Employment

17. The plaintiff's male supervisors and coworkers intentionally isolated her by excluding her.

18. For example, Jerry Jones, the Business Center Manager, regularly excluded the plaintiff from division meetings that he conducted with only the male Area Managers present.

D. The Transfer to Technical Engineer

19. The plaintiff was involuntarily transferred from the position of Area Manager to that of Technical Engineer on January 5, 1998. This position removed the plaintiff's supervisory responsibilities.

20. This transfer effectively prohibited the plaintiff from receiving more pay increases and reduced her retirement income.

*17 21. The plaintiff was the only Area Manager transferred out of the sixteen (16) Area Managers.

22. After transferring the plaintiff out of the Area Manager position, the defendant filled her position with a man.

23. After the plaintiff's removal from the Area Manager position, there were no female Area Managers.

24. The defendant's act of forcing the plaintiff to transfer to the Technical Engineer job was a clear intent to cause her resignation as the Technical Engineer position required the plaintiff to do extensive manual labor including lifting two hundred and fifty (250) eighty (80) pound tires off of one truck and onto another.

25. The plaintiff was the only woman in that position.

26. Despite the grueling physical barriers the defendant threw in front of the plaintiff, the plaintiff did her job.

E. Disparate Treatment in Training and Discipline

27. The plaintiff received no training for the Technical Engineer position, and there was no job procedure manual or written job description available to the plaintiff.

28. The plaintiff was suspended for 3 days for allegedly making an error that similarly situated men made and were not suspended.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                    Page 11

2006 WL 2612645 (U.S.)

**\*18** VI. Count III - Age Discrimination in Employment Act Disparate Treatment

29. The plaintiff re-alleges and incorporates by reference paragraphs 1-28 above with the same force and effect as if fully set out in specific detail herein below.

30. Plaintiff was over age 40 at the time of the relevant acts of discrimination. Out of the 20 Area Managers, the plaintiff was the oldest.

31. The defendant willfully discriminated against the plaintiff because of her age by transferring her to the position of Technical Engineer.

32. When the plaintiff was transferred to the position of Technical Engineer, her Area Manager position was filled by a younger male named Steve Thompson, her former co-worker. In turn, the defendant promoted a male in his twenties (20's) into the Area Manager position vacated by Thompson.

33. Significantly younger Area Managers received substantially higher salaries than the plaintiff for substantially equal work.

34. The defendant disciplined the plaintiff by suspending her for three days from her position as Technical Engineer when similarly situated Technical Engineers younger than the plaintiff were not disciplined for committing similar errors.

**\*19** VII. Count IV - Retaliation in Violation of the Equal Pay Act, and Title VII

35. In the fall of 1997, the plaintiff objected to the defendant's discriminatory pay practice by complaining to her supervisor, Jerry Jones, that she was being paid unfairly compared to her male co-workers performing similarly in equal positions.

36. Shortly thereafter, Jones instructed the plaintiff that it was in her own best interest to interview for and accept the position of Technical Engineer.

37. In January of 1999, the defendant moved the plaintiff to that position.

38. The defendant has further retaliated against the plaintiff by failing to re-hire her. The plaintiff properly applied for an Area Manager position at Goodyear on November 8, 1999. The Employment Specialist, Don Gardner, told her that they are not rehiring for Area Manager positions.

39. However, there are five (5) Area Manager positions available and at least one male Area Manager who retired was rehired. To this date, the defendant has refused to rehire the plaintiff.

VIII. Count V - Constructive Discharge

40. The plaintiff re-alleges and incorporates by reference paragraphs 1-39 above with the same force and effect as if fully set out in specific detail herein below.

**\*20** 41. The defendant created an environment so hostile and abusive that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                              Page 12

2006 WL 2612645 (U.S.)

plaintiff suffered depression requiring medical treatment.

42. Eventually, the terms and conditions of her Technical Engineer job and the unwarranted discipline by the defendant forced the plaintiff into resignation against her will.

WHEREFORE, the plaintiff respectfully prays that this Court assume jurisdiction of this action and after trial:

1. Issue a declaratory judgment that the employment policies, practices, procedures, conditions and customs of the defendant, Goodyear, are violative of the rights of the plaintiff as secured by Title VII of the Act of Congress known as the "Civil Rights Act of 1964," as amended, 42 U.S.C. § 2000e et seq., the "Equal Pay Act", 29 U.S.C. §206(d) and 29 U.S.C. 215(a)(3) and the "Age Discrimination in Employment Act", 29 U.S.C. §621 et seq.

2. Grant the plaintiff a permanent injunction enjoining the defendant, Goodyear, its agents, successors, employees, attorneys and those acting in concert with the defendants, from continuing to violate Title VII of the Act of Congress known as the "Civil Rights Act of 1964," as amended, 42 U.S.C. § 2000e et seq. and the "Equal Pay Act", 29 U.S.C. §206(d) and 29 U.S.C. 215(a)(3) and the "Age Discrimination in Employment Act", 29 U.S.C. §621 et seq

3. Enter an Order requiring the defendant to make the plaintiff whole by awarding her reinstatement, lost wages (plus interest), liquidated damages, compensatory and *21 punitive damages, front pay and loss of benefits including retirement, pension seniority and other benefits of employment.

4. The plaintiff further prays for such other relief and benefits as the cause of justice may require, including, but not limited to, an award of costs, attorneys' fees and expenses.

                THE PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY
Respectfully submitted,

_____

 Jon C. Goldfarb (GOL015)
 Susan W. Bullock
 Attorneys for Plaintiff

GORDON SILBERMAN WIGGINS & CHILDS, P.C.

1400 SouthTrust Tower

Birmingham, Alabama 35203

(205) 328-0640

    *22 IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA
                          EASTERN DIVISION
                    LILLY M. LEDBETTER, Plaintiff,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                              Page 13

2006 WL 2612645 (U.S.)

                              v.
         GOODYEAR TIRE AND RUBBER COMPANY, INC., Defendant.
              CIVIL ACTION NO. CV--99-JEO-3137-E
                            ANSWER
  COMES NOW Defendant, Goodyear Tire and Rubber Company, Inc. ("Goodyear"), and for
answer to plaintiff's complaint, states as follows:

                        FIRST DEFENSE
  To the extent Plaintiff seeks to recover under Title VII, as amended, for events
occurring more than 180 days before she filed her EEOC charge, such claims are
barred by *23 Plaintiff's failure to file a timely charge of discrimination, a
necessary condition precedent to suit.

                        SECOND DEFENSE
  To the extent Plaintiff has not filed her Complaint within ninety (90) days of
the date she received her Notice of Right to Sue from the EEOC, her claims under
Title VII, as amended, are untimely.

                        THIRD DEFENSE
  To the extent Plaintiff seeks recovery under Title VII, as amended, for events
that are not like or related to the allegations in her EEOC charge she has failed
to satisfy a necessary condition precedent to suit.

                        FOURTH DEFENSE
  To the extent Plaintiff's claims occurred beyond the applicable statutes of
limitations period, those claims are barred.

                        FIFTH DEFENSE
  Plaintiff's claims for equitable relief may not be tried before a jury.

                     *24 SIXTH DEFENSE
  To the extent that Plaintiff's Complaint challenges employment decisions
affecting her, such decisions were made on the basis of legitimate
non-discriminatory factors. To the extent a fact finder finds otherwise, Goodyear
would nevertheless have made the same decisions regarding Plaintiff.

                        SEVENTH DEFENSE
  To the extent Plaintiff has failed to satisfy her duty to mitigate her damages,
Plaintiff's claims for backpay should be dismissed.

                        EIGHTH DEFENSE
  Plaintiff's claims are barred in whole or in part by the doctrines of unclean
hands, waiver, laches, and estoppel.

                        NINTH DEFENSE
  Plaintiff's damages under Title VII, if any, are subject to limitations found at
42 U.S.C. § 1981a(b)(3).

                     *25 TENTH DEFENSE
  Plaintiff is not entitled to an award of punitive damages as she has not pled and

       © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645 (U.S.)

cannot prove facts sufficient to support an award under applicable law.

ELEVENTH DEFENSE
  An award of punitive damages against Goodyear would violate the constitutions of
the United States and the State of Alabama.

TWELFTH DEFENSE
  Plaintiff cannot recover punitive damages against defendant because such an
award, which is penal in nature, would violate defendant's constitutional rights
protected under the Alabama Constitution of 1901, as amended (the "Alabama
Constitution"), and the Constitution of the United States (the "United States
Constitution"), unless defendant is afforded the same procedural safeguards as are
criminal defendants, including, but not limited to, the right to avoid
self-incrimination, the fight to forego production and *26 disclosure of
incriminating documents, and the right to the requirement of a level of proof
beyond a reasonable doubt.

THIRTEENTH DEFENSE
  Based upon Alabama procedures relative to punitive damages, which provide no
objective, logical, or reasonable standards or criteria which govern the award,
and the amount of the award, of punitive damages, Goodyear is denied equal
protection of the laws as guaranteed by the Fourteenth Amendment to the United
States Constitution, and Article 1, " 1, 6, and 22 of the Alabama Constitution,
separately and severally.

FOURTEENTH DEFENSE
  Goodyear adopts all defenses made available to it under the decision rendered by
the United States Supreme Court in BMW of North America, Inc. v. Gore, 116 S. Ct.
1589 (1996).

*27 FIFTEENTH DEFENSE
  Plaintiff is not entitled to an award of punitive damages because Goodyear made a
good faith effort to comply with Title VII.

SIXTEENTH DEFENSE
  For answer to the numbered paragraphs of Plaintiff's Complaint, Goodyear says as
follows:

  1) Goodyear admits that this Court has subject matter jurisdiction over all
claims brought by this Plaintiff pursuant to Title VII of the Civil Rights Act of
1964, as amended. Goodyear denies that it has in any way violated that statute,
that Plaintiff is entitled to any relief and that Plaintiff may try any claims for
equitable relief before a jury.

  2) Goodyear admits that Plaintiff was employed by Goodyear in Butler County,
Alabama, which is in the Middle District of the State of Alabama.

  3) Upon information and belief, Goodyear admits that Plaintiff is black, over 19
years of age, and a *28 citizen of the United States and the State of Alabama,
residing in Butler County, Alabama.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                    Page 15

2006 WL 2612645 (U.S.)

  4) Goodyear

  5) No response is required. However, Goodyear denies that it has violated any law
or that Plaintiff is entitled to any relief whatsoever from Goodyear.

  6) Goodyear admits that plaintiff is black. Otherwise, Goodyear denies the
allegations in Paragraph 6 of the Complaint.

  7) Goodyear denies the allegations in Paragraph 7 of the Complaint.

  8) Goodyear denies the allegations in Paragraph 8 of the Complaint.

  9) Goodyear denies the allegations in Paragraph 9 of the Complaint.

  10) Goodyear readopts and herein reincorporates its previous responses.

  *29 11) Goodyear admits the allegations in Paragraph 11 of the Complaint, except
that Goodyear's corporate records indicate that plaintiff was hired by

  12) Goodyear denies the allegations in Paragraph 12 of the Complaint.

  13) Goodyear admits the allegations in Paragraph 13 of the Complaint, except that
Goodyear's records indicate that Plaintiff's transfer was effective

  14) Goodyear admits that Plaintiff's pay went from $350.00 per week to $6.25 per
hour after the transfer and that her benefits were changed.

  15) Goodyear admits that plaintiff was replaced as manager by (white, female).
Otherwise, denied.

  16) Goodyear admits that made the decision to demote Plaintiff from manager to
assistant manager.

  17) Goodyear admits that the Equal Employment Opportunity Commission received
plaintiff's Charge of Discrimination complaining of adverse treatment on

  *30 18) Goodyear admits that plaintiff's position as assistant manager required
her to work fewer hours and that Plaintiff quit effective. Otherwise, Goodyear
denies the allegations in Paragraph 18 of the Complaint.

  19) Goodyear denies the allegations in Paragraph 19 of the Complaint.

  20) Goodyear denies the allegations in Paragraph 20 of the Complaint.

  21) Goodyear readopts and herein reincorporates its previous responses.

  22) Goodyear admits the allegations in Paragraph 22 of the Complaint.

  23) Goodyear denies the allegations in Paragraph 23 of the Complaint.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                    Page 16

2006 WL 2612645 (U.S.)

24) Goodyear admits that Plaintiff was demoted from manager to assistant manager. Otherwise, denied.

25) Goodyear denies the allegations in Paragraph 25 of the Complaint.

**\*31** 26) Goodyear denies the allegations in Paragraph 26 of the Complaint.

27) Goodyear admits the allegations in Paragraph 27 of the Complaint.

28) Goodyear denies the allegations in Paragraph 28 of the Complaint.

29) Goodyear admits that Plaintiff was demoted from manager to assistant manager. Otherwise, denied.

30) Goodyear denies the allegations in Paragraph 30 of the Complaint.

31) Goodyear denies the allegations in Paragraph 31 of the Complaint.

32) Goodyear admits that Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission.

33) Goodyear denies the allegations in Paragraph 33 of the Complaint.

34) Goodyear denies the allegations in Paragraph 34 of the Complaint.

**\*32** 35) Except to the extent expressly admitted, Goodyear denies all allegations in the Complaint.

WHEREFORE, Goodyear demands a judgment in its favor and an award of its costs in defending this action.

-----------------------------------

Ronald H. Kent, Jr.
(KEN030)
Attorney for Defendant
Goodyear Tire and Rubber Company, Inc.

I hereby certify that I have this date served the foregoing on:
Jon C. Goldfarb
Susan W. Bullock
Gordon, Silberman Wiggins & Childs, P.C.
1400 SouthTrust Tower
Birmingham, Alabama 35203
by placing a copy of same in the United States Mail, first-class postage prepaid and addressed to his regular mailing address, on this ____th day of February, 2000.

-----------------------------------

OF COUNSEL

**\*33** Trial Transcript
Direct Examination of Lilly Ledbetter

[\*23]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                    Page 17

2006 WL 2612645 (U.S.)

Q. MRS. LEDBETTER, WHERE WERE YOU BORN AND RAISED?
A: CALHOUN COUNTY, ALABAMA.
Q. AND ARE YOU MARRIED?
A. YES, I AM.
Q. IS THIS YOUR HUSBAND BACK HERE?
A. YES, SIR.
Q. HOW LONG HAVE YOU BEEN MARRIED?
A. 47 YEARS.
Q. WHAT IS YOUR DATE OF BIRTH?
A. #XXXX I'M 64 YEARS OLD.
Q. TELL ME BRIEFLY WHAT YOUR EDUCATIONAL BACKGROUND IS.
A. FINISHED JACKSONVILLE HIGH SCHOOL, AND I HAVE APPROXIMATELY SIXTY HOURS OF
COLLEGE CREDIT.
*34 Q. WHERE DO YOU GO TO COLLEGE?
A. JACKSONVILLE STATE, GEORGIA, AND I HAVE SOME CLASSES FROM [*24] MEMPHIS STATE
UNIVERSITY AND AUBURN.
Q. WHAT YEAR DID YOU START WORKING AT THE GOODYEAR COMPANY?
A. FEBRUARY 5TH, 1979.
Q. PRIOR TO THAT, WHAT DID YOU DO, BRIEFLY?
A. I WAS - WORKED FOR GENERAL ELECTRIC AND THEN I STAYED HOME FOR TEN YEARS TO
RAISE MY CHILDREN. AND THEN I WENT TO WORK FOR JACKSONVILLE STATE UNIVERSITY,
ASSISTANT FINANCIAL AID DIRECTOR. AND WHEN I WENT TO GOODYEAR, I WAS A DISTRICT
MANAGER FOR H & R BLOCK. I MANAGED FOURTEEN LOCATIONS.
Q. WHEN YOU STARTED AT GOODYEAR IN FEBRUARY OF '79, WHAT JOB DID YOU START IN?
A. I WAS HIRED IN ON THE SQUAD, WHICH WAS SUPERVISOR'S TRAINING PROGRAM, AND
LATER I BECAME A SUPERVISOR.
Q. HOW LONG, APPROXIMATELY, DID YOU WORK AS A SUPERVISOR AT THE GOODYEAR PLANT?
*35 A. MY ENTIRE CAREER, EXCEPT FOR THOSE LAST FEW MONTHS OF 1998 AS A
TECHNOLOGIST SPECIALIST.
Q. WE'VE HEARD SOMETHING CALLED AREA MANAGER. AT SOME POINT IN TIME, DID THE
TITLE CHANGE?
A. YES, IT WAS A SUPERVISOR. AND IN 1985, THEY CHANGED THE JOB DESCRIPTION
SOMEWHAT, ADDED ADDITIONAL RESPONSIBILITY TO THE JOB, AND IT CHANGED TO AREA
MANAGER AT THAT TIME.
Q. WHEN THE JOB TITLE CHANGED OVER TO AREA MANAGER, WERE YOU REQUIRED TO GO
THROUGH SOME SPECIAL TRAINING? [*25]
A. YES, WE WERE.
Q. WHAT WAS THAT FOR?
A. THAT WAS IN ORDER TO PREPARE US AND HAVE US READY TO SUPERVISE THE
MAINTENANCE AND ELECTRICIAN PEOPLE.
Q. WERE YOU TESTED ON THAT TRAINING ON ELECTRICAL AND MECHANICAL?
A. YES, I WAS.
Q. HOW DID YOU SCORE ON THAT TEST IN COMPARISON TO ALL THE MEN THAT YOU WERE
WORKING WITH?
*36 A. WITH THE MECHANICAL, I FINISHED SECOND OUT OF ALL THE 44 TO 60 PEOPLE;
AND THE ELECTRICIAN'S TEST, I FINISHED FOURTH OUT OF ALL OF THEM. AND THEN WHEN
YOU AVERAGED THE TWO GRADES TOGETHER, I FINISHED SECOND.
     *****

[*29]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                    Page 18

2006 WL 2612645 (U.S.)


    Q. DID THE PLANT MANAGER, RICHARD ODELL, SAY ANYTHING THAT INDICATED THAT YOU
WERE NOT WELCOME THERE AS A WOMAN?
    A. YES, SIR.
    Q. WHAT DID HE SAY TO YOU?
    A. HE SAID THAT - THAT THAT PLANT DID NOT NEED WOMEN, THAT WE DIDN'T HELP IT, WE
CAUSED PROBLEMS.
    *****

  [*30]
    Q. NAME FOR ME THE OTHER WOMEN THAT YOU KNOW OF THAT WORKED AS AREA MANAGERS
WHEN YOU WERE AN AREA MANAGER.
    A. JOANNE FIRESTONE WAS THERE FOR A FEW YEARS. SHE QUIT. CATHY ROBERTSON, SHE
WAS AN AREA MANAGER. SHE CAME ON *37 BOARD ABOUT 1993, AND I BELIEVE SHE QUIT IN
1998.
    Q. DO YOU KNOW OF ANY OTHER WOMEN WHO WORKED AS AREA MANAGERS?
    A. NOT WHILE I WAS THERE. I CAN'T THINK OF ANY RIGHT NOW.
    Q. APPROXIMATELY, SO WE AN GET AN UNDERSTANDING - THERE'S YOU AND THOSE TWO
OTHER WOMEN FOR A SHORT PERIOD OF TIME - APPROXIMATELY HOW MANY MEN WORKED AS AREA
MANAGERS?
    A. PROBABLY SOMEWHERE IN THE NEIGHBORHOOD OF EIGHTY.
    Q. DURING THAT ENTIRE PERIOD?
    A. DURING MY ENTIRE CAREER.
    Q. DO YOU KNOW OF ANY WOMAN WHO WORKED AS AN AREA MANAGER FOR AS LONG AS YOU
DID?
    A. NO, SIR, I DO NOT.
    *****

  [*31]
    Q. WHEN YOU STARTED AT GOODYEAR, WHO WERE THE OTHER MALES THAT STARTED OFF
WORKING WITH YOU, CONTINUED TO *38 WORK WITH YOU, UP UNTIL THE END OF YOUR
EMPLOYMENT?
    A. STEVE THOMPSON, DAVID BARNES, JIMMY TODD, TERRY AMBERSON, DONALD MYERS.
    Q. OKAY. HAVE YOU HAD AN OPPORTUNITY TO GO THROUGH THE - THE FIVE MEN - THOSE
FIVE MEN - HAVE YOU HAD AN OPPORTUNITY TO LOOK AT THEIR PAY RECORDS IN COMPARISON
TO YOURS?
    A. YES, SIR, I HAVE.
    Q. HAVE YOU LOOKED AT THEIR PAY RECORDS UP UNTIL THE PRESENT?
    A. YES, SIR.
    Q. AND WHEN YOU WERE LOOKING AT THEIR PAY RECORDS, DID YOU ASSIST MY PARALEGAL
IN GOING GO THROUGH AND CREATING A CHART?
    A. YES, WE DID.
    (MR. GOLDFARB HOLDING LARGE CHART.)
    THE COURT: DON'T SHOW IT TO THE JURY UNTIL IT'S RECEIVED IN EVIDENCE.
    MR. GOLDFARB: OKAY.
    Q. THIS IS A CHART - IS THIS A CHART THAT YOU CREATED, MRS. LEDBETTER?
    *39 A. YES, SIR, IT IS.
    *****

  [*34]
    Q. QUICKLY, JUST RUNNING THROUGH THIS, ON APRIL 1ST, 1979, WHAT WAS YOUR SALARY

          © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                           Page 19

2006 WL 2612645 (U.S.)


AND THE SALARY OF THE MEN AT THAT TIME?
   A. EACH OF US WAS MAKING $16,760.52.
   Q. AND THEN OCTOBER 1979, WHAT WAS YOUR SALARIES?
   A. EACH OF US CONTINUED TO KEEP THE SAME SALARY AT $18,216.96.
   Q. DID YOU CONTINUE TO HOLD THE SAME JOB TITLE THAT THESE MEN HELD DURING YOUR
CAREER?
   A. YES, SIR, I DID.
   Q. THEY WERE ARE MANAGERS AND YOU WERE AN AREA MANAGER?
   A. YES, SIR.
   *****

   [*36]
   Q. LET'S JUST TALK ABOUT MR. MAUDSLEY.
   *40 A. OKAY.
   Q. DID MR. MAUDSLEY - WHAT WAS HIS JOB AT THAT PARTICULAR TIME, WHAT DID HE DO
TO YOU?
   A. HE WAS MY BUSINESS CENTER MANAGER, OR AT THAT TIME, THEY WERE CALLED
DEPARTMENT FOREMEN. HE WAS RATING ME, DOING THE ANNUAL EVALUATIONS.
   AND HE TOLD ME THAT IF I WOULD MEET HIM OVER AT THE RAMADA INN IN ATTALLA, THAT
I POSSIBLY COULD MOVE UP FROM BEING EVALUATED ELEVEN OUT OF TWELVE, WHICH IS NEAR
THE BOTTOM; OR I MIGHT BE UP TO FIVE OR MAYBE EVEN A THREE.
   Q. WHAT ELSE DID MR. MAUDSLEY SAY?
   A. AND HE SAID IF I DIDN'T DO THAT, THAT I WOULD NOT GET EVALUATED VERY HIGHLY.
AND I ASKED HIM HOW COULD HE DO THAT, BASED ON MY JOB [*37] PERFORMANCE. AND HE
SAID IT WAS MORE IMPORTANT AT GOODYEAR THAT MY BOSSES LIKED ME THAN ME TO DO A
GOOD JOB.
   THE COURT: NOW, LADIES AND GENTLEMEN, LET ME GIVE YOU A CAUTIONARY INSTRUCTION.
YOU SHOULD NOT RECEIVE THIS TESTIMONY AND EVIDENCE FOR THE PURPOSE OF ASSESSING
DAMAGES, *41 BECAUSE IT OCCURRED TOO FAR BACK IN TIME OF LIABILITY FOR THE
COMPANY.
   Q. WHAT DID YOU DO AFTER MR. MAUDSLEY MADE THAT COMMENT TOWARDS YOU?
   A. WELL, I TRIED TO HANDLE IT MYSELF FOR A WHILE AND IT CONTINUED TO GET WORSE,
SO I WENT TO JERRY JONES FOR ASSISTANCE. BECAUSE AT THAT TIME, HE WAS IN H.R. AND
HE WAS PERSONNEL SPECIALIST IN THE RADIAL PLANT.
   Q. SO, JERRY JONES IS THE NAME OF THIS - HE WAS A PERSONNEL SPECIALIST?
   A. THAT'S WHAT I KNEW HIM AS.
   Q. SO YOU WENT TO JERRY JONES, AND WHAT DID YOU SAY TO HIM?
   A. I TOLD HIM I NEEDED SOME ASSISTANCE, I WAS BEING HARASSED; AND I NEEDED TO
EITHER BE MOVED OR I NEEDED SOMEBODY TO HELP ME IN REGARDS TO MY SITUATION.
   Q. WHAT DID JERRY JONES SAY TO YOU WHEN YOU TOLD HIM ABOUT
   WHAT MR. MAUDSLEY HAD DONE ABOUT THE SEXUAL HARASSMENT? WHAT DID HE SAY?
   A. HE TOLD ME I WAS A TROUBLEMAKER, AND THAT MR. - WE'E NOT TALKING ABOUT - HE
SAID THAT THESE MEN HAD GOOD *42 CAREERS [*38] AT GOODYEAR AND THEY WERE NOT GOING
TO DISMISS THEM; AND THAT GOODYEAR REALLY DIDN'T NEED TROUBLEMAKERS LIKE ME.
   Q. AND IS THAT - AFTER THAT IS WHEN YOU FILED YOUR EEOC CHARGE?
   A. YES, SIR. WELL, ACTUALLY, I HAD ANOTHER MEETING WITH MR. JONES SOME TIME
LATER, AND HE SAID THEN THAT THEY WOULD GET RID OF ME. AND THAT'S WHEN I WENT TO
THE PAY PHONE AND CALLED EEOC.
   Q. WHAT HAPPENED WITH THE EEOC?
   A. I BEGGED THEM TO GET A CHARGE IN THERE BEFORE THE NEXT WEEK, BECAUSE I KNEW

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                    Page 20

2006 WL 2612645 (U.S.)


THAT WHEN - BY THE NEXT WEEK, THAT I'D PROBABLY BE TERMINATED.
   Q. AND THEN - SO YOU FILED AN EEOC CHARGE; RIGHT?
   A. YES, SIR.
   Q. THAT'S EXHIBIT 3?
   A. YES, SIR.
   Q. AND THEN AFTER YOU FILED THE EEOC CHARGE, HOW WAS THAT RESOLVED?
   A. I RECEIVED THE RIGHT TO SUE, AND THEN WE - THE COMPANY AND I REACHED AN *43
AGREEMENT, AND I GOT MY AREA MANAGER'S JOB BACK AND MOVED AWAY FROM THOSE TWO.
   Q. SO YOU WERE PUT - YOU HAD BEEN TAKEN OUT OF THE MANAGEMENT JOB AND YOU GOT
PUT BACK IN THE AREA MANAGER JOB IN 1982 OR '83?
   A. YES, SIR.
   *****

   [*40]
   Q. NOW, FROM 1990 TO 1998, MOVING ON UP TO - CLOSER TO THE PRESENT, AND UP TO
THE PRESENT WHEN YOU LEFT - DID YOU WORK WITH, OR WERE YOU SUPERVISED BY MR.
MAUDSLEY OR MR. JONES?
   A. YES. YES, SIR.
   Q. WHO AMONG - WHO OF THOSE TWO SUPERVISED YOU FIRST?
   A. I HAD - WELL, ACTUALLY, I WASN'T SUPERVISED BY MAUDSLEY, HE WAS MY AUDITOR.
   Q. WHAT IS AN AUDITOR?
   A. AN AUDITOR IS ONE WHO COMES THROUGH THE DEPARTMENT AND HE CHECKS CERTAIN
ASPECTS OF THE DEPARTMENT, WHETHER IT BE SAFETY, HOUSEKEEPING - THERE'S *44 ABOUT
EIGHT DIFFERENT THINGS THAT HE CHECKS - AND HE EVALUATES. HE HAS FORMS HE FILLS
OUT. AND THEN ALSO, THE AREA MANAGERS COMPLETE CERTAIN [*41] FORMS, DOCUMENTS. AND
MY - THE TIRE BUILDERS, THE WORKERS, FILLED OUT FORMS; AND WE, IN TURN, TURNED
THOSE IN, AND HE KEEPS CHECK ON THOSE, TOO.
   Q. MR. MAUDSLEY WOULD KEEP RECORDS OF YOUR PERFORMANCE -
   A. THAT'S CORRECT.
   Q. - THROUGH THESE AUDITS? HOW DID HE EVALUATE YOU?
   A. VERY POORLY. IN FACT, HE COME THROUGH THE DEPARTMENT AND WRITE PEOPLE UP FOR
NOT - FOR EXAMPLE, NOT HAVING SAFETY EQUIPMENT ON. AND YOU COULD BE - I COULD BE
STANDING THERE LOOKING AT THEM AND THEY'D HAVE IT ON. BUT YET HE WOULD FILL THE
PAPERWORK OUT THAT THEY DID NOT HAVE IT ON. HE'D ALSO SAY I HADN'T TURNED IN
FORMS, AND I HAD.
   Q. SO, SAFETY EQUIPMENT, SUCH AS - SAY, FOR EXAMPLE, GOGGLES?
   A. RIGHT.
   Q. GIVE ME AN EXAMPLE OF THAT SITUATION.
   A. I HAD ONE TIRE BUILDER THAT HE HAD HIS COMPLETE PPE EQUIPMENT ON: EAR PLUGS,
*45 GOGGLES, SAFETY SHOES - AND MAUDSLEY DISCUSSED GOLF WITH HIM. BUT YET, WHEN
THE PAPERWORK CAME BACK, MY BUILDER GRAY GOT WROTE UP FOR NOT HAVING PPE EQUIPMENT
ON.
   Q. DID HE HAVE IT ON?
   A. YES, HE HAD IT ON. AND HE HAD HAD IT ON THAT NIGHT.
   Q. DID YOU - WHEN YOU WERE GETTING THESE - DID YOU THINK THESE SCORES THAT MR.
MAUDSLEY WAS GIVING YOU WERE CORRECT? [*42]
   A. NO.
   Q. WERE THEY -
   A. - I KNEW THEY WASN'T.
   Q. DID YOU CONFRONT HIM ABOUT THESE ERRONEOUS SCORES THAT HE WAS GIVING YOU?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                      Page 21

2006 WL 2612645 (U.S.)


A. YES, I DID. I WENT TO MR. MAUDSLEY FIRST -
MR. ST. CLAIR: YOUR HONOR, AGAIN, I OBJECT TO THIS ON THE ISSUE OF TIMELINESS.
IT'S NOT THE ISSUES OF THIS CASE.
MR. GOLDFARB: THIS -
**46 THE COURT: RESPONSE?
MR. GOLDFARB: HE WAS HER AUDITOR IN AS LATE AS 1997 AND '98 - '97 -
THE WITNESS: - '97
MR. GOLDFARB: - HE WAS HER AUDITOR.
THE COURT: OBJECTION IS OVERRULED.
Q. GO AHEAD.
A. I WENT TO MIKE AND ASKED HIM WHY DID HE CONTINUE TO DOWNGRADE MY DEPARTMENT
AND DOWNGRADE MY REPORTS WHEN HE KNEW THAT THEY WAS THERE AND IT WAS - IT'S GOOD
AND BETTER THAN MOST. AND HE SAID, WELL, HELL, IT'S A LOT EASIER TO DOWNGRADE YOU.
HE SAID, YOU'E JUST A LITTLE FEMALE AND THESE BIG OLD GUYS, I MEAN, THEY'E GOING
TO BEAT UP ON ME AND PUSH ME AROUND AND CUSS ME. AND SAID, I KNOW YOU'E NOT GOING
TO [*43] CUSS BACK. HE SAID, HELL, IT'S A LOT EASIER TO WRITE YOU UP.
Q. DID MR. MAUDSLEY DO ANYTHING ELSE TO YOU SIMILAR TO THAT?
A. YES, SIR. HE CONTINUED TO ASK ME OUT, GO OUT WITH HIM. AND I FINALLY TOLD HIM
NO. AND THEN FROM THAT STANDPOINT, MY EVALUATIONS, THE AUDITS GOT WORSE.
**47 *****

[*57]
Q. WHEN YOU WERE IN THE RLT JOB, WHAT WAS THE LAST DOCUMENT THAT - THAT'S THE
JOB THAT MR. PAYNE GOT - WHAT WAS THE LAST DOCUMENT THAT YOU RECEIVED FROM
GOODYEAR RELATED TO YOUR JOB PERFORMANCE?
A. THAT IT WAS OUTSTANDING. [*58]
Q. WAS IT -
A. - GREAT JOB.
Q. OKAY. WHAT WAS THAT DOCUMENT?
A. IT WAS A NOTE FROM KIM WHITEMAN.
Q. DID YOU RECEIVE ANY PERFORMANCE AWARDS WHILE YOU WERE IN THE RLT?
A. YES, I DID.
Q. WHAT TYPE OF PERFORMANCE AWARDS?
A. THAT WAS 1995 WHEN MIKE TUCKER TOLD ME I'D DONE AN OUTSTANDING JOB, I GOT A
TOP PERFORMANCE AWARD.
Q. WAS THAT THE LAST DOCUMENT YOU RECEIVED WHEN YOU WERE IN RLT?
A. THAT'S CORRECT.
**48 *****

[*74]
Q. WHEN YOU WENT OVER TO THE TECHNOLOGY ENGINEER JOB, TELL ME, DID YOU RECEIVE
ANY TRAINING, MATERIALS -
A. NO, SIR.
Q. - OR ANYTHING -
A. NO, SIR. THEY SAID THERE WAS NOT ANY. I ASKED FOR A JOB DESCRIPTION AND A
PROCEDURE BOOK, AND THEY DIDN'T HAVE THEM.
Q. NOW, AS AN AREA MANAGER ALL YOUR CAREER, YOU'VE BEEN SUPERVISING PEOPLE;
RIGHT?
A. RIGHT.
Q. YOU GO OVER TO THE TECH JOB, AND TELL US WHAT - WHAT WERE YOUR DUTIES, WHAT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                    Page 22

2006 WL 2612645 (U.S.)


DID YOU DO WHEN YOU GOT OVER TO THE TECHNICAL ENGINEER JOB, WHAT DID THEY HAVE YOU
DOING?
    A. ONE OF THE MAIN RESPONSIBILITIES, WE WERE RUNNING HUMMER TIRES IN THE PLANT.
AND IT WAS OUR JOB TO CHECK, HAND CHECK, AT LEAST A HUNDRED AND TWENTY-FIVE PER
SHIFT, WHICH MEANT THAT IF THE OFF-GOING SHIFT DIDN'T DO THEIRS, THAT MEANT I
CAUGHT 250 OF *49 THEM. [*75] AND THEY WEIGH 80 POUNDS A PIECE. THEY GO ON
HUMMERS. THEY'RE EXTREMELY HEAVY TIRES. THERE WERE 16 PER TRUCK. I HAD TO GET THEM
OFF THE TRUCK. I HAD TO EXAMINE THEM INSIDE, BOTH SIDES, TREAD, ALL THE - THE
ENTIRE TIRE, BECAUSE THIS COULD NOT - WE COULD NOT HAVE ANY DEFECTS GET OUT OF THE
PLANT. AND THEN I HAD TO EXAMINE APPROXIMATELY 120 OF THE REGULAR TIRES PER SHIFT,
AND I HAD TO WORK IN THE PITS ALSO. AND THE PITS IS WHERE THEY CURED THE TIRES.
    Q. HOW DID YOU MOVE THESE 80-POUND TIRES AROUND?
    A. JUST ROCKING AND PUSHING UNTIL I COULD GET THEM OFF THE TRUCK. AND JUST
ROCKING AND PULLING AND PUSHING, AND FINALLY GET THEM OFF THE TRUCK.
    Q. COULD YOU PICK THEM UP?
    A. I COULDN'T PICK THEM UP. 80 POUNDS EACH, I'D JUST KEEP ROLLING THEM UNTIL I
COULD CHECK EACH SECTION AND EACH SPOT ON THE TIRE - INSIDE AND OUT.
    *****

                    *50 Cross-Examination of Lilly Ledbetter
    [*90]
    Q. YES, MA'AM. YOU DON'T - YOU DON'T CLAIM TO BE AS QUALIFIED AS DICK JONES TO
BE AN AREA MANAGER IN THE TIRE ASSEMBLY ROOM, DO YOU?
    A. HOW DO YOU DEFINE "AS QUALIFIED"? BECAUSE I HAD 20 YEARS EXPERIENCE AS AN
AREA MANAGER; I HAD BEEN A MANAGER FOR 15 YEARS PRIOR TO GOING TO GOODYEAR, AND
MANAGEMENT IS MANAGEMENT.
    *****

                    Redirect Examination of Lilly Ledbetter
    [*151]
    Q. MR. JONES IS THE PERSON WHEN YOU - WHO YOU COMPLAINED ABOUT THE SEXUAL
HARASSMENT; RIGHT?
    A. THAT'S RIGHT.
    Q. AND LOTHER YARBROUGH IS THE PERSON WHO WAS PUTTING HIS HANDS ON YOU THAT YOU
JUST TESTIFIED ABOUT IS THE PERSON YOU TOLD MR. JONES ABOUT; RIGHT?
    A. THAT'S RIGHT.
    *51 Q. AND WHAT DID HE SAY TO YOU?
    A. HE SAID, WELL, LOTHER HAS 30 YEARS SERVICE, HE'S A GOOD EMPLOYEE AND WE'LL
DEFINITELY KEEP HIM. YOU'RE A TROUBLEMAKER AND WE DON'T NEED YOU.
    *****

                    Direct Examination of Cathy Robertson
    [*206]
    Q. HAVE YOU EVER WORKED AT THE GOODYEAR PLANT BEFORE?
    A. YES, SIR, I HAVE.
    Q. TELL ME ABOUT YOUR EMPLOYMENT HISTORY, PLEASE, AT THE GOODYEAR PLANT.
    A. I HIRED IN IN APRIL OF 1976. I WORKED AS A UNION WORKER IN THE PLANT FOR 17
YEARS. I BUILT TUBES, CURED, BUILT TIRES FOR EIGHT YEARS.
    I WAS A UNION REPRESENTATIVE FOR ONE YEAR, AND I - IN SUPERVISION FOR FIVE
YEARS.

                    © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645 (U.S.)


*****

**\*52** [*208]
Q. YOU WERE SUPERVISED BY MEN OR WOMEN?
A. IT WAS JUST MEN.
Q. AT SOME POINT - WELL, ALSO, YOU SAID YOU WERE A UNION - HOW LONG WERE YOU A
UNION REP?
A. ONE YEAR.
Q. AT SOME POINT, DID YOU BECOME AN AREA MANAGER.
A. YES, SIR. IN 1993, I - THEY OPENED UP A TESTING, ASSESSMENT PROGRAM WHERE
ANYBODY THAT WAS INTERESTED COULD TURN IN A RESUME. AND IF THEY WERE CHOSEN, THEY
COULD GO THROUGH THIS CLASS AND TEST AND GO THROUGH ALL KIND OF QUESTIONS AND
ANSWER SESSIONS; THEN THEY CHOSE FROM THAT POOL. I DON'T REMEMBER HOW MANY
SUPERVISORS THEY PUT ON AT THAT TIME, BUT IT WAS PROBABLY TWO OR THREE.
Q. AND YOU WERE ONE OF THEM?
A. YES, SIR.
Q. YOU KNOW WHY YOU WERE PICKED?
**\*53** A. WELL, I HAVE MY IDEAS ABOUT THAT. I FEEL LIKE IT WAS TIME THAT THEY HAD
ANOTHER WOMAN SUPERVISOR -
MR. ST. CLAIR: YOUR HONOR, I OBJECT TO WHAT SHE FELT.
THE COURT: SUSTAINED.

Q. HOW LONG DID YOU WORK AS AN AREA MANAGER? [*209]
A. FIVE YEARS.
Q. WHERE DO YOU WORK - DID YOU LEAVE?
A. YES, SIR. I TOOK A BUYOUT WHEN THE PLANT DECIDED TO CLOSE DOWN. I FIGURED I'D
BE THE FIRST ONE OUT THE DOOR -
Q. WHERE DO YOU WORK TODAY?
A. I WORK AT HONDA MANUFACTURING IN LINCOLN.
Q. ARE YOU A SUPERVISOR AT HONDA TODAY?
A. YES, SIR.
Q. WERE YOU EVALUATED WHILE YOU WERE AN AREA MANAGER?
A. THE ONLY EVALUATION I REMEMBER WAS THE YEAR BEFORE I LEFT. AND, LITERALLY, **\*54**
IT STUNK. I REALLY DIDN'T AGREE WITH IT. I TOLD THE GENTLEMAN THAT WAS GIVING THE
EVALUATION - TELLING ME THE RESULTS OF THE EVALUATION THAT I DIDN'T AGREE WITH IT.
AND HE SAID, WELL, THAT'S JUST THE WAY IT IS. THIS IS THE WAY YOU'E EVALUATED. AND
THEY JUST LEFT IT AT THAT. I JUST TOLD THEM I DIDN'T AGREE WITH ANY OF IT.
Q. WERE YOU DOING ANYTHING DIFFERENT THAN THE MEN THAT WORKED ALONG BESIDE OF
YOU -
A. NO, SIR, WE WORKED IN THE SAME JOB.
Q. WHY DO YOU THINK YOU WERE - WHY WERE YOU GRADED LOWER?
MR. ST. CLAIR: YOUR HONOR, OBJECT TO WHAT SHE THINKS OR FEELS.
Q. WHY - WHAT IS YOUR UNDERSTANDING THAT YOU WERE GRADED LOWER - YOUR OPINION?
[*210]
THE COURT: OVERRULED. I'LL ALLOW HER TO TESTIFY TO HER UNDERSTANDING.

Q. WHAT IS YOUR UNDERSTANDING?
A. MY UNDERSTANDING WAS THAT I JUST - THE WAY THEY PUT IT, I WAS NOT DOING THE
JOB 100 PERCENT THAT THEY - WHAT **\*55** THEY EXPECTED OF ME. AND I WAS DOING MY JOB
EXACTLY LIKE EVERYBODY ELSE WAS. I WAS DOING WHAT THEY TOLD ME TO DO. AND ANYTHING

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                    Page 24

2006 WL 2612645 (U.S.)


THEY SAID WHAT THEY WERE EXPECTING OF ME, THAT'S WHAT I DONE.
    Q. AND YOU WERE WORKING THE SAME AS THE MEN?
    A. YES, SIR.
    Q. WHAT - WHAT WAS YOUR - DID YOU REACH AN UNDERSTANDING AS TO WHY YOU WERE PAID
- WHY YOUR EVALUATION WAS LOWER?
    A. JUST SEEMED - WELL, THE WOMEN WERE, FOR SOME REASON, RATED LOWER THAN THE
MEN. THEY DIDN'T THINK THEY COULD DO THE JOB THAT THE MEN COULD DO.
    Q. DID YOU LET THEM KNOW YOU THOUGHT THE EVALUATION WAS WRONG?
    A. YES, SIR, I DID.
    Q. AS A RESULT - WELL, TELL ME ABOUT YOUR RAISES AS A RESULT OF THE EVALUATION.
HOW DID THAT GO?
    A. THE RAISE THAT WAS GIVEN TO ME AT THAT EVALUATION, I WAS TOLD BY SAM CLARK
THAT THAT RAISE - THAT HE HAD TO GET ME UP TO A CERTAIN LEVEL BECAUSE I WAS *56
WAY BELOW THE LEVEL THAT I [*211] WAS SUPPOSED TO BE AT, PAY WISE.
    Q. SAM CLARK IS UPPER MANAGEMENT?
    A. HE WAS LIKE A MANAGER OVER THE AREA MANAGERS. YES, SIR.
    Q. DO YOU KNOW HOW MUCH YOU WERE PAID WHEN YOU STARTED OFF AS AN AREA MANAGER?
    A. NO, SIR, I DON'T KNOW HOW MUCH I MADE WHEN I STARTED OFF. I KNOW WHAT I COME
OUT MAKING.
    Q. ALL RIGHT. IF I COULD GET EXHIBIT -
    MR. GOLDFARB: I WANT TO OFFER EXHIBIT 98, WHICH IS HER PAY RECORDS.
    THE COURT: WITHOUT OBJECTION, IT'S RECEIVED IN EVIDENCE.

    Q. THIS IS EXHIBIT 98.
    THE COURT: IT MAY BE PUBLISHED TO THE JURY.

    Q. MA'AM, I DON'T KNOW IF YOU'VE EVER SEEN THAT BEFORE, THAT'S SOMETHING THE
COMPANY DOES, IT SHOWS YOUR PAY *57 RECORDS. HAVE YOU SEEN ANYTHING LIKE THAT?
    A. NO, SIR.
    Q. DID YOU KNOW WHAT YOUR PAY WAS - I UNDERSTAND YOU WERE TOLD YOU WERE PAID
LESS - BUT DID YOU KNOW WHAT YOUR PAY WAS IN COMPARISON TO THE MEN YOU WORKED
WITH?
    A. NO, SIR. I DIDN'T KNOW THERE WAS ANY LIMIT THEY HAD TO BE AT. I WAS NOT TOLD
THERE WAS A LEVEL THAT WAS A MINIMUM [*212] LEVEL OR A MAXIMUM LEVEL. I WAS JUST
TOLD, THIS IS WHAT YOU WOULD BE PAID. THERE WOULD BE NO DEDUCTION, THIS IS IT.
    Q. THESE ARE SOME EXHIBITS THAT THE DEFENDANT ENTERED. AND IF I COULD SHOW YOU -
    MR. GOLDFARB: MAY I APPROACH THE WITNESS, YOUR HONOR?
    THE COURT: YES.

    Q. EXHIBIT 61 WAS MR. AMBERSON'S RECORDS, AND THE COMMON DATE IS 2/1/95. YOU SEE
THAT ON THERE?
    A. YES.
    *58 Q. AND YOU'RE AT 2728 A MONTH; RIGHT?
    A. YES, SIR.
    Q. MR. AMBERSON, DO YOU SEE HOW MUCH HE IS AT A MONTH?
    A. 4425.
    Q. THAT'S ON DEFENDANT'S EXHIBIT 61. ANOTHER AREA MANAGER THEY'VE GIVEN US THAT
WE HAVE HERE IS MR. BARNES. ON 2/1/95, YOU WERE AT 27, HE WAS AT HOW MUCH?
    A. 4186.
    Q. AND MR. TODD, WHAT WAS HE AT WHEN YOU WERE 2728?

            © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                      Page 25

2006 WL 2612645 (U.S.)

A. 4662.
Q. MR. THOMPSON, 64, WHAT WAS HE AT ON THAT DATE?
A. 4320.
Q. AND MR. MYERS? [*213]
A. 3960.
Q. AND YOU WERE AT 27?
A. YES, SIR.
*59 Q. DID YOU KNOW THAT THEY WERE PAID THAT MUCH MORE THAN YOU?
A. YOU ALWAYS HEAR RUMORS THAT - AND I'VE HEARD IT OUT OF SEVERAL PEOPLE'S
MOUTHS THAT THEY MADE QUITE A BIT MORE THAN I DID.
Q. AND YOU COULD GET OVERTIME AS AN AREA MANAGER AT THAT COMPANY; RIGHT?
A. YES, SIR.
Q. THAT'S - YOU UNDERSTOOD THAT THEY ALSO GOT OVERTIME; RIGHT?
A. YES, SIR. BUT THAT WOULDN'T BE REFLECTED ON YOUR -
Q. BUT THAT'S NOT OVERTIME?
A. - RIGHT.
Q. DID YOU COME TO AN UNDERSTANDING AS TO WHY YOU WERE BEING PAID LESS THAN THE
MEN THAT WERE HOLDING THE SAME JOB YOU WERE?
A. NO, SIR, I WAS NEVER GIVEN THE REASON FOR THAT. I - I ALWAYS FELT BECAUSE I
WAS A FEMALE AND I WAS PUT IN -
MR. ST. CLAIR: YOUR HONOR, I OBJECT TO FEELINGS.

Q. WHAT WAS YOUR UNDERSTANDING?
THE COURT: SUSTAINED.
Q. DID YOU COME UP WITH ANY OTHER REASON AS TO THE REASON [*214] YOU WERE PAID
LESS AS AN AREA MANAGER THAN THE MEN?
A. JUST BEING A FEMALE -
Q. ALL RIGHT. AND YOUR HIRE DATE -
A. - IN A MAN'S WORLD.
Q. - WAS 1976; RIGHT?
A. YES, SIR.
Q. YOU WERE - DO YOU KNOW WHETHER YOU WERE HIRED BEFORE OR AFTER DONALD MYERS?
A. NO, SIR, I DON'T KNOW WHAT DATE HE WAS HIRED ON.
Q. LOOK AT EXHIBIT 63, SEE WHAT HIS CONTINUOUS SERVICE DATE IS?
A. 11/16/77.
Q. SO YOU WERE HIRED BEFORE HIM?
A. YES, SIR. I WAS HIRED IN '76.
*61 Q. DID YOU EVER COMPLAIN THAT YOU WERE BEING PAID LESS BECAUSE OF YOUR
GENDER?
A. NO, SIR, I DID NOT COMPLAIN, BECAUSE I WAS A SINGLE MOTHER WITH A HANDICAPPED
CHILD, AND I FELT THAT MY JOB - I KNEW THAT MY JOB WOULD BE IN JEOPARDY IF I
STARTED COMPLAINING ABOUT THE PAY.AND YOU DID NOT HAVE ANY SECURITY BEING ON A
SALARY JOB, BECAUSE THEY COULD LET YOU GO AT ANY TIME FOR ANY REASON.
Q. DID YOU WORK WITH MRS. LEDBETTER WHILE YOU WERE AN AREA MANAGER?
A. YES, SIR, I DID. [*215]
Q. DID YOU SAY YOU WERE AN AREA MANAGER IN STOCK PREP?
A. STOCK PREP. UH-HUH.
Q. AND SHE WAS AN AREA MANAGER WHERE, WHEN YOU WERE IN STOCK PREP?
A. SHE WAS IN THE TIRE ROOM. WE SUPPLIED THE COMPONENTS FOR HER TIRES.
Q. SO YOU GET THE COMPONENTS TOGETHER AND SHE BUILDS THE TIRES?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                          Page 26

2006 WL 2612645 (U.S.)


A. RIGHT.
*62 Q. DID YOU HAVE ANY - SO YOU HAD TO WORK WITH HER; RIGHT?
A. YES, SIR.
Q. WERE YOU ON NIGHT SHIFT?
A. YES, SIR.
Q. AND SHE WAS ON NIGHT SHIFT?
A. YES, SIR.
Q. DID YOU HAVE ANY PROBLEMS WITH THE WAY SHE DID HER JOB?
A. NO, SIR, I DID NOT.
Q. DID IT CAUSE YOU ANY PROBLEMS ON YOUR END?
A. NO, SIR, IT DID NOT.
Q. FROM YOUR UNDERSTANDING, DID MRS. LEDBETTER KNOW WHAT SHE WAS DOING ON HER
JOB?
A. YES, SHE DID.
*****


                    *63 Direct Examination of Retha Burns
[*224]
Q. WHEN WERE YOU HIRED AT GOODYEAR?
A. 1971.
Q. WERE YOU EVER A SUPERVISOR AT GOODYEAR?
A. YES, I WAS.
Q. WHEN WERE YOU FIRST A SUPERVISOR.
A. IN 1971, I WENT ON THE PLANT SQUADRON TRAINING PROGRAM, AND I WAS SUPERVISOR
UNTIL - FOR EIGHT YEARS.
Q. AND -
A. - 1973, EXCUSE ME.
Q. WHY DID YOU STOP BEING A SUPERVISOR AFTER BEING A SUPERVISOR FOR EIGHT YEARS
AT THAT TIME PERIOD?
A. I HAD A SMALL CHILD AT HOME, I WAS A SINGLE PARENT. I WAS WORKING SECOND AND
THIRD SHIFT, SIX DAYS A WEEK. THE LADY THAT HAD BEEN KEEPING MY CHILD DIED OF
CANCER, AND I HAD NO ONE TO TAKE CARE OF HER.
*64 Q. AT THAT PERIOD OF TIME, IT WAS CALLED SUPERVISOR. DID THAT JOB TITLE
LATER GET ANOTHER NAME?
A. AREA MANAGER IS WHAT IT'S CALLED TODAY.
Q. DID YOU FILE AN EEOC CHARGE AGAINST THE COMPANY?
A. YES, SIR, I DID.
MR. GOLDFARB: WE OFFER EXHIBIT 90. [*225]

Q. WELL, FIRST, IS THAT THE EEOC CHARGE YOU FILED?
A. YES, SIR, IT IS.
MR. GOLDFARB: WE OFFER EXHIBIT 90.
MR. ST. CLAIR: YOUR HONOR, WE JUST RENEW THE OBJECTION OF THE MOTION IN LIMINE.
THE COURT: ALL RIGHT. IT'S RECEIVED.

Q. IN THAT CHARGE YOU STATE THAT YOU WERE DISCRIMINATED AGAINST IN PAY, AMONG
OTHER THINGS, BUT YOU SAY IN PAY. DO YOU BELIEVE THAT?
*65 A. YES, SIR, I DO.
Q. HAVE YOU BEEN DISCRIMINATED AGAINST AS A SUPERVISOR, OR AS AN AREA - WORKING
THE JOB AS AN AREA MANAGER IN PAY AT GOODYEAR?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645 (U.S.)


A. IN THE EARLY NINETIES, I WAS APPROACHED BY HAROLD SMITH, THE THEN PLANT
MANAGER, TO GO BACK ON SUPERVISION. HE CALLED ME INTO HIS OFFICE, TOLD ME HOW MUCH
I WOULD BE STARTING AT, WHICH WAS THIRTY-TWO HUNDRED DOLLARS A MONTH, WHICH HE
SAID WAS THE BASE SALARY FOR AN AREA MANAGER; AND ASKED ME WOULD I CONSIDER GOING
BACK ON SUPERVISION.

AND I DID ACCEPT THE JOB, I DID GO IN THE SUPERVISION JOB. I WORKED IT FOR THREE
AND A HALF MONTHS. AT THE END OF THAT TIME, I NEVER GOT ANY MONEY.

I APPROACHED HIM - [*226]

THE COURT: WHAT DO YOU MEAN YOU NEVER GOT ANY MONEY?

THE WITNESS: I NEVER GOT ANY DIFFERENCE IN PAY. AT THE TIME, I WAS A SECRETARY
AND I WAS MAKING APPROXIMATELY TWENTY-TWO HUNDRED DOLLARS A MONTH. I WENT ON
SUPERVISION JOB, EVEN THOUGH I HAD EIGHT YEARS EXPERIENCE IN THE PAST. HE TOLD ME
HE WOULD START ME AT THIRTY-TWO HUNDRED AND THEN HE *66 WOULD GIVE ME RAISES TO
GET ME UP TO WHAT THE MEN WERE MAKING.

HOWEVER, I WORKED THE JOB THREE AND A HALF MONTHS, I NEVER RECEIVED A DIME. I
WORKED THAT JOB AS AN AREA MANAGER, I WAS ON SECOND SHIFT - EXCUSE ME, I WAS ON
THIRD SHIFT, AND HE NEVER PAID ME.


Q. WHERE WERE YOU WORKING AS AN AREA MANAGER AT A SECRETARY'S PAY, WHAT
PARTICULAR AREA?

A. I HAD - IT WAS CALLED THE - THERE WAS - IT WAS AN ARF LINE. IN ADDITION I HAD
R1, R2, R3H TIRE MACHINES; I HAD TRUCKERS, I HAD INSPECTION. I HAD A TOTAL OF 52
EMPLOYEES THAT I WAS RESPONSIBLE FOR.

Q. WERE THEY MAKING MORE THAN YOU>

A. OH, MUCH MORE.

Q. THE PEOPLE THAT YOU WERE SUPERVISING?

A. EXACTLY. I WAS MAKING SECRETARIAL PAY.

Q. IS THAT PARTICULAR JOB IN THE ARF ROOM ONE OF THE HARDEST [*227] JOBS AS AN
AREA MANAGER?

A. AT THAT TIME IT WAS, I WAS TOLD, THE HARDEST JOB.

*67 Q. WHY DO YOU THINK THEY WOULD NOT PAY YOU THE RATE THAT THE PLANT MANAGER
TOLD YOU THAT WE WOULD PAY YOU TO GET YOU UP TO THE THIRTY - -

A. I THINK IT WAS BECAUSE I WAS A FEMALE.

Q. YOU WERE MAKING APPROXIMATELY - HE HAD TOLD YOU THIRTY-TWO HUNDRED?

A. YEAH. I WAS GOING TO BE GETTING IN THE NEIGHBORHOOD OF A THOUSAND DOLLAR A
MONTH RAISE.

Q. SO YOU WERE MAKING ABOUT 2,000 OR TWENTY-TWO HUNDRED?

A. BETWEEN 2,000 AND TWENTY-TWO HUNDRED. I WAS GOING TO START AT THIRTY-TWO
HUNDRED, WITH THE UNDERSTANDING THE FACT THAT I HAD EIGHT YEARS EXPERIENCE THAT HE
WOULD PROGRESS ME UP AND GET ME TO WHAT THE MEN WERE MAKING.

Q. WHAT IS YOUR - HOW DID IT COME UP - WHAT'S YOUR UNDERSTANDING OF WHAT THE
THIRTY-TWO HUNDRED NUMBER REPRESENTED?

A. HE TOLD ME THAT WAS THE BASE LINE FOR AN AREA MANAGER.

Q. DID YOU EVER RECEIVE THE BASE, EVEN THE BASE PAY, AS AN AREA MANAGER?

*68 A. NO. I STAYED DOWN THERE, WHICH WAS THREE AND A HALF MONTHS AT THAT TIME
WHEN I WENT BACK AT TWO MONTHS AND ASKED ABOUT THE MONEY. "WE'RE WORKING ON IT."

I WENT BACK AT THREE MONTHS AND ASKED ABOUT THE MONEY. [*228] "WE'RE WORKING ON
IT." AT THREE AND A HALF MONTHS, HE FINALLY SAYS, "WE CAN'T GIVE YOU THE MONEY."

Q. AND WHAT HAPPENED?

A. I TOLD HIM I WANTED TO GO BACK TO THE OFFICE. I WAS NOT GOING TO WORK A

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645 (U.S.)

SUPERVISIONAL JOB FOR SECRETARIAL PAY.
    HE TOLD ME HE COULD GIVE ME A 20 PERCENT RAISE. 20 PERCENT, BEING - THAT WOULD
HAVE GOT ME UP TO THE NEIGHBORHOOD OF TWENTY-SIX HUNDRED DOLLARS.
    Q. STILL BELOW THE BASE?
    A. STILL MUCH BELOW THE BASE, FROM WHAT HE TOLD ME THE BASE WAS.
    *****

                        *69 Direct Examination of Kelly Owen
    [*257]
    Q. - BUT LET ME ASK A QUESTION. I KNOW IT WILL SEEM OBVIOUS, BUT JUST TO
ESTABLISH IT. DID YOU HAVE ANY ROLE OR SAY-SO IN WHAT THE SALARIES OF THE
EMPLOYEES WERE WHEN YOU CAME INTO THE AREA?
    A. NO.
    Q. JUST WHATEVER THEY WERE, THEY WERE?
    A. YEAH. WHATEVER THEY WERE, THEY WERE. WHAT I HAD SAY-SO IN IS HOW MUCH RAISE
THEY GOT FOR THE YEAR OF 19-- - FOR '98, I HAD A SAY IN WHAT THE RAISE WAS, BASED
ON THEIR '97 PERFORMANCE.
    Q. NOW, IN DETERMINING THE RAISE FOR 1998 UNDER THE SYSTEM IN PLACE AT THAT
TIME, WERE YOU SUPPOSED TO GIVE CONSIDERATION TO SOMEBODY WHO MAYBE HAD A LOWER
SALARY [*258] BECAUSE OF SOMETHING IN THE PAST?
    A. NO. IT WOULD HAVE STRICTLY BEEN FOR THE YEAR 1997. NOW, THERE ARE
REQUIREMENTS WHERE IF THEY'RE BELOW THE MINIMUM PAY RANGE FOR THEIR JOB, YOU HAVE
TO DO SOMETHING. IN THE CASE FOR THIS YEAR, THERE WAS NO ONE BELOW THE MINIMUM PAY
RANGE, SO THAT DIDN'T *70 ENTER INTO THE MERIT PLAN FOR THAT YEAR.
    *****

                        Cross-Examination of Kelly Owen
    [*268]
    Q. UNDERLYING THE EVALUATION, YOU'VE GOT YOUR AUDITS AND YOU'VE GOT THE COMPUTER
SYSTEM THAT SPITS OUT WHAT YOU NEED IT TO SPIT OUT, AND YOU'VE GOT SOME CHARTS
SHOWING THE ACTUAL PRODUCTION YOU'VE TESTIFIED TO; RIGHT?
    A. UH-HUH.
    Q. CORRECT?
    A. THAT'S CORRECT.
    Q. AND WHEN YOU GAVE HER THIS EVALUATION, THIS WAS IN FEBRUARY OF 1998; CORRECT?
    A. THAT'S CORRECT.
    Q. WHERE, SIR, ARE THE UNDERLYING DOCUMENTS THAT CAN SHOW US AND THE JURY, AND
CONCLUDE THIS, THAT SHOW HER PRODUCTION IS WORSE THAN EVERYBODY ELSE'S PRODUCTION?
WHERE ARE THOSE - WHERE ARE THE AUDITS?
    *71 A. I - SIR, I COULDN'T TELL YOU WHERE THOSE AUDITS ARE. WHAT I CAN TELL YOU
IS THAT AT THE TIME WE DID THOSE, THAT ME AND LILLY AND THE REST OF THE TEAM
MEMBERS LOOKED AT THOSE DOCUMENTS AND USED THOSE TO JUSTIFY THE COMMENTS THAT I
PUT ON THIS.
    Q. BUT MRS. LEDBETTER DIDN'T FILL OUT THAT EVALUATION, DID SHE?
    A. NO.
    Q. GOODYEAR FILLED OUT THAT EVALUATION, DIDN'T THEY?
    A. GOODYEAR DIDN'T FILL IT OUT, I DID. [*269]
    Q. YOU DID? YOU WERE A GOODYEAR MANAGER?
    A. THAT'S CORRECT.
    Q. AND WHAT YOU USED WAS THE DOCUMENTS THAT YOU'VE GONE THROUGH AND TOLD US

                · © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                           Page 29

2006 WL 2612645 (U.S.)

ABOUT; THE AUDITS, THE - THAT SHOWED WITHOUT QUESTION, HERE IS THE ACTUAL
PRODUCTION NUMBERS - AND WHAT MR. ST. CLAIR SAYS IS YOU CAN'T MESS WITH THAT,
THAT'S THE REAL THING; AND WE COULD LOOK AT THAT AND SEE WHAT HER PRODUCTION
NUMBERS ARE AND EVERYBODY ELSE'S PRODUCTION NUMBERS ARE, COULDN'T WE?
    A. YEAH, BACK IN 1997. YES.
    *72 Q. BUT YOU DESTROYED THOSE DOCUMENTS, DIDN'T YOU?
    A. I DIDN'T DESTROY ANYTHING.
    Q. THEY'E DESTROYED, AREN'T THEY?
    A. I DON'T KNOW.
    Q. WELL, YOU'D HAVE THEM HERE TODAY IF THEY WEREN'T DESTROYED, WOULDN'T YOU?
THEY'D SHOW FOR SURE -
    A. I DON'T KNOW WHERE THE DOCUMENTS ARE, SIR.
    Q. HAVE YOU LOOKED FOR THEM?
    A. NO, I HAVEN'T LOOKED FOR THEM. I JUST FOUND OUT I WAS COMING A WEEK AGO.
    Q. DO YOU KNOW WHY I DON'T HAVE THEM? BECAUSE I'VE ASKED FOR THEM.
    A. OKAY.
    Q. DO YOU KNOW WHY? DO YOU KNOW WHY WE DON'T HAVE THEM?
    A. I DON'T KNOW. [*270]
    Q. IS THERE - IS THERE A POLICY -
    A. - I DON'T KNOW -
    *73 Q. - WELL, DO YOU KNOW THAT MRS. LEDBETTER WENT TO THE EEOC A MONTH AFTER
THIS DATE THAT YOU'D SAT DOWN WITH HER, A MONTH OR SO AFTER, FILLED OUT A
QUESTIONNAIRE; THREE MONTHS LATER, SHE FILES A CHARGE AND Y'ALL GET IT IN
SEPTEMBER, AND THEN THOSE DOCUMENTS ARE GONE; DO YOU KNOW WHY?
    A. NO, I DON'T KNOW WHY.
    Q. I MEAN, WOULDN'T YOU THINK THAT'S THE BEST WAY TO SHOW OBJECTIVELY THAT HER
PERFORMANCE IS NOT AS GOOD AS EVERYBODY ELSE'S, TO COME UP WITH THE ACTUAL "HERE'S
THE PRODUCTION NUMBERS"?
    A. I DIDN'T FEEL THERE WAS A NEED FOR THAT, BECAUSE WE REVIEWED THOSE AT THE
TIME OF THE EVALUATION. AND WHAT YOU HAVE TO REMEMBER IS THAT THE TEAM MEMBER HAS
AN OPPORTUNITY TO MAKE COMMENTS WHEN THEY DISAGREE WITH THEIR EVALUATION, AND THEY
ALSO HAVE THE OPPORTUNITY TO - THEY GET IT TO SIGN IT.
    Q. WOULDN'T YOU THINK MRS. LEDBETTER WAS - IF SHE'S IN A NEW JOB, GOT
TRANSFERRED OUT OF HER JOB, SHE'S SCARED TO DEATH THAT SHE'S ABOUT TO LOSE HER
JOB? HERE SHE GOES OFF TO A NEW JOB, YOU KNEW SHE WAS SCARED.
    *74 A. AT THE TIME I EVALUATED MRS. LEDBETTER, I DON'T THINK SHE WAS CONCERNED
SHE WAS GOING TO LOSE HER JOB.
    Q. ONE THING THAT YOU DID HAVE - YOU LOOKED BACK AT THE [*271] PRIOR YEAR - WAS
THE NOTES THAT JERRY JONES MADE ABOUT MRS. LEDBETTER, DIDN'T YOU?
    A. JERRY PROVIDED ME WITH SOME NOTES HE PASSED DOWN. THAT'S CORRECT.
    Q. HOW MANY PAGES?
    A. I DON'T RECALL HOW MANY PAGES THERE WERE OF NOTES. IT WAS - WE SAT DOWN FOR A
DAY AND WENT THROUGH EVERY MANAGER'S STRENGTHS AND WEAKNESSES. AND THERE WERE
SOME COMMENTS ON, YOU KNOW, WHERE HE FELT PEOPLE NEEDED TO WORK TO GET TO BE BETTER
MANAGERS, AND KIND OF GOT ME UP TO SPEED ON THE PEOPLE RUNNING THE DEPARTMENT.
    Q. AND THOSE NOTES ARE SOME OTHER UNDERLYING DOCUMENTS THAT WOULD SHOW WHAT WENT
INTO THE EVALUATION THAT THEY'RE USING TO SAY HER PERFORMANCE IS BAD; RIGHT?
    A. NO. I WOULDN'T HAVE USED JERRY'S DOCUMENTS THAT HE PROVIDED ME TO DO THIS
EVALUATION.
    *75 Q. YOU WOULD IGNORE THE NOTES THAT HE HAD - HE'D BEEN WITH HER THE MAJORITY

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                              Page 30

2006 WL 2612645 (U.S.)

OF THAT YEAR AND THE YEAR BEFORE; RIGHT?
   A. THE NOTES THAT JERRY GAVE ME WERE NOT PERFORMANCE NUMBERS. THEY WEREN'T
NUMBERS THAT YOU COULD ACTUALLY DO AN EVALUATION ON.
   THE PERFORMANCE NUMBERS WERE IN THE BUSINESS CENTER SCORECARDS THAT WERE KEPT
THROUGHOUT THE BUSINESS. THE NOTES THAT JERRY SHARED WITH ME ON PASS DOWN WERE
MORE PRIVATE NOTES ABOUT PEOPLE'S PERFORMANCE AND WHERE THEY STOOD AS FAR [*272]
AS, YOU KNOW, DIFFERENT PARAMETERS, THE WAY THEY MANAGED THE BUSINESS.
   Q. OKAY. THOSE WERE PERFORMANCE NOTES THAT JERRY USED - GAVE YOU TO TALK TO YOU
ABOUT MRS. LEDBETTER. WHAT I WANT TO KNOW, SIR, IS WHERE ARE THOSE NOTES?
   A. THOSE NOTES WERE NOT PERTINENT TO THIS EVALUATION; AND, THEREFORE, I WOULDN'T
HAVE KEPT THOSE -
   Q. - THEY'RE PERTINENT TO THIS LAWSUIT - I'M TRYING TO GET AN UNDERSTANDING OF
WHAT ABOUT MRS. LEDBETTER'S PERFORMANCE IS SO BAD, YOU'VE THROWN - HAVE YOU THROWN
AWAY THE AUDITS?
   *76 A. I HAVEN'T THROWN AWAY ANYTHING.
   Q. SO THEY MIGHT BE OVER THERE AT THE PLANT RIGHT NOW?
   A. I DON'T KNOW. I HAVEN'T BEEN IN THE PLANT SINCE - SINCE I LEFT THE BUSINESS
CENTER.
   Q. OKAY. DID YOU THROW AWAY JERRY'S NOTES?
   A. JERRY'S NOTES, I WOULD NOT HAVE KEPT. NO.
   Q. EVEN IF THERE WAS AN EEOC CHARGE THAT CAME SHORTLY AFTER?
   A. I WASN'T AWARE OF ANY EEOC CHARGE.
   Q. OKAY. BUT YOU WERE - AT THAT TIME, YOU WERE A MANAGER AT THE COMPANY; RIGHT?
   A. YES, I WAS.
   Q. YOU SAID YOU - WHERE - WHERE DO YOU LIVE RIGHT NOW?
   A. AMERICANA, BRAZIL.
   Q. YOU LIVE IN -
   THE REPORTER: I'M SORRY? [*273]
   THE WITNESS: AMERICANA, BRAZIL.
   *77 Q. OH, SO YOU CAME UP HERE FROM BRAZIL TO TESTIFY.
   A. THAT'S CORRECT.
   Q. HOW OLD ARE YOU?
   A. I'M 38 YEARS OLD.
   Q. YOU SAID THE PRODUCTION NUMBERS WERE POSTED. IS IT A BIG BOARD THAT THEY'E
POSTED ON?
   A. IT WAS IN THE CONFERENCE ROOMS.
   Q. ARE ALL THOSE THROWN AWAY?
   A. I - I CAN'T ANSWER THOSE TYPES OF QUESTIONS, BECAUSE I HAVEN'T BEEN WORKING
IN GADSDEN.
   Q. WHO IS -
   A. - CERTAINLY, I DIDN'T THROW THEM AWAY.
   Q. WHO'S THE AUDITOR?
   A. THE AUDITOR AT THE TIME THAT I WAS THERE WAS MIKE MAUDSLEY.
   Q. MIKE MAUDSLEY, THE AUDITOR IN THE ARF ROOM; RIGHT?
   A. THAT'S CORRECT.
   *78 Q. AND HE IS THE AUDITOR WHO DID THE EVALUATION THAT YOU USED - WHO DID HIS
AUDITS AND THE SUMMARY SCORES OF THE AUDITS THAT YOU USED TO DO YOUR EVALUATIONS;
RIGHT?
   A. THAT'S NOT CORRECT.
   Q. I THOUGHT YOU SAID YOU USED THE AUDITS TO DO YOUR EVALUATION?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                    Page 31

2006 WL 2612645 (U.S.)

A. I USED THE AUDITS TO DO A PORTION OF THE EVALUATION. [*274]

Q. WELL, DID YOU - AND YOU - ONLY SUPERVISED HER YOURSELF FOR A VERY SHORT PERIOD OF TIME?

A. THREE MONTHS, YEAH.

Q. AT THE BEGINNING OF YOUR TESTIMONY, YOU TESTIFIED ABOUT HOW THE AUDITS ARE USED TO DO THE EVALUATION, SO NOW YOU'E ONLY SAYING YOU USED JUST A SMALL PORTION OR A BIG PORTION? HOW MUCH?

A. WOULD YOU LIKE ME TO CLARIFY THAT?

Q. I WANT TO KNOW HOW MUCH OF THE SCORECARDS THAT MR. MAUDSLEY DID THAT BECAME THE AUDITS - BECAUSE IT'S A MONTHLY SCORECARD AND IT SUMMARIZES THE YEARLY; RIGHT?

*79 A. LET ME HELP YOU UNDERSTAND THAT. THERE WERE REALLY THREE PARTS, OKAY, TO THE PERFORMANCE REVIEW.

OKAY. THERE WAS THE PART THAT WAS THE NUMERICAL DATA. OKAY. THAT PART WAS TAKEN FROM COMPUTER REPORTS AND FROM INFORMATION THAT THE PRODUCTION SPECIALIST SUPPLIED -

Q. AND DOES THAT -

A. - WHICH WOULD HAVE BEEN FOR LILLY, WOULD HAVE BEEN VANCE HOLDERFIELD. OKAY -

Q. - DOES THAT EXIST TODAY?

A. I DON'T KNOW.

Q. WHO CREATED THAT?

A. WELL, THOSE WOULD HAVE BEEN COMPUTER-GENERATED REPORTS THAT VANCE HOLDERFIELD WOULD HAVE PUT INTO A SPREADSHEET FOR THE ARE MANAGERS AND MYSELF. [*275]

Q. AND YOU KEEP THEM, DON'T YOU?

A. YEAH, WE KEPT THEM.

Q. WHAT IF THERE'S A - YOU KNOW, THIS COMPANY IS NOT A COMPANY LIKE FIRESTONE - BUT WHAT IF THERE'S A PROBLEM LIKE FIRESTONE AND SOMETHING *80 HAPPENED WITH THE TIRES - YOU KEEP THOSE REPORTS, DON'T YOU? YOU'VE GOT TO -

A. THERE IS CERTAIN DATA THAT YOU KEEP FOR LONG PERIODS OF TIME. THERE'S CERTAIN DATA THAT YOU KEEP FOR SHORT PERIODS OF TIME.

Q. AND YOU DON'T KNOW WHICH -

A. AND I DON'T - YOU'D HAVE TO ASK SOMEONE ELSE.

Q. ALL RIGHT. AND THERE'S A WHOLE ANOTHER SECTION OF THE AUDIT THAT MR. MAUDSLEY - IS BASED ON WHAT MR. MAUDSLEY DOES; RIGHT?

A. THERE IS - THERE IS A PORTION OF THE DATA THAT I USED, YES, THAT MR. MAUDSLEY -

Q. CORRECT?

A. THAT'S CORRECT.

Q. IN FACT, IF YOU WOULD LOOK AT - I MEAN, I'VE SEEN A COUPLE OF SCORECARDS, AND THE SCORECARDS ARE BASICALLY THE SAME AS THE AREAS IN THE EVALUATION: WASTE, QUALITY, PRODUCTION - ALL THOSE ARE ON THE SCORECARDS, AREN'T THEY - HOUSEKEEPING?

A. UH-HUH.

*81 Q. CORRECT? [*276]

A. OH, YES.

Q. RIGHT? THAT'S A WHOLE EVALUATION.

A. YEAH, IT'S ON IT.

Q. ALL BASED ON THE AUDIT?

A. NO, IT'S NOT ALL BASED ON THE AUDIT.

Q. ALL RIGHT. IS THERE A THIRD ONE, OR IS THAT JUST YOUR OWN OBSERVATION.

A. THAT WOULD BE CORRECT.

Q. ALL RIGHT. NOW, THIS SAYS -

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                    Page 32

2006 WL 2612645 (U.S.)

A. AS THE MANAGER OF THE DEPARTMENT, I WOULD MAKE OBSERVATIONS LIKE, INSURES LIGHT DUTY LABOR IS USED EFFECTIVELY. IF YOU LOOK AT PERFORMANCE STANDARD NO. 2 ON THE FIRST PAGE, THAT WOULD BE ONE THAT I WOULD HAVE DISCUSSED WITH LILLY, AND SAID, YEAH, I THINK YOU UTILIZE YOUR LIGHT DUTY. THAT WOULD HAVE BEEN BASED ON MY OBSERVATION.

Q. AND YOU WOULD BASE THAT ON THE TIME PERIOD WHEN YOU - I GUESS WHEN YOU WOULD ACTUALLY SIGN THOSE TIMECARDS? AS HER SUPERVISOR, YOU WOULD SIGN HER TIMECARDS?

*82 A. I GUESS - WHAT ARE YOU ASKING ME? COULD YOU REPEAT THE QUESTION -

Q. - YOU KNOW WHAT A TIMECARD - I'VE GOT SOME - WE'VE GOT A - LOOKED AT SOME DOCUMENTS AT SOME POINT IN TIME THAT SHOWED WHEN YOU ACTUALLY DID SUPERVISE HER, I GUESS, AND YOU SIGNED HER TIMECARDS?

A. YEAH. ALL THE TIMECARDS WERE HANDED IN AND SIGNED - *****

[*280]
Q. OKAY.

A. - THAT'S A SEPARATE CONVERSATION.

Q. THE NEXT DOCUMENT THAT Y'ALL TALKED ABOUT IS THIS EXHIBIT 48, AND THIS IS THE RANKING WHICH PUTS MRS. LEDBETTER NEXT TO THE BOTTOM AND MR. NANCE IS UNDER HER; RIGHT?

A. THAT'S CORRECT.

Q. MR. NANCE MAKES A LOT MORE MONEY THAN SHE DOES, DOESN'T HE?

A. AT THAT TIME, YEAH, HE DID.

Q. I MEAN, IF YOU LOOK AT THIS THING, THERE IS - WHO ARE THE TWO LOWEST PAID PEOPLE ON THERE?

*83 A. IN THE AREA MANAGER CLASSIFICATION?

Q. NO, ON THE WHOLE LIST. I WANT TO JUST TELL THEM EVERYTHING. WHO ARE THE TWO LOWEST PAID PEOPLE ON THIS LIST?

A. IT WOULD BE THE SECRETARY, RETHA BURNS -

Q. WHO JUST TESTIFIED EARLIER?

A. - AND IT WOULD BE LILLY LEDBETTER, WHO WAS AN AREA MANAGER AT THE TIME.

Q. ARE THERE ANY OTHER WOMEN ON THIS LIST?

A. NO.

Q. AND THE TWO LOWEST PAID PEOPLE ON THIS LIST ARE FEMALE; RIGHT?

A. YES. *****

Cross-Examination of Jerry Jones
[*308]
Q. SO, SINCE 1973, YOU HAD BEEN IN MANAGEMENT AT GOODYEAR?

A. THAT'S CORRECT.

Q. AND DURING THAT PERIOD OF TIME, HOW MANY WOMEN AREA [*309] MANAGERS *84 EVER WORKED UNDER YOU, OTHER THAN MRS. LEDBETTER?

A. OKAY. IT WILL TAKE A MINUTE, I'LL TRY TO - FOR THE ENTIRE PERIOD?

Q. YEAH.

A. YOU WANT BY NAME, OR JUST BEST I CAN COME UP WITH?

Q. JUST BEST YOU CAN COME UP WITH, OTHER THAN MRS. LEDBETTER.

A. OKAY.

Q. WHO, AND FOR HOW LONG?

A. OKAY. MARY LEVINSON.

Q. ALL RIGHT. HOW LONG DID - MRS. MARY LEVINSON WAS NOT AN AREA MANAGER VERY LONG, THOUGH, WAS SHE?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                          Page 33

2006 WL 2612645 (U.S.)

A. MARY LEVINSON WAS AN AREA MANAGER IN THE ARE ROOM, WHICH IS THE SAME SECTION
THAT -
Q. YEAH.
A. - MRS. LEDBETTER WAS HERE. SHE CAME, AND WHEN WE WENT TO FOUR SHIFT
OPERATION, WORKED THE JOB IN THE TIRE ROOM HERE. WHEN WE HAD THE FIRST LAYOFF, SHE
WAS INVOLVED; WENT ON TO DANVILLE, VIRGINIA AS AN AREA *85 MANAGER; THEN SHE WENT
TO LAWTON, OKLAHOMA -
Q. ALL RIGHT. WELL, I'M TALKING ABOUT WHILE SHE WAS HERE AT THIS GOODYEAR PLANT?
A. OKAY.
Q. JUST THIS GOODYEAR PLANT?
A. OKAY. ANYWAY, SHE WAS - [*310]
Q. SO SHE WAS - SO SHE WAS AN AREA MANAGER FOR ABOUT HOW LONG, A MATTER OF
MONTHS?
A. I REALLY DON'T KNOW. OKAY?
Q. WHO WAS THE NEXT ONE?
A. NEXT ONE WOULD BE SUE DOUGLAS, WHO WAS A -
Q. OKAY. WHEN WAS THAT?
A. THAT WAS IN EIGHTY - EARLY '95 PERIOD.
Q. HOW LONG WAS SUE DOUGLAS AN AREA MANAGER?
A. FROM '85 UNTIL SHE HAD CANCER AND PASSED AWAY SOMETIME IN THE LATE EIGHTIES.
Q. OKAY. SO -
*86 A. I DON'T REMEMBER WHEN THAT WAS.
Q. - FOR A FEW YEARS? DID YOU SUPERVISE HER THAT WHOLE TIME?
A. YES, I THINK I DID.
Q. OKAY. WHO ELSE?
A. OKAY -
Q. LET ME ASK YOU THIS QUESTION: HOW MANY TIMES DID YOU SUPERVISE MORE THAN ONE
WOMAN WHO WAS AN AREA MANAGER AT THE SAME TIME?
A. IN MOST CASES, LIKE ON A SHIFT WHERE YOU'D BE MEETING WITH A CREW, THERE WAS
PROBABLY NO MORE THAN ONE ON A CREW, MAYBE.
*****

[*312]
Q. AND AS PART OF YOUR H.R. TRAINING, IF YOU SAW A DISCREPANCY OF A WOMAN
WORKING WITH A BUNCH OF OTHER MEN, IN HER PAY, WOULDN'T THAT TURN ON A LIGHT IN
YOUR HEAD?
A. IN LOOKING AT SALARIES, WHAT YOU LOOK AT IS - IS THE GROUP ABOVE THE MID -
THE LOW POINT. IN OTHER WORDS, IF THERE'S A MINIMUM AMOUNT OF SALARY, YOU TRY TO
*87 MAKE SURE NOBODY STAYS - GETS BELOW THAT.
BUT AS FAR AS WHERE SOMEBODY IS AT IN THE SALARY RANKING, THAT IS AN
ACCUMULATION OF THEIR HISTORICAL MERITS; THEIR - THEIR HISTORY OVER THE YEARS;
THAT THEIR TOTAL SALARY IS AN ACCUMULATION OF EACH YEAR.
THE FACT THAT - YOU WOULD LOOK, IF THERE'S SOMEBODY BELOW THE LOW POINT, AND
SAY, HEY, I NEED TO DO SOMETHING TO KEEP THEM. BUT AS LONG AS THEY'RE IN THEIR
RANGE, IT'S NOT SOMETHING YOU WOULD LOOK AT. YOU'D ALSO LOOK AT WHERE THEY WERE
PERFORMING.
*****

                    Direct Examination of Michael Tucker
[*338]

         © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                    Page 34

2006 WL 2612645 (U.S.)


A. YOU'E READING THAT EXACTLY RIGHT. WE WERE GIVEN AN ALLOCATION, A TOTAL
ALLOCATION. AND DURING THIS PAY PERIOD OR DURING THIS POLICY PERIOD, WE WERE ABLE
TO GIVE A NUMBER OF RAISES, MAINLY BECAUSE OF THE AMOUNT OF MONEY THAT I WAS
BUDGETED.
Q. RIGHT. I NOTICE THAT DOWN AT THE BOTTOM IT SAYS "TOTAL ALLOCATION" *88 AND
"TOTAL EXPENDITURES." WHAT DOES THAT MEAN?
A. THAT'S THE TOTAL AMOUNT OF MONEY THAT WE WERE GIVEN TO ALLOCATE - TO DIVVY
OUT INTO RAISES.
Q. SO YOU HAD A SET BUDGET, AND THEN YOU HAD TO DECIDE HOW TO DISTRIBUTE IT -
A. THAT'S CORRECT. AND THE POLICY ALSO STATED A MAXIMUM TIME FRAME, EITHER  12
OR 18 MONTHS, BY WHICH YOU COULD ACTUALLY GIVE SOMEONE A MERIT INCREASE. AND IT
ALSO OUTLINED A MAXIMUM AMOUNT, PERCENTAGE AMOUNT, THAT YOU COULD GIVE SOMEONE.
*****

[*342]
A. *** BUT DURING THIS PERIOD, I HAD $906 THAT I HAD TO SHARE - THAT I COULD
SHARE WITH THESE INDIVIDUALS. AND YOU CAN SEE MR. MILLER AND MR. THOMPSON AT THAT
TIME WERE NOT ELIGIBLE FOR A RAISE. AND SO I WAS ABLE TO GIVE EVERYONE, EXCEPT
THOSE TWO IN MY AREA OF RESPONSIBILITY, A MERIT INCREASE. MAINLY, ONCE AGAIN, TO
TRY TO MAKE CERTAIN THAT LILLY WAS NOT AT THE BOTTOM OF THE PAY RANGE, OR UNDER
THE MINIMUM.
*****
*89 Q. LET ME NOW SHOW YOU WHAT WE'VE MARKED AS DEFENDANT'S EXHIBIT 6. IS THAT A
DOCUMENT THAT YOU PREPARED?
A. (LOOKING AT EXHIBIT.) YES, SIR, IT IS.
Q. THESE OTHER DOCUMENTS, THE ONES FROM THE EARLIER YEARS, I THINK MRS.
LEDBETTER SAID THAT SHE FOUND THEM - FOUND ONE OF THEM IN THE TRASH CAN OR
SOMETHING, AND THEN KEPT THEM ALL OVER THESE YEARS. [*343] WOULD YOU - WOULD THESE
BE DOCUMENTS YOU WOULD HAVE KEPT -
A. YES, THESE ARE DOCUMENTS THAT SHOULD BE ALWAYS - THEY'E CONFIDENTIAL
DOCUMENTS, DOCUMENTS THAT ALWAYS SHOULD BE LOCKED UP. ****
Q. NOW, THIS IS YOUR - WHAT IS DEFENDANT'S EXHIBIT 6?
A. THIS IS THE MERIT ALLOCATION FOR RADIAL TIRE ROOM BUSINESS CENTER IN GADSDEN.
*****

                    *90 Cross-Examination of Michael Tucker
[*354]
Q. AND YOU KNOW THAT - SURELY YOU ARE - YOU ARE FAMILIAR WITH THE POLICIES AND
PROCEDURES CONCERNING THE TOP PERFORMANCE AWARD AND THE - AND THE INDIVIDUAL
PERFORMANCE AWARD?
A. YES, SIR.
Q. AND YOU KNOW THAT THAT AWARD IS SUPPOSED TO BE GIVEN FOR TOP PERFORMANCE,
DON'T YOU?
A. PER THAT POLICY, IT WAS STATED IT WAS FOR TOP PERFORMANCE. YES, SIR.
Q. IN FACT, IT SAYS - AND I'M LOOKING AT PLAINTIFF'S EXHIBIT 17, WHICH WAS
PREVIOUSLY ADMITTED - IT SAYS THAT "IT IS CRITICAL THAT TPA'S ONLY BE GRANTED TO
THOSE INDIVIDUALS WHO HAVE DEMONSTRATED, THROUGH VALUE, ADDED CONTRIBUTIONS THAT
THEY ARE, IN FACT, THE TOP PERFORMERS IN THE COMPANY."
YOU KNEW IT SAID THAT, DIDN'T YOU?
A. THAT'S WHAT THE POLICY SAYS.

                © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                      Page 35

2006 WL 2612645 (U.S.)


Q. FOR - AND ALSO SAYS "FOR THE TOP PERFORMANCE AWARD FOR ONLY THE HIGHEST LEVEL
OF INDIVIDUAL PERFORMANCE AND CONTRIBUTION IN AN *91 ORGANIZATION"; THAT'S - YOU
KNEW THAT WAS WHAT IT SAID?

A. YES, SIR.

Q. AND IF YOU LOOK AT PLAINTIFF'S EXHIBIT NUMBER 16, WHICH [*355] IS THE SALARY
COMPENSATION PROGRAM, DID YOU KNOW THAT IT ALSO SAID FOR TOP PERFORMERS, "THOSE
WHO CONSISTENTLY EXCEED ALL PERFORMANCE STANDARDS OF THEIR JOB RESPONSIBILITIES"?
ON PAGE 10, YOU SEE THAT?

A. (LOOKING AT EXHIBIT.) YES, SIR.

Q. SO THE AWARD THAT YOU GAVE HER, BASED UPON THE COMPANY RULES AND REGULATIONS,
WAS ONLY SUPPOSED TO BE GIVEN TO THOSE - IT WAS CRITICAL THAT IT ONLY BE GIVEN TO
THOSE WHO WERE THE VERY BEST IN PERFORMANCE; CORRECT?

A. PER THE POLICY. YES, SIR.

Q. AND, IN FACT, WHEN YOU GAVE THE AWARD TO MRS. LEDBETTER, YOU TOLD HER, DIDN'T
YOU, THAT THE REASON SHE WAS GETTING SUCH A BIG INCREASE, 7.85 PERCENT, WAS
BECAUSE SHE WAS BEING AWARDED THE TOP PERFORMANCE AWARD AND THE INDIVIDUAL
PERFORMANCE AWARDS, DIDN'T YOU?

A. SIR, I DON'T RECALL TELLING HER THAT. NO.

*92 Q. WELL, WHAT DID YOU TELL HER? IF YOU DON'T REMEMBER TELLING HER THAT, WHAT
DID YOU TELL HER WAS THE REASON WHY YOU WERE GIVING HER A 7.85 PERCENT RAISE -

A. ONCE AGAIN, WE GO BACK TO LILLY'S SALARY RANGE, AND I WAS DOING EVERYTHING
THAT I COULD TO MOVE HER SALARY UP.

AND AT THAT TIME, THE ONLY - DURING THAT PERIOD, THE ONLY WAY THAT I COULD GIVE
HER A 7.85 PERCENT MERIT INCREASE WAS TO GIVE HER THE TOP PERFORMANCE AWARD.

Q. BUT WHAT DID YOU TELL HER? THAT'S NOT WHAT YOU TOLD HER, [*356] IS IT?

A. SIR, IN 1994, I CAN'T SIT HERE AND TELL YOU EXACTLY WHAT I DID TELL HER. BUT
-

Q. DO YOU REMEMBER WHEN YOUR DEPOSITION WAS TAKEN?

A. YES, SIR.

Q. LOOK WITH ME, IF YOU WOULD, AT PAGE 177.

A. (LOOKING AT DEPOSITION.)

Q. AND WE'E GOING TO BEGIN AT LINE 177, AND MR. GOLDFARB ASKS YOU THIS QUESTION
BEGINNING AT LINE 7:

*93 "WHEN YOU GAVE MRS. LEDBETTER THE 8 PERCENT RAISE, IT WAS IN DECEMBER OF
1995, DID YOU TELL HER THE REASON SHE WAS GETTING AN 8 PERCENT RAISE?"

READ YOUR ANSWER, PLEASE.

A. SAYS: "I CAN'T RECALL EXACTLY WHAT I SAID TO LILLY. I DON'T THINK THAT - I
DON'T THINK - I'M ALMOST SURE THAT I DIDN'T TELL HER THAT SHE WAS RECEIVING A
MERIT INCREASE BECAUSE OF WHAT HER SALARY WAS."

Q. "YOU TOLD HER IT WAS BASED ON HER JOB PERFORMANCE?"

WHAT WAS YOUR ANSWER?

A. "BASED ON HER JOB PERFORMANCE."

*****

[*358]

Q. OKAY. FOR 2 AND 3, WHEN YOU LOOK AT THEM, IT'S CLEAR AS A BELL THAT SHE IS
WAY LOWER THAN ALL THOSE OTHER MEN ON THE LIST, ISN'T SHE?

A. LILLY'S RATE WAS LESS THAN THE OTHER PEOPLE DOWN THERE.

Q. IN FACT, THERE'S NOT A MAN ON THERE THAT IS EVEN CLOSE TO THE LOW RANGE OF
2967, IS THERE?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                    Page 36

2006 WL 2612645 (U.S.)

*94 A. ON THIS DOCUMENT, NO, SIR.
Q. IN FACT, EXCEPT FOR MR. BICE, WHO MADE 3995 IN '94, EVERYBODY ELSE MAKES 4400
OR MORE - IS THAT A MONTH OR IS THAT BIWEEKLY?
A. THAT'S A MONTHLY SALARY.
Q. A MONTH?
A. MR. THOMPSON MAKES 4320. [*359]
Q. MRS. LEDBETTER MAKES 3288, DOESN'T SHE?
A. ACCORDING TO THIS DOCUMENT, YES, SIR.
THE COURT: AND YOU HAVE NO REASON TO DOUBT THE DOCUMENT?
THE WITNESS: SIR?
THE COURT: YOU HAVE NO REASON TO DOUBT THE DOCUMENT?
THE WITNESS: NO, SIR.

Q. AND - AND IT BECAME OBVIOUS TO YOU HOW LOW HER SALARY WAS, DIDN'T IT?
A. PER THE MINIMUM RANGE, HER SALARY WAS LOW.
*95 Q. AND DIDN'T IT ALSO BECOME OBVIOUS TO YOU WHEN YOU COMPARED HER SALARY TO
EVERYBODY ELSE'S ON THIS LIST, WHO JUST HAPPENED TO BE MEN, THAT IT WAS WAY LOWER
THAN THEIRS?
A. THEIR SALARIES DIDN'T COME INTO - INTO IT AT ALL. I WAS REFERRING - I MEAN,
IT WAS ALWAYS GOING BACK TO LILLY'S SALARY, NOT ANYONE ELSE'S SALARY.
Q. ALL RIGHT. THEN LET ME ASK YOU THIS: IF IT DIDN'T HAVE ANYTHING TO DO WITH
THE MEN'S SALARY, BUT IT HAD TO DO WITH STRICTLY THE FACT THAT SHE WAS BELOW THE
MINIMUM, WHY DID YOU LIE TO HER AND TELL HER IT WAS BECAUSE OF HER PERFORMANCE?
WHY DIDN'T YOU JUST TELL HER, IT'S BECAUSE YOU'E BELOW THE MINIMUM?
A. I - I CAN'T RECALL. YOU KNOW, I - MAYBE I DID AND [*360] MAYBE I DIDN'T. I
CAN'T RECALL WHAT I TOLD MRS. LEDBETTER, BUT YOU HAVE MY DEPOSITION.
Q. ISN'T IT BECAUSE YOU REALIZED, BUT YOU JUST CAN'T ADMIT IT BECAUSE YOU STILL
WORK AT THE COMPANY, THAT THIS LADY WAS NEVER PAID LIKE THE MEN -
A. NO, SIR.
Q. - AND YOU DIDN'T THINK IT WAS RIGHT?
A. NO, SIR.
*96 Q. BUT YOU COULDN'T TELL HER THAT; AND THE REASON YOU COULDN'T TELL HER THAT
IS BECAUSE YOU'D BE ADMITTING IT, AND THE COMPANY THAT YOU WORK FOR WOULD -
A. SIR, I CAN'T HEAR WHAT YOU SAID.
Q. - I SAID, AND YOU DIDN'T ADMIT IT BECAUSE YOU KNEW IF YOU DID AND TOLD HER
THE REAL REASON, THAT YOU'D BE ADMITTING THAT GOODYEAR HAD NOT BEEN PAYING THIS
WOMAN WHAT SHE DESERVED?
A. NO, SIR. THAT'S NOT CORRECT.
THE COURT: WELL, ARE YOU SAYING THAT SHE WAS BEING PAID WHAT SHE DESERVED?
THE WITNESS: SIR, SHE - WITH HER JOB RATE, THERE'S A MINIMUM AND A MAXIMUM.
OKAY. IT'S MY RESPONSIBILITY TO KEEP ANYONE THAT'S WORKING IN MY AREA OF
RESPONSIBILITY ABOVE THE MINIMUM. AND THAT WAS WHAT I WAS DOING. AND I -
THE COURT: SO SHE WAS BEING PAID BELOW THE MINIMUM?
THE WITNESS: AT ONE TIME. YES, Sir. [*361]
*97 THE COURT: AND BECAUSE SHE WAS BEING PAID BELOW THE MINIMUM, YOU RAISED HER
SALARY?
THE WITNESS: YES, SIR.

Q. BUT YOU DIDN'T TELL HER THAT; INSTEAD, YOU TOLD HER IT WAS BECAUSE OF HER
PERFORMANCE?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                          Page 37

2006 WL 2612645 (U.S.)

  A. NO, SIR. I - I -
  Q. THAT'S WHAT YOU TOLD HER? YOU DIDN'T TELL HER IT WAS BECAUSE SHE WAS BELOW
MINIMUM, YOU TOLD HER IT WAS BECAUSE OF HER PERFORMANCE, DIDN'T YOU?
  A. WELL, MERIT INCREASES WAS REALLY, AT THAT TIME, THE ONLY WAY THAT I WAS AWARE
OF THAT WE COULD RAISE SALARIES. AND IT WASN'T COMMON KNOWLEDGE TO SHARE MINIMUM
AND MAXIMUM SALARIES AT THAT TIME.
  Q. AND NOW, CONVENIENTLY, WE DON'T KNOW WHERE THE '95 SALARIED EMPLOYEE SHEET IS
THAT SHOWS WHERE YOU GAVE HER THAT 7.85 PERCENT, WHICH WOULD ALSO SHOW WHERE SHE
RANKED IN HER PERFORMANCE GROUP; WE DON'T HAVE THAT DOCUMENT, DO WE?
  A. THAT DOCUMENT HASN'T - THAT DOCUMENT HASN'T BEEN PROVIDED TO ME.
  *98 Q. DO YOU KNOW WHERE IT IS?
  A. NO, SIR.
  *****

     Arguments on Defendant's Motion for Directed Verdict At the Close of Evidence
  [*382]

                        (IN OPEN COURT, JURY NOT PRESENT.)
  THE COURT: ALL RIGHT. I'LL NOW HEAR THE DEFENDANT'S MOTION AT THE CLOSE OF ALL -
AT THE CLOSE OF THE PLAINTIFF'S CASE IN CHIEF.
  MR. ST. CLAIR: YES, YOUR HONOR.
  THE DEFENDANT MOVES FOR A JUDGMENT AS A MATTER OF LAW ON ALL OF THE CLAIMS IN
THE CASE.
  THE COURT: YES, SIR. THAT MOTION IS DENIED GENERALLY. THE MOTION IS GRANTED WITH
RESPECT TO THE THREE DAY SUSPENSION.
  *****

  [*384]
  THE COURT: YES. OTHERWISE, THE MOTION FOR JUDGMENT AS A MATTER OF LAW IS DENIED.


                        *99 Jury Instructions
  [*457]
  AND SHE MUST PROVE THAT EACH CLAIM AROSE WITHIN SIX MONTHS OF HER FILING A
CHARGE OF DISCRIMINATION WITH THE EEOC, OR HER COMPLETION AND SUBMISSION TO THE
EEOC OF A QUESTIONNAIRE RELATING TO THE CLAIM.
  *****

  [*459]
  AN EMPLOYER SUCH AS GOODYEAR IS REQUIRED, AFTER AN EEOC CHARGE IS FILED AGAINST
IT, TO PRESERVE ALL EXISTING PERSONNEL RECORDS RELATED TO THE CHARGE UNTIL THE
CHARGE HAS BEEN DISPOSED OF. IF AN EMPLOYER DESTROYS PERSONNEL RECORDS RELEVANT TO
THE CHARGE, THEN YOU MAY INFER THAT IF THE PERSONNEL RECORDS HAD BEEN PRESERVED
THEY WOULD HAVE BEEN BENEFICIAL TO THE PLAINTIFF AND NOT HELPFUL TO THE DEFENDANT.
IN THE ABSENCE OF AN EEOC CHARGE, AN EMPLOYER IS REQUIRED TO PRESERVE THE
PERSONNEL RECORDS FOR A YEAR.
  PLAINTIFF'S THIRD CLAIM IS THAT AS AN AREA MANAGER, SHE WAS PAID A LOWER SALARY
BY THE DEFENDANT BECAUSE OF HER SEX. AGAIN, IT IS UNLAWFUL UNDER TITLE VII FOR AN
EMPLOYER TO *100 DISCRIMINATE ON THE BASIS OF SEX IN THE PAYMENT OF SALARIES TO
ITS EMPLOYEES.
  IN ORDER TO PREVAIL ON THIS DISPARATE SALARY CLAIM, THE PLAINTIFF MUST PROVE

            © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                          Page 38

2006 WL 2612645 (U.S.)

THAT EACH OF THE FOLLOWING TWO FACTS IS MORE LIKELY SO THAN NOT:
  FIRST: THAT WHILE PERFORMING THE SAME WORK AS SIMILARLY SITUATED MEN, SHE WAS
PAID A LOWER SALARY;
  SECONDLY: THAT HER SEX MADE A DIFFERENCE IN GOODYEAR'S DECISION TO PAY HER A
LOWER SALARY THAN SIMILARLY SITUATED MALE EMPLOYEES.
  *****

  [*462]
  YOU SHOULD CONSIDER ANY LOST WAGES AND FRINGE BENEFITS WHICH THE PLAINTIFF
SUFFERED, BEGINNING SIX MONTHS FROM THE DAY THAT SHE FILED HER EEOC QUESTIONNAIRE
AND CONTINUING UP TO TODAY - IF YOU FIND THAT PLAINTIFF'S EMPLOYMENT WOULD HAVE
CONTINUED UP TO TODAY.
  HOWEVER, IF YOU FIND THAT EVEN HAD THERE BEEN NO DISCRIMINATION OR RETALIATION,
PLAINTIFF WOULD NOT HAVE CONTINUED TO WORK UP TO THE PRESENT DATE, YOU WOULD THEN
DETERMINE THE DATE ON WHICH PLAINTIFF'S EMPLOYMENT *101 WOULD LAWFULLY HAVE COME
TO AN END. AND THEN AWARD DAMAGES UP TO THAT DATE.
  IN ADDITION TO BACK PAY AND LOST WAGES, YOU MAY ALSO AWARD COMPENSATORY DAMAGES
FOR MENTAL ANGUISH ARISING OUT OF SEXUAL DISCRIMINATION OR RETALIATION. THESE
KINDS OF DAMAGES - DAMAGES FOR EMOTIONAL DISTURBANCE, MENTAL ANGUISH - ARE NOT
RESTRICTED TO ACTUAL LOSS OF TIME OR MONEY; THEY COVER BOTH THE MENTAL AND
PHYSICAL ASPECTS OF INJURY - TANGIBLE AND INTANGIBLE. NO EVIDENCE OF THE VALUE OF
SUCH THINGS AS EMOTIONAL OR MENTAL ANGUISH HAS BEEN OR NEED BE INTRODUCED. IN THAT
RESPECT IT IS NOT VALUE THAT YOU ARE TRYING TO DETERMINE, BUT AN AMOUNT THAT WILL
FAIRLY AND REASONABLY COMPENSATE FOR THE LOSSES THE PLAINTIFF HAS SUFFERED.
THERE'S NO EXACT OR MATHEMATICAL STANDARD TO BE APPLIED; BUT ANY AWARD FOR MENTAL
ANGUISH MUST BE FAIR AND JUST IN LIGHT OF EVIDENCE.
  *****

                         *102 Delivery of Jury Verdict
  [*476]
  THE COURT: THE CLERK WILL RECEIVE THE VERDICT.
  (HANDING VERDICT TO THE CLERK.)
  *****
  "QUESTION NUMBER 3: DO YOU FIND IT MORE LIKELY THAN NOT THAT DEFENDANT PAID
PLAINTIFF AND UNEQUAL SALARY BECAUSE OF HER SEX?" THE ANSWER IS "YES."

  *103 EEOC FORM 5A JAN 78

CHARGE OF DISCRIMINATION

CHARGE NUMBER(S) (AGENCY USE ONLY)

[x] EEOC 042 82 1553 (AMENDED)

NAME: Ms. Lilly Ledbetter

HOME TELEPHONE NUMBER: (205) 435-6757

STREET ADDRESS: 1206 East Mountain Avenue
 Jacksonville, AL 36265

            © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                              Page 39

2006 WL 2612645 (U.S.)


COUNTY: Calhoun

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP
COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME. (If more
than one list below).

NAME: Goodyear Tire & Rubber Company

TELEPHONE: (205) 546-6341

STREET ADDRESS: 922 Meighan (East) Boulevard
 Gadsden, AL 35903

CAUSE OF DISCRIMINATION BASED ON MY (Check appropriate box(es))

[ ] RACE [ ] COLOR [x] SEX [ ] RELIGION

[ ] NATIONAL ORIGIN [ ] OTHER (Specify)

DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE: May 14, 1982

THE PARTICULARS ARE:
  I. On May 14, 1982, I was demoted from my position in process control and
transferred to a job in quality control. I have been employed since February 5,
1979. The employer has more than 15 employees.
  II. Jerry Jones, personnel, and Chuck Fritz, division superintendent, told me I
was being transferred because *104 I could not stay in process control after I had
complained about being sexually harassed by my supervisor. They also stated that I
was not performing up to standard after I complained of sexual harassment.
  III. I believe I have been discriminated against because of my sex, female,
inasmuch as:
  1. Effective in February 1982, I received a merit increase in my salary because
according to Mr. Fritz I was doing a good job.
  2. Although the employer is not classifying my transfer as a demotion, I am
performing less desirable tasks and I am not fully qualified for the jobs in
quality control because I have not been trained. Also, I am no longer classified
as a supervisor.
  3. I reported to Mr. Jones and Mr. Fritz that my immediate supervisor, Lother
Yarbrough, who is classified as a uniformity specialist was sexually harassing me
by making sexual propositions, touching my body, constantly talking to me in
explicit sexual terms, and threatening that he will have my job if I do not submit
to his demands.
  4. Mr. Jones and Mr. Fritz told me they would conduct an investigation. They
indicated that Mr. Yarbrough admitted to them that he had done those things of
which I had accused him, except touching by breasts. They told me that Mr.
Yarbrough would remain on his job but I would be transferred.
  5. It should be noted that Mr. Yarbrough has the reputation of being a
womanizer.
  6. I have not received the same training as men in a number of positions,
including supervisor in Dept. 555 and Dept. 541, process control and most

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                    Page 40

2006 WL 2612645 (U.S.)

currently, in quality control.
    IV. Females as a class have been victimized by sexual harassment on the job at
Respondent's Gadsden plant.

                    *105 (ORIGINAL CHARGE FILED ON 06/08/82)
    I will advise the agency if I change my address or telephone number and I will
cooperate fully with it in the processing of my charge in accordance with its
procedures.

    I declare under penalty of perjury that the foregoing is true and correct

    DATE

    CHARGING PARTY (Signature)
    CHARGE FILE COPY

                        *106 STATE OF ALABAMA
                         COUNTY OF CALHOUN
                             AFFIDAVIT
    Ms. Lilly Ledbetter, being first duly sworn says, based upon her own personal
knowledge, as follows:

    1. I am the charging party in E.E.O.C. Charge No. 042821553 against Goodyear Tire
and Rubber Company, Gadsden, Alabama.

    2. I have been asked to briefly describe the sexual harassment I have endured in
my employment at Goodyear. I have also been asked to describe how I was denied
training opportunities that were otherwise available to male supervisors.

    3. During the period June, 1979 to July 1, 1980, I was supervisor in Department
543 and I supervised twenty-two (22) people, and I was a supervisor in Department
541, and I supervised sixteen (16) people.

    4. During this period the shift foreman, Mr. Bill Edwards, told me that the bra I
was wearing appeared to be a french bra because it "had those things high and my
nipples were showing". Mr. Edwards often referred to my department as the
department that appeared like a "whorehouse". Mr. Edwards also told me that "if I
kept bending over at the file cabinet, I might get something rammed in my a.. that
I did not want."

    5. I was supervisor in Department 555 from July 1, 1980 until June 30, 1981. The
department foreman, Mr. Mike Maudsley, evaluated my work in March, 1981. He asked
if I was married and said he wanted to date me. He talked to me almost five hours
about himself. He told me that he was rating me number 11 out of 12 employees, but
I could move up to a number 5 or maybe a number 3 rating if I *107 would meet him
at the Ramada Inn. I asked how he could justify the low rating based on my job
performance and he said it was more important that my bosses like me. During this
period of time, I was supervising nineteen (19) people.

    6. I transferred to Process Control on July 1, 1981. My supervisor was Lother

            © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645 (U.S.)

Yarbrough. Lother Yarbrough constantly told me intimate details regarding his sex
life. In August he told me that Goodyear people were saying how I would be his
next woman. In December he started telling me I would have to love him because his
woman threw him out. I did nothing to encourage this behavior and did not welcome
this behavior at all. I told this to Mr. Yarbrough. I also told him I was not
qualified to help him with his own personal problems. Starting in January, 1982,
Mr. Yarbrough seemed obsessed with his requests and propositions for me to go to
bed and have sex with him. He said we would be a great pair. When I refused him,
he told me my job with Goodyear depended on him and he could get my job if I did
not please him. He said if I would do all the things he wanted me to do, then I
would have an opportunity for advancement. Otherwise, my job was in jeopardy.

 Mr. Yarborough regularly propositioned me to go to his house and go to bed with
him so that we would forget our problems. He would tell me to hold my shoulders
back so my "boobs" would stand out. He told me on one occasion that I did not
appear to have on a bra. He regularly said how he could see every curve of my body
through my clothes.

 On May 10, 1982, while testing tires, Mr. Yarbrough kept putting his hands on me.
He rubbed his hands up and down and around on my back and touched my breasts. I
quickly moved away from him. Then he said, "now that you have got me worked up
what are you going to do about it?"

 I told Mr. Yarbrough that I would do nothing about it. He reacted by overloading
me with work and refused to provide me with assistance. When I complained about my
*108 work load, Mr. Yarbrough told me that I had not pleased my boss and that he
was going to have my job.

 7. When I was transferred to Department 541 and later to Department 555, I
received no training whatsoever.

 8. The supervisor training which was available after I transferred to Process
Control was not made available to me. I had asked whether I could secure this
training, but I was told that I would not need the training.

 9. In January, 1982, Goodyear scheduled statistic classes for employees and I was
not included in these classes.

 10. In March, 1982, I was not permitted to attend an E.E.O.C. seminar for
supervisors.

 11. In May, 1982, I complained about the fact that I had not received the degree
of training and education that males had received from the Company. Mr. Bullock
told me that Goodyear did not care if I had any further training or education.
 /s/Lilly Ledbetter
 Lilly Ledbetter

                          STATE OF ALABAMA
                          COUNTY OF CALHOUN
  I, the undersigned authority, a Notary Public in and for said County and State,

        © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                              Page 42

2006 WL 2612645 (U.S.)


do hereby certify that Lilly Ledbetter, whose name is signed to the foregoing
Affidavit, appeared before me on this date and after being duly sworn by me
deposes and says under oath that the matters contained in the foregoing Affidavit
are true.

 **\*109** Witness my hand and official seal on this 26th day of January, 1983.
 /s/Debbie Snow
 NOTARY PUBLIC


                    **\*110** THE GOOD YEAR TIRE & RUBBER COMPANY


          BOOK 1
          MECHANICAL

 1. R. HOLMAN          88%
 2. L. LEDBETTER       81
 3. B. POWELL          77
 4. C. OWENS           76
 5. R. FORTENBERRY     76
 6. D. BELYEU          75
 7. J. SHEARS          74
 8. G. GRAHAM          74
 9. L. HUGHES          74
 10. S. THOMPSON       72
 11. R. MAXWELL        72
 12. M. TUCKER         69
 13. K. TIDEMORE       69
 14. P. THOMAS         66
 15. P. MCLEOD         66
 16. G. PAYNE          66
 17. K. KOEHLER        66
 18. J. GARRISON       65
 19. C. SMITH          65
 20. R. GOSS           65
 21. J. MOON           63
 22. G. NELSON         63
 23. G. RUSSELL        63
 24. B. PHARES         60
 25. T. HOLLINGTON     59
 26. T. MAGOURIK       59
 27. B. MYERS          59
 28. D. BARNES         59
 29. G. HOWZE          57
 30. P. JODAN          54
 31. M. ATKINS         54
 32. W. CHAPMAN        52
 33. B. THOMAS         52
 34. J. BONDS          51
 35. A. KISNER         50
 36. B. MILLER         50

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                           Page 43

2006 WL 2612645 (U.S.)

```
37. B. HEAD          49
38. M. LEVINSON      49
39. D. PASLAY        45
40. N. MURPHY        45
41. R. TAYLOR        43
42. P. ELROD         42
43. ?. CRAWFORD      36
44. E. HARPER        35
45. S. DOUGLAS       34
46. B. MAJOR         23
```

         INCOMPLETE

```
1.W. DAVIS
2.J. KELL
3.A. DRINKARD
4.J. PIKE
```

          BOOK II
          ELECTRICAL

```
1.K. KOEHLER        96%
2.C. OWENS          94
3.R. MAXWELL        94
4.L. LEDBETTER      94
5.D. BELYEU         93
6.R. HOLMAN         92
7.G. PAYNE          92
8.G. GRAHAM         89
9.B. THOMAS         89
10.S. THOMPSON      88
11. T. MAGOURIK     87
12. G. RUSSELL      87
13. B. MYERS        86
14. J. SHEARS       84
15. J. GARRISON     84
16. M. TUCKER       84
17. R. FORTENBERRY  84
18. N. MURPHY       83
19. R. GOSS         82
20. P. JODAN        82
21. L. HUGHES       82
22. A. DRINKARD     81
23. J. KELL         77
24. G. NELSON       77
25. J. MOON         77
26. T. HOLLINGTON   77
27. J. PIKE         77
28. W. CHAPMAN      76
29. B. PHARES       76
```

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                              Page 44

2006 WL 2612645 (U.S.)


```
30. D. PASLAY      75
31. M. LEVINSON    74
32. P. MCLEOD      74
33. W. DAVIS       73
34. P. THOMAS      73
35. A. KISNER      72
36. C. SMITH       70
37. G. HOWZE       70
38. J. BONDS       70
39. B. MILLER      68
40. M. ATKINS      67
41. E. HARPER      65
42. R. TAYLOR      52
43. B. MAJOR       34
44. S. DOUGLAS     32
```

        INCOMPLETE

```
1.K. TIDEMORE
2.B. POWELL
3.B. HEAD
4.D. BARNES
5.P. ELROD
6.?. CRAWFORD
```


                    *112 *****

TO: A056756 GADSDEN6 Ledbetter, L.M.

FROM: A055008 GADSDEN6 Jones, J.F.

DATE: FEBRUARY 4, 1992

SUBJECT: RLT assignment
  F

Congratulations on your new assignment, you have worked very hard and have made a
lot of improvement in the last few years and deserve the opportunity. J Jones
  F
  F

*113 TO:

FROM: A030302 GADSDEN6 Whiteman, K.

DATE: AUGUST 20, 1992

SUBJECT: Past 8 months

Steve, Dick, Jimmy and Lilly

            © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645 (U.S.)

I just wanted to tell the 4 of you that the past several months have been the most rewarding of my Goodyear career. The things that you 4 have accomplished have really been exceptional and I am proud to have worked with you. Keep the momentum going, and I know you will, and remember to make decisions based on what is the right thing to do. Thanks for all the help, support and teaching you have done for me. Call or stop if I can ever be of help...Kim

## *114 PAY FOR PERFORMANCE GOODYEAR
### Salary Compensation Program

As Goodyear continues to unfold its competitive strategy in the marketplaces of the world, the management of all resources will play a growing and vital role in our company's future. The most crucial resource is our team of Goodyear associates. It is increasingly important that we not only hire the best people, but that we make absolutely certain our associates are compensated fairly in return for the contributions they make toward our success.

Goodyear recognizes that associates would like to know more about their salaries, how they are determined, how their performance is rewarded, and how pay increases are planned and administered. This booklet is intended to share with you, in general terms, guidelines which have been provided annually for managers to assist them in performance appraisals and salary compensation programs. We encourage our associates to get answers not found in this booklet from their managers or Personnel Departments.

Reaching our corporate objectives requires a team effort from all our associates. It is management's objective to assure that the proper tools, training and incentives are in place so that associates have the opportunity to perform at their best, and are properly and competitively rewarded for their contributions.

This booklet conveys how highly Goodyear values performance and strives to make the best use of its payroll dollars to recognize and reward our salaried associates.

P2

As a salaried associate of Goodyear, you likely have a natural curiosity about your salary and the policies that determine how Goodyear salary ranges are established for various jobs. Since salaries represent one of our largest expenditures, we want to be sure that we spend our salary dollars effectively. That means paying salaries which help us attract, retain, and motivate *115 deserving associates. Goodyear's salary compensation program is designed to accomplish these goals. We believe that our salaried associates should understand salary compensation policies and how they work. We have prepared this booklet to explain the basic elements of our salary program. The following pages will give you a better understanding of the process we use to accomplish our salary compensation objectives and manage our salary dollars.

Your salary probably ranks high on the list of things that are most important to you and you want to know that you're paid fairly for the work you do. Your salary is just as important to the Company as it is to you. We spend a lot of time and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                    Page 46

2006 WL 2612645 (U.S.)

effort testing the fairness of our salaries, and making sure they are competitive
with others in the job marketplace. For Goodyear to achieve its compensation
objectives, our program must pay salaries that:
- are fair and equitable within the Company (internal equity)
- are competitive in the marketplace (external competitiveness)
- reward individuals on the basis of their performance (pay for performance)

P3

### WHAT DO THESE OBJECTIVE MEAN?

Internal Equity - The value of a job within the company depends on numerous
factors, among which are technical knowledge required, the complexity of the work
and the decision-making authority involved. The more difficult or demanding the
job is, the higher its pay level should be. Pay levels for jobs reflect the
relative value of the jobs within the Company.

External Competitiveness - Through salary surveys, we compare our salaries to
those paid by other companies for *116 similar positions. We want to be sure that
our salaries attract and retain the best talent.

Pay for Performance - Once we establish a salary structure that's internally
equitable and externally competitive, your performance on the job is a major
factor in determining your pay within the salary range.

P4

### HOW OUR SALARY PROGRAM WORKS

Listed below are the main elements of Goodyear's Salary Compensation Program:
1. POSITION DESCRIPTION - outlines and describes in broad terms the content of
your job.
2. EXEMPT or NON EXEMPT? - analysis to determine whether a job will be
classified as exempt or non exempt.
3. POSITION EVALUATION - determines the relative value of the position and
defines the value in terms of Hay points or job levels.
4. SALARY RANGES - conversion of Hay points or job levels into specified salary
ranges.
5. PERFORMANCE APPRAISAL - provides an opportunity for you and your manager to
assess your performance on designated elements of your job.
6. MERIT INCREASE GUIDELINES - assist management in administering the merit
budget allocation.
7. PROMOTIONAL INCREASE POLICY - outlines the requirements of a promotion, and
how the position change may affect your salary.

P5

The following pages will expound upon each of these elements, then conclude with
comments on the selection of associates for job changes.

Accurate and thorough position descriptions are the primary sources of
information for performing position evaluations. Position descriptions outline the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645                                                        Page 47

2006 WL 2612645 (U.S.)

major functions and responsibilities, as well as the problems and challenges in
the job. They are used primarily in position evaluation, position comparisons, and
performance appraisals for comparing your accomplishments to your responsibilities.

 The description provides you and your manager with the basic content of job
functions identifying major responsibilities and reporting relationships. It is
reach manager's / department's responsibility to ensure that position descriptions
are reviewed regularly and reflect current and accurate information. If your job
responsibilities have changed significantly since the description was written,
bring the changes to your manager's attention. After any new, revised, or updated
position has been approved by the department / division management, it should be
forwarded to the Salaried Compensation Department for review to determine the
appropriate Hay point rating or job level.

 Once a position description is received by the Salaried Compensation Department,
a determination is made on whether a job is exempt or not exempt from the
provisions of the Fair Labor Standards Act of 1938. This Act, commonly called the
"Wage and Hour Law", covers many topics such as minimum wage, employment standards
for minors, and overtime regulations.

 Whether or not a job is exempt from the provisions of this Act depends on several
factors, such as work responsibilities and education or training necessary to
perform the job. Also, various guidelines and tests *118 established by the Act
help determine if a position meets the criteria for exempt status.

 The tern "position evaluation" refers to the method we use to establish the
relationship between positions. This is done by comparing one position to others
within Goodyear as well as considering its contribution to the achievement of
Company objectives. The evaluation focuses entirely on the position, NOT on the
performance of the individual in that position.

 EXEMPT POSITIONS are evaluated under the professionally developed process called
the Hay Job Evaluation System. Using the Hay System we determine a point value for
each position in terms of three main factors - Know-How, Problem Solving and
Accountability.
 • KNOW-HOW measures the skills, education, and experience necessary to perform a
particular job. The evaluation considers the specialized, technical, or practical
knowledge required by the job along with an assessment of managerial and human
relation skills.
 • PROBLEM SOLVING measures the degree to which "know-how" is used to identify,
define and solve job related problems. The creativity, overall complexity, and the
type of thinking challenge needed in performing the job are assessed.
 • ACCOUNTABILITY measures the amount of personal and [P8] procedural control to
which the position is held responsible. The assessment of accountability is based
upon the freedom to act and implement decisions, impact of the job on end results,
and the size of the area (expressed in dollars) most clearly affected by the job.

 *119 Each position is analyzed using these components, and Hay points are
assigned for Know-How, Problem Solving, and Accountability based on the relative
value of this position to other positions within the Company.

                © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2612645 (U.S.)

When the position evaluation is completed, the points for each of the factors are
added together to get a total point value for the position. From time to time,
Goodyear point totals are correlated with similar position in other companies
evaluated under the Hay System to help insure evaluation correctness.

Once established, the point total is multiplied by a formula that establishes a
salary range for the position. Salary ranges are also compared to market pay data
and national surveys to validate the competitiveness of ours alary ranges.

NON EXEMPT POSITIONS are evaluated by comparing each job to similar positions
outside Goodyear and other positions within the Company. Incorporating both
factors, external competitiveness and internal equity, we determine a fair value
for the job. Once these comparisons have been made a job level (often called a
"pay grade") and salary range is assigned.

After the job evaluation process, each exempt and non exempt position is assigned
salary range. A salary range consists of a minimum, midpoint, and maximum dollar
value. Salary range midpoints are designed around an average market salary which
reflects the current prevailing value of the position in the marketplace. Salary
ranges are calculated so that the range maximum is 50% grater than the range
minimum. This range spread is established to allow for differences in pay that
recognize individual differences in qualifications, experience, and performance.

*120 We make sure Goodyear salary ranges remain competitive by participating in
surveys which tell us what other companies are paying for positions similar to
those in our Company. Each year a review is made to determine whether all ranges
are in need of adjustment to stay competitive in the marketplace.

Like other major expenditures in a well-managed business, merit increases are
controlled by an approved budget. We refer to such a budget as a "merit budget"
because it establishes the amount of merit funds to be available each year for
merit increases. Recommendations concerning the size of Goodyear's merit budget
are generally made around the end of each year for the following year. Although
many factors are considered, some of the most important considerations are:
 • the current level of each position's salary in relation to pay practices of
other companies on a local and national basis,
 • projections for the coming year regarding merit budget activity of other major
companies on a national basis,
 • economic conditions in general,
 • and Goodyear's business objectives, profitability and ability to afford a
merit budget in a given year.

Each department/division is allocated a portion of the total merit budget
approved for the year. This allocation is derived from the amount of the
department's/division's total base salary.

*121 Every year managers responsible for administering departmental or divisional
merit programs are provided with approved merit increase guidelines. These
guidelines establish the minimum and maximum increase percentage which may be
granted, the minimum time interval between increases, and other such details.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.