# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CINDY SLANE,      :
           :
   Plaintiff,     :
           :
  v.         :   CASE NO. 3:02CV00821 (AWT)
           :
QUINNIPIAC UNIVERSITY  :
SCHOOL OF LAW,    :
           :
   Defendant.    :   AUGUST 31, 2007

## MEMORANDUM OF LAW RE: LIMITATIONS PERIOD DEFENSE

Per the revised scheduling order entered by the Court on June 27, 2007, this supplemental memorandum of law will address the impact of the U.S. Supreme Court's decision in Ledbetter v. Goodyear Tire & Rubber Co., Inc., 550 U.S. __, 127 S. Ct. 2162, 167 L. Ed. 2d 982 (2007) on the scope of the upcoming jury trial in the above-captioned case. In short, under the rule of law announced in Ledbetter, plaintiff's claims for intentional wage-based gender discrimination are unquestionably time-barred and must therefore be dismissed.

## I.  Background

Plaintiff Cindy Slane ("plaintiff") contends that virtually throughout her decade long tenure as a permanent member of the Quinnipiac University School of Law ("defendant" or "QUSL") faculty, she has been under-compensated in a manner that contravenes the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq., and the Connecticut Fair Employment Practices Act ("FEPA"), Conn. Gen. Stat. §§ 46a-60, et seq. Plaintiff's pay

discrimination claims survived summary judgment, and trial is set to commence on October 15, 2007.

At the summary judgment hearing conducted on February 6, 2007, however, the Court directed the parties to brief what was described as the "adverse employment action/statute of limitations issue." (Tr. 52). The question presented is whether plaintiff can assert a *timely* claim for intentional pay discrimination challenging salary decisions made more than 300 days before her EEOC filing, but within 300 days of her alleged discovery that an ostensibly gender-based disparity existed.

Thereafter, the parties alerted the Court to the then-pending Ledbetter case wherein the U.S. Supreme Court was called upon to determine: "Whether and under what circumstances a plaintiff may bring an action under Title VII of the Civil Rights Act of 1964 alleging illegal pay discrimination when the disparate pay is received during the limitations period, but is the result of intentionally discriminatory pay decisions that occurred outside the limitations period." Ledbetter, 127 S. Ct. at 2166. Because the limitations period defense advanced by defendant in the matter *sub judice* implicated the very question presented to the U.S. Supreme Court in Ledbetter, the parties suggested, and the Court agreed, that briefing on the so-called "adverse employment action/statute of limitations issue" be put off until the Ledbetter case was decided.

The Ledbetter decision was handed down on May 29, 2007, and, in derogation of plaintiff's pay discrimination claims sounding in disparate treatment, roundly "reject[ed] the suggestion that an employment practice committed with no improper purpose and no discriminatory intent is rendered unlawful nonetheless because it gives some effect to an intentional discriminatory act that occurred outside the charging period." 127 S. Ct. at

2172.  All that properly remains of this case after <u>Ledbetter</u> is an EPA claim predicated on the salary discrepancy between plaintiff and a male comparator (Professor Leslie Book) and retaliation claims averring that QUSL (i) has failed to increase plaintiff's salary to a "fair" level, and (ii) awarded her a below-standard 1% salary increase in 2002, as retribution for pursuing her wage discrimination claims at the administrative level and in court.

## II.    **Stipulated Facts**

As reflected in the Joint Trial Memorandum, dated April 9, 2007, the parties have stipulated to the following facts:

A.    Following her graduation from law school in the spring of 1992, plaintiff worked for the Connecticut law firm of Day, Berry & Howard for approximately two years from September 1992 through August 1994.

B.    Neil Cogan ("Cogan") served as Dean of the Quinnipiac University School of Law ("QUSL" or "Law School") from July 1, 1993 through June 30, 2000, and was on sabbatical from July 1, 2000 through June 30, 2001.

C.    In August 1994, QUSL, through Cogan, hired plaintiff as a Visiting Instructor of Law and Director of Field Placement Programs at an initial annual salary of $40,000.00.

D.    While he was Dean of QUSL, Cogan was required to submit his salary recommendations for new faculty members to the Quinnipiac University ("QU") Provost, John Bennett ("Bennett"), for approval.  Cogan was also required to obtain Bennett's approval for any adjustments he recommended to the salaries of existing faculty

members.  Each year, QU allocated a raise pool to QUSL for allocation to the law school faculty, as recommended by the Dean of QUSL and subject to the Provost's approval.

E.      In 1996, Cogan recommended that QUSL's externship program be made permanent and that plaintiff be hired to a tenure position as director of the program.

F.      In the fall of 1996, QUSL's faculty voted to extend to plaintiff an offer of a 5-year contract as permanent Director of Field Placement Programs with the option to request that her position be converted to a tenure-track position.   Plaintiff's responsibilities, however, did not change.

G.      Since the Fall semester of 1997, plaintiff's title has been Assistant Clinical Professor of Law and Director of Field Placement Programs.

H.      In 1997, QUSL, through Cogan, hired Book as an Assistant Clinical Professor of Law and Director of QUSL's Tax Clinic at an annual salary of $75,000.00. Book's annual salary was $78,750.00 for the 1998-1999 academic year, and $81,000.00 for the 1999-2000 academic year.

I.      As Director of QUSL's Tax Clinic, Book had ultimate responsibility for cases handled by the clinic and supervised the students enrolled in the clinic.  Book also taught a seminar course for the students enrolled in the Tax Clinic designed to assist students in the ability to represent individuals in tax controversies, which included a discussion of the substantive and procedural aspects of tax law.

J.      There are typically between 8 and 10 students enrolled in the Tax Clinic during any given semester.

K.    In or about March or April of 2000, Book announced he was leaving QUSL to accept a position with Villanova University School of Law as an Associate Professor of Law and Director of its Federal Tax Clinic.

L.    Plaintiff's salary history is as follows: 1994/1995 = $40,000.00; 1995/1996 = $45,000.00; 1996/1997 = $48,000.00; $1997/1998 = $54,000.00 (prorated to $10,000.00 due to a leave of absence); 1998/1999 = $58,000.00 (prorated to $46,400.00 due to her return from a leave of absence at a reduced course load); 1999/2000 = $59,750.00; 2000/2001 = $60,650.00; 2001/2002 = $62,590.00; 2002/2003 = $63,216.00; 2003/2004 = $65,150.00; 2004/2005 = $67,350.00; 2005/2006 = $69,800.00; 2006/2007 = $72,400.00.[1]

## III.    Plaintiff's Wage Discrimination Claims

Aside from the modest raise QUSL granted her for the 2002/2003 academic year, allegedly as an act of retaliation, plaintiff does not take issue with her annual salary increases.  Those raises were invariably near the median or on the high-end, percentage-wise, relative to other faculty members, hence plaintiff has no cause to complain, nor does she.

Accordingly, the only pay decision plaintiff can possibly challenge on a theory of intentional wage-based gender discrimination dates back to her appointment to the faculty as a permanent member in the Fall of 1996, when she was awarded a five-year contract at an initial salary of $48,000.00 per annum.  Plaintiff, however, did not file a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and/or the Connecticut Commission on Human Rights and Opportunities

---

[1] For the 2007/2008 academic year, QUSL increased plaintiff's annual salary to $75,600.00.

("CHRO") until November 2000.  At that point, according to the U.S. Supreme Court's decision in <u>Ledbetter</u>, the 180 and 300-day periods of repose under the FEPA and Title VII, respectively, had long since expired.

## IV.    **The Ledbetter Case**

The salient facts of the <u>Ledbetter</u> case were succinctly summarized by the Supreme Court as follows:

> Petitioner Lilly Ledbetter (Ledbetter) worked for respondent Goodyear Tire and Rubber Company (Goodyear) at its Gadsden, Alabama, plant from 1979 until 1998.  During much of this time, salaried employees at the plant were given or denied raises based on their supervisors' evaluation of their performance.  In March 1998, Ledbetter submitted a questionnaire to the EEOC alleging certain acts of sex discrimination, and in July of that year she filed a formal EEOC charge.  After taking early retirement in November 1998, Ledbetter commenced this action, in which she asserted, among other claims, a Title VII pay discrimination claim and a claim under the Equal Pay Act of 1963 (EPA), 29 U.S.C. § 206(d).
>
> ... In support of [her Title VII] claim, Ledbetter introduced evidence that during the course of her employment several supervisors had given her poor evaluations because of her sex, that as a result of these evaluations her pay was not increased as much as it would have been if she had been evaluated fairly, and that these past pay decisions continued to affect the amount of her pay throughout her employment.  Toward the end of her time she was being paid significantly less than any of her male colleagues.

<u>Ledbetter</u>, 127 S. Ct. at 2165-66.

These facts implicated the fundamental question whether "Ledbetter's pay discrimination claim was time barred with respect to all pay decisions made prior to September 26, 1997—that is, 180 days before the filing of her EEOC questionnaire."  <u>Id.</u> at 2166 (Footnote omitted).  The issue was outcome determinative because "Ledbetter [did] not assert that the relevant Goodyear decisionmakers acted with actual discriminatory intent either when they issued her checks during the EEOC charging period or when they denied her a raise in 1998.  Rather, she argue[d] that the paychecks

were unlawful because they would have been larger if she had been evaluated in a nondiscriminatory manner *prior to* the EEOC charging period.  Similarly, she maintain[ed] that the 1998 decision was unlawful because it 'carried forward' the effects of prior, uncharged discrimination decisions.  In essence, she suggests that it is sufficient that discriminatory acts that occurred prior to the charging period had continuing effects during that period." Id. at 2167 (Emphasis in original).

The Court rejected "[t]his argument [as] squarely foreclosed by our precedents." Id. Those precedents, Justice Alito explained on behalf of the majority, stand for the proposition that, contrary to the fundamental tenet advocated by Ms. Ledbetter, and by plaintiff at oral argument on the motion for summary judgment (Tr. 48-49), "current effects alone cannot breathe life into prior, uncharged discrimination; ... such effects in themselves have 'no present legal consequences.'  Ledbetter should have filed an EEOC charge within 180 days after each allegedly discriminatory pay decision was made and communicated to her.  She did not do so, and the paychecks that were issued to her during the 180 days prior to the filing of her EEOC charge do not provide a basis for overcoming that failure." Id. at 2169.

## V.   Argument

Against this backdrop it is apparent that, in the aftermath of Ledbetter, plaintiff's Title VII and FEPA wage discrimination claims cannot survive a timeliness challenge.

### A.    *Under Ledbetter, Plaintiff's Title VII Claim For Intentional Pay Discrimination Is Unquestionably Time-Barred.*

Precisely as was the case in Ledbetter, plaintiff complains that she continues to suffer the effects of a bygone salary decision alleged to be discriminatory.  Specifically, it is plaintiff's contention that her salary was set at a discriminatorily low level back in

1996 when her position became permanent (at which time she was awarded a five-year contract), and as a result her annual salary increases, albeit favorable in percentage terms, are less in actual dollars than they would have been were she compensated in a non-discriminatory manner at the outset.

Plaintiff's Title VII claim, like Ms. Ledbetter's, is predicated on the theory of "disparate treatment, the central element of which is discriminatory intent." Ledbetter, 127 S. Ct. at 2167. Plaintiff, however, again like Ms. Ledbetter, does not claim to have been victimized by a discriminatory pay decision rendered within the operative EEOC charge filing period, in this instance 300 days prior to November 6, 2000, i.e., January 10, 2000. Rather, plaintiff, once again like Ms. Ledbetter, "relies on the intent associated with other decisions made by other persons at other times," id. at 2169, namely the original 1996 decision setting her annual salary as a permanent faculty member at $48,000.00. But, as the Supreme Court made abundantly clear a Title VII plaintiff cannot "shift intent from one act (the act that consummates the discriminatory employment practice) to a later act that was not performed with bias or discriminatory motive. The effect of this shift would be to impose liability in the absence of the requisite intent." Id. at 2170.

That is, the Supreme Court "reject[ed] the suggestion that an employment practice committed with no improper purpose and no discriminatory intent" -- such as defendant's annual adjustments of plaintiff's salary -- "is somehow rendered unlawful nonetheless because it gives some effect to an intentional discriminatory act that occurred outside the charging period." Id. at 2172. Plaintiff's Title VII wage discrimination "claim is, for this reason, untimely." Id.; see also Pearson v. Board of Education, __ F. Supp. 2d __, 2007

WL 2296453, at *14 (S.D.N.Y. Aug. 10, 2007)(applying Ledbetter and finding wage-related discrimination claim untimely where plaintiffs did not allege any denial of compensation occurring within the EEOC charge filing period); Al-Haideri v. Trustees of Columbia University, 2007 WL 2187102, at *2 (S.D.N.Y. July 26, 2007)(same); Plant v. Deutsche Bank Securities, Inc., 2007 WL 2187109, at *3 (S.D.N.Y. July 23, 2007)(same).

**B.    *Plaintiff's State Law Pay Discrimination Claim Is Likewise Time-Barred Under Ledbetter.***

To date, no appellate court in Connecticut has had an opportunity to apply Ledbetter in the context of an FEPA pay discrimination case. Invariably, however, Connecticut courts "look to federal law for guidance in interpreting state employment discrimination law, and analyze claims under [the FEPA] in the same manner as federal courts evaluate federal discrimination claims." Jackson v. Water Pollution Control Authority of City of Bridgeport, 278 Conn. 692, 705 n.11, 900 A.2d 498 (2006).

Although Connecticut's Supreme Court has "recognized that, under certain circumstances, federal law defines 'the beginning and not the end of our approach to the subject [of employment discrimination],'" State v. Commission on Human Rights and Opportunities, 211 Conn. 464, 470, 559 A.2d 1120 (1989), it has only broken ranks with federal precedent in those limited circumstances where there are substantive differences between the FEPA and its federal counterpart. For example, in Evening Sentinel v. National Organization for Women, 168 Conn. 26, 357 A.2d 498 (1975), the court rejected the plaintiff's claim that its "interpretation of bona fide occupational qualification ... must coincide with the federal statute, namely that it must be 'reasonably necessary to the normal operation of the particular business or enterprise'" because, quite simply, "these

qualifications are not written onto the Connecticut law." Id. at 34 n.5. See also Hatt v. Burlington Coat Factory, 263 Conn. 279, 309 n.22, 819 A.2d 260 (2003)(FEPA "has a far broader application than the federal Americans With Disabilities Act" in that coverage extends to entities with only three employees, whereas the ADA has a fifteen employee threshold for coverage).

Here, however, the FEPA's limitations period provision, Conn. Gen. Stat. § 46a-82(e), is, by design, a virtual mirror image of its Title VII counterpart, 42 U.S.C. § 2000e-5(e)(1). Williams, 257 Conn. at 275 (observing that when the General Assembly has amended Section 46a-82(e), it has done so out of "concern for consistency with the federal legislation."). The former provides, in relevant part, that, "[a]ny complaint filed pursuant to this section must be filed within one hundred and eighty days after the alleged act of discrimination," whereas the latter similarly reads, "[a] charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred." Hence, this court and state trial courts have routinely applied federal precedent to resolve limitations period issues under the FEPA. See, e.g., Evarts v. Southern New England Tel. Co., 2006 WL 2864716, at *7 (D. Conn. Oct. 2, 2006); Tosado v. State, 2007 WL 969392, at *3-4 (Conn. Super. March 15, 2007).[2]

Admittedly, the Connecticut Supreme Court's decisions in Veeder-Root Co. v. Commission on Human Rights and Opportunities, 165 Conn. 318, 334 A.2d 443 (1973) and State v. Commission on Human Rights and Opportunities, supra, might, at first

---

[2] We are aware of the Appellate Court's recent split decision in Vollemans v. Town of Wallingford, 103 Conn. App. 188, __ A.2d __ (2007), where the majority, over a vigorous dissent, deemed the rationale of Delaware State College v. Ricks, 449 U.S. 250, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980) unpersuasive. Ricks, however, involved the altogether different issue of whether an employment discrimination claim accrues at the time of notice or implementation. In any event, "[d]ecisions of a state's intermediate and lower courts are not binding on the federal courts." Allstate Ins. Co. v. Valley Physical Medicine & Rehabilitation, P.C., 475 F. Supp. 2d 213, 221 (E.D.N.Y. 2007). Divided intermediate court opinions, like Vollemans, are of particularly limited utility.

blush, appear to be in tension with <u>Ledbetter</u>.  Upon close examination, however, those decisions rest on the same rationale as <u>Bazemore v. Friday</u>, 478 U.S. 385, 106 S. Ct. 3000, 92 L. Ed. 2d 3165 (1986), which in turn is "entirely consistent" with the precedent relied upon by the <u>Ledbetter</u> majority.  <u>Ledbetter</u>, 127 S. Ct. at 2173.

"<u>Bazemore</u> stands for the proposition that an employer violates Title VII and triggers a new EEOC charging period whenever the employer issues paychecks using a discriminatory pay structure." <u>Ledbetter</u>, 127 S. Ct. at 2174.  That was precisely the scenario in <u>Veeder-Root Co.</u>, where a discriminatory pay scale established prior to the FEPA's amendment to include gender as a protected characteristic remained in effect thereafter, prompting the complainant to file a CHRO charge, but not until some sixteen months later.  The court's conclusion that the claim was timely blends seamlessly with the teaching of <u>Bazemore</u> that "the employer engages in intentional discrimination whenever it issues a check to one of the[] disfavored employees" under the discriminatory policy.  <u>Ledbetter</u>, 127 S. Ct. at 2173.  Similarly, in <u>State v. Commission on Human Rights and Opportunities</u>, the court held that each separate payment of retirement benefits pursuant to a discriminatory pension plan constitutes a fresh violation of the FEPA.  <u>Id.</u> at 476.

That these interpretations of the FEPA's limitation period provision are in accord with <u>Ledbetter</u> is amply illustrated by the Ninth Circuit's post-<u>Ledbetter</u> *en banc* decision in <u>Hulteen v. AT&T Corp.</u>, __ F.3d __, 2007 WL 2332071 (9th Cir. Aug. 17, 2007).  There, the Court of Appeals ruled that AT&T violated Title VII by calculating retirement benefits after the effective date of the Pregnancy Discrimination Act of 1978 ("PDA"), 42 U.S.C. § 2000e(k), to include service credit for all pre-PDA temporary disability leaves

except those leaves occasioned by pregnancy.  This result was "true to Bazemore and Ledbetter" because AT&T "adopted a policy that calculates pregnancy leave differently than other temporary disability leave, and it engages in intentional discrimination *each time it applies the policy* in a benefits calculation for an employee affected by pregnancy, even if the pregnancy occurred before the enactment of the PDA." Id. at *4 (Citations omitted)(Emphasis in original).  Veeder-Root Co. and State v. Commission on Human Rights and Opportunities are in this very same sense "true to Bazemore and Ledbetter."

This case, however, unlike Bazemore, Veeder-Root Co. and State v. Commission on Human Rights and Opportunities, involves a challenge to discrete individual salary decisions made well more than 180 days before plaintiff's CHRO filing, not the application of a discriminatory pay system.  Consequently, "Bazemore [and by extension Veeder-Root Co. and State v. Commission on Human Rights and Opportunities] is of no help to [plaintiff]" for, as Ledbetter holds, "a new [FEPA] violation does not occur and a new charging period is not triggered when an employer issues checks pursuant to a system that is 'facially nondiscriminatory and neutrally applied.'  The fact that precharging period discrimination adversely affects the calculation of a neutral factor (like seniority) that is used in determining future pay does not mean that each new paycheck constitutes a new violation and restarts the [FEPA] charging period." Ledbetter, 127 S. Ct. at 2174.

Because in so holding the U.S. Supreme Court was interpreting a provision of Title VII that is in all pertinent respects identical to Conn. Gen. Stat. § 46a-82(e), and employed reasoning that is consistent with Connecticut Supreme Court precedent, FEPA

claim for wage discrimination is, like her Title VII pay discrimination claim, time-barred.[3]

### C.  *Plaintiff's Contention That The Limitations Period Was Tolled Until She Ostensibly Discovered The Salary Discrepancy Alleged To Be Discriminatory Is Incompatible With Ledbetter.*

Plaintiff claims she was ignorant of Professor Book's higher salary until May 2000 and, seizing upon a footnote in the Ledbetter decision, advocates for a "discovery rule" that would toll the limitations period in disparate treatment pay discrimination cases pending detection of an ostensibly gender-based salary discrepancy.[4]  However, such an expansive "discovery" rule has never been found applicable to Title VII cases and, in any event, is plainly anathema to the principles that form the foundation of the majority opinion in Ledbetter.

To be clear, there are two components to plaintiff's wage discrimination claim under Title VII and the FEPA, one predicated on the general asseveration that plaintiff's salary was artificially depressed on account of her gender and another founded on the discrepancy between her salary and Professor Book's, i.e., an EPA-type theory of intentional discrimination.  (See Order Re Defendant's Motion for Summary Judgment [Doc. No. 62], dated Feb. 7, 2007).  Plaintiff's proposed discovery rule, as we understand it, obviously cannot save the first prong of her Title VII/FEPA disparate treatment claim from the bar of the limitations period because she points to no "discovery" that triggered her recognition of wage-based gender discrimination.  Instead, plaintiff avers that her

---

[3] If the Court has trepidation about resolving a determinative State law question of first impression, it enjoys discretion to certify the Ledbetter issue to the Supreme Court of Connecticut.  Conn. Gen. Stat. § 51-199b(d).

[4] The footnote in question reads as follows: "We have previously declined to address whether Title VII suits are amenable to a discovery rule.  Because Ledbetter does not argue that such a rule would change the outcome in her case, we have no occasion to address this issue."  Ledbetter, 127 S. Ct. at 2177 n.10 (Citation omitted).

annual raises were, on an actual dollar basis, lower than they would have been in the absence of an allegedly discriminatorily depressed starting salary.    That aspect of plaintiff's Title VII/FEPA pay discrimination claim necessarily went by the wayside with the Supreme Court's rejection of the argument "that each new paycheck constitutes a new violation and restarts the EEOC charging period." Ledbetter, 127 S. Ct. at 2174.

As for the EPA-like Title VII claim, although, because the issue was not raised, the Supreme Court "declined to address whether Title VII suits are amenable to a discovery rule," id. at 2177, n.10, the majority expressly rejected the dissent's policy-based argument that Ms. Ledbetter's Title VII claim ought be deemed timely because "she did not realize for some time that she had been victimized." Id. at 2175. Indeed, the dissent placed heavy reliance on "the realities of the workplace," observing that "[c]ompensation disparities ... are often hidden from sight." Id. at 2181 (Ginsburg, J., dissenting).    Justice Ginsburg emphasized that "[i]t is not unusual ... for management to decline to publish employee pay levels, or for employees to keep private their own salaries" and, in fact, "Goodyear kept salaries confidential; employees had only limited access to information regarding their colleagues' earnings." Id. at 2181-82 (Ginsburg, J., dissenting).    See also Id. at 2179 (Ginsburg, J., dissenting)("Comparative pay information, moreover, is often hidden from the employee's view.  Employers may keep under wraps the pay differentials maintained among supervisors, no less the reasons for those differentials.").

Neither the inherent difficulty in detecting pay discrimination nor any of the other policy considerations driving the dissent's analysis held sway with the majority.  Justice Alito countered that: "We are not in a position to evaluate Ledbetter's policy arguments,

and it is not our prerogative to change the way in which Title VII balances the interests of aggrieved employees against the interest in encouraging the 'prompt processing of all charges of employment discrimination,' and the interest in repose. [¶] Ledbetter's policy arguments for giving special treatment to pay claims finds no support in the statute and are inconsistent with our precedents. We apply the statute as written, and this means that any unlawful employment practice, including those involving compensation, must be presented to the EEOC within the time prescribed by statute." Id. at 2177 (Footnote omitted).

"Thus, when alleging a discriminatory pay disparity, the operative date *is not the discovery of the disparity*, but when the salary was determined. Accordingly, a plaintiff should file 'an EEOC charge within 300 days after each allegedly discriminatory pay decision was made.'" Waheed v. SUNY Brooklyn Educational Opportunity Center, 2007 WL 2126092, at *5 (E.D.N.Y. July 24, 2007)(Emphasis added), quoting Ledbetter, 127 S. Ct. at 2169. In Waheed, a national origin-based pay discrimination case, the district court, applying Ledbetter in the context of an EPA-type Title VII claim, ruled that where the plaintiff "was hired in April 2002 at the wage rate of $7.50 per hour" and "[i]n August or September 2002, she discovered that a non-Russian-Ukranian employee received a higher wage... the EEOC charge needed to be filed *within 300 days of April 2002*." Id. (Emphasis added). Under Ledbetter, then, plaintiff's May 2000 discovery of the discrepancy between her salary and Professor Book's was, for limitations period

purposes, a non-event.[5]

Even were <u>Ledbetter</u> somehow ambiguous on the point, there is no precedent in this Circuit (or elsewhere) adopting a discovery rule in Title VII cases, at least not in the sense favored by plaintiff.  To the contrary, "the Second Circuit has held that the statutory time periods 'commence upon the *employer's commission of the discriminatory act and are not tolled or delayed pending the employee's realization that the conduct was discriminatory* unless the employee was actively misled by his employer, he was prevented in some extraordinary way from exercising his rights, or he asserted his rights in the wrong forum, in which event tolling of the time bar might be permitted as a matter of fairness.'"  <u>Carrion v. Coca-Cola Bottling Co. of New England</u>, 2006 WL 3526748, at *3 (D. Conn. Dec. 1, 2006)(Emphasis added), quoting <u>Miller v. Int'l Telephone and Telegraph Corp.</u>, 755 F.2d 20, 24 (2d Cir. 1985).  Plaintiff does not proffer -- nor could she proffer -- evidence from which a jury could reasonably find such circumstances present in this case.

The point seemingly lost on plaintiff is that in the employment discrimination context, "the discovery rule is concerned with knowledge of *actual* injury, not legal injury."  <u>Podobnik v. U.S. Postal Service</u>, 409 F.3d 584, 590 (3d Cir. 2005)(Emphasis in original).  Plaintiff's wage discrimination claims therefore accrued when she was advised by QUSL that her salary as a full-time permanent faculty member had been set at

---

[5] Plaintiff's professed ignorance of Professor Book's starting salary is highly questionable.  By virtue of, if nothing else, the standard hiring announcement distributed by QUSL detailing Professor Book's background and experience, plaintiff was necessarily aware that Professor Book joined QUSL's faculty after several years as an associate in the New York City office of Baker & McKenzie.  Associate salaries at large New York City law firms were then, as now, the subject of substantial press coverage (<u>see</u> articles attached hereto at Tab A), and hence a matter of common knowledge in the legal community.  Plaintiff must, therefore, have been aware Professor Book left a position paying in excess of $100,000.00 to join the QUSL faculty.  Simple common sense should have prompted plaintiff to deduce that in order to procure Professor Book's services, QUSL had to offer him a substantially greater salary than the $54,000.00 plaintiff was earning at the time.  (<u>See</u> King Dep., 7/16/2007, at pp. 17-18)(Excerpt attached at Tab B).

$48,000.00, a figure plaintiff contends was discriminatorily low.  At that point, plaintiff "became aware: '(1) that [s]he had been injured, i.e., [assigned an artificially deflated compensation rate], and (2) that this injury had been caused by another party's conduct.'" Carrion, at *4 (Citation omitted).  See also Milani v. Int'l Business Machines Corp., 322 F. Supp. 2d 434, 453 (S.D.N.Y. 2004)("Indeed, 'it is settled that an employment discrimination claim accrues on the date that an adverse employment determination is made and communicated to the plaintiff.'")(Citations omitted), *aff'd mem.*, 137 Fed. Appx. 430 (2d Cir. 2005); Marrero-Gutierrez v. Molina, 491 F.3d 1, 6 (1st Cir. 2007)("In the employment discrimination context, this circuit has rejected the contention that claims do not accrue until the plaintiff knows of both the injury and the discriminatory animus.")(Citations omitted).[6]

As the Third Circuit cogently reasoned, "Were we to extend the reach of the discovery rule to delay accrual until a plaintiff learned that a legal injury had occurred, as [plaintiff] requests, a statute of limitations would become effectively meaningless, as a plaintiff could, through ignorance or fraud, bring [a] discrimination claim at any point in his lifetime, regardless of how long ago the underlying acts had occurred." Podobnik, 409 F.3d at 591.  The Ledbetter majority echoed similar sentiments, ardently denouncing the dissent's suggestion that "if a single pay decision made 20 years ago continued to affect an employee's pay today, ... the employee could file a timely EEOC charge today... even if the employee had full knowledge of all the circumstances relating to the 20-year-od decision at the time it was made." Ledbetter, 127 S. Ct. at 2175 (Footnote omitted).

---

[6] One can argue, perhaps, that plaintiff could not have pressed an EPA-type Title VII claim until such time as there was a male comparator on the faculty.  Even accepting that line of reasoning, plaintiff's claim would have accrued at the latest with the first salary action taken by defendant following Professor Book's hiring for the 1997/1998 academic year, which dates back to the Summer of 1997, substantially more than 300 days before plaintiff filed her EEOC charge.

Second Circuit precedent is permeated with like refrains.  See, e.g., Jowers v. Lakeside Family and Children's Services, 435 F. Supp. 2d 280, 284 (S.D.N.Y. 2006)("Plaintiff's allegation that he was late in filing his complaint because he did not know his termination was discriminatory before attending the Workers' Compensation Hearing is not sufficient to require tolling, as the old saw says, ignorance of the law is no excuse."), aff'd mem., 2007 WL 1547844 (2d Cir. May 29, 2007); Genao v. New York City Dept. of Parks and Recreation, 2005 WL 1220899, at *4 (E.D.N.Y. May 23, 2005)("Nor is the limitations period tolled while an employee waits for evidence of discrimination.    Such a rule would eviscerate the purpose of the limitations period.")(Citation and footnote omitted), aff'd mem., 178 Fed. Appx. 42 (2d Cir. 2006).[7]

Quite clearly, then, the sweeping "discovery" rule proposed by plaintiff finds no support in the case law; on the contrary, the approach she favors has been considered and rejected by the Second Circuit and cannot possibly be squared with the U.S. Supreme Court's decision in Ledbetter.

**D.    _There Is No Equitable Basis For Tolling The Limitations Period._**

It is well settled that "[t]he filing deadline for the formal [EEOC] complaint is not jurisdictional and, like a statute of limitations, is subject to equitable tolling."  Zerilli-Edelglass v. New York City Transit Authority, 333 F.3d 74, 80 (2d Cir. 2003).  The same is true of the FEPA's administrative filing requirement.  Williams v. Commission on Human Rights and Opportunities, 257 Conn. 258, 264, 777 A.2d 645 (2001).

---

[7] The analysis under the FEPA is no different.  Like Title VII, the FEPA is an occurrence statute in that a CHRO charge must be filed within 180 days of the "alleged act of discrimination."  Conn. Gen. Stat. § 46a-82(e); Kahn v. Fairfield University, 357 F. Supp. 2d 496, 503 (D. Conn. 2005).  As such, "the time period in which a plaintiff must commence an action begins to run at the moment the act or omission complained of occurs" and there is no basis for "delaying the start of the limitation period until the cause of action has accrued or the injury has occurred."  Valentine v. LaBow, 95 Conn. App. 436, 444, 897 A.2d 624 (2006)(Citation and internal quotation marks omitted).

Nevertheless, in addressing the "time limitation on filing Title VII claims, the Second Circuit has held that, 'in the absence of a recognized equitable consideration, the court cannot extend the limitations period by even one day." Slootskin v. John Brown Engineering and Construction, Inc., 2006 WL 516748, at *3 (D. Conn. March 1, 2006), quoting Johnson v. Al Tech Specialties Steel Corp., 731 F.2d 143, 146 (2d Cir. 1984).

While generally available, "[e]quitable tolling is appropriate in rare and exceptional circumstance[s] where a party is prevented from exercising his or her rights. This Circuit held equitable tolling appropriate in instances where (1) the plaintiff actively pursued judicial remedies but filed a defective pleading during the time period; (2) the plaintiff was unaware of an administrative remedy because of the defendant's misleading conduct; (3) the plaintiff's medical condition prevented her from filing the complaint within a timely fashion; (4) the plaintiff has received inadequate notice; or (5) a motion for appointment of counsel is pending." Molnar v. Legal Sea Foods, Inc., 473 F. Supp. 2d 428, 430 (S.D.N.Y. 2007)(Citations omitted). See also Williams v. Commission on Human Rights and Opportunities, 67 Conn. App. 316, 329, 786 A.2d 1283 (2001)("Usually, in employment discrimination cases, time limits will not be tolled absent some behavior of the employer designed to delay the filing of the complaint or fraud."). None of these circumstances are remotely present in this case.

To the extent plaintiff even seeks to invoke equitable tolling as a means of evading Title VII's 300-day limitations period, and that is by no means clear, she can offer nothing in support beyond the University's general policy concerning the confidentiality of personnel records and QUSL's practice of not publishing faculty members' salaries. (See Saxton Dep. at pp. 73-79)(Excerpt attached at Tab C). But of

course were employment practices of this sort even pertinent to the limitations period analysis the dissent's policy-based arguments in <u>Ledbetter</u> would surely have carried the day. <u>Cf.</u> <u>Ledbetter</u>, 127 S. Ct. at 2181-82 (Ginsburg, J., dissenting)(citing "[t]he problem of concealed pay disparities" as a basis for distinguishing pay discrimination from "singular discrete acts 'easy to identify'" such as "promotions, transfers, hirings and firings" that "are generally public events, known to co-workers" and, as such, "an employee can immediately seek out an explanation and evaluate it for pretext.").

The majority, however, was unimpressed by Ms. Ledbetter's plea "in favor of giving the alleged victims of pay discrimination more time before they are required to file a charge with the EEOC" on the theory that "pay discrimination is harder to detect than other forms of employment discrimination." <u>Id.</u> at 2177 (Footnote omitted). Plaintiff cannot resurrect that very argument under the banner of equity without altogether gutting <u>Ledbetter</u>. Equitable tolling is, therefore, unavailable to plaintiff as a means of extending the limitations period on her intentional discrimination claims.[8]

## VI.    <u>Conclusion</u>

In this case, as in <u>Ledbetter</u>, "all [plaintiff] has alleged is that [QUSL]'s agents discriminated against her individually in the past and that this discrimination reduced the amount of later paychecks. Because [plaintiff] did not file timely EEOC charges relating to her employer's discriminatory pay decisions in the past, she cannot maintain a suit based on that past discrimination at this time." <u>Ledbetter</u>, 127 S. Ct. at 2174. Plaintiff's

---

[8] Another exceedingly narrow equitable consideration that might allow for suspension of the limitations period sounds in estoppel and is "'invoked in cases where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused him to delay in bringing his lawsuit,' for example, 'where the defendant misrepresented the length of the limitations period or in some way lulled the plaintiff into believing that it was not necessary for him to commence litigation.'" <u>Kotec v. Japanese Educational Institute of New York</u>, 321 F. Supp. 2d 428, 432 (D. Conn. 2004)(Citations omitted). Because plaintiff denies knowing of the alleged wage-based discrimination until May 2000, equitable estoppel is necessarily inapplicable here.

wage discrimination claims under Title VII and the FEPA must therefore be dismissed in advance of trial.

<div style="margin-left:40%">

Respectfully submitted,

DEFENDANT,
QUINNIPIAC UNIVERSITY
SCHOOL OF LAW


By:_____
    Lawrence Peikes (ct07913)
    lpeikes@wiggin.com
    Meghan D. Burns (ct26267)
    mburns@wiggin.com
    Wiggin and Dana LLP
    Its Attorneys
    400 Atlantic Street
    P.O. Box 110325
    Stamford, CT 06911-0325
    (203) 363-7600
    (203) 363-7676 (fax)

</div>

## **CERTIFICATE OF SERVICE**

This is to certify that on this 31st day of August, 2007, a copy of the foregoing has been was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system.  Parties may access this filing through the court's CM/ECF System.

Gregg D. Adler, Esq.
Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.
557 Prospect Avenue
Hartford, CT  06105

_____
Lawrence Peikes

\7377\201\657755.1