# TAB B
Case No. 3:02cv00821 (AWT)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------

CINDY SLANE                   :

    Plaintiff         :   CIVIL ACTION NO.

VS.                           :   3:02CV00821 (AWT)

QUINNIPIAC UNIVERSITY         :
SCHOOL OF LAW                     JULY 16, 2007

    Defendant         :
---------------------------

DEPOSITION OF DAVID KING

APPEARANCES:

    LIVINGSTON, ADLER, PULDA, MEIKLEJOHN & KELLY
    Attorney for the Plaintiff
    557 Prospect Avenue
    Hartford, Connecticut 06105
    BY:  GREGG D. ADLER, ESQ.
    (860) 233-9821

    WIGGIN & DANA, LLP
    Attorney for the Defendant
    One Century Tower
    Post Office Box 1832
    New Haven, Connecticut 06508-1832
    BY:  MEGHAN D. BURNS, ESQ.
    (860) 297-3700

Also present:  Cindy Slane

ROSEMARY BRENNAN
LICENSED COURT REPORTER # 59

NIZIANKIEWICZ AND MILLER REPORTING SERVICE
972 Tolland Street
East Hartford, Connecticut 06108-1533

17

1  here. Can we sit down and discuss this," I'm
2  not sure what would have happened.
3       Q   You certainly wouldn't have been in a
4  position to give her that information at that
5  time?
6       A   At the time I was associate dean I
7  didn't have the information. So that's
8  correct. I wouldn't have been in a position to
9  give it to her.
10      Q   Let's take her, the plaintiff, and
11 Les Book. When Les Book was hired in 1997,
12 there was no announcement as to what he was
13 going to be paid, correct?
14      A   Correct.
15      Q   So the plaintiff would have no reason
16 to believe that he was being paid substantially
17 more than she was at that time, correct?
18      A   I'm not sure.
19      Q   Do you have any reason to believe
20 that Professor Slane would have had -- withdraw
21 that.
22          Do you have any reason to believe
23 that Professor Slane should have known about
24 the disparity between her pay and Les Book's
25 pay at the time he was hired?

18

1    A    Without getting into the legal theory
2  of this case, I guess I would analogize it to
3  say a second-year associate at a law firm who
4  sees that a seventh-year lateral is hired, and
5  I would think the second-year associate would
6  have reason to believe that the lateral was
7  making more money.
8         So I guess I would say that someone
9  in Professor Slane's position who saw that
10 someone with Professor Book's education and
11 experience was being hired might have reason to
12 believe he was being paid more.
13   Q    Other than that theoretical basis is
14 there anything that occurred other than what
15 you just said that you think would have given
16 her reason to believe he was being paid more
17 than she was?
18   A    Not that I can think of.
19   Q    During the time that you were interim
20 dean do you recall having a conversation with
21 Carrie Kaas about what the university or what
22 you were contemplating paying the person who
23 was going to fill Les Book's position, which
24 would be Michelle O'Connor?
25   A    I very well might have, but I don't

# TAB C
Case No. 3:02cv00821 (AWT)

```
                UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT


-------------------------------x
CINDY SLANE,                   |
        Plaintiff,             |  CIVIL ACTION NO.
                               |  3:02CV00821(AWT)
        vs.                    |
                               |
QUINNIPIAC UNIVERSITY          |  June 12, 2007
SCHOOL OF LAW,                 |
        Defendant.             |
-------------------------------x
```

DEPOSITION OF BRAD SAXTON

Taken before Kerry A. Angelo, LSR # 459, a Court Reporter and Notary Public within and for the State of Connecticut, pursuant to Notice and the Federal Rules of Civil Procedure, at Quinnipiac School of Law, 275 Mt. Carmel Avenue, Hamden, Connecticut 06518, on June 12, 2007, commencing at 10:09 a.m.

TYSZKA COURT REPORTING
189 Old Forge Road
West Hartford, CT
860.379.7955

COPY

Case 3:02-cv-00821-AWT    Document 92-3    Filed 08/31/2007    Page 7 of 13

73

accurate or not.

And I -- the past couple of years, actually, I don't think I've -- I may have gone -- I probably did consult with David in the few situations where I was really coming down on somebody with a very low raise to let him know why I was doing it and what I was thinking.

Q   You don't normally share salary information with other faculty members, other than the individual involved, correct?

A   Correct. I do, generally, give the faculty the aggregated parameters, you know, Here's the kind of pool I was looking at this year. And I talk with them about how I go about the process of making the decisions.

Q   But in that case, you're sort of evaluating their individual performance in light of the raise pool you have available so that you can articulate to them where they fit in performancewise to the raise pool, correct?

A   Yes.

Q   But you're -- you don't tell a faculty member what you're paying some other faculty member?

A   I do not.

Q   Are you aware of whether the University has any practices or policies with respect to sharing salary information?

A   In the institutional policies that we have that --

1    payroll information is one of the things that's described as
2    confidential information so, you know, it's in people's
3    faculty files.
4           But, you know, the University does have University
5    policies that sort of, you know, talk about the
6    confidentiality of personnel records, and that includes
7    payroll information.  But when I -- I guess my
8    interpretation of it is that the -- I'm sorry.
9       Q    Before we get to your interpretation -- I'll ask
10   you about your interpretation.
11      A    Okay.
12      Q    But let's -- I just want to follow up on -- so is
13   there -- are you -- is there something in writing that
14   indicates that faculty payroll information is confidential,
15   that you're aware of?
16      A    Yes.
17      Q    What document is that in?
18      A    It's in the University's institutional-wide
19   personnel policies.
20      Q    And that policy is followed by the law school as
21   part of the University?
22      A    Yes.
23      Q    Have you ever been -- withdraw that.
24           Is it your understanding that that policy was in
25   effect prior to you being here, or do you know?

1  A    I'm pretty confident that it's sort of a
2  long-standing institutional policy.
3  Q    You don't share salary information with anyone
4  other than -- I mean -- withdraw that.  You have already
5  answered that.
6       Do you know -- are you aware of any policy or
7  practice with respect to faculty members sharing, with each
8  other, salary information?
9  A    Aware of a policy or a practice?
10 Q    Yeah.
11 A    Which one, policy or practice?
12 Q    Whether it's encouraged, discouraged, do you know
13 -- is there any --
14 A    I don't think there is a policy or practice.  I
15 mean, I -- I think people are aware, you know, that -- that
16 the institutional policy is that payroll information is
17 confidential.  That's sort of the institutional culture.
18      And I've heard -- a number of faculty members have
19 said to me in, you know, my meetings with them individually
20 or something, saying, I don't know what other people and I
21 don't care what other people make, or, I don't, you know,
22 want to know that.
23      So there's -- I think it's sort of the culture.
24 But I -- there's nothing that I'm aware of that would
25 suggest to any faculty member that they would be punished if

1  they shared their -- their faculty salary information with
2  another person or that they would be precluded from doing
3  that. I just --
4      Q    The culture, as I understand you articulated, is
5  that -- is that -- it is, from your perception, faculty
6  understands that they're not supposed to know what other
7  people are making?
8      A    I think -- I think they understand that it's not
9  public information; that, you know, that it is not something
10 that is broadly distributed publicly. But I would be
11 surprised if any faculty member would think that our
12 policies would preclude them from telling, you know, their
13 friend or another faculty member, Oh, here's what my salary
14 is.
15     Q    Are you aware of any practice of faculty members
16 sharing salary information with each other?
17     A    I don't really know.
18     Q    I mean, has anyone ever to come you in a salary
19 negotiation and said, Well, I know "X" person's making this,
20 how come you're not paying me that?
21     A    No. It's probably much more common that I've
22 heard people say, I don't know what other people are making
23 and I don't care what other people are making.
24          I have -- I have had some faculty members come to
25 me, voicing their suspicion, in general terms, that there's

1  a sort of perception that we -- we have a limited circle of
2  sort of star quality -- that's what people use, the term
3  "star quality" -- top act -- top performers who are paid way
4  more money than everybody else.  There's a sort of
5  perception out there, at least among a couple of people,
6  that, you know, there are wild disparities between a limited
7  class of people who are making tens of thousands of dollars
8  more than everybody else.
9         So I do have some faculty members coming in to me
10 with that kind of perception, but they -- they're never very
11 specific about what it is, other than a general, I think
12 there's a group of people that make huge amounts of money.
13     Q    And it's not really true; is it?
14     A    It's not true the way they think of it as being
15 true.
16     Q    But the perception is --
17     A    Yeah.  The perception is -- right.  Right.
18     Q    Are you aware of any specific instances, since
19 you've been dean, where a faculty member has asked what
20 others are making?  Has anybody ever asked you for
21 information -- other than in this case, has anyone ever
22 asked you information about what their peers are making?
23     A    No.  I don't recall anybody ever asking me for
24 a -- you know, how much money does so-and-so make or what is
25 so-and-so's salary.

Case 3:02-cv-00821-AWT     Document 92-3     Filed 08/31/2007     Page 12 of 13

78

1    I do remember Carry Cass has occasionally talked
2  with me -- and my sense is that, among the clinical folks,
3  that maybe there's more open discussion with each other
4  about sort of who's doing what or what's going on.
5    But I don't know that the -- I do know that Carry
6  has come to me, saying, I heard that so-and-so got summer
7  teaching money for this or I heard so-and-so was getting,
8  you know, money to write this or do that.  And that led me
9  to believe -- these -- these are relatively recent, you
10 know, couple years sorts of things, that, you know, there
11 was some discussion there.
12   I have had some other faculty members who -- and
13 these were -- there were really, you know, a couple of
14 people who have this perception of the star faculty members
15 making, you know, 50 to $60,000 more than anybody else
16 makes -- who have not said, I want to know how much somebody
17 makes, but have wanted to say, I -- you know, I heard that
18 there was people who got raises.  They were 15 percent
19 raises when you were doing this and I -- you know, I don't
20 know if that's true or not, but they were sort of asking for
21 information.
22   I've never had a faculty member, that I can
23 recall, saying, How much does so-and-so make.
24 Q    If somebody asked you what other faculty members
25 make, you would -- what would you do?

1    A    I would say no. I would say you're -- you know,
2    you're free to ask so-and-so if they want to tell you. But
3    I view that as confidential information, and our policies
4    make it confidential information; that we don't publish
5    individual faculty's salary information.
6    Q    So you wouldn't communicate it to a person?
7    A    No.
8    Q    Because you have to abide by the institutional
9    policy?
10   A    Right.
11   Q    Again, I know you weren't the dean when 99 percent
12   of the things that happened in this lawsuit happened, but I
13   just want to get some process issues straightened out.
14   A    Okay.
15   Q    Could you -- as I understand the process -- and I
16   want you articulate it for me -- that when you get ready to
17   set existing faculty salaries for the upcoming year --
18   A    Okay.
19   Q    -- you're given, from probably the provost, a
20   raise pool?
21   A    Right.
22   Q    A percentage raise pool?
23   A    Right.
24   Q    Could you just explain what that is and what you
25   do with it?